**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DISTRICT**

|  |  |
|---|---|
| ) | |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | **CASE NO. 1:16-CR-258-MJG** |
| **v.** ) | |
| ) | |
| **REPUBLIC NATIONAL** ) | |
| **DISTRIBUTING COMPANY, LLC,** ) | |
| **EUGENE GERZSENYI, JASON** ) | |
| **LOCKERMAN, AND LISA ROBBINS,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS INDICTMENT**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

STATEMENT OF FACTS .........................................................................................3
    I.     Republic's Operations are Subject to a Pervasive State Regulatory Scheme ..........3
    II.    The U.S. Attorney's Office Nearly Put Republic Out of Business by Freezing the Company's Nationwide Operating Accounts on the Eve of Payroll ..............................................................................................................5
    III.   Mr. Kay Obtained the Seizure Warrant Based on False Statements of His Wife Proffered to the District Court Under Oath ......................................7
    IV.   The Government Engaged in a Series of Improper Investigatory Tactics ..............9
        A.    The Government Sought to Induce Defendant Jason Lockerman to Participate in an Unlawful Operation Using Republic's Licenses ..............9
        B.    The Government Attempted to Cripple Republic's Operations ................10
    V.    The Government Returned the Instant Indictment on May 24, 2016 ....................10

APPLICABLE LEGAL STANDARD .......................................................................11

ARGUMENT ...........................................................................................................12
    I.     THE INDICTMENT DOES NOT ALLEGE A CRIME .......................................15
        A.    The Indictment Transforms the Lawful Operation of a State Liquor Wholesaler into a Federal Crime ...........................................................15
            1.    State Regulation Controls the Wholesale Spirits Trade in Maryland ................................................................................15
            2.    The Government Seeks to Use Federal Criminal Law to Regulate the Liquor Industry ........................................................16
        B.    Republic's Conduct Charged in the Indictment is the Same as "Control States" ..................................................................................20
    II.    THE WIRE FRAUD AND WIRE FRAUD CONSPIRACY COUNTS SHOULD BE DISMISSED ................................................................................21
        A.    The Indictment Fails to Allege a Requisite Material Falsehood ...............22
        B.    The Indictment Fails to Allege Necessary Elements of a Conspiracy ................................................................................24
    III.   THE GOVERNMENT'S MISCONDUCT WARRANTS DISMISSAL ...............27
        A.    Mr. Kay's Proffer of False Testimony to the Court in the Midst of a Serious Conflict of Interest Warrants Dismissal of the Indictment ...........28
        B.    The Indictment is a Tool of Vindictive and Retaliatory Prosecution .........30
        C.    The Government's Pattern of Improper Investigatory Tactics Warrants Dismissal ...................................................................................33

CONCLUSION ........................................................................................................34

# TABLE OF AUTHORITIES

**CASES:**

*Direct Sales Co. v. United States*,
  319 U.S. 703 (1943)...............................................................................................25, 26

*Hemi Group, LLC v. City of New York*,
  559 U.S. 1 (2010)................................................................................18, 19, 20, 23

*McBoyle v. United States*,
  283 U.S. 25 (1931)...............................................................................................16

*Neder v. United States*,
  527 U.S. 1 (1999)............................................................................................22, 23

*Pasquantino v. United States*,
  544 U.S. 349 (2005).....................................................................................18, 19, 24

*Sherman v. Robinson*,
  606 N.E.2d 1365 (N.Y. 1992)..................................................................................18

*United States v. Colton*,
  231 F.3d 890 (4th Cir. 2000) ..................................................................................22

*United States v. Covington*,
  395 U.S. 57 (1969)...............................................................................................22

*United States v. Cuong Gia Le*,
  310 F. Supp. 2d 763 (E.D. Va. 2004) .........................................................................11

*United States v. Czubinski*,
  106 F.3d 1069 (1st Cir. 1997) .................................................................................14

*United States v. Daniels*,
  973 F.2d 272 (4th Cir. 1992) ..................................................................................11

*United States v. Falcone*,
  311 U.S. 205 (1940)..........................................................................................25, 26

*United States v. Good*,
  326 F.3d 589 (4th Cir. 2003) ..................................................................................23

*United States v. Goodwin*,
  457 U.S. 368 (1982)..............................................................................................30

*United States v. Harb*,
  No. 2:07-cr-426 TS, 2009 U.S. Dist. LEXIS 16057 (D. Utah Feb. 27, 2009).........................31

*United States v. Harriss,*
   347 U.S. 612 (1954).................................................................16

*United States v. Hooker,*
   841 F.2d 1225 (4th Cir. 1988) ...............................................12

*United States v. Landham,*
   251 F.3d 1072 (6th Cir. 2001) ...............................................11

*United States v. Laub,*
   385 U.S. 475 (1967).................................................................24

*United States v. Linton,*
   502 F. Supp. 861 (D. Nev. 1980)...........................................27

*United States v. Logan,*
   593 Fed. App'x 179 (4th Cir. 2014) .......................................25

*United States v. Marshank,*
   777 F. Supp. 1507 (N.D. Cal. 1991) ......................................30

*United States v. Maryland State Licensed Beverage Ass'n,*
   138 F. Supp. 685 (D. Md. 1956)............................................16
   168 F. Supp. 431 (D. Md. 1958)............................................16

*United States v. Omni Int'l Corp.,*
   634 F. Supp. 1414 (D. Md. 1986) ................................... *passim*

*United States v. P.H.E. Inc.,*
   965 F.2d 848 (10th Cir. 1992) ...............................................31

*United States v. Pasquantino,*
   336 F.3d 321 (4th Cir. 2003) ...........................................22, 23

*United States v. Polychron,*
   841 F.2d 833 (8th Cir. 1988) .................................................15

*United States v. Restrepo,*
   930 F.2d 705 (9th Cir. 1991) ...........................................12, 27

*United States v. Shabbir,*
   64 F. Supp. 2d 479 (D. Md. 1999).........................................15

*United States v. Spruill,*
   118 F.3d 221 (4th Cir. 1997) .................................................11

*United States v. Weimert,*
   819 F.3d 351 (7th Cir. 2016) ...........................................13, 24

*United States v. Wilson*,
   262 F.3d 305 (4th Cir. 2001) .......................................................................30

*Wayte v. United States*,
   470 U.S. 598 (1985)....................................................................................32

## STATUTES & REGULATIONS:

18 U.S.C.
   § 1343.........................................................................................................22

5 C.F.R.
   § 2635.502(a)..............................................................................................29

27 C.F.R.
   § 6.153(a)....................................................................................................17

28 C.F.R.
   § 45.2(a)(2).................................................................................................29
   § 45.2(c)(2).................................................................................................29

Code of Md. Regulations
   .03.02.01 *et seq.* ..........................................................................................4
   .03.02.01.05..................................................................................................4
   .03.02.01.16..................................................................................................5
   .03.02.01.22(F)..............................................................................................5
   .03.02.04(A)(5)..............................................................................................5
   .03.02.05.04(A)(1)..........................................................................................5
   .03.02.05.05..................................................................................................5
   .03.02.05.06(B)(3)..........................................................................................4
   .03.02.05.09(A)(1)..........................................................................................5
   .03.02.05.11(A)(1)..........................................................................................5
   .03.02.05.11(B)(5)..........................................................................................5
   .03.05.05.12(B)(6)..........................................................................................4

Md. Code Ann. Alcoholic Beverages
   § 1-101 *et seq.*..............................................................................................4
   § 2-317.......................................................................................................17
   § 12-101.................................................................................................16, 17

N.H. REV. STAT. ANN.
   § 175:4.......................................................................................................21

NY CLS Al. Bev.
   § 102..........................................................................................................12
   § 130..........................................................................................................12

OTHER AUTHORITIES:

84 Md. Op. Atty. Gen. 21 .......................................................................................... 4, 15

Coffee, John C., Jr. & Charles K. Whitehead, *The Federalization of Fraud: Mail and Wire Fraud Statutes, in White Collar Crime: Business and Regulatory Offenses* § 9.05 (1990).................................................................................................................13

Freedman, Alix M. & John R. Emshwiller, *Vintage System: Big Liquor Wholesaler Finds Change Stalking Its Very Private World*, WALL ST. J., Oct. 4, 1999......................................18

Gager, Russ, *New Hampshire State Liquor Commission,* RETAIL MERCHANDISER (undated) ..........................................................................................................................21

Md. Lawyers' R. of Prof'l Conduct 1.7 ......................................................................29

## INTRODUCTION

Republic National Distributing Company ("Republic" or the "Company"), the corporate defendant in this case, has been in existence for more than a century.  The Company is the second largest wholesaler of wines and spirits in the United States with sales operations in 23 states.  This case began on June 5, 2012, when an Assistant U.S. Attorney in the District of Maryland submitted an affidavit, sworn under oath by a federal agent (the "Agent's Affidavit"), to a U.S. Magistrate Judge.  Based on the Agent's Affidavit, the AUSA applied for a seizure warrant that would freeze all of Republic's bank accounts nationwide.  In exchange for moving the court to lift the seizure warrant, the same AUSA demanded that Republic deposit the amount of $50 million under the control of the government.  In order to be able to pay its more than 7,000 employees at the time and continue its business, Republic acceded to the government's demand.

A month later, in July 2012, Republic sought relief from the U.S. District Court pursuant to Federal Rule of Criminal Procedure 41(g).  In a sealed hearing in December 2012 followed by two sealed evidentiary hearings in June and August 2015, Republic conclusively demonstrated that the Agent's Affidavit included false assertions of international funds transfers.  The case agent who swore the Agent's Affidavit was, in fact, married to the AUSA who obtained the seizure warrant.  In the first of these hearings, the AUSA stated that if he proceeded with his intended case, "Republic will probably end up out of business."  At the final sealed hearing, on August 27, 2015, the Court concluded that Republic's funds had been unlawfully seized and ordered that they be forthwith returned to the Company.  The Court ordered the AUSA to report his conduct to the U.S. Attorney that same day.

Nine months later, the government returned the instant twenty-three count indictment (the "Indictment"), charging Republic and three low-level employees of the Company's Maryland operation with wire fraud conspiracy, wire fraud and money laundering.  The gravamen of the government's case is that (a) Republic knowingly sold spirits at wholesale to four licensed retail stores located in rural Cecil County, Maryland, (b) with the knowledge that some of those spirits would, in turn, be purchased by individuals who traveled to Cecil County from outside of Maryland, (c) which individuals would then transport the sprits to undisclosed locations in the State of New York, and (d) the spirits would then be acquired and sold by retailers in New York without the payment of the requisite taxes due to that state.

During the relevant period (June 2009 through June 2012) sales by Republic in Maryland accounted for approximately 7.8% of the Company's nationwide revenue.  Sales in Cecil County accounted for a small 0.3% (three tenths of one percent) of Republic's national revenue and sales to the four retail stores named in the Indictment accounted for an infinitesimal 0.04% (four one hundredths of one percent) of Republic's national revenue.

For the reasons stated in detail in this Memorandum, the Defendants' move to dismiss the Indictment, pursuant to Fed R. Crim. P. 12(b), because:

a) the Indictment fails to allege a crime cognizable by any statute or any judicial interpretation of law and there is no reported case in which the federal government has ever sought to prosecute a company or individual on this theory;

b) the Indictment fails to allege essential elements of each of the offenses with which Republic is charged; and

   c)  a pervasive pattern of deliberate and flagrant misconduct by the government and the

       AUSA responsible for the investigation and prosecution of this case warrants dismissal of

       the Indictment.

As demonstrated in this memorandum and the accompanying submissions to the Court, any one

of these factors, standing alone, would provide ample basis for the Court to dismiss the

Indictment.  When the three are considered together, the responsibility of the Court to dismiss the

Indictment in full is clear and immediate.

## **STATEMENT OF FACTS**[1]

## I.  **Republic's Operations are Subject to a Pervasive State Regulatory Scheme**

Republic is one of the largest wholesale liquor distributors in the United States.  The

Company now employs approximately 9,000 people in 23 states, including Maryland.  Like most

states, Maryland has carefully devised a "three-tier system" of liquor distribution, where (i) a

manufacturer sells products to a licensed state wholesaler, (ii) the wholesaler then pays excise

taxes and delivers the products to licensed state retailers, and (iii) the licensed retailer sells the

products to consumers and collects applicable sales taxes.[2]  As the holder of a liquor wholesale

license in Maryland, Republic is subject to comprehensive regulation at every step of the

distribution process.

The express purpose of Maryland's three-tier system is to "divorce entirely the

wholesaler from the . . . retailer" to prevent so-called "tied house" practices, where "a retail

outlet . . . is controlled by a manufacturer, wholesaler, or other entity in the chain of distribution."

---

[1] Although Republic vigorously denies all allegations of wrongdoing, the factual allegations in the Indictment are assumed to be true for the purposes of this motion.

[2] *See* August 1, 2016 Decl. of Charles W. Ehart, DPA ¶ 7, attached hereto as Exhibit A.

3

84 Md. Op. Atty. Gen. 21 (citation omitted) (first alteration in original).  The Maryland General

Assembly:

> has endorsed these purposes, stating that it is the intent and purpose of [the alcoholic beverage law] that every retail dealer shall at all times, be and remain free to purchase the alcoholic beverages sold by him, from any holder of a manufacturer's or wholesaler's license.  By keeping separate the different levels of distribution and discouraging horizontal and vertical integration of the alcoholic beverage industry, these laws prevent liquor manufacturers, brewers, and wholesalers from artificially stimulating the sale of their product by certain controls over a retail licensee to the detriment of the general public and the industry at large.

*Id.*  (internal quotation marks and citations omitted) (alteration in original).

To ensure the efficient regulation of the three-tier system, Maryland law imposes specific

duties on license holders depending on their role in the chain of distribution.  *See* Md. Code Ann.

Alcoholic Beverages, § 1-101 *et seq*.  *See also* Code of Maryland Regulations ("COMAR")

03.02.01 *et seq*.  For example, Maryland law restricts wholesaler visits to retail stores.  *See*

COMAR 03.02.05.12(B)(6) (restricting a wholesaler's "visits to a licensed retailer's premises" to

"short, spontaneous, and unannounced" visits).  The Code of Maryland limits the circumstances

where a wholesaler may interact with consumers.  *See* COMAR 03.02.05.06(B)(3).[3]  Republic

must painstakingly document all sales to all retailers in Maryland.  The Company is required to

submit to the Maryland Comptroller's Office proposed prices and detailed monthly reports

listing the precise number of spirit gallons sold in Maryland by county.  *See* COMAR

03.02.01.05.  For every order, the Company must generate and retain invoices which identify,

among other things (i) the product sold, (ii) the amount sold, (iii) the date, (iv) the customer

name and account number, (v) the customer's outstanding balance, and (vi) the name of the

---

[3] "A supplier or licensed wholesaler representative may have casual conversations with consumers away from the licensed retail premises concerning the merits of products if the conversations or discussions are not for the purpose of selling or offering for sale alcoholic beverages to the consumers."  COMAR 03.02.05.06(B)(3).

appropriate Republic sales person.  The Company must maintain and disclose sales records to the

State of Maryland at the request of the Maryland Comptroller.  Republic is obliged to keep

complete and accurate records of deliveries and to file monthly tax returns and reports with the

Alcohol and Tobacco Tax Bureau.  Put simply, Republic is subject to an intricate web of

regulations that imposes duties on every facet of the Company's operations in Maryland.[4]

## II.   The U.S. Attorney's Office Nearly Put Republic Out of Business by Freezing the Company's Nationwide Operating Accounts on the Eve of Payroll

Seven years ago, government agents began conducting undercover surveillance of

approximately four retail liquor stores in Cecil County, Maryland.  *See* Agent's Aff. 4.[5]  The

agents allegedly observed these retail stores selling liquor in large volumes to third party buyers,

who allegedly transported the liquor to New York in the hopes of profiting from the disparity

between Maryland and New York excise taxes.  *Id.* 4-5.  During the investigation, the

government indicated that certain sales by the retailers to third party buyers involved products

distributed by Republic and at least one other major liquor wholesaler that has not been charged

(the "Second Wholesaler").

The sales at issue constituted a negligible fraction—much less than 1%—of Republic's

total corporate revenue.  Currently, Republic's yearly sales revenues are approximately $6.5

billion.  The Company netted slightly more than $2 million in gross profit (gross revenue less

---

[4] *See*, *e.g.*, COMAR 03.02.01.22(F) (imposing a duty to verify before accepting delivery that a transporter delivering products to the wholesaler possesses the required documentation); *see* COMAR 03.02.01.16 (imposing a duty to file reports when a retailer's check is returned unpaid); *see* COMAR 03.02.05.04(A)(5) (imposing a duty to "maintain documentation on their respective premises for a period of two years for [alcoholic beverage] lists sold to a licensed retailer"); *see* COMAR 03.02.05.04(A)(1) (imposing a duty to refrain from "furnish[ing], procur[ing], or otherwise prepar[ing] an alcoholic beverage list for a licensed retailer"); COMAR 03.02.05.05 (imposing a duty to refrain from participating in tastings); COMAR 03.02.05.09(A)(1) (imposing a duty to refrain from identifying a particular retail store in advertising); *see* COMAR 03.02.05.11(A)(1) (prohibiting wholesalers from providing anything of value to a licensed retailer); *see* COMAR 03.02.05.11(B)(5) (requiring wholesalers to refrain from participating in stocking or rearranging shelves in connection with a shelf-management plan).

[5] A redacted version of the Agent's Affidavit is attached as Exhibit B.

direct costs) as a result of *all sales* to the Cecil County stores over the three-year period relevant to this case.

More than four years ago, Assistant U.S. Attorney Richard Kay proffered the Agent's Affidavit to the district court *ex parte* and under seal to support the seizure of five Republic bank accounts which held balances totaling approximately $50 million.  The stated basis for the seizure was the same conduct alleged in the Indictment returned four years later—namely that low-level Republic employees, along with employees of the Second Wholesaler, sold liquor to two or more retail stores in Cecil County, Maryland with knowledge that some of the product would be transported by retail purchasers across state lines for sale in New York.  On June 5, 2012, Magistrate Judge Stephanie A. Gallagher issued the seizure warrant.

The following day, without providing any notice to Republic or its counsel, the government served the seizure warrant on Republic's primary bank, Wells Fargo Bank, NA ("Wells Fargo").  The seizure froze five bank accounts, including Republic's Master Concentration Account—a sweep account used to manage cash flow for the Company's nationwide operations.[6]  In total, the seizure froze bank accounts holding approximately $50 million and arrested the Company's nationwide transactional activity.[7]  Wells Fargo halted tens of millions of dollars in scheduled payments to suppliers constituting 55% of Republic's total business and cancelled mandatory tax payments, threatening Republic's license in the State of Florida.[8]  The seizure—served on the eve of payroll—threatened the financial integrity of the Company and jeopardized payroll for the families of Republic's then 7,000 employees.[9]

---

[6] *See* August 12, 2012 Declaration of Republic Treasurer Dennis Bashuk ¶¶ 16-17, attached hereto as Exhibit C.

[7] *See* July 9, 2012 Declaration of Republic Treasurer Dennis Bashuk ¶¶ 8-15, attached hereto as Exhibit D.

[8] *See id.* at ¶¶ 14-15.

[9] *See id.* at ¶ 9.

On the afternoon of Friday, June 8, 2012, Republic discovered the seizure and sought to contain the harm.  When contacted by Republic's counsel, AUSA Kay agreed to move the Court to release the seizure warrant, provided that Republic deposit $50 million in cash into an escrow account as substitute security under 19 U.S.C. § 1614.  Republic immediately transferred $50 million to undersigned counsel's bank account to prevent the Company from going out of business.

### III.    Mr. Kay Obtained the Seizure Warrant Based on False Statements of His Wife Proffered to the District Court Under Oath

On July 23, 2012, Republic filed a Petition for Release under Federal Rule of Criminal Procedure 41(g), seeking the return of the $50 million seized by the government.[10]  On August 6, 2012, Magistrate Judge Gallagher unsealed the Affidavit as part of the Rule 41(g) proceeding. Once the Affidavit was produced to Republic, the Company obtained and reviewed bank records from Wells Fargo for all of the money transfers identified in the Agent's Affidavit.  It immediately became clear that the government relied on material false statements to support a claim of international money laundering under 18 U.S.C. § 1956(a)(2)(A).  The Special Agent affiant stated that, upon "evaluat[ion] of extensive financial records," all of the seized accounts are involved in international money laundering "because each transaction was designed to move those same proceeds until they were moved off-shore to purchase more liquor."[11]  The Agent's Affidavit further stated that "funds are being transferred from accounts in the United States to accounts outside the United States."[12]  The Agent's Affidavit contains eight separate references

---

[10] *See* Case No. RDB-12-2472.  The proceedings were partially unsealed pursuant to the Court's Orders dated June 28, 2016 and July 22, 2016.

[11] Agent's Aff. 2, 21.

[12] *Id.* at 13.

to off-shore or international transactions involving Republic.[13]  In fact, no payment for any of the products described in the Affidavit involved electronic funds transfers outside of the United States.[14]

Even after the government was placed on notice of these material false statements, AUSA Kay failed to disclose to the Court or counsel that the seizure warrant was obtained based on the sworn testimony of his wife, a DHS Special Agent named Lisa Ward.  During a December 17, 2012 hearing, U.S. District Judge Richard Bennett ordered that $45 million of the seized funds be released from escrow and returned to Republic.  On May 6, 2015, nearly three years after the seizure of Republic's bank accounts, the Court ordered a status report from the parties and scheduled a series of hearings.  On August 27, 2015, after concluding that "[t]his case cries out for . . . resolution by the Court,"[15] Judge Bennett conducted a day-long sealed evidentiary hearing "to give the government an opportunity to respond with respect to some very real concerns that I have here in this case."[16]  The Court held that the government's international money laundering theory was "highly questionable at best"[17] and was premised upon "the most sketchy of evidence."[18]  Judge Bennett stated, "[T]o infer that there's some impropriety here, I've had the better part of the day listening to this, and that is tenuous at best, if not a stretch."[19] Judge Bennett ordered the immediate return to Republic of all funds that the government originally seized in June 2012.  The Court characterized Mr. Kay's conflict of interest as

---

[13] *See id.* at 1-2, 12-14, 21.

[14] *See* August 12, 2012 Bashuk Decl. ¶¶ 14-15

[15] August 27, 2015 Hr'g Tr. 128:3.  A redacted version of this hearing transcript is attached as Exhibit E.

[16] *Id.* at 127:17-19.

[17] *Id.* at 131:3.

[18] *Id.* at 127:21-23.

[19] *Id.* at 131:11-13.

"troubling"[20] and ordered him to self-report the allegations of ethical impropriety to the U.S.

Attorney.[21]

## IV.     The Government Engaged in a Series of Improper Investigatory Tactics

### A.     The Government Sought to Induce Defendant Jason Lockerman to Participate in an Unlawful Operation Using Republic's Licenses

Shortly after the seizure described above, AUSA Kay pressured Defendant Jason

Lockerman, then a Republic salesman, to participate in a "sting operation" with one or more of

Republic's customers.[22]  At the time, Mr. Kay had informed Mr. Lockerman that he was a

witness in the investigation, not a target.[23]  Mr. Kay's proposed undercover operation involved

(1) Mr. Lockerman wearing a "wire" and recording meetings with Republic's customers, (2) an

undercover government agent—disguised as a Republic employee—engaging in sales of

alcoholic beverages using one or more of Republic's wholesale licenses, and (3) the "sale" of

thousands of dollars of liquor without the knowledge of Republic, the wholesale license holder.

As part of his effort to orchestrate these operations, AUSA Kay demanded that

Lockerman not disclose his activities to Republic or its counsel.  While Mr. Lockerman was

willing to cooperate with the government, he expressed reluctance "to cooperate in a manner that

. . . involve[d] him representing himself (or anyone else) as an RNDC agent or selling alcohol

under RNDC's license[s]."[24]  After Mr. Lockerman expressed reluctance to cooperate in the sting

---

[20] *Id.* at 128:4-5.

[21] *Id.* at 121:23-25, 123:11-14, 128:9-21.

[22] *See* June 26, 2012 Letter from Danny Onorato to Richard Kay.

[23] *See id.* at 1.

[24] June 27, 2012 Letter from Danny Onorato to Richard Kay.

operation demanded by the government, Mr. Kay immediately upgraded Mr. Lockerman's status from "subject" to "target."[25]

## B.    The Government Attempted to Cripple Republic's Operations

The seizure warrant—premised upon material false statements—appears to have been designed to inflict maximum damage upon the Company in order to extract a large settlement. On December 13, 2012, during one of the sealed proceedings before Judge Bennett, AUSA Kay openly stated that he would put Republic out of business:

> Your Honor, I think that -- let me preface my suggestion with one remark, and that is this. That is if we go through either a criminal trial against [Republic] or a civil forfeiture proceeding against the funds that we believe are forfeitable in this case, either one will be a public case. If that's the case, [Republic] will probably end up out of business because they will be unable to hold licenses. Their suppliers probably won't deal with them any longer. The likelihood of there being anything left for the government to take at that point could be very high.[26]

Once the Court returned to Republic the $50 million unlawfully seized by the government, and once it became clear to Mr. Kay that Republic would not agree to make a large and arbitrary cash payment, the government sought the instant twenty-three count grand jury Indictment.

## V.    The Government Returned the Instant Indictment on May 24, 2016

On May 24, 2016, after nearly four years of little activity in the investigation, the government framed the Indictment based on the exact evidence reflected in the seizure warrant that it has possessed for four years and that the Court found insufficient to retain any part of Republic's property following the 2012 seizure. The government has refashioned its legal

---

[25] *See* June 27, 2012 Letter from Richard Kay to Danny Onorato ("Your client has been a target of the investigation for some time; in fact, I have a target letter in my file, naming Mr. Lockerman, that is dated June 5, 2012.").

[26] Dec. 13, 2012 Hr'g Tr. 65:13-22. A redacted copy of this transcript is attached as Exhibit F.

theories to support the charges after the legal basis for the seizure was largely discredited by the Court.[27]  The Indictment alleges that Republic and three of its former employees entered into a criminal wire fraud conspiracy with four owners of retail stores in Cecil County, four buyers who allegedly transported the liquor to retailers in and around New York, and "others known and unknown to the Grand Jury" to deprive the State of New York of excise taxes and to take business from New York distributors.  Indictment ¶¶ 9, 10.

## APPLICABLE LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(B)(iv) permits a defendant to file a motion to dismiss charges if an indictment fails to state an offense.  To satisfy the pleading requirements of Federal Rule of Criminal Procedure 7(c), the indictment must contain a statement of "essential facts constituting the offense charged."  "To be legally sufficient, the indictment must assert facts which in law constitute an offense, and which, if proved, would establish prima facie the defendant's commission of that crime."  *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001).  "[A]n indictment that fails to allege each essential element of the offense is plainly insufficient and must be dismissed."  *United States v. Cuong Gia Le*, 310 F. Supp. 2d 763, 772 (E.D. Va. 2004).  *See also United States v. Spruill*, 118 F.3d 221, 227 (4th Cir. 1997) (vacating conviction where count failed to charge essential element of offense); *see United States v. Daniels*, 973 F.2d 272, 275 (4th Cir. 1992) (reversing conviction and remanding with instructions to dismiss count that was "fatally defective because it failed to specifically include every essential element of the charged offense").  Every element of an offense must be charged in order to satisfy the Fifth Amendment's requirement that the grand jury consider all elements of

---

[27] The government no longer alleges that Republic's conduct violated the "international money laundering" statute, 18 U.S.C. § 1956(a)(2)(A).  Four years after the seizure, the government is pursuing alternative legal theories including "aiding and abetting" liability under 18 U.S.C. § 2 and conspiracy under 18 U.S.C. § 1349.

an offense and the Sixth Amendment's requirement that the indictment sufficiently notify the defendant of the charges against him.  *See United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir. 1988) (en banc).

An indictment may also be dismissed based on "[r]epeated instances of deliberate and flagrant misconduct."  *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1438 (D. Md. 1986). Courts may dismiss an indictment due to government misconduct "on alternative grounds: a violation of due process or the court's supervisory powers."  *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991).

## ARGUMENT

The Indictment in this case seeks to criminalize lawful deliveries of spirits to licensed retailers in full compliance with all applicable laws and regulations of Maryland.  The government, in this Indictment, seeks to manipulate the wire fraud statute to criminalize commercial activity that is the subject of state regulation by constitutional mandate.  The conduct alleged in the Indictment is not a crime and has never previously been charged as a crime anywhere in the United States.  Moreover, the Indictment fails to allege an *actual* material falsehood and the sole allegation of misrepresentation in the Indictment is, itself, false and lacking any basis in the documentation upon which the government seeks to rely.

The government seeks to impose federal criminal liability upon the lawful operation of a state liquor wholesaler based on the conduct of parties multiple steps removed from Republic's sale to licensed retailers.[28]  In an unprecedented attempt at federal encroachment into matters delegated by the Constitution to state regulatory enforcement, the Indictment seeks to criminalize

---

[28] Even the conduct of these third parties would carry limited penalties under New York state law.  For example, it is a misdemeanor under New York law to (1) deliver alcoholic beverages to persons in the state who are not duly licensed to traffic in alcoholic beverages, and (2) sell alcoholic beverages without an appropriate license. *See* NY CLS Al. Bev. §§ 102, 130.

Republic's failure to cut off sales to the four Cecil County retailers based on an alleged awareness of "bootlegging" activity.  Republic was under no legal duty to cut off sales to Cecil County retailers or investigate the conduct and tax payments of end-consumers.[29]  Nevertheless, the government is seeking to create, through federal criminal prosecution, a duty that has not been enacted by legislation, executive order or regulation and that would upend the three-tier system of distribution that Maryland has carefully maintained for more than eighty years.  The three-tier state regulatory scheme is designed to effectively wall off wholesalers from retailers. To avoid federal criminal liability that would result from enforcement of the prosecutor's new federal duty, liquor wholesalers would have to coordinate and control retail stores in direct contravention of the purpose of Maryland's "three-tier" regulatory scheme.  This case raises serious notice and due process concerns by introducing conflicting legal duties into an industry that relies extensively upon the state regulatory scheme to determine what is required by law.

The "[m]ail and wire fraud statutes 'have long provided prosecutors with a means by which to salvage a modest, but dubious, victory from investigations that essentially proved unfruitful.'" *United States v. Weimert*, 819 F.3d 351, 356 (7th Cir. 2016) (citing John C. Coffee, Jr. & Charles K. Whitehead, *The Federalization of Fraud: Mail and Wire Fraud Statutes, in White Collar Crime: Business and Regulatory Offenses* § 9.05, at 9-73 (1990)).  In the absence of any articulable federal interest, the government relies on the federal wire fraud statutes to regulate conduct delegated by the Constitution to state regulatory enforcement.  The wire fraud statutes have never before been stretched to criminalize the conduct of the holder of a state liquor wholesale license (or a retail license holder for that matter) based on lawful sales to licensed retail stores.

---

[29] *See* Ehart Decl. ¶ 11.

The Indictment fails to allege essential elements of the crimes charged, including any material false assertion.  In fact, the only false assertion alleged in the Indictment is true—even accepting the government's version of the facts—as Republic delivered all relevant products exclusively to licensed Maryland retailers.[30]  The Indictment fails to allege any agreement on the part of Republic to achieve the object of the conspiracy.  There is no allegation that Republic knew that any required New York taxes were not paid, much less actively encouraged the non-payment of taxes as would be required to properly allege a conspiracy.  Accepting the factual allegations in the light most favorable to the government, the Indictment alleges only that certain low-level employees of Republic had knowledge of certain buyers' unlawful intentions—a degree of knowledge that the Supreme Court has repeatedly found insufficient to adequately allege a conspiracy, absent a specific agreement and intent to join the conspiracy.  In light of "the broad scope of the federal fraud statutes," motions to dismiss based on "insufficient pleadings or selective prosecution generally deserve careful consideration." *United States v. Czubinski*, 106 F.3d 1069, 1071 (1st Cir. 1997).

The prosecutor is pursuing this unprecedented and unfounded case after his wife, Special Agent M. Lisa Ward, served as the investigating agent and proffered the Agent's Affidavit to the district court, *ex parte* and under seal, to support the seizure of Republic's nationwide bank accounts.  As set forth below, this case has been plagued from its inception by government misconduct, including an unlawful and nearly catastrophic seizure premised upon false statements in the Agent's Affidavit, outrageous investigatory tactics, and an undisputed effort to cripple the Company in order to extract a maximum cash penalty.  Each of these instances of

---

[30] The government alleges that Republic falsely reported to the Maryland Comptroller's Office that "all liquor sold to the Cecil County retailers was intended for resale in Maryland."  Indictment ¶ 22.  As set forth below, the relevant report requires Republic to identify the amount of distilled spirits "delivered to" retail licensees in Maryland.

misconduct warrants dismissal of the Indictment.  But it is the government's pattern of repeated and flagrant misconduct that requires dismissal to preserve the integrity of the judicial system.

## I.      THE INDICTMENT DOES NOT ALLEGE A CRIME

### A.      The Indictment Transforms the Lawful Operation of a State Liquor Wholesaler into a Federal Crime

The conduct alleged in the Indictment does not constitute a crime.  Rather, the Indictment seeks to charge as federal felonies the lawful operation of a liquor wholesale distributor in Maryland's three-tier system.  To survive a motion to dismiss under Federal Rule of Criminal Procedure 12(b) for "failure to state an offense," "the indictment must allege that [the defendant] committed acts which, if proven, would sustain a violation" of law.  *See United States v. Shabbir*, 64 F. Supp. 2d 479, 481 (D. Md. 1999).  *See also United States v. Polychron*, 841 F.2d 833, 834 (8th Cir. 1988) ("If the acts alleged in the indictment do not constitute a violation of law, the indictment is properly dismissed.").

#### 1.      State Regulation Controls the Wholesale Spirits Trade in Maryland

The holder of a liquor wholesale license in Maryland, Republic is subject to extensive regulation in Maryland.  Those regulations have evolved over eighty years to prevent "tied house" practices or coordination between wholesalers and retailers.  *See* 84 Md. Op. Atty. Gen. 21.  The scores of duties detailed above imposed upon license holders in Maryland ensure efficient and orderly regulation of the three-tier system.  Those legal duties are imposed following customary protections of notice and opportunity to comment, as well as the benefit and expertise of Maryland regulators.

Republic operates in an industry that relies heavily upon this regulatory scheme to determine what is required by law.  Due process requires that a criminal statute give to "a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute."

15

*United States v. Harriss*, 347 U.S. 612, 617 (1954).  *See also McBoyle v. United States*, 283 U.S. 25, 27 (1931) (Due process requires "fair warning … in language that the common world will understand, of what the law intends to do if a certain line is passed.  To make warning fair, so far as possible the line should be clear.").  This Court has expressed concerns about injecting "conflicting demands" into Maryland's liquor regulations and creating "a witches' brew for the lawyer or client who wishes to know what may legally be done."  *United States v. Maryland State Licensed Beverage Ass'n*, 138 F. Supp. 685, 703 (D. Md. 1956) (declining to dismiss an indictment charging Sherman Act violations in light of the federal antitrust regulatory scheme, but noting that the arguments "presented should be given serious consideration"), *rev'd on other grounds*, 240 F.2d 420 (4th Cir. 1957).  *See also United States v. Maryland State Licensed Beverage Ass'n*, 168 F. Supp. 431, 445 (D. Md. 1958) (noting in the antitrust context that a "federal court dealing with problems arising out of the liquor traffic in Maryland cannot properly ignore the[] provisions [of the alcoholic beverage law of the State of Maryland] . . . . [T]his court should consider the expressed policy of the State of Maryland in determining what relief should be granted in this case . . . [and] weigh the difficulties of enforcing its decree").  Due process dictates that well-settled statutory and common law duties—not speculative legal obligations conjured by a lone federal prosecutor—should regulate Republic's conduct in the marketplace.

### 2.    The Government Seeks to Use Federal Criminal Law to Regulate the Liquor Industry

Under Maryland law, "every retailer shall at all times, be and remain free to purchase the alcoholic beverages sold by him, from any holder of a manufacturer's or wholesaler's license." Md. Code Ann., Alcoholic Beverages, § 12-101 (repealed 2016).[31]  Applicable federal regulation

---

[31] "The former statement that 'it being the intent and purpose of this article that every retail dealer shall at all times, be and remain free to purchase the alcoholic beverages sold by him, from any holder of a ... wholesaler's

prohibits any wholesaler practice that "restricts or hampers the free economic choice of a retailer to decide which products to purchase *or the quantity in which to purchase them for sale to consumers*." *See* 27 C.F.R. § 6.153(a) (emphasis added).  The Indictment is nothing less than an effort by a federal prosecutor to unilaterally impose upon liquor wholesalers duties that are unknown in the state regulatory scheme that has been in place for more than eighty years. Specifically, the Indictment charges Republic with a crime for not cutting off supply to certain retailers based on an alleged awareness of sales by licensed retail customers of Republic to out-of-state purchasers.  To comply with the conflicting demands created by state law and the duties the prosecutor seeks to impose in the Indictment, Republic would be forced to engage in the exact discriminatory practices that are prohibited by state law, including determining the quantity of liquor a retailer is capable of lawfully selling to consumers.  Republic would jeopardize its wholesale license and subject itself to administrative actions for discrimination if the Company engaged in such practices.  *See* Md. Code Ann., Alcoholic Beverages, § 12-101 (repealed 2016); *see* 27 C.F.R. § 6.153(a).

The allegations of criminal conduct in the Indictment, if sustained, will inevitably lead to a patchwork of criminal standards and effectively recalibrate the function of a distributor in Maryland's highly regulated three-tier system.  Liquor wholesalers would be subject to a range of undisclosed duties, presumably established by the U.S. Attorney's Office for the District of Maryland in its sole discretion, which duties would then be subject to change without the involvement of any legislative body or any regulatory process.

---

license issued under the provisions of this article' is deleted as unnecessary."  Md. Code Ann. Alcoholic Beverages, § 2-317 revisor's note.  *See also* Md. Code Ann. Alcoholic Beverages, § 1-101 editor's note ("[I]t is the intention of the General Assembly that, except as expressly provided in this Act, this Act shall be construed as a *nonsubstantive revision* and may not otherwise be construed to render any substantive change in the law of the State.") (emphasis added).

A wholesaler would now be under a duty to investigate retailer conduct that is foreign to state law, by requiring wholesalers to assume a law enforcement function and somehow monitor the conduct of alcoholic beverage retailers. *See Sherman v. Robinson*, 606 N.E.2d 1365, 1368 (N.Y. 1992) (affirming grant of summary judgment to a *retailer*, in an opinion that applies with even greater force to a wholesaler, and noting that nothing in the law "imposed upon [a retail store] a duty, merely because a quantity of alcoholic beverages was purchased, to investigate possible ultimate consumers in the parking lot beyond its doors").

The Indictment alleges that the parties engaged in a criminal conspiracy because "the New York retailers and their agents, and the Maryland retailers . . . did not pay New York excise taxes." Indictment ¶ 21. Even accepting the allegations as true, there could be no criminal liability if the New York retailers ultimately paid New York excise taxes. *See Hemi Group, LLC v. City of New York*, 559 U.S. 1, 11 (2010) ("Indeed, the fourth-party taxpayers here only caused harm to the City in the first place if they decided not to pay taxes they were legally obligated to pay."); *see Pasquantino v. United States*, 544 U.S. 349, 356 (2005) (stating that smugglers would have avoided wire fraud liability and "complied with [their] legal obligation" if "they would have paid money to [the] Canad[ian] [government]"). A fatal flaw in the government's theory of criminality is that Republic could have no way of knowing whether New York taxes were eventually paid on products allegedly transported across state lines. Compliance with this new regulatory scheme, formulated and imposed by the U.S. Attorney's Office in Baltimore, would require the very wholesaler/retailer integration that the three-tier system was specifically designed to prevent. *See* Alix M. Freedman & John R. Emshwiller, *Vintage System: Big Liquor Wholesaler Finds Change Stalking Its Very Private World*, WALL ST. J., Oct. 4, 1999, at A1

(noting that "tied house" practices were widely believed to have allowed organized crime to dominate the industry).

Moreover, Republic was under no legal duty to take steps to avoid this new theory of federal criminal liability.  In *Hemi Group*, the Supreme Court reversed the Second Circuit's finding that the City of New York had stated a RICO claim predicated on the wire fraud statute. 559 U.S. at 1.  There, out-of-state cigarette dealers allegedly failed to file reports with New York State under the Jenkins Act, which requires that any person who sells or ships cigarettes across a state line to a buyer other than a licensed distributor report the sale to the buyer's state tobacco tax administrator.  *Id.*  The City of New York claimed that the failure of the out-of-state dealer to file the reports made it easier for New York consumers to avoid paying taxes, and therefore caused lost revenue to the City.  *Id.* at 3.  The Supreme Court, however, concluded that the out-of-state distributor owed no duty to the City of New York and flatly refused to extend the reach of the federal statute:

> The City's theory thus requires that the Court extend RICO liability [predicated upon the wire fraud statute] to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City).  Indeed, the fourth-party taxpayers here only caused harm to the City in the first place if they decided not to pay taxes they were legally obligated to pay.  Put simply, Hemi's obligation was to file the Jenkins Act reports with the State, not the City, and the City's harm was directly caused by the customers, not Hemi. The Court has never before stretched the causal chain of a RICO violation so far, and declines to do so today.
>
> . . . .
>
> It is about the RICO liability of a company for lost taxes it had no obligation to collect, remit, or pay, which harmed a party to whom it owed no duty.  It is about imposing such liability to substitute for or complement a governing body's uncertain ability or desire to collect taxes directly from those who owe them.

*Id.* at 3, 17.[32]

In this case, Republic had no legal duty to pay excise taxes to the State of New York or New York City and owed no duty to New York wholesalers. Indictment ¶ 21. Nor was Republic legally obliged to "register as [a] liquor wholesaler[] or distributor[] in New York." *Id.* Republic's legal obligation was to pay Maryland excise taxes on the products sold to the Cecil County retailers and there is no allegation—and there can be no allegation—that Republic failed to pay the taxes due to the State of Maryland.

**B.      Republic's Conduct Charged in the Indictment is the Same as "Control States"**

The Indictment charges Republic with a crime for engaging in activity that is engaged in and endorsed by state governments that directly control the sale of alcohol through state-owned stores ("control states").[33] The State of New Hampshire, for example, is a "control state" and openly encourages customers from neighboring states to travel into New Hampshire to purchase alcoholic beverages at one of a network of large retail stores owned by the state and located along its borders with Massachusetts, Maine and Vermont, as well as Canada. New Hampshire is one of eighteen "control" states where the state government directly controls the distribution of alcoholic beverages. According to the Chairman of the New Hampshire State Liquor Commission:

> [Fifty] percent of our business comes from cross-border, so we market heavily in the neighboring states, not only radio, print ads, emails, but also Facebook and Twitter . . . . We have about a $2.1 million advertising budget, and most of that budget is spent cross-border, because 30 to 40

---

[32] The Supreme Court has also signaled that it will not accept efforts to use federal fraud statutes as state tax collection devices. *See, e.g., Hemi Group*, 559 U.S. at 16 n.2 (recognizing "the troubling specter of turning RICO into a tax collection statute"); *see Pasquantino*, 544 U.S. at 378 n.6 (Ginsburg, J. dissenting) (expressing concerns about "federal prosecutors . . . resort[ing] to the wire and mail fraud statutes to reach schemes to evade not only foreign taxes, but state and local taxes as well").

[33] *See* Ehart Decl. ¶ 8.

percent of that business comes from Massachusetts, and the rest from Maine, New York, Connecticut, New Jersey and Vermont.[34]

In fact, New Hampshire law requires that all advertising "funds appropriated to the [New Hampshire Liquor] [C]ommission . . . be expended to optimize the profitability of the commission" and mandates that "[e]ighty percent of liquor advertising" must be published "with out-of-state media." N.H. REV. STAT. ANN. § 175:4. The Indictment, in this case, frames as a federal crime the sale of alcohol to retailers with the knowledge that the product will be transported to and perhaps sold in another state. The State of New Hampshire, in its role as a retailer, pursues a public policy of advertising to attract purchasers from other states. New Hampshire does nothing to police those sales or otherwise determine what happens to the product it sells, where the product goes, whether the product is resold and whether tax obligations of any other state are met. Just as it is not a crime for State of New Hampshire regulators to (1) sell liquor to purchasers knowing that they will travel back across state lines and (2) actively encourage such cross-border sales, it is not a crime for Republic to operate in an industry that fosters a lawful inter-state customer base. Even accepting all of the government's allegations as true, the Indictment does not allege a crime.

## II. THE WIRE FRAUD AND WIRE FRAUD CONSPIRACY COUNTS SHOULD BE DISMISSED

Even if the alleged conduct is within the reach of the wire fraud statutes, the Indictment has not alleged essential elements of wire fraud and conspiracy. While the Indictment alleges that Defendants were engaged in a scheme to defraud New York State and City of excise taxes in violation of the conspiracy and wire fraud statutes, the Indictment fails to meet minimal

---

[34] *See* Russ Gager, *New Hampshire State Liquor Commission*, RETAIL MERCHANDISER (undated), http://www.retail-merchandiser.com/reports/retail-supplier/674-new-hampshire-state-liquor-commission.

requirements of Rule 7(c) to contain a statement of "essential facts constituting the offense charged" with respect to both statutes.

### A.        The Indictment Fails to Allege a Requisite Material Falsehood

The wire fraud statute prohibits the use of interstate wires to effect "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "[A] scheme … to defraud" requires "an assertion of a material falsehood with the intent to deceive or active concealment of a material fact with the intent to deceive." *United States v. Pasquantino*, 336 F.3d 321, 333 (4th Cir. 2003). "The scheme or artifice to defraud can be in the form of an assertion of a material falsehood with the intent to deceive or active concealment of a material fact with the intent to deceive." *Id.* at 333 (citing *United States v. Colton*, 231 F.3d 890, 899-901 (4th Cir. 2000)). A fact is material "if it has a natural tendency to influence or is capable of influencing" the intended victim. *Neder v. United States*, 527 U.S. 1, 16, 22, 24 (1999) (internal quotation marks and alterations omitted).

The Indictment alleges a single material falsehood in support of its charges of wire fraud. That allegation appears at Paragraph 22 of the Indictment: "It was further part of the scheme and artifice to defraud that RNDC filed false and fraudulent reports to the Maryland State Comptroller's Office, indicating that all liquor sold to the Cecil County retailers was intended for resale in Maryland." Indictment ¶ 22. This allegation in the Indictment is not true. The government relies on the Monthly Excise Tax Return from Manufacturers and Wholesalers of Distilled Spirits and Wine, Maryland Alcohol Tax Form ATT-034,[35] (the "Monthly Return"), attached as Exhibit G. The Monthly Return nowhere requires liquor wholesalers to certify that

---

[35] A copy of Form ATT-034 is available at forms.marylandtaxes.com/alcohol_forms/ATT034fi.pdf. There is no prohibition against consideration of this evidence in the context of a motion to dismiss. Rule 12(b) "permits factual hearings prior to trial if necessary to resolve issues of fact peculiar to the motion." *United States v. Covington*, 395 U.S. 57, 60 (1969).

all liquor sold "was intended for resale in Maryland."[36]  That allegation, upon which the wire fraud charges in this case rest, is false.  It was made up by the government and presumably told to the grand jury.

Rather, the Monthly Excise Tax Return from Manufacturers and Wholesalers of Distilled Spirits and Wine requires liquor wholesalers to report the amount of distilled spirits (in proof gallons) "[d]elivered to retail licensees in MD [Maryland] (less returns)."  Maryland Alcohol Tax Form ATT-034.  The instructions for Form ATT-034 require wholesalers to file separate sheets identifying "each State or the District of Columbia *shipped into*."  *Id.* at 2 (emphasis added).  Here, Republic is alleged to have delivered product to retail licensees in Maryland.  In other words, even accepting the government's version of events, Republic's report was, in fact, accurate—not "false" or "fraudulent."  *See United States v. Good*, 326 F.3d 589, 592 (4th Cir. 2003) ("[A] prosecution for a false statement under § 1001 or under the perjury statutes cannot be based on … [a] response [that is] literally and factually correct.") (first alteration in original).  Moreover, the reports to the Maryland Comptroller's Office—the only material falsehood alleged in the Indictment—do not satisfy the wire fraud statute's materiality requirement because the report was incapable of influencing the purported victims: the State of New York and New York wholesalers—who would never have seen it.  *See Hemi Group*, 559 U.S. at 3, 17; *see Neder*, 527 U.S. at 24.

Republic is not alleged to have engaged in any deceptive activity that might trigger liability.  For example, in *Pasquantino*, the defendant smugglers and drivers[37] "devised and headed" a "bootlegging" operation for four years.  336 F.3d at 325.  The defendants hid products

---

[36] *See* Ehart Decl. ¶ 13.

[37] There, the government did not charge the Maryland retailers, who sold large quantities of liquor to the defendants.  Nor did the government charge the liquor wholesalers, who were an additional step removed from the underlying conduct and distributed the liquor to the uncharged retail stores.

in the trunks of their vehicles to avoid detection and deliberately failed to declare the liquor at

the Canadian border.  *See Pasquantino*, 544 U.S. at 353.  In response to questions by a Canadian

border official about the goods the defendants were transporting into the country, the defendants

failed to disclose that they were transporting liquor.  One defendant abruptly drove away from a

Canadian official when the defendant was ordered to participate in a second vehicle inspection.

Here, there is no allegation that the transactions involving Republic were anything other

than open, transparent and accurate. *See Weimert*, 819 F.3d at 354, 364 (reversing wire fraud

conviction because "[t]here [was] no evidence that [the defendant] misled anyone about any

material facts or about promises of future actions . . . All terms of the transaction . . . were

disclosed to all interested parties.").  Republic is not alleged to have facilitated in any way the

reshipment of product to New York.  The Indictment does not identify a single deceptive action

on the part of Republic, much less the requisite material falsehood required to allege the offense

of wire fraud.

**B.    The Indictment Fails to Allege Necessary Elements of a Conspiracy**

If the Court concludes that the Indictment fails to allege an offense under the wire fraud

statute, which would warrant dismissal of the substantive wire fraud charges, the Court must also

dismiss the conspiracy count in the Indictment.  *See*, *e.g.*, *United States v. Laub*, 385 U.S. 475,

487 (1967) (noting that where the conduct alleged to have been the object of the conspiracy does

not constitute a crime, the indictment fails to allege the essential element of an agreement to

commit an unlawful act).  Moreover, the conspiracy allegations themselves contain fatal defects

that warrant dismissal.  "The [essential] elements of conspiracy under 18 U.S.C. § 1349 . . . are:

(1) two or more persons made an agreement to commit an unlawful act; (2) the defendant knew

the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully,

with the intent to further the unlawful purpose." *United States v. Logan*, 593 Fed. App'x 179, 185 (4th Cir. 2014) (citation omitted).  The Supreme Court has held that "one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and *the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally*."  *Direct Sales Co. v. United States*, 319 U.S. 703, 709 (1943) (emphasis added).

The Indictment presumes that Republic "knowingly conspired" with the retailers and smugglers, but there is no allegation of an agreement by Republic or individuals to achieve the object of conspiracy.  It is not alleged that Republic had a specific intent to further the unlawful purpose of the conspiracy.  There is no allegation that Republic or the individual defendants knew that four retail store owners, the four drivers, and "others . . . unknown to the grand jury" would ultimately fail to pay New York taxes, let alone an allegation that Republic encouraged their non-payment of New York taxes.  Nor is there any allegation that Republic knew that the product would not ultimately be delivered lawfully to a licensed recipient as permitted under New York ABC Law § 102(1)(a).

Absent an allegation of a specific agreement and intent to join a conspiracy, allegations that amount to mere knowledge of illegality are insufficient to constitute the offense of conspiracy.  In *United States v. Falcone*, 311 U.S. 205, 206 (1940), sixteen distillers conspired to manufacture illegal alcohol.  Five distributors sold sugar and yeast to the distillers with knowledge that the distillers intended to unlawfully manufacture alcohol.  Based on the distributors' repeated sales of large quantities to the distillers, the government charged the distributors and distillers with conspiracy to violate the revenue laws.  The jury returned a guilty

verdict on all counts.  The Second Circuit reversed the distributors' convictions and the Supreme

Court affirmed.

> [T]he sale by [the distributors] of materials, knowing that they would be
> used by others in illicit distilling, was not sufficient to establish that
> respondents were guilty of the conspiracy charged . . . . [W]e are satisfied
> that the evidence on which the Government relies does not do more than
> show knowledge by respondents that the materials would be used for illicit
> distilling[.] … [O]ne who without more furnishes supplies to an illicit
> distiller is not guilty of conspiracy even though his sale may have
> furthered the object of a conspiracy to which the distiller was a party but
> of which the supplier had no knowledge.

*Id.* at 206, 208, 210-11.  *See also Direct Sales*, 319 U.S. at 712 n.8, 713 (requiring in order to

demonstrate "stimulation or active incitement to purchase" affirmative actions on the part of the

seller beyond mere "knowledge, acquiescence, carelessness, indifference" and beyond a

"continuous course of sales, made either with strong suspicion of the buyer's wrongful use or

with knowledge").  For example, the defendant in *Direct Sales* solicited orders of morphine

every ten days, employing volume discounts, targeted solicitations, and high pressure sales

tactics.  319 U.S. at 706.  *Falcone* and *Direct Sales* make clear that the Indictment must allege

affirmative conduct on the part of the defendants beyond sales made with knowledge of certain

buyers' unlawful intentions.

    Nowhere does the Indictment allege that Republic or the individual defendants

encouraged, stimulated, or instigated the alleged enterprise.  Here, the Indictment merely alleges

that (1) three Republic employees were aware that products were being transported out of state,

Indictment ¶¶ 13, 23, and (2) two Republic employees expressed a willingness to re-open

Northside's account—which had been closed due to long-term non-payment—if the retailer took

appropriate steps to pay down its debt.  Such allegations are a far cry from the requisite

"stimulation or active incitement" of the alleged conspiracy.  The Indictment's failure to allege

an agreement or something more than mere knowledge of illegal activity is fatal to the
conspiracy count.

The defects in the substantive wire fraud and conspiracy allegations necessitate dismissal
of the remaining counts in the Indictment.  A conviction for money laundering under 18 U.S.C. §
1957 would require promotion of the underlying predicate activity of wire fraud in the course of
Republic's operations.  Similarly, aiding and abetting liability under 18 U.S.C. § 2 requires the
commission of an underlying offense against the United States.  Accordingly, the Court should
dismiss all counts in the Indictment for failure to state an offense.

## III.    THE GOVERNMENT'S MISCONDUCT WARRANTS DISMISSAL

This Court has held that "[r]epeated instances of deliberate and flagrant misconduct
justify dismissal of the indictment."  *United States v. Omni Int'l Corp.*, 634 F. Supp. 1414, 1438
(D. Md. 1986).  *See also United States v. Linton*, 502 F. Supp. 861, 865-66 (D. Nev. 1980)
(noting that courts must "protect[] the judicial process from the stigma of illegal or unfair
government conduct").  Generally, "dismissal of an indictment because of outrageous
government conduct may be predicated on alternative grounds: a violation of due process or the
court's supervisory powers."  *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991).
According to this Court, "the unifying premise in all of the supervisory power cases—that
although the doctrine operates to vindicate a defendant's rights in an individual case, it is
designed and invoked primarily to preserve the integrity of the judicial system" and to "prevent
the federal courts from becoming accomplices to such misconduct."  *Omni*, 634 F. Supp. at 1438
(internal quotation marks and citations omitted).

### A.     Mr. Kay's Proffer of False Testimony to the Court in the Midst of a Serious Conflict of Interest Warrants Dismissal of the Indictment

Special Agent Ward swore under oath in the Agent's Affidavit that she reviewed the necessary bank records to confirm whether Republic engaged in a material international transfer.[38]  Those records made clear that Republic *did not* engage in any foreign transfer, yet the Government filled the Affidavit with eight references to off-shore transactions for the obvious purpose of obtaining a broader seizure warrant and the authority to seize Republic's nationwide bank accounts.  The false allegations of international transfers were the lynchpin of the government's probable cause showing because they led the Magistrate Judge to believe that there was a threat of dissipation of assets outside of the United States.[39]  In the Rule 41(g) proceedings brought by Republic, the Court characterized the testimony as "highly questionable" and "sketchy."[40]  Courts in this District have dismissed indictments based on similarly false and misleading testimony.  In *Omni*, this Court dismissed an indictment due in large part[41] to the government's "certainly misleading and probably false" testimony during an evidentiary hearing and "lack of candor in colloquies with and testimony before the Court."  634 F. Supp. at 1423, 1431.

Once the government was placed on notice of material false statements in the Affidavit, AUSA Kay compounded the misconduct.  He failed to candidly admit that the statements were false or otherwise attempt to correct the record.  Much like in *Omni*, "[t]he facts were made

---

[38] Agent's Aff. 2, 11-12 (testifying that the affiant "evaluated extensive financial records" and "obtained bank statements from Wachovia Bank (now Wells Fargo) for all accounts belonging to Republic").

[39] As set forth in Republic's Reply in Further Support of Petition for Release at 5-6, the alternative statutory bases for the seizure, Sections 1343 and 1957, do not authorize the seizure of the entire contents of Republic's bank accounts.

[40] August 27, 2015 Hr'g Tr. at 131:3, 127:21-23.

[41] In *Omni*, this Court confronted alteration of documents, attempts to obtain privileged information, and many forms of misconduct at issue here, including false and misleading statements under oath, ethical violations, and a cavalier response to allegations of misconduct.  634 F. Supp. at 1417-21.

available to the Court only through extensive investigation on behalf of defendants and many days of hearings." *Id.* at 1435; *see also id.* at 1434 ("The AUSA's failure to be fully candid could have had tragic consequences.  The Court was faced with the issue of whether or not to permit an evidentiary hearing.  If the Court had blindly relied on the AUSA's representations, no hearing would have been held.").  AUSA Kay continued to assert a spurious international money laundering theory to the "amazement" of Judge Bennett.  Aug. 27, 2015 Hr'g Tr. at 126:12-20 ("Somewhat to my amazement . . . it is still apparently the position of the government that there's some sort of evidence of willful violation of the international money laundering laws.").

The rationale for dismissal in *Omni* is even more compelling here because AUSA Kay engaged in this conduct in the midst of a glaring conflict of interest.  Once the Affidavit was called into question, AUSA Kay failed to disclose to the Court or counsel for Republic that the seizure warrant was obtained based on the sworn testimony of his wife and then failed to correct or remediate the testimony once it was discovered to be false.  Such conduct constitutes a serious conflict of interest in violation of federal and Maryland rules and standards of professional conduct, as well as the federal regulations governing employees of the Department of Justice.[42]

When the plainly untrue allegation of material falsehood made in Paragraph 22 of the Indictment is considered, the pattern of misconduct is unmistakable.  When Mr. Kay and Agent Ward had no evidence of international money transfers to support a money laundering claim in the Agent's Affidavit—they made it up.  As noted above, when no material falsehood could be

---

[42] *See*, *e.g.*, 28 C.F.R. § 45.2(a)(2) ("[N]o employee shall participate in a criminal investigation or prosecution if he has a personal . . . relationship with . . . [a]ny person . . . which he knows has a specific and substantial interest that would be directly affected by the outcome of the investigation or prosecution."); *see id.* § 45.2(c)(2) ("An employee is presumed to have a personal relationship with his . . . spouse."); *see* 5 C.F.R. § 2635.502(a) (prohibiting participation in a case "where the employee determines that the circumstances would cause a reasonable person with knowledge of the relevant facts to question his impartiality in the matter"); *see* Md. Lawyers' R. of Prof'l Conduct 1.7 (prohibiting a lawyer from representing a client where the representation "will be materially limited by the lawyer's responsibilities to . . . [a] third person or by a personal interest of the lawyer").

found to support charges of wire fraud in the Indictment—Mr. Kay made it up.  This conduct, inconsistent with the most basic duties of a lawyer and prosecutor and offensive to any sense of justice, demands redress by the Court.

Courts have invoked their supervisory powers to dismiss indictments based on the government's violation of ethics rules.  *See*, *e.g.*, *United States v. Marshank*, 777 F. Supp. 1507, 1529-30 (N.D. Cal. 1991) (dismissing indictment after concluding that "[j]udicial integrity is severely threatened when professional ethical and court rules . . . are flouted by the government").  AUSA Kay's conflict of interest forced him to choose between the interests of his client, the United States, and the personal and professional interests of his wife.  As a result of this serious conflict of interest, Mr. Kay elicited from his wife false testimony that nearly put Republic out of business.  Such conduct clearly warrants dismissal of the Indictment.

**B.      The Indictment is a Tool of Vindictive and Retaliatory Prosecution**

Courts are authorized to dismiss an indictment where, as here, a "reasonable likelihood of vindictiveness exists."  *United States v. Goodwin*, 457 U.S. 368, 373 (1982).  Generally, to establish prosecutorial vindictiveness, "a defendant must show, through objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus."  *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001).  Courts consider prosecutions "vindictive" where charges are brought "solely to 'penalize' the defendant and could not be justified as a proper exercise of prosecutorial discretion."  *Goodwin*, 457 U.S. at 380 n.12.

The facts in this case are compelling.  For four years, the prosecutor has been intent on pressuring Republic to buckle.  It began with the freezing of all the Company's accounts, paralyzing its operations and threatening the survival of a company that had been in business for

more than a century.  But Republic did not buckle.  In the succeeding four years, nothing has

happened to improve the government's case.  On the contrary, because the Company was willing

to fight back, demanding and securing the release of all of the frozen funds, while demonstrating

the falsity of the Agent's Affidavit on which the original freezing order was based, the

government has lost ground.  Worse, in this case, Republic's determination to vindicate its rights

has resulted in professional embarrassment to Mr. Kay's wife and to Mr. Kay himself. Nothing

about the legitimate progress of this case over the past four years—actually, there really has not

been any—would account for the decision to bring charges now rather than years ago when the

government was threatening that an indictment was imminent.  The only reasonable explanation

is that the prosecutor wants to make the Company pay for fighting back.  There should be no

question what Mr. Kay expects will be the consequences to Republic.  He was open about it

almost four years ago: "[I]f we go through either a criminal trial against [Republic] or a civil

forfeiture proceeding against the funds that we believe are forfeitable in this case, . . . [Republic]

will probably end up out of business."[43]  Such an effort to cripple a company constitutes

vindictive prosecution.  *See United States v. Harb*, No. 2:07-cr-426 TS, 2009 U.S. Dist. LEXIS

16057, at *9 (D. Utah Feb. 27, 2009) (denying a vindictive prosecution claim in part because

there was "no evidence that the government is attempting to put defendants out of business"); *see

also United States v. P.H.E. Inc.*, 965 F.2d 848, 854 (10th Cir. 1992) (finding vindictive

prosecution where prosecutor wrote letters admitting that the goal of a multiple prosecution

scheme was to put a company out of business).

Furthermore, the Supreme Court has held that "the decision to prosecute may not be

deliberately based upon an unjustifiable standard . . . including the exercise of protected statutory

---

[43] Dec. 13, 2012 Hr'g Tr. 65:14-22.

and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (internal quotation marks and citations omitted).  Beginning in July 2011, Agent Lisa Ward (Mr. Kay's wife) "received information indicating" that Republic's "employees and agents have been engaged in selling liquor, knowing that it was being transferred for resale in New York without paying New York State liquor taxes."[44]  The record suggests that Mr. Kay pursued the investigation to further the interests of his wife despite the fact that the described conduct of retail sellers and buyers had never formed the basis for criminal charges against a wholesale distributor of liquor in any court in the United States.

Judge Bennett anticipated the prospects of a retaliatory prosecution when he ordered the return of $50 million to the Company.  *See* June 12, 2015 Hr'g Tr. 18:23-25 ("The question becomes whether [proceeding criminally is] retaliatory or not").[45]  The Affidavit alleges that the Second Wholesaler engaged in an identical scheme involving far more significant sales to Cecil County retail stores.  To the knowledge of Republic, at no time has the Second Wholesaler sought relief under Rule 41(g) or any other legal mechanism to recover the assets seized by the government pursuant to the same warrant.  Tellingly, the Second Wholesaler has not been indicted.[46]  The record in this case demonstrates that Mr. Kay brought this case not to remedy a violation of federal law, but to retaliate against Republic for exercising its rights to seek recovery of its assets that, as the Court concluded, had been unlawfully seized by the government.

---

[44] Agent's Aff. 4.

[45] A copy of the June 12, 2015 hearing transcript is attached as Exhibit H.

[46] For additional support for Republic's vindictive and retaliatory prosecution claims, please see the attached addendum filed under seal.

**C.     The Government's Pattern of Improper Investigatory Tactics Warrants Dismissal**

The government has engaged in a series of improper investigatory tactics throughout this case that have previously justified dismissal of an indictment.  This Court has previously dismissed an indictment based on "patently improper" investigatory tactics.  *Omni*, 634 F. Supp. at 1439 ("If no legal precedent presently exists in reported cases to proscribe such outrageous conduct, one needs to be added at this time.  This investigatory tactic is patently improper.").  In a transparent effort to cripple the Company and force a settlement, the government served a seizure warrant on Republic's nationwide bank accounts in a manner that almost put the Company out of business and jeopardized the paychecks of 7,000 employees.  The government pressured Defendant Jason Lockerman, a former Republic salesman, to participate in an undercover sting operation, which would have involved theft from his employer and the unlicensed sale of alcohol.  Mr. Kay designated Mr. Lockerman a target of his investigation in direct response to his reluctance to participate in such a sting operation, not in response to the emergence of any new evidence.

While much of this misconduct warrants dismissal, "[a]t issue here are not merely a few, isolated incidents that can be shrugged aside due to the passage of time and length of the hearings."  *Omni*, 634 F. Supp. at 1432.  Aside from *Omni*, there does not appear to be another case where government personnel engaged in misconduct in as many forms as occurred here. The government may argue that Republic's property was ultimately returned or that the seizure did not actually put the Company out of business, but to accept such arguments would be to adopt a "harmless error" test expressly rejected by this Court.  *See id.* at 1438 ("A common thread underlying many decisions is that the magnitude of the misconduct affects the use of the supervisory power, whether or not actual prejudice is shown. … Factually, the misconduct here is

not isolated, but long standing . . . . Whether or not there is prejudice, the supervisory power to

have any significance must be applicable to cases of repeated, flagrant governmental

misconduct.").  The government's conduct in this case warrants dismissal to deter such conduct

by government officials, to preserve the integrity of the judicial process, and to remedy

violations of constitutional and other legal rights.

## CONCLUSION

For the foregoing reasons, Defendants respectfully move the Court to dismiss all counts

of the Indictment.

Dated: August 1, 2016                              Respectfully submitted,


_____/s/_____                  _____/s/_____
Mark J. MacDougall (Bar No. 18547)               Robert P. Trout (Bar No. 01669)
Connor Mullin                                    John F. Hundley
AKIN GUMP STRAUSS HAUER & FELD, LLP              TROUT CACHERIS & JANIS PLLC
1333 New Hampshire Avenue, NW                    1350 Connecticut Avenue NW
Washington, DC 20036                             Suite 300
Telephone:  (202) 887-4000                       Washington, DC 20036
Fax:  (202) 887-4288                             Telephone: (202) 464-3300
E-mail:  mmacdougall@akingump.com                Fax:  (202) 464-3319
                                                 Email: rtrout@troutcacheris.com

Steven H. Levin
LEVIN AND CURLETT LLC                            *Counsel for Defendant Eugene Gerzsenyi*
201 N. Charles Street Suite 2000
Baltimore, MD 21201
Telephone: (410) 685-4444
Email: slevin@levincurlett.com


*Counsel for Defendant RNDC*


_____/s/_____                  _____/s/_____
Danny C. Onorato (Bar No. 15706)                 Thomas M. Buchanan (Bar No. 06913)
Robert J. Spagnoletti                            Matthew M. Saxon
Stuart A. Sears                                  WINSTON AND STRAWN LLP
SCHERTLER AND ONORATO LLP                        1700 K Street NW
575 Seventh St NW Ste 300 South                  Washington, DC 20006

34

Washington, DC 20004
Telephone: (202) 628-4199
Fax: (202) 628-4177
Email: donorato@schertlerlaw.com

*Counsel for Defendant Jason Lockerman*

Telephone: (202) 282-5000
Fax: (202) 282-5100
Email: tbuchanan@winston.com

*Counsel for Defendant Lisa Robbins*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing document was served via electronic case

filing on this 1st day of August, 2016 upon:

Richard C. Kay
Assistant U.S. Attorney
United States Attorney's Office
36 South Charles Street, Fourth Floor
Baltimore, MD 21201
Richard.Kay@usdoj.gov

Tamera Lynn Fine
Assistant U.S. Attorney
United States Attorney's Office
36 South Charles Street, Fourth Floor
Baltimore, MD 21201
Tamera.Fine@usdoj.gov

                    /s/
Mark J. MacDougall