# EXHIBIT B

12-2709SAG *thru* 12-2711SAG

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANTS

### I. Purpose of the Affidavit

This Affidavit is submitted in support of an application for seizure warrants for the following bank accounts:

A. The contents of Wells Fargo Bank Account ▇▇▇▇9332 in the name of **Republic National Distributing Co. LLC**, located in Baltimore, Maryland;

B. The contents of Wells Fargo Bank Account ▇▇▇▇277 in the name of **Republic National Distributing Co. LLC Receivables Securitization**, located in Baltimore, Maryland;

C. The contents of Wells Fargo Bank Account ▇▇▇▇9442 in the name of **Republic National Distributing Co. LLC Master Concentration Account,** located in Baltimore, Maryland;

D. The contents of Wells Fargo Bank Account ▇▇▇▇5227 in the name of **Republic National Distributing Co. LLC Louisiana & Control States EFT,** located in Baltimore, Maryland;

E. The contents of Wells Fargo Bank Account ▇▇▇▇9264 in the name of **Republic National Distributing Co. LLC Supplier EFT,** located in Baltimore, Maryland;



I submit that there is probable cause to believe that Republic National, ▇▇▇▇▇▇▇▇, and others have been engaged in

1

activities constituting wire fraud and money laundering from at least 2007 up to and including the present, and that the accounts mentioned above contain the proceeds of wire fraud conducted in violation of 18 U.S.C. section 1343, and also are involved in money laundering transactions conducted in violation of 18 U.S.C. section 1956 and 1957, and, therefore, are subject to seizure and forfeiture pursuant to 18 U.S.C. section 981(a)(1)(A) and (C).

## II. **Affiant**

Your Affiant, M. Lisa Ward, has been a Special Agent with Homeland Security Investigations (HSI), known previously as U.S. Customs Service, for twenty-one years. During that time, I prepared and executed numerous federal search and seizure warrants, worked on Title III court-authorized intercepts, seized evidence of both state and federal violations, interviewed numerous suspects, witnesses, and informants, and evaluated extensive financial records as part of these investigations.

## III. **Applicable Statutes**

### Title 18 U.S.C. § 1343 (Wire Fraud)

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall [have committed an offense].

### Title 18 U.S.C. § 1957 (Money Laundering)

(a) Whoever, [using transactions in the United States] …, knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and

2

is derived from specified unlawful activity, shall [have committed an offense. [Wire fraud is a specified unlawful activity as defined in 18 U.S.C. sections 1956(c)(7) and 1961(1)(A).]

## Title 18 U.S.C. section 1956(a)(2)(A) (Money Laundering)

(2)   Whoever … transmits, or transfers, or attempts to … transmit, or transfer … funds from a place in the United States to or through a place outside the United States … –
(A)   with the intent to promote the carrying on of specified unlawful activity [shall have committed an offense]. [Wire fraud is a specified unlawful activity as defined in 18 U.S.C. sections 1956(c)(7) and 1961(1)(A).]

## Title 18 U.S.C. section 981 (Asset Forfeiture)

(a)(1)  The following property is subject to forfeiture to the United States:

(A)   Any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 ... of this title, or any property traceable to such property.
*     *     *
(C)   Any property, real or personal, which constitutes or is derived from proceeds traceable to ... any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title)[which includes wire fraud in violation of 18 U.S.C. section 1343], or a conspiracy to commit such offense.

## IV.   Probable Cause

Your Affiant has participated in the investigation of the above-described offenses, and this affidavit is based upon my participation in this investigation, as well as reports made to me by other agents and officers of HSI, Alcohol and Tobacco Tax and Trade Bureau (TTB), Bureau of Alcohol, Tobacco and Firearms (ATF), Internal Revenue Service (IRS), New York State Tax Criminal Investigations Division (NYSTCID), other law enforcement authorities, and from sources as indicated herein. This is a summary that is not meant to include each and every fact known to me.

Beginning in July 2011, SAC/Baltimore HIDTA Financial Group received information indicating that **REPUBLIC NATIONAL DISTRIBUTING COMPANY** (herein referred to as "REPUBLIC"), ███████ ███████

████████████████ ████████████████ ████████████████

████████████████ and their employees and agents have been engaged in selling liquor, knowing that it was being transferred for resale in New York without paying New York State liquor taxes. The information indicated that various individuals in New York were contacting liquor stores in Cecil County and ordering cases of liquor by telephone or by faxes sent to Maryland. The New Yorkers then would drive vans or trucks from New York to Cecil County, pay cash, load the cases of liquor into the vans or trucks, and drive back to New York where the liquor is sold without paying the New York taxes. As is demonstrated herein, employees and agents of **REPUBLIC** and ███████ supplied the liquor knowing that it was to be sent to New York.

**REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC**, is located at 8201 Stayton Drive, Jessup, Maryland 20794, and ████████████

████ █████ █████ ██ █████ ██████ ██ is located at

████████████ ██████████████. 

## Northside Liquors

Beginning in 2009, investigators with TTB and ATF initiated an investigation of Northside Liquors (herein referred to as "Northside") located at 701 North Bridge Street in Elkton, Maryland. Surveillance agents saw vans and trucks bearing New York

license plates arriving almost daily at Northside, where the driver would go inside and then cases of liquor were loaded into the vans or trucks, literally through the back door of Northside. Agents then followed a number of these same vans and trucks as they headed up I-95 towards New York. Police stopped at least one of these vans and confirmed that the van was loaded with cases of liquor. New York authorities followed a number of these vans and trucks and confirmed that liquor retailers in and around New York City were selling the liquor. New York authorities confirmed that such sales are done to avoid paying the substantial state and city liquor taxes.

I know from my training and experience that criminals often profit by purchasing distilled spirits at lower tax rates in one state and then transporting the distilled spirits for sale in a state with a higher tax rate. I know that the state tax rate in Maryland for distilled spirits is $1.50 per gallon, and that the rate in the state of New York is $6.44 per gallon with an additional tax rate of $1.00 per gallon for the City of New York. Thus, the purchase of liquor in Maryland for sale in New York caused the defrauding of New York of the tax amounts that were due and owing for products sold in New York. Because the orders for liquor were placed by telephone and fax from New York to Maryland, the fraud, as outlined herein, was committed by wire in violation of 18 U.S.C. section 1343.

## The Distributors

In Maryland, Northside placed orders with Baltimore area liquor distributors **REPUBLIC** and ███████████ Each distributor handles a discrete set of brands. ████ ████████████████████████████ ████ ██ ███ ████ ███ █ ██ █ ████ ██ ██ ████████

During 2010, surveillance agents confirmed that deliveries were made by **REPUBLIC** ████ ██████ to Northside, and then vehicles registered in New York and New Jersey traveled to Maryland to pick up their orders.  ATF and TTB agents made undercover orders to Northside by fax from New York, paid cash, and took delivery of cases of liquor that had been delivered by **REPUBLIC** ████ ██████ Out-of-state customers paid Northside in cash that included (1) payment for the cost of the liquor, (2) plus 9% Maryland sales tax, and (3) plus a 2% to 5% commission that was retained by Northside. Bank records indicate that cash collected by Northside was deposited into their bank accounts before payment was made by check to **REPUBLIC** ████ ██████ for the liquor that had been delivered.

## A Search Warrant Was Executed at Northside

In early 2011, ATF and TTB agents executed a search warrant at Northside and seized more than 500 cases of liquor and numerous documents, including copies of faxes that had been received from New York that contained orders of cases of liquor. Each fax specifies the brands, number of cases, and the costs. After the search, ████ **REPUBLIC** ████ ██████ stopped shipping liquor to

6

Northside, and they filed a legal action against Northside to attempt to collect for previously delivered liquor, some of which was seized during the search but most of which had been delivered to smugglers from New York. According to records, Northside owed **REPUBLIC** ███ ██████ approximately $100,000 ██ ███████ ██████

### Sources Describe the Scheme

In July 2011, HSI agents interviewed two Confidential Sources (hereinafter "Sources") who had been employed at Northside at least during the 2009 to 2011 period. The Sources were familiar with the business of the illegal liquor sales between Maryland and New York. According to the Sources, orders from New York came in by fax; each fax was then placed on a clipboard on the wall in the office, which is behind the front, retail part of the store. Sales representatives from ████ **REPUBLIC** ███ ██████ routinely came into Northside two or three times every week and they would first pick up from the cashier a short list of items needed to restock the front, retail part of the store. Then the sales rep routinely would go to the office in back, take the clipboard off the wall, and go through the faxes to add up the orders for out-of-state.

The sales rep then transmitted the order totals to the main office, and then, within days, a large truck from **REPUBLIC** ███ ██████ would arrive and deliver the order, which would be held in the back, warehouse part of Northside. Then, the vans from New York would arrive, the driver would pay cash, and the cases of liquor

would be loaded into the van. The cash would then be deposited into the bank and the funds would be transferred to **REPUBLIC's** ██ ███████ bank accounts. These deposits and transfers are confirmed by bank records.

Northside had no routine, standing order with ████ **REPUBLIC** ██ ██████ Instead, Northside only ordered and received liquor that was to be picked up by New York smugglers within days.

### Surveillance Confirms the Sources' Information

The Sources said that, during the period before the search and after, several other liquor stores in Cecil County continued to conduct similar, illegal sales to New York customers. Surveillance agents confirmed this information during the month of December 2011, as they saw a number of vans and trucks with New York license plates arrive and leave several other liquor stores in Cecil County, including one known as Chesapeake Wine and Spirits ("Chesapeake"). These other liquor stores all are supplied routinely by **REPUBLIC** ██ ███████

According to the Sources, the sales reps are paid by commission and the more liquor they would sell, the higher their commissions; so, the sales reps of ███ **REPUBLIC** ██ ████ were not only aware of the illegal sales to New York, they encouraged them. The Sources went on to say that members of management for ██ **REPUBLIC** ██ █████ had been to visit Northside, had seen the large warehouse space and the small retail front, and were aware of and encouraged the illegal sales to New York; business

cards that were seized during the execution of the search warrant corroborate this information.

### The Liquor Orders Were Extraordinarily Large

The Sources said that the amounts and types of orders placed to the distributors each week were wholesale amounts that far exceeded the capacity of the small, retail operation at the front of the store. According to the Sources, it would be perfectly obvious to any one with knowledge of the retail liquor business that it literally would take years to sell in retail the quantities of liquor that **REPUBLIC** ██ ██████ was delivering to Northside every couple of weeks.

Indeed, bank records show deposits from most **REPUBLIC** ██ ██████ customers around the state of Maryland to be under $3,000; exceptional are the Cecil County customers who routinely paid more than $15,000 and sometimes paid up to hundreds of thousands of dollars in each check. In fact, in one ten-day period at the end of November 2011, for example, Chesapeake paid **REPUBLIC** over $300,000 ██████ ██████ ████████. Records seized from Northside show similar scales of purchases.

### The Prior Owner of Northside Had a Similar Operation

According to the Sources, the prior owner of Northside was investigated by the ATF for wholesaling liquor to New York in 2007 and 2008. ATF records confirm that the prior owner admitted to ATF agents, in a hand-written statement, that most of his business went to out-of-state sales. The prior owner paid a fine to ATF and then

sold the business to the current owners. According to the Sources, ▄▄▄ **REPUBLIC** ▄▄▄ ▄▄▄▄▄▄ were the main distributors of liquor to Northside when the prior owner was in operation.

During the period at least from August through October 2011, well after the January 2011 search warrant execution, the Sources reported that salesmen from ▄▄▄ **REPUBLIC** ▄▄▄ ▄▄▄▄▄▄ continued to contact the Northside management to solicit "back door" liquor sales, referring to the illegal liquor sales to New York customers. At the time, however, Northside's purchasing accounts with both **REPUBLIC** ▄▄▄ ▄▄▄▄▄▄ were closed due to debts owed at the time of the January 2011 seizure, mentioned above.

### Transactions with REPUBLIC.

In September 2011, an ICE undercover agent went to the **REPUBLIC** offices in Jessup, posing as an investor in Northside, and met with "EG" and "LR", both of whom are managers in the accounting department, to ask how to get the account re-opened. During the recorded conversation, EG stated that a lot of money could be made through the "back door" sales of liquor to New York, but that, if asked, **REPUBLIC** would deny knowledge of such sales. EG also indicated that other liquor stores in that area were also selling to New York customers. EG warned the undercover agent to be careful because the government was watching Northside.

In October 2011, management personnel from **REPUBLIC** advised Northside that their purchasing account could be re-opened with a good-faith payment of only $25,000 on the $100,000 debt owed.

**REPUBLIC** advised Northside management that additional payments on the debt were expected from the profits generated by "back door" sales to New York. LR of **REPUBLIC** provided Northside management with **Wachovia Bank** (now Wells Fargo) account number █████9332 (hereinafter **9332**) for the $25,000 payment. The undercover agent told LR that Northside was expecting faxed orders for liquor from New York. On October 11, 2011, a cash deposit of $25,000 was made to **REPUBLIC** into the 9332 account.

During the first week of December 2011, a purchaser from New York contacted Northside and placed an order for 44 cases of liquor to include 31 cases of Johnnie Walker Black whiskey, 4 cases of Georgi vodka, 8 cases of Malibu rum and one case of Jim Beam whiskey. On December 8, 2011, Northside placed an order with **REPUBLIC** for nine cases of liquor because it had the other 35 cases of ordered liquor in inventory from earlier deliveries from **REPUBLIC** ████ ████████ On December 9, 2011, **REPUBLIC** delivered the order of eight cases of Malibu brand rum and one case of Jim Beam brand whiskey. Northside paid **REPUBLIC'S** truck driver six money orders totaling $1,584.12.

On December 11, 2011, the New York customer picked up the 44 cases of liquor, including the nine purchased from **REPUBLIC**. The customer paid $10,371 in cash, which Northside deposited into its bank account.

Subsequent to this transaction, your Affiant obtained bank statements from Wachovia Bank (now Wells Fargo) for all accounts

belonging to **REPUBLIC**.   Your Affiant located statements for 9332, the commercial checking account into which the $25,000 payment to **REPUBLIC** was made, and the records confirmed a $25,000 "Counter Deposit" for October 11, 2011. This corresponds to the $25,000 cash deposit made to **REPUBLIC** to re-open the account with Northside. Subsequent payments by Northside were made into the same 9332 account.

Your Affiant determined that all of the payments made into 9332 were routinely transferred in amounts over $10,000 to Wachovia Bank (now Wells Fargo) account number ████████9277 (hereinafter 9277). Your Affiant determined that 9277 is a commercial checking account that received deposits from other **REPUBLIC** accounts.   All funds from this account then routinely were transferred in amounts over $10,000 into Wachovia Bank (Wells Fargo) account number ████████9442 (hereinafter 9442).

Account number 9442 is a commercial checking account labeled "Master Concentration Account." Bank records show numerous, almost routine transfers from this account in amounts over $10,000 into two, additional accounts: account number ████████5227 (hereinafter 5227) and account number ████████9264 (hereinafter 9264).

Account number 5227 is a commercial checking account labeled "Louisiana and Control States EFT." Bank records show numerous debits made from this account, during the May 2011 through May 2012 period, to accounts owned by liquor manufacturers and distributors. Many of these liquor manufacturers are located off-shore. Your

Affiant also noted debits from this account to United States Customs and Border Protection (hereinafter CBP), as well as to tax and revenue collection agencies for Virginia, North Carolina, and Louisiana.

Based on this information, I submit that there is probable cause to believe that this account was used to pay for liquor supplied by manufacturers, to pay for customs duties on liquor imported from off-shore, and to pay states for taxes and revenue levied on alcohol. Because some of the liquor manufacturers are located off-shore, there is reason to believe that these funds are being transferred from accounts in the United States to accounts outside the United States to pay for the importation of liquor.

Account number **9264** is a commercial checking account labeled "Supplier EFT." Again, bank records show debits made from this account to liquor manufacturers and distributors, many of which are located off-shore. Your Affiant also noted debits from this account to CBP, United States Treasury, Internal Revenue Service, as well as tax and revenue collection agencies for Arizona, Georgia, Virginia, Pennsylvania, and Maryland. As above, based on this information, I submit that there is probable cause to believe that this account also was used to pay for liquor supplied by off-shore manufacturers, to pay for customs duties on liquor imported from off-shore, and to pay for federal and state taxes and revenue levied on alcohol.

Customs and Border Protection (CBP) records confirm that from May 2, 2011, through May 8, 2012, **REPUBLIC** imported approximately

$47 million in liquor from numerous manufacturers and distributors through the Port of Baltimore. U.S. imports included <u>Jameson</u> via Irish Distilleries Ltd. and <u>Courvoisier</u> S.A. Ultimately, both Jameson and Courvoisier S.A. products were obtained by Northside only from **REPUBLIC** and then sold illegally to New York customers.

In sum, your Affiant believes that account number <u>9332</u> is used by **REPUBLIC** to deposit payments for liquor from Northside and other Cecil County liquor stores with proceeds of the sales to the New York smugglers. Funds then are transferred exclusively from this account into account number <u>9277</u>. Funds are then transferred to account number <u>9442</u>, and then directly into account number <u>5227</u> and account number <u>9264</u>, and both of these accounts then are ultimately used to make payment to both foreign and domestic liquor manufacturers and distributors, and to pay taxes and revenue to government agencies. Transfers between these accounts appear to be nearly exclusively in amounts over $10,000.











## Other Liquor Stores Are Similarly Involved

As is mentioned above, **REPUBLIC** ███ █████████ also distribute to other liquor stores in Cecil County that sell in wholesale amounts to New York buyers. Bank records pertaining to just one of these stores, Chesapeake Wine and Spirits, indicate that it routinely pays large amounts by check to **REPUBLIC** ███ █████████. As an example, one such check, dated March 25, 2012, is in the amount of $70,000. The back of the check indicates that it was deposited into **REPUBLIC's** Wells Fargo <u>9332</u> account. ████████ █████ █████ ████ ██ ████ █ ██ ██ █ ████ █ ██████ ██ ████████ ████ ██████████ ███████████ ████ ████████

Surveillance agents report that there are only a few retail customers each day at Chesapeake with small, hand-carried purchases, but the bank records indicate that the store is buying several hundred thousand dollars worth of liquor each month from **REPUBLIC** ███ █████████ At the same time, surveillance agents also report that truckloads of liquor are going out the back door to trucks bearing New York license plates several times every week. Therefore, there is probable cause to believe that most of the funds deposited into the **REPUBLIC** ███ █████████ accounts from these Cecil County liquor stores are proceeds of the illegal sales to New York.

## Commingled Funds

Your affiant knows that courts have held that there is no requirement that a substantial portion of the commingled funds in

an account be derived from the criminal activity, so long as there is some evidence that some of the commingled funds were from criminal activity. United States V. Ward, 197 F.3d 1076 (11th Cir. 1999). The Fourth Circuit has also stated that when funds are drawn from a commingled account, the government is entitled to a presumption that the transaction involves criminally derived funds. United States V. Wilkinson, 137 F.3d 214 (4th Cir. 1998).

Your affiant knows that in forfeiture cases, the probable cause standard is the same as that in search and seizure cases, requiring a court "'to make a practical, common-sense decision whether, given all the circumstances set forth ... there is a fair probability' that the properties to be forfeited are proceeds of illegal ... transactions." United States v. Thomas, 913 F.2d 1111, 1114 (4th Cir. 1990)(drug case).

## The Money Laundering Summarized

As is indicated above, the sales of liquor by **REPUBLIC** ▇▇ ▇▇▇▇ to the Cecil County liquor stores is in violation of the wire fraud statute because it is done with the knowledge that it is not for retail sale in Maryland, but is intended to supply smugglers who are transporting it to New York and selling it there, which deprives New York of its tax revenue. The cash proceeds of the sale of liquor to New York buyers is then deposited by the liquor stores into their bank accounts, and then checks are drawn in amounts well over $10,000 and the checks are then deposited by **REPUBLIC** ▇▇ ▇▇▇▇ in their daily business accounts at Wells Fargo. Those funds are then swept into a series of other accounts

in a series of transactions that are over $10,000 to reach accounts that are used to pay for liquor, some of which is imported in bulk from off-shore through the port of Baltimore. The bank records confirm this and they also show routine payments to CBP to cover importation fees. The CBP records also confirm large amounts of imports of liquor to Baltimore by both **REPUBLIC** ██ ███████.

This activity describes a cycle of proceeds from the New York smugglers to the Cecil County liquor stores and then to **REPUBLIC** ██ ███████, and then through several accounts until it is used to import liquor from off-shore. The imported and domestic liquor is then distributed to the Cecil County stores. Therefore, all of the specified accounts contain the proceeds of wire fraud.

All of the specified accounts also are involved in money laundering in violation of section 1957 because **REPUBLIC** ██ ██████ knowingly moved wire fraud proceeds through these accounts in amounts greater than $10,000. The specified accounts are also involved in money laundering transactions in violation of 1956(a)(2)(A) because each transaction was designed to move those same proceeds until they were moved off-shore to purchase more liquor that was imported through the Port of Baltimore. A significant amount of the imported liquor was then supplied to Cecil County stores with the demonstrated knowledge that it would be moved to, and sold in New York.

## Damming Athority Is Requested

Further, based upon the my training and experience, in the event that this Court grants this application for seizure warrants, I believe there is a likelihood that the accounts will continue to receive deposits and transfers of funds to be used in furtherance of the above-described conduct for a period of time after such warrants are initially executed. It is probable that those involved in the above-described conduct will be unable to promptly stop the flow of funds or inform all of their Cecil County contacts of this investigation. As such, I request that any warrant issued by this court direct the receiving bank to allow funds to be credited to the account but to disallow any of such funds to be debited out of the accounts for any reason for a period of 10 calendar days from the issuance of such warrants.

## V.   Conclusion

Based on the foregoing, I submit that there is probable cause to believe that Republic National, ███████ ███████, and others have been engaged in activities constituting wire fraud and money laundering from at least 2007 up to and including the present, and that the following accounts contain the proceeds of wire fraud conducted in violation of 18 U.S.C. section 1343, and also were involved in money laundering transactions conducted in violation of 18 U.S.C. section 1956 and 1957, and, therefore, are subject to seizure and forfeiture pursuant to 18 U.S.C. section 981(a)(1)(A) and (C) :

12-2709SAG Add 12-2711SAG

A. The contents of Wells Fargo Bank Account ████████9332 in the name of **Republic National Distributing Co. LLC**, located in Baltimore, Maryland;

B. The contents of Wells Fargo Bank Account ████████9277 in the name of **Republic National Distributing Co. LLC Receivables Securitization**, located in Baltimore, Maryland;

C. The contents of Wells Fargo Bank Account ████████9442 in the name of **Republic National Distributing Co. LLC Master Concentration Account,** located in Baltimore, Maryland;

D. The contents of Wells Fargo Bank Account ████████5227 in the name of **Republic National Distributing Co. LLC Louisiana & Control States EFT**, located in Baltimore, Maryland;

E. The contents of Wells Fargo Bank Account ████████9264 in the name of **Republic National Distributing Co. LLC Supplier EFT**, located in Baltimore, Maryland;



F. ████████████████████████████████████████████

G. ████████████████████████████████████████████

H. ████████████████████████████████████████████

I. ████████████████████████████████████████████

J. ████████████████████████████████████████████

M. Lisa Ward
Special Agent
Homeland Security Investigations

Subscribed and sworn before me on June 5, 2012.

Stephanie A. Gallagher
United States Magistrate Judge