# EXHIBIT E

1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF MARYLAND
2

3    REPUBLIC NATIONAL DISTRIBUTING COMPANY )
                                            )
4              Plaintiff,                   ) CIVIL NO.: RDB-12-2472
          vs.                               )
5                                           )
     UNITED STATES OF AMERICA,              )
6                                           )
               Defendant.                   )
7                                           )
     _____   )
8

9                    Transcript of Proceedings
                Before the Honorable Richard D. Bennett
10             Thursday, August 27th, 2015; 11:00 a.m.
                       Baltimore, Maryland
11

12   For the Plaintiff:

13        Mark J. MacDougall, Esquire
          Nicole Sprinzen, Esquire
14        W. Randolph Teslik , Esquire
          Connor Mullin, Esquire
15

16   For the Defendant:

17        Richard Kay, AUSA

18

19

20

21

22   _____

23                 Christine T. Asif, RPR, CRR
                   Federal Official Court Reporter
24               101 W. Lombard Street, 4th Floor
                     Baltimore, Maryland 21201

25

```
1                    P R O C E E D I N G S

2              THE COURT:  This is calling the matter of Republic

3    National Distributing Company versus United States, Civil

4    Number RDB-12-2472.  And this matter is being conducted under

5    seal.  And the courtroom will be secured because it relates to

6    the original petition filed by Republic National Distributing

7    Company in August of 2012 for release of $50 million held in

8    escrow.

9              And subsequently, as I'll go over in a moment, some

10   $45 million of that was released, but there's still $5 million

11   that remains being held in escrow.  And we're here today in

12   continuation of the hearing that I conducted, sealed hearing

13   that I conducted on June the 12th of this year.

14             If counsel would identify themselves for the record,

15   please.

16             MR. MACDOUGALL:  Good morning, Your Honor, for the

17   petitioner, Republic National Distributing Company, Mark

18   MacDougall.  With me is Randy Teslik, Nicole Sprinzen, and

19   Connor Mullin.  We also have two corporate officers here as

20   witnesses, Tom White and Dennis Bashuk.

21             THE COURT:  Yes.  Nice to see you, Mr. MacDougall.

22   And welcome to all the rest of you.  Nice to see you.

23             And on behalf of the government.

24             MR. KAY:  Good morning, Your Honor, Richard Kay for

25   the United States.
```

1              THE COURT:  Good morning, Mr. Kay.  Nice to see you

2     as well.

3              Let me just clarify.  Let's just go over procedurally

4     where we are here on this, and then we will proceed.  And I

5     understand that there's going to be some introduction of some

6     evidence here, and I think you're planning to call two

7     witnesses.  Is that right, Mr. MacDougall?

8              MR. MACDOUGALL:  Yes, Your Honor.

9              THE COURT:  All right.  Essentially, in December of

10    2012, I held a hearing in light of the petition having been

11    filed by the Republic National in this case in August of 2012,

12    and essentially was on the petition for release of $50 million

13    in escrow being held at the behest of the government, by

14    counsel for Republic National.

15             At that hearing, Republic National articulated its

16    objections to Magistrate Judge Gallagher's report and

17    recommendations, essentially, on two findings that Judge

18    Gallagher had made.  First, that release of the funds in escrow

19    could not be granted because 18 United States Code, Section

20    983(f) nor rule 41(g) of the Federal Rules of Criminal

21    Procedure entitled the company to relief.

22             And essentially, most of the hearing, according to my

23    notes, was focused upon Rule 41(g) with respect to whether or

24    not there had been a deprivation of a property entitling

25    Republic National to some relief.  And essentially, Republic

1    National took the position that the escrow arrangements that

2    were arranged essentially deprived Republic National of the use

3    of those funds.

4            Essentially, after that hearing, I determined that I

5    would grant in part and deny in part the relief sought at that

6    time by Republic National.  Specifically, I accepted Judge

7    Gallagher's finding that Republic National could not seek

8    relief under Section 983(f) of Title 18, which entitles a party

9    to immediate release of seized funds only if the business

10   itself has been seized, citing various case authorities for

11   that proposition.

12           As for the Rule 41(g) analysis, I rejected Magistrate

13   Judge Gallagher's finding that relief could not be sought under

14   Rule 41(g).  And I determined that Republic National had, in

15   fact, suffered a deprivation of property, which permitted the

16   company to seek relief under Rule 41(g).  And that the

17   placement of $50 million in escrow was disproportionate to the

18   alleged criminal conduct that was under investigation.

19           And therefore, I ordered that $45 million be released

20   from the escrow account and that $5 million remain in that

21   account pending the -- escrow account of the law firm --

22   pending the outcome of any future civil forfeiture proceeding

23   or any criminal investigation.  And I signed an order to that

24   effect on or about December 14, 2012.

25           Have I correctly summarized the procedural posture of

***SEALED***

1   this case generally from the point of view of the petitioner,

2   Republic National, Mr. MacDougall?

3           MR. MACDOUGALL:  Yes, you have, Your Honor.

4           THE COURT:  Mr. Kay, correct from your point of view?

5           MR. KAY:  That's correct.

6           THE COURT:  Okay.  So the -- that was the status of

7   it, and I entered an order in December of 2012 to that effect.

8   And then the docket entries correctly note that there was no

9   activity on this matter from December of 2012 until May of

10  2015.

11          And then, finally, in May of 2015, at my behest, I

12  asked counsel for the parties, for Republic National, the

13  petitioner, as well as for the government, to submit a status

14  report to me.  And the status report was submitted by the

15  government, paper No. 20, on May 7th.  And it was submitted on

16  May 7th of this year.  And it submitted by Republic

17  National, paper No. 21, on May the 11th.

18          And in light of the status reports that were

19  submitted, I scheduled another hearing, sealed hearing, on

20  Friday, June the 12th of this year, earlier this summer, at

21  which time we conducted a hearing.  And there were more

22  specific allegations that were made by the petitioner with

23  respect to the alleged inaccuracies of an affidavit of Special

24  Agent Lisa Ward in the initial application and affidavit for a

25  search warrant.

***SEALED***

1        And I've reviewed the transcript of that hearing, and

2   essentially I agreed that we would conduct a further hearing on

3   this matter.  And I issued a letter order, paper No. 27,

4   essentially, having a continuation of the hearing from Friday

5   June the 12th until today and established a briefing schedule.

6   And we're now continuing with the hearing today that we began

7   on June the 12th.

8        Once again, have I correctly summarized that from the

9   point of view of you, Mr. MacDougall?

10       MR. MACDOUGALL:  Yes, Your Honor.

11       THE COURT:  Mr. Kay, from your point of view?

12       MR. KAY:  Yes, Your Honor.

13       THE COURT:  So that's where we are on this.  The

14   reason I'm trying to make sure we're clear on that is, is that

15   there does seem to be some suggestion in these submissions by

16   the petitioner with respect to the scope of this hearing, and

17   some reference to, essentially, *Franks versus Delaware*, the

18   1978 Supreme Court opinion at 438 U.S. 154 with respect to

19   essentially attacking the affidavit itself.  A *Franks* hearing

20   may or may not be granted in a -- in a criminal context.

21       And essentially, the defendant must make, as the 4th

22   Circuit has established in *United States versus Colkley,*

23   C-o-l-k-l-e-y, 899 F.2d 297, a 4th Circuit opinion in 1990, a

24   *Franks* hearing may be held if there's a dual showing that; one,

25   a defendant makes a substantial preliminary showing that false

1   statements were knowingly and intentionally or with reckless

2   disregard for the truth included by an affiant in a search

3   warrant; and secondarily -- secondly, that the offending

4   information was essential to the probable cause determination.

5          And I note that in the submissions in the briefing

6   schedule, Republic -- the petitioner, Republic National has not

7   only moved for the release of the remaining funds held in

8   escrow, which is essentially the gravamen of the original

9   petition here, but also striking the affidavit from the record

10  of the case and vacating the seizure warrant, which essentially

11  would be a quasi *Franks versus Delaware* matter.

12         And as to that, I don't see anywhere that I've

13  indicated -- this is not a *Franks versus Delaware* hearing.

14  I've indicated and I'll certainly hear -- I've reviewed the

15  affidavit.  I'll certainly hear from any witnesses either side

16  wants to call, and I'll certainly review any exhibits that are

17  submitted.  All of it in the context of whether or not the

18  remaining $5 million should be released, which would give the

19  Republic National the complete but only relief that was

20  initially sought.

21         And I don't know -- and Mr. MacDougall, before we get

22  started, this Court does not need to make a finding with

23  respect to the validity or lack thereof of the affidavit of

24  Special Agent Lisa Ward or many of the other issues you've

25  raised or I don't even need to vacate the seizure warrant in

***SEALED***

1    order to release the remaining funds under Rule 41(g); correct?

2              MR. MACDOUGALL:  I agree with that, Your Honor.  But

3    if I may be heard.

4              THE COURT:  Sure.

5              MR. MACDOUGALL:  And we certainly agree with the

6    Court that this is not a *Franks* hearing, and we have not

7    requested that government agents or government witnesses be

8    available for testimony.  We do have witnesses as we explained

9    to the Court.

10             THE COURT:  Sure.  You want to show some

11   inaccuracies, and I've essentially said that's fine in terms of

12   my getting the full flavor of what this case is about.

13             MR. MACDOUGALL:  I agree with that.  The relief that

14   is sought under the Rule 41(g) motion is a release of the

15   money.  The Court does certainly have the authority to strike

16   any pleading and vacate any order if it finds appropriate basis

17   for doing that.  And we will urge the Court at the end of the

18   evidence today to consider that as appropriate relief.

19             THE COURT:  Okay.  I understand.  I guess my point

20   is, is that so we put this in appropriate context.  My view is

21   I'm certainly willing to hear evidence from either side in

22   terms of the entire scenario here, in terms of whether or not

23   there has -- let's say if there had been mistakes made or

24   misunderstandings in the context of what would be the basis to

25   continue to hold $5 million.  Essentially, you've already --

1    you basically received 90 percent of the relief you sought.

2           The government is free to take whatever steps it

3    chooses in any kind of investigation or file into a civil

4    forfeiture action.  This being a related case, if there were to

5    be any criminal case brought from this or any civil forfeiture

6    action, it would come to me.  It would be assigned to me by the

7    clerk of the Court.

8           But I don't know that we're there yet, I guess, is

9    what we're saying.  This is a petition for return of funds and

10   that's in the context in which the Court is addressing it.  But

11   I'd be glad to hear from either side in terms of any evidence

12   one wants to present.  It remains to be seen if I think that it

13   would be appropriate to strike the affidavit from the record or

14   vacate the seizure warrant itself.

15          I don't know that we're there yet, Mr. MacDougall.

16   I'm just verifying that that preliminary view that I have of

17   the matter does not in any way prejudice your client's right to

18   be back here to continue the hearing to seek return of the

19   remaining $5 million.  So I think that's where we are.

20          MR. MACDOUGALL:  I agree with that, Your Honor.

21   Thank you.

22          THE COURT:  Okay.  And just to clarify again, the $5

23   million is remaining in an escrow account in your law firm's

24   escrow account; is that right?

25          MR. MACDOUGALL:  That's right.  Yes.

```
1          THE COURT:  All right.  Thank you.
2          Mr. Kay, do you want to be heard on this generally?
3    I'm not -- you noted in your papers that a Franks versus
4    Delaware hearing is in a criminal context and a motion to
5    suppress, not in a Rule 41(g) return of property.  And I've
6    not -- just to your understanding, I'm not ordering a Franks
7    versus Delaware hearing, nor am I expecting the case agent,
8    Lisa Ward, in this matter, who is the affiant, who the record
9    reflects is also your spouse, your wife, I'm not expecting her
10   to testify.
11         You know, you choose to do what you want to do in
12   terms of response to the affidavit.  This is not a quasi Franks
13   versus Delaware hearing.  I'm just trying to address the matter
14   in light of the length of time here in terms of whether or not
15   there's a basis for the government to continue to hold on or
16   require the law firm of Akin Gump to hold on to $5 million in
17   an escrow account.
18         That's essentially where I am.  If you have any other
19   thoughts about what's going to be conducted here today, I'd be
20   glad to hear from you.
21         MR. KAY:  No, Your Honor.  I think you've summarized
22   it exactly right.  I agree with the Court.  I just want to say
23   one thing about the Franks context.  And I think that what
24   Mr. MacDougall has suggested is that it's one way to examine
25   the inaccuracies that he's suggested are here.  And the
```

1    government does not oppose that.  We're not saying that this is

2    a *Franks* context.  We're just saying that he's saying that

3    there's some sort of technique to analogize to *Franks* to just

4    say whether it's a proper way to analyze what we've got here.

5    I think that that's fair.

6              THE COURT:  And just so both of you understand, for

7    example, there are essentially, I think, three alleged

8    inaccuracies.  And I've already noted in the papers submitted

9    that two of those three, apparently, there appears to be some

10   acknowledgment by the government that it was more in the matter

11   of a theory than actual facts, which is educational for me in

12   terms of whether there's some viable possibility, we're talking

13   about international movement of money, for example.

14             Apparently -- again, Mr. Kay, I'll hear from you

15   later.  Apparently, the response has been that that isn't a

16   specific allegation, but it's a theory.  So the fact that it's

17   a theory and not a specific allegation, in all candor, is

18   further help to me to understand what the need would be to hold

19   on to $5 million for any continued period of time without a way

20   to deal with that.

21             So it is helpful for me to hear that, and it will

22   certainly effect my judgment in terms of, you know, the matter

23   of whether I do or don't grant the ultimate relief, which is

24   sought, which is the release of the remaining $5 million.  So

25   it will be helpful to me to hear testimony.  I'm certainly

1    willing to do so in that context.  So with that, we're

2    continuing on, as I've said, with the hearing that we started

3    in June.

4              And Mr. MacDougall, I'll be glad to hear from you in

5    terms of any witnesses you want to present or any exhibits

6    you'd like to introduce, and then I'll hear from the

7    government.  Go right ahead.

8              MR. MACDOUGALL:  Thank you, Your Honor.  If I may be

9    heard for a moment by way of opening.  And does the Court

10   prefer the lecturn --

11             THE COURT:  You can stand behind the table.  I was a

12   great roamer myself, Mr. MacDougall.  So you can sit down -- if

13   you're addressing the Court, I want you to stand up.  But you

14   can stay behind the table, you can go behind the podium.  I

15   don't think you need to go by the jury box, but if it makes you

16   feel comfortable, go ahead and do that too.

17             MR. MACDOUGALL:  It would, Your Honor, but I'll

18   restrain myself.

19             THE COURT:  That's fine.  Go ahead.

20             MR. MACDOUGALL:  Thank you, Your Honor.  As the Court

21   noted, we are going to ask the Court at the conclusion of this

22   hearing to consider three forms of relief.  The first is the

23   release of the $5 million that the Court has noted was the

24   relief sought when the initial petition was filed.

25             The second is to strike Agent Ward's affidavit of

1    June 5th, 2012 because of the inaccuracies and the misleading

2    nature of it.  And the third is to vacate the seizure warrant

3    that was signed by Magistrate Judge Gallagher that day.

4            We're going to offer the Court the testimony of two

5    witnesses.  They're here today.  The first is Dennis Bashuk.

6    Mr. Bashuk is the long time treasurer for Republic National.

7    He's based in Atlanta and he's the national treasurer for the

8    company.

9            The other witness is Thomas White.  Mr. White is the

10   regional president for Republic and is responsible for the full

11   operations in five eastern states, including the state of

12   Maryland.

13           We will be offering in evidence three sets of bank

14   records.  Those records are for three of the accounts that were

15   seized and those are the accounts that are cited in the agent's

16   affidavit as being the source of transfer of funds overseas.

17   And the transfer of funds overseas is critical to what we're

18   trying to prove here today, Your Honor.

19           Mr. Kay, I would note, has agreed to stipulate to

20   both authenticity and admissibility of those records, so we

21   don't have a Wells Fargo custodian here today.

22           MR. KAY:  That's correct, Your Honor.

23           THE COURT:  Thank you.

24           MR. MACDOUGALL:  Your Honor, I would also ask the

25   witnesses -- ask the Court's permission to allow the witnesses

1    to use two demonstrative exhibits, which are accumulations of

2    large bodies of data -- of evidence.  And again, those have

3    been produced to Mr. Kay.

4         MR. KAY:  Your Honor, I've not seen those exhibits

5    yet.

6         THE COURT:  Okay.  Why don't you just take a look at

7    those, Mr. Kay.  We'll get there eventually.

8         MR. KAY:  They've not provided them, Your Honor.

9         THE COURT:  Okay, whatever.  But I think they're

10   about to be.

11        MR. MACDOUGALL:  They should have.  Sorry about that.

12        So Your Honor, the evidence that the Court will hear

13   today is going to show that this is an old company.  At the

14   time of the affidavit and the time of the search warrant -- the

15   seizure warrant, it was doing business in 22 states with more

16   than 7,000 employees, about 350 of whom are here in Maryland.

17        The Court's going to hear convincing evidence.  In

18   the five seized accounts, there were no material international

19   transfers and substantially, all of Republic's purchases of

20   product which exceeds $4 billion a year were paid to U.S. banks

21   and U.S. companies.  Now, some of those U.S. companies are

22   affiliates and associates of -- affiliates and subsidiaries of

23   foreign companies, some are not.  Some are foreign

24   manufacturers that are subsidiaries of U.S. companies.

25        But the important point to us, Your Honor, is there

1   is no evidence -- and the Court will hear this evidence.

2   There's no evidence in the records of the bank and the evidence

3   that Agent Ward reviewed, the records she reviewed, to show

4   wire transfers or any kind of transfers going from this company

5   in a material way over to another country as required by

6   Section 1956(a)(2)(A).

7           The Court will also hear evidence about the Cecil

8   County stores that are the focus of the affidavit and the focus

9   of Mr. Kay's investigation.  There are two stores noted in the

10  affidavit:  North Side and Cecil County.  The Court will hear

11  evidence that will not be disputed that the business generated

12  by those stores is an infinitesimally small part of Republic's

13  National business and a very small part of its Maryland

14  business.

15          If you were to accumulate all of the sales to those

16  stores over the period of the investigation, it would be a very

17  small fraction of $50 million.  And, in fact, a fraction of $5

18  million.  And the reason that that evidence will be important,

19  Your Honor, is the critical goal -- and I think the evidence

20  will be convincing -- the critical goal of Mr. Kay and Ms. Ward

21  and the government was to convince Magistrate Judge Gallagher

22  that this was an international money laundering case.  And the

23  international money laundering statute requires movement of

24  money from the United States offshore.  And there is no

25  evidence of that.  And through what we believe the Court will

```
 1    find to be creative drafting in the affidavit, that evidence is

 2    clear.

 3            The Court will also hear from Mr. Bashuk and

 4    Mr. White that on the day that the affidavit was filed and the

 5    next day when the warrant was served on Wells Fargo, there was

 6    a purpose of -- there was a focus on that day.  And the reason

 7    for that was that's the date paychecks go out.  And but for a

 8    mistake that was made in the affidavit ███████████████████

 9    ████████████████████  instead of an account owned by Republic,

10    which caused Wells Fargo to reject the warrant --

11            THE COURT:  ██████████████████, being apparently

12    another subject of inquiry in addition to Republic.

13            MR. MACDOUGALL:  Yes, Your Honor.  I think that's in

14    the records of this case.

15            THE COURT:  Yes.

16            MR. MACDOUGALL:  But for that mistake, 7,000

17    paychecks would have bounced nationwide.  Some did actually

18    bounce.  And the evidence that the Court is going to hear is

19    going to make clear that this was not about freezing assets in

20    order to recover the proceeds of prospective or alleged crime.

21    It was about putting a thumb on the carotid artery of the

22    company and putting maximum pressure on the company and then

23    demanding $50 million, which for almost any company is an

24    enormous amount of money in order to settle the case.  This

25    company rejected that effort and that's why we're here today.
```

```
 1          THE COURT:  Well, ultimately, Republic National did

 2   put $50 million in escrow that triggered your petitioned in

 3   August to get that money back and triggered the hearing in

 4   December, ultimately, when I ordered that 45 of the 50 million

 5   be released; correct?

 6          MR. MACDOUGALL:  That's right.  And by very clear

 7   inference from this evidence, the Court is going to be able to

 8   conclude that the effort by the government to put a

 9   stranglehold on the company was really what this was all about.

10          One of the reasons that the Court can believe that is

11   that once it was clear that the amount of money that had been

12   seized was many, many times the maximum theoretical amount that

13   could have been actually proceeds of crime under Mr. Kay's

14   theory, the government did nothing.  They -- there was no

15   discussion of, you know, "Well, let's drop it down to 5

16   million, we had to come to this court and ask the Court for

17   relief."

18          And to this day there is still no effort on the

19   government's part to say, "Maybe we grabbed too much.  Maybe we

20   took too much."  Because if you take the international money

21   laundering factor out of the seizure warrant and you're just

22   left with wire fraud and 1957, the only funds that can be

23   seized are the proceeds of the offense --

24          THE COURT:  Specifically from Cecil County.

25          MR. MACDOUGALL:  Yes, sir.  That's right.  And so
```

1    back in 2012, in June 2012, if those two statutes were the

2    basis for the seizure warrant without the international money

3    laundering, all the government could have possibly seized would

4    have been several hundred thousand dollars.

5              But that wasn't the plan, the plan as the evidence

6    will show, was to seize a very large amount of money and put

7    maximum pressure on this company to come in write a check to

8    get out of this situation.  So that's essentially the evidence

9    the Court will hear.

10             And with the Court's approval, we'll call our first

11   witness.

12             THE COURT:  All right.  Just so I can, the references

13   you're making in terms of the possible violations of any money

14   laundering statute, 18, united States Code, Sections

15   1956(a)(2)(A) and 1957.  1956(a)(2)(A) is the international

16   aspect of that money laundering statute; correct?

17             MR. MACDOUGALL:  That's right.

18             THE COURT:  1957 is the more basic domestic aspect of

19   money laundering; correct?

20             MR. MACDOUGALL:  That's correct.

21             THE COURT:  All right.  Thank you.  Do you want to be

22   heard any further in the opening statement, Mr. Kay, before we

23   hear testimony?

24             MR. KAY:  Your Honor, just -- I think it might help

25   to clarify one point.  And that's about the 1957 --

1          THE COURT:  1957 is not an international money

2    laundering charge.  1956(a)(2)(A) is; correct?

3          MR. KAY:  That's correct.  But one thing that Mr. --

4          THE COURT:  And the company has not been charged with

5    that, but that was the basis of the application and affidavit

6    for the search warrant.

7          MR. KAY:  Exactly so, Your Honor.  I just wanted to

8    point one thing out.  Mr. MacDougall did say that the only

9    thing that is seizable or forfeitable in relation to a 1957,

10   the domestic violation, is the proceeds.  And that's not true.

11   They've cited an incorrect case in their materials, a case

12   called *United States versus Moore.*

13         The proper case, Your Honor, is *United States versus*

14   *Kivanc*, K-i-v-a-n-c.  It's found at 714 F.3d 782.  It's a 4th

15   Circuit published case, Your Honor.  And in that case it says

16   specifically -- was the holding of the case that under section

17   981, "any real or personal property involved in a money

18   laundering transaction in violation of section 1957 is subject

19   to civil forfeiture and consequently when legitimate funds are

20   commingled with property involved in money laundering or

21   purchased with criminally derived proceeds" -- the entire

22   property, the entire property, Your Honor, including the

23   legitimate funds is subject to forfeiture.  So he's just wrong

24   about that, Your Honor.

25         THE COURT:  Again, just to clarify, Mr. Kay, on that

```
1    legal point, it's subject to legal forfeiture.
2              MR. KAY:  That's correct.
3              THE COURT:  As a result of a civil forfeiture
4    action.
5              MR. KAY:  Correct.  And it can be seized in
6    anticipation --
7              THE COURT:  I know it can be seized.  But the point
8    is, is that the matter of it being potentially subject to a
9    civil forfeiture action in the event of a successful civil
10   forfeiture action is somewhat distinct from -- not that it can
11   be seized, but it's somewhat distinct from the matter of
12   whether or not there need to be an escrow amount as to that
13   amount.
14             MR. KAY:  That's correct.  Your Honor --
15             THE COURT:  That's what's before me.  I'm not going
16   to have to decide that today.  It may be that I rule against
17   the government and say that the $5 million has to be released,
18   the petition is granted, and this case is closed, and awaits
19   whether or not there are further developments.  But I don't
20   know that I need to necessarily decide that --
21             MR. KAY:  That's exactly right.  I didn't want the
22   wrong legal case to be before the Court.  I've got a copy of
23   Kivanc --
24             THE COURT:  That's fine.  I'm reasonably familiar
25   with what you're speaking.
```

***SEALED***                                    21

```
 1              Okay.  With that, I'll be glad to hear from your
 2    first witness, Mr. MacDougall.
 3              MR. MACDOUGALL:  Thank you, Your Honor.  The
 4    petitioner Republic calls Dennis Bashuk.
 5              THE COURT:  Mr. Bash, if you'll come forward, please.
 6    By the way, is the person here in the back of the courtroom, is
 7    she with one of the teams here?
 8              MR. KAY:  She's a special agent with ICE, Your
 9    Honor.
10              THE COURT:  All right.  She's certainly welcome to
11    come sit at the table.
12              Do you have any objection with that, Mr. MacDougall?
13              MR. MACDOUGALL:  No objection.
14              THE COURT:  She's certainly welcome.  Do you want her
15    to come to the table?
16              MR. KAY:  Not necessary, Your Honor.
17              THE CLERK:  Sir, please raise your right hand.
18              THE COURT:  Good morning.
19
20                         DENNIS BASHUK,
21    called as a witness, being first duly sworn, was examined and
22    testified as follows:
23              THE WITNESS:  I do.
24              THE CLERK:  Thank you.  Please be seated.  State and
25    spell your last name for the record.
```

Direct Examination Dennis Bashuk

```
1              THE WITNESS:  Dennis Bashuk, B-a-s-h-u-k.

2              THE CLERK:  Thank you.

3                       DIRECT EXAMINATION

4   BY MR. MACDOUGALL:

5   Q    Good morning, Mr. Bashuk.

6   A    Good morning.

7   Q    Tell the Court what is your occupation, please?

8   A    I am the treasurer for Republic National Distributing

9   Company.

10  Q    How long have you had that job?

11  A    11 years.

12  Q    Okay.  Could you speak a little bit closer to the

13  microphone, please?

14             THE COURT:  Pull it down closer to you, you'll be

15  fine.  Just pull the microphone down -- there you go.  You're

16  good.

17  Q    (BY MR. MACDOUGALL)  And Mr. Bashuk, before joining

18  Republic, what job did you have then?

19  A    I worked for a smaller wholesaler in Massachusetts in a

20  financial position.

21  Q    Where did you go to school?

22  A    Went to graduate school at Indiana University and

23  undergraduate at the State University of New York at

24  Binghamton.

25  Q    So you've been Republic's treasurer for about 12 years?
```

1    A    11, little less than 11.

2    Q    Okay.  How would you describe Republic's business?

3    A    We're in the business of distributing beverage and

4    nonbeverage alcohol in the United States.

5    Q    How many states does Republic do business?

6    A    26 states and the District of Columbia.

7    Q    You used the word "wholesale," what is a wholesaler in the

8    liquor industry?  What does he do?

9    A    We're the middleman.  We buy the product from the

10   suppliers and then we sell to the retail who then sells to the

11   consumers.

12   Q    Where does a wholesaler obtain product?

13   A    We buy the product from our suppliers.

14   Q    And where do you sell it?

15   A    We sell it in states to package stores, to restaurants, to

16   grocery stores and any other outlet that has a license to sell

17   product.

18   Q    So would it be fair to say a wholesaler is a middleman?

19   A    It is a middleman, yes.

20   Q    Now, can a wholesaler sell to an individual customer?  Can

21   I walk into the warehouse in Jessup, Maryland and buy

22   something?

23   A    No.

24   Q    Why not?

25   A    It's against the law.  State of Maryland and the federal

Direct Examination Dennis Bashuk

1    laws prohibit that.

2    Q    Okay.

3    A    You know, state laws may vary a little bit, but generally

4    speaking, that's against the law.

5    Q    What was the total approximate revenue of Republic in the

6    calendar year, fiscal year 2011?

7    A    $4 and a half dollars.

8    Q    That's nationwide?

9    A    Yes.

10   Q    And how about in 2012?

11   A    5.2 billion dollars.

12   Q    What was the total capital or shareholders equity of

13   Republic at the end of 2011?

14   A    Just short of a billion dollars.

15   Q    And how about the end of 2012?

16   A    Little bit more than that, but still less than a

17   billion.

18   Q    Now, you're treasurer of Republic.  Can you tell us,

19   please, what your responsibilities involve?

20   A    The cash flow management of the company and managing the

21   bank relationships.

22   Q    And where does Republic maintain its primary banking

23   relationship?

24   A    Well, we have three credit facilities, and Wells Fargo is

25   the lead bank and most of our actual bank accounts are with

Direct Examination Dennis Bashuk

1   Wells Fargo.

2   Q    How long has that relationship lasted?

3   A    Well, before Wells Fargo, Wachovia Bank, they had merged.

4   Wachovia was our bank and our owners had a relationship with

5   the Wachovia/Wells Fargo Bank for probably 20 years.

6   Q    What kind of depository services, depository services does

7   Wells Fargo provide?

8   A    In most of the markets we have a physical account, a

9   depository account, so at the end of the night we will scan

10   checks into those accounts.

11   Q    And about how many depository accounts does Republic

12   currently maintain with Wells Fargo?

13   A    At Wells Fargo we have about 12 or 13.

14   Q    And was that general -- I'm sorry?

15   A    12 or 13 depository only accounts at Wells Fargo.

16   Q    Okay.  How many total accounts do you have at Wells

17   Fargo?

18   A    About 33.

19   Q    And was that true in 2011, 2012?

20   A    We may have had a couple less.  We've done some mergers in

21   some markets that didn't exist back then, but close to 30.

22   Q    Why does Republic have so many bank accounts?

23   A    Well, we have disbursement accounts that we use for

24   different reasons.  We have a payroll account, we have a

25   payables account which we use for physical checks.  We have an

Direct Examination Dennis Bashuk

```
 1   EFT account, which is primarily ACH, so a lot of the big wine
 2   and spirit suppliers get paid electronically that way.  We may
 3   do wires to some of the smaller wineries as well.  And so we
 4   segregate for accounting purposes the different accounts.
 5   Q    And how about credit services, what credit services does
 6   Wells Fargo provide?
 7   A    Like I said, they're one of our big lenders, they're also
 8   the lead in one of our big credit facilities, which is a
 9   ten-bank, bank group.
10   Q    Mr. Bashuk, I'm going to ask you to have a look at what's
11   being marked as Plaintiff's Exhibit 1 for identification.
12            MR. MACDOUGALL:  And for Mr. Kay's purposes, that's
13   the chart captioned Master Concentration Account.  May I
14   approach the witness, Your Honor.
15            THE COURT:  Yes certainly.
16            MR. MACDOUGALL:  Your Honor, we had provided the
17   Court with copies of those exhibits in advance.
18            THE COURT:  Yes.  I don't have them with me, but I'm
19   certain -- thank you very much.
20            We have a local rule 107.5, an exhibit is deemed to
21   be introduced once it's referenced unless there's any
22   objection.  I gather there is no objection to this, Mr. Kay?
23            MR. KAY:  No, Your Honor.
24            THE COURT:  This will be already in evidence.  It's
25   in evidence now.
```

Direct Examination Dennis Bashuk

1          MR. MACDOUGALL:  Thank you, Your Honor.

2   Q    (BY MR. MACDOUGALL)  Take a look, please, at Exhibit 1 now

3   in evidence, Mr. Bashuk.  Were you involved in the preparation

4   of this chart?

5   A    I was.

6   Q    What was your factual basis for preparing the chart?

7   A    These represent the bank accounts that we have at Wells

8   Fargo.

9   Q    And do you believe this chart would assist you in your

10  testimony concerning the banking activities and cash management

11  activities of Republic?

12  A    Yes, it will.

13  Q    Okay.  Would you please describe what the chart shows?

14  A    Of the 33 accounts, the top section are primarily

15  disbursement accounts.  I mentioned earlier we have payable

16  accounts and payroll accounts and EFT accounts that we use to

17  pay our suppliers.  The bottom set of accounts are the

18  depository accounts in the markets that we use Wells Fargo

19  depository services.

20          MR. MACDOUGALL:  Your Honor, if I may ask, we'd next

21  like to have the witness testify concerning some references in

22  the affidavit.  The affidavit I assume is part of the record in

23  this case.  We could have it marked as an exhibit --

24          THE COURT:  Why don't we introduce it as Plaintiff's

25  Exhibit -- this whole proceeding is sealed, obviously, so yet

Direct Examination Dennis Bashuk

1   that can be introduced as well, certainly.

2           MR. MACDOUGALL:  Thank you, Your Honor may I

3   approach?

4           THE COURT:  Absolutely.  Have the clerk mark that

5   that's Plaintiff's Exhibit.  I have a copy of the affidavit up

6   here.  That's Plaintiff's Exhibit 2.  This is the affidavit of

7   Special Agent Lisa Ward of the Department of Homeland Security,

8   Immigration Customs Enforcement.  Is that correct, Mr. Kay?

9           MR. KAY:  That's correct.

10          THE COURT:  That's fine.  You may go ahead,

11  Mr. MacDougall.

12          MR. MACDOUGALL:  Thank you.

13  Q   (BY MR. MACDOUGALL)  Are you familiar with this affidavit,

14  Mr. Bashuk?

15  A   I am.

16  Q   How did you become aware of its existence?

17  A   During this process it came to my --

18          MR. KAY:  Your Honor, can he move a little closer?  I

19  can't hear a word he's saying.

20          THE COURT:  Sure.  Just pull it up.  I can hear him.

21  Pull up closer, that's fine.

22  Q   (BY MR. MACDOUGALL)  I'd like you to please have a look at

23  Exhibit 2 in evidence, petitioner's Exhibit 2, at the first

24  page in particular.  The first sentence talks about -- "the

25  affidavit is submitted in support of an application for seizure

Direct Examination Dennis Bashuk

1    warrants for the following bank accounts."  Do you see that?

2    A    I do.

3    Q    Immediately thereafter, there's a list of five bank

4    accounts captioned A through E.  Do you see those?

5    A    I do.

6    Q    What's the -- what entity is the owner of those accounts?

7    Do you recognize those accounts?

8    A    I do.  That's Republic National Distributing Company.

9    Q    And with respect to paragraphs A through E where each of

10   those accounts is identified, the same language appears at the

11   end of each phrase, "located in Baltimore Maryland."  Is that

12   true?

13   A    It is not.  I mean there is one account that probably has

14   a physical location in Jessup, Maryland, that would be the

15   depository account we use for Jessup, but you know, we scan the

16   checks and we don't actually disburse any funds from Maryland,

17   let alone Baltimore.

18   Q    Where are these five accounts actually located?

19   A    Well, Atlanta.  It's another -- I'm sure, a branch in

20   Jessup, Maryland that would recognize that account number but

21   they were all established in Atlanta.

22   Q    Going back to Exhibit 1, if you would please, the chart,

23   are the five accounts listed in Agent Ward's affidavit depicted

24   in this chart?

25   A    They are.

Direct Examination Dennis Bashuk

1    Q    If you would please identify each one.  And for everyone's

2    convenience, I'll just read them off from the affidavit.

3              Paragraph --

4              THE COURT:  You might be able to actually -- if he

5    touches the screen there, Mr. MacDougall, it will actually show

6    up on the screen.  It would be helpful to me to -- maybe it

7    highlight them as well.  He can actually just touch the screen

8    there and then he can -- when he's finished, he could touch the

9    bottom of the screen and it will go off.  But he can just touch

10   each one of those accounts that he's referencing -- along with

11   testifying.

12             MR. MACDOUGALL:  Thank you, Your Honor.

13   Q    (BY MR. MACDOUGALL)  Mr. Bashuk, can you identify in the

14   chart, please, the first account which ends in the letters

15   9332?

16   A    Is it -- that one right there.

17   Q    Okay.  And that account is caption No. 109 Jessup,

18   Maryland; is that right?

19   A    Yes.  That's the depository account we use in Jessup.

20   Q    Paragraph B identifies an account with the last four

21   digits 9227.  Do you see that here in the chart?

22   A    I do.

23   Q    Where is that?

24   A    That one is right here.

25   Q    And what is that account called?

Direct Examination Dennis Bashuk

1    A    That is our receivable securitization account, and what we

2    do with that is we roll up all the individual depository

3    accounts into that every night.  We have a credit facility that

4    actually uses the receivables as collateral, so that's required

5    under our loan agreement.

6    Q    Paragraph C ends in the digits 9442.  Again, the account

7    is not named, but could you identify where that is in the

8    chart?

9    A    That one is right here.  And that is what we call our

10   concentration account, and that's the account where all the

11   activity of the company rolls up at the end of every night

12   through a process called ZBA banking.

13   Q    What does ZBA mean?

14   A    Zero balance account.  So all the accounts underneath will

15   either be funded if there's a shortfall, or if there's -- in

16   the case of depository accounts, if there's cash in the

17   accounts, those will ultimately move up to that account.  The

18   debits and the credits will net.  So in that case, the

19   disbursements and the collections will net for the most part

20   and any shortfall will be funded by our revolver and any excess

21   will go to pay down the revolver.

22   Q    The next one is paragraph D.  It ends in four digits 5227.

23   Where is that in the chart?

24   A    That is a disbursement account that we use in Louisiana

25   for both the State of Louisiana and our, what we call our

Direct Examination Dennis Bashuk

1   control state business.

2   Q    The last account captioned E ends in the digits 9264.

3   Where is that in the chart?

4   A    That is up here.  This is a disbursement account that we

5   use to pay our suppliers, electrical ones, that we pay

6   electronically as well as to pay for customs, activity, and for

7   taxes.

8   Q    Okay.  Let me please direct your attention to the Maryland

9   account --

10          THE COURT:  And actually, just for the record, so

11   it's helpful for me, Mr. MacDougall, those five accounts have

12   all got red highlighting ink on the exhibit, Plaintiff's

13   Exhibit 1.

14          MR. MACDOUGALL:  That's correct, Your Honor.

15          THE COURT:  Okay.

16          MR. MACDOUGALL:  That's specifically to identify --

17          THE COURT:  Yes, thank you.

18   Q    (BY MR. MACDOUGALL)   Mr. Bashuk, let's start with the

19   Maryland account, Jessup No. 109.  The account ends in the

20   digits 9332.  What's the primary purpose of this account?

21   A    Its only purpose is for supplier -- or for

22   customer-related activity.  So we deposit all of our checks at

23   the end of the night into that account, either physically or

24   scanned in electronically.

25   Q    What is the primary purpose of that account in 2012?

Direct Examination Dennis Bashuk

1    A    The same.  It's for customer deposits.

2    Q    Do you recall sitting here today -- what was the

3    approximate annual total of deposits, deposits into this

4    account in 2011?

5    A    So our revenue in Maryland would have been about $330

6    million.  So for the most part, that would have been the

7    deposit for the year.

8    Q    So all the revenue collected in Maryland by the company

9    goes into that account.  That's where you deposit the money.

10   A    For Maryland, yes.

11   Q    Okay.  Now, how, mechanically, are collections deposited

12   into that account?  How does that happen?

13   A    So we will have -- most of the customers will mail checks

14   to the office.  In some cases a driver or salesperson may pick

15   it up.  At the end of the night there will be an administrative

16   person that will then combine all those checks and now, even in

17   2012, they then bundle them up and they would scan them into

18   the system so they would go right to the bank from our

19   warehouse.

20   Q    And once they're transferred into this account, once

21   they're deposited, where does the money go after that?

22   A    Once it's cleared, funds, just like all the other

23   depository accounts, those will then ZBA up to that

24   securitization account ending in 9277.

25        So there will be a single wire into that 9277 account from

Direct Examination Dennis Bashuk

```
 1    all of these depository accounts.  And in addition, there's

 2    another account for the non Wells Fargo that will also get

 3    wired into that secure -- all the collections from other

 4    customers and non Wells Fargo locations will end up in that

 5    account as well every night.

 6    Q    And that securitization account is 9277.  That's right

 7    dead center in the middle of the chart; right?

 8    A    Correct.

 9    Q    And is it correct that the Maryland account that you've

10    just testified to is one of, it looks like about a dozen

11    accounts that all flow into that securitization account?

12    A    Correct.

13    Q    Now, is money from the Maryland account ever transferred

14    anywhere else other than to securitization account?

15    A    No, just up to that other account.

16    Q    And more specifically, are funds from the Maryland account

17    ever transferred to accounts outside of the United States?

18    A    No.

19    Q    Was that true in 2011?

20    A    Yes.

21    Q    Was it true in 2012?

22    A    Yes.

23    Q    Okay.  I'd like you to turn next to the second account,

24    the receivable securitization account, which is No. 9227, and

25    it's the one we just mentioned in the center of the chart.  Do
```

Direct Examination Dennis Bashuk

1   you see that?

2   A    Yes, I do.

3   Q    Why is it called receivable securitization account?

4   A    Because we've got a particular credit facility where we

5   actually securitize our receivables.  So we technically sell

6   them to the bank and we create a security out of them.  So

7   that's the proper name for the account.

8   Q    And where did the funds in this account -- deposited in

9   this account, originate?

10  A    From all the individual depository accounts.

11  Q    Do you know what the approximate annual total deposits to

12  this account were in 2011?

13  A    Very close to the 4 and a half million dollars, because

14  again, we have another incoming wire every night from the non

15  Wells Fargo collection accounts.

16  Q    And how would that account, the total deposits to that

17  account compare to the total revenue reported by the company

18  for the same period?

19  A    Very close, if not exact.

20  Q    So what happens to funds after they're deposited in the

21  receivable securitization account?

22  A    Again, those go through -- it's an electronic transfer,

23  it's a very quick process.  So it ultimately ends up in the

24  master account ending in 9442.

25  Q    And just to be clear, your testimony a couple minutes ago

Direct Examination Dennis Bashuk

1    regarding the entire flow of funds into the account, did you

2    intend to say million or billion?

3    A    Billion.  4 and a half billion dollars.  I apologize.

4    Q    Your testimony just a second ago was that the funds from

5    the receivable securitization account flow into the master

6    concentration account.  Do they go anywhere else?

7    A    No.

8    Q    Okay.  More specifically, are funds from the receivable

9    securitization account ever transferred outside the United

10   States?

11   A    No.

12   Q    Was that true in 2011?

13   A    Yes.

14   Q    Was it true in 2012?

15   A    Yes.

16   Q    Mr. Bashuk, the third account I'd like you to talk about

17   for a moment is the master concentration account.  That's

18   number 9442.  On the chart that appears at the center of the

19   top, do you see that?

20   A    I do.

21   Q    Why is it called that name?

22   A    Well, it's the concentration account because it

23   concentrates all of our disbursements and collections.  It's

24   just the main account, so it's called the master account.

25   Q    And where do funds that are deposited in that account

Direct Examination Dennis Bashuk

1    originate?

2    A    Well, the collections will again roll up through the

3    securitization account.  The disbursements -- so we will -- you

4    know, we will, at the end of the night the ZBA process, all the

5    disbursement activity -- we will fund those accounts from this

6    account.  All the collections will go -- what happens is we'll

7    net the debits and the credits.  And if there's a shortfall to

8    fund those disbursement accounts, we'll draw down the loan to

9    do that.  And if there's excess, we'll pay down the loan after

10   the cash that sits there is used to pay the, you know, to pay

11   for all the other disbursements.

12          MR. MACDOUGALL:  May I approach the witness, Your

13   Honor.

14          THE COURT:  Yes, sir.

15          MR. MACDOUGALL:  Mr. Bashuk, I'm going to hand you a

16   binder that's been marked Petitioner's Exhibit No. 3 for

17   identification.

18          Your Honor, this is the first of three sets of bank

19   records that I believe the government has stipulated to both

20   admissibility and --

21          THE COURT:  All right.  So admitted.

22          MR. MACDOUGALL:  Thank you, Your Honor.

23   Q    (BY MR. MACDOUGALL)  Are you familiar with these

24   statements?

25   A    I am.

Direct Examination Dennis Bashuk

1   Q    Where are they produced?

2   A    At Wells Fargo.

3   Q    When are they received by Republic in the ordinary course

4   of business?

5   A    Monthly.

6   Q    And now the binder that you have in front of you,

7   Petitioner's Exhibit 3, what time periods are reflected in

8   there?

9   A    This is May of 2011 through May of 2012.

10  Q    How does the master concentration account and the activity

11  reflected in those statements relate to Republic's credit

12  facilities?

13  A    Well, again, all of the activity contained here, all of

14  the expenses will be funded from, again, the credit facility of

15  which Wells Fargo is one of the participants.

16  Q    What's the average overnight balance in the master

17  concentration account?

18  A    Again, it varies.  Theoretically, it should be zero, but

19  there's always timing issues.  Because again, the goal is any

20  excess cash that sits in that account should be swept to pay

21  down the loan.  Any shortfalls will be funded and then

22  distributed downward to the other disbursement accounts.

23  Q    And is that zero balance phenomena reflected in the

24  statements in front of you as Exhibit 3?

25  A    Yes.  Yes, you can see the debits and the credits where

Direct Examination Dennis Bashuk

1    all the accounts net to zero.

2    Q    How are these authorized every day?  Who approves the

3    zeroing out of the account every day?

4    A    This is all an automated process.

5    Q    So it's not authorized by anyone at Republic or Wells

6    Fargo?

7    A    No.

8    Q    It just happens?

9    A    It just happens.

10   Q    How does Republic make payroll and pay for the products

11   themselves generally?

12   A    Well, again, when we make payroll, we'll do -- most of our

13   employees have direct deposits and so we have payroll accounts

14   where that actually goes through the federal system and we fund

15   the individual bank accounts of our employees.

16        The payment of product is done several ways.  Some of the

17   smaller companies, we'll write checks to.  We've got some

18   wineries overseas where we will potentially wire money.  But

19   for the most part, all of our large suppliers, both the wine

20   and spirit, they will -- actually take the money via ACH, out

21   of that EFT account.  So they give us a notice a few days

22   beforehand and then they actually draw the funds out of that

23   account.

24   Q    Have you taken time to review the 12 months statements

25   that you have in front of you as Exhibit 3 from May of 2011 to

Direct Examination Dennis Bashuk

1    May of 2012 before testifying today?

2    A    Yes.

3    Q    Did you identify any wire transfers from the master

4    concentration account to accounts outside the United States?

5    A    Some small overseas wine companies.

6    Q    Okay.  About how many did you find?

7    A    Less than 100.

8    Q    Okay.  What was the purpose of those wires?

9    A    Again, to pay for some boutique wine in South America or

10   Europe.

11   Q    You previously testified that in the year that we're

12   talking about, 2011 to 2012 -- I'm sorry.  2011, the revenue

13   was about 4 and a half billion dollars.  What was the total

14   value of those wires to the boutique wine merchants?

15   A    Little bit more than a million and a half dollars.

16   Q    All right.  I'd like to ask you to now turn to the

17   Louisiana and Control States EFT account, which is 5227 on the

18   chart.

19   A    Okay.

20   Q    And that is in the top full row or the second row.  In

21   total, it ends in 5227.  Do you see that?

22   A    I do.

23   Q    What is that account, what is the Louisiana and Control

24   States EFT?

25   A    Kind of have a separate -- at least at the time, we had a

Direct Examination Dennis Bashuk

1    separate accounting department in Louisiana.  So they were

2    responsible for doing the accounting for the State of

3    Louisiana.  And then our control states, which are, you know,

4    brokerage relationships -- but most of the control states, I

5    mean, we don't take inventory, so we would have made payments

6    for just the normal Louisiana business plus the nonalcoholic

7    purchases in the control states.

8    Q    Would you tell the Court how an EFT works, what that is?

9    A    Well, again EFT would be either an ACH or wire.  And we

10   actually, in this account, would do both.  And so in the case

11   of a supplier who debited our account via the ACH, we set up a,

12   you know, a template with that supplier.  They send us a

13   notification and then a couple days later the actual funds will

14   move from our account to theirs.

15   Q    What's a control state?  Could you describe that in a

16   little more detail?

17   A    It's a state where the state actually controls the

18   distribution of the liquor and we act as a broker and we get a

19   commission for helping them to do that.  But they actually, you

20   know, manage the inventory in their stores or whatever, every

21   state is a little bit different, but our role is not to take,

22   you know, the inventory or deliver it.

23   Q    So states like Virginia who have state liquor stores would

24   be an example of a control state?

25   A    Virginia, yes for spirits.

Direct Examination Dennis Bashuk

1   Q      Is Maryland a control state?

2   A      It is not.

3           MR. MACDOUGALL:  May I approach the witness, Your

4   Honor?

5           THE COURT:  Yes, certainly.

6   Q    (BY MR. MACDOUGALL)  Mr. Bashuk, I'm going to ask you to

7   have a look at Plaintiff's Exhibit No. 4 for identification.

8           MR. MACDOUGALL:  Your Honor, Exhibit 4 is the binder

9   of 12 months statements for the LLC supplier EFT account.

10  Again --

11          THE COURT:  So admitted.

12          MR. MACDOUGALL:  Thank you, Your Honor.  Looking at

13  the -- I think I misspoke, Your Honor.  That was the Louisiana

14  and Control States account.

15  Q    (BY MR. MACDOUGALL)  I'm going to have the same questions

16  I had about the previous accounts, Mr. Bashuk.  Where are these

17  statements produced?

18  A      At Wells Fargo.

19  Q      And when are they received by Republic?

20  A      Monthly.

21  Q      What 12 months do you have in that binder?

22  A      June of 2011 through May of 2012.

23  Q      Where are funds deposited in the Louisiana and Control

24  States EFT account originate?  Where do they come from?

25  A      That would be funded from the master account.

Direct Examination Dennis Bashuk

```
 1   Q    And where do funds that go out of that account go?  How
 2   are debits created in that account?
 3   A    Well, those would go to pay our suppliers and tax
 4   payments, perhaps, and customs and duties.
 5   Q    Okay.  Now, you've testified that Maryland is not a
 6   control state.
 7   A    Correct.
 8   Q    And this is -- and Maryland is not a Louisiana.
 9   A    No.
10   Q    And this is a Louisiana and Control States EFT account?
11   A    Correct.
12   Q    So what's the relationship between this account, the
13   Louisiana and Control States EFT account, one of the five
14   accounts seized, and Republic's business in Maryland?
15   A    Absolutely nothing.
16   Q    Now, do EFTs from this account pay for product that's
17   delivered to Jessup, Maryland or anywhere else in Maryland?
18   A    No.
19   Q    Do EFTs in this account pay taxes to the State of
20   Maryland?
21   A    No, they do not.
22   Q    Was that true in 2011?
23   A    Yes.
24   Q    Is it true in 2012?
25   A    Yes.
```

Direct Examination Dennis Bashuk

1          MR. MACDOUGALL:  May I approach one more time, Your

2     Honor?

3          THE COURT:  Yes, sir.

4     Q    (BY MR. MACDOUGALL)  Mr. Bashuk, I'm going to hand you

5     another binder marked Petitioner's Exhibit No. 5 for

6     identification.

7          MR. MACDOUGALL:  For the record, Your Honor, I

8     believe I misspoke in the previous exhibit, calling it the

9     supplier and EFT account.  That was the Louisiana and Control

10    States account.  That was Exhibit 4.  This Exhibit 5 for

11    identification is the LLC Supplier EFT account.  And on the

12    same basis, I would move it to admission.

13         THE COURT:  So admitted.

14         MR. MACDOUGALL:  Thank you, Your Honor.

15    Q    (BY MR. MACDOUGALL)  This is the fifth account on the

16    chart, Mr. Bashuk.  And the fifth account that was seized

17    pursuant to the warrant in June 2012, LLC Supplier EFT account.

18    Can you find that on the chart?

19    A    I can.

20    Q    Okay.  And that is in the second row just to the east of

21    the center; is that right?

22    A    I see it, yeah.

23    Q    Why is it called by that name?

24    A    Well, because primarily what we do out of that account is

25    make electronic payments to our supplier and things that are

Direct Examination Dennis Bashuk

1    related to the product like the taxes and customs fees.

2    Q    Looking at Exhibit 5, where are those statements

3    produced?

4    A    Wells Fargo.

5    Q    And when are they received by Republic?

6    A    Monthly.

7    Q    What time periods are reflected in Exhibit 5?

8    A    May of 2011 through May of 2012.

9    Q    So where do the funds deposited in that account, the

10   supplier EFT account, go?

11   A    Those will be go to our suppliers, our big wine and spirit

12   suppliers that we have a relationship with, whereas part of the

13   agreement, they can debit our account for payment of product.

14   Q    And where do they originate?

15   A    They will come from the master account at the end of the

16   night and they'll fund that and it will zero out after those

17   funds are disbursed.

18   Q    This is the fifth seized account.  What's the relationship

19   between this account, the LLC Supplier EFT account, the

20   statements in front of you Exhibit 5, and Republic's business

21   in Maryland?

22   A    We will pay for product that we buy for Maryland.  We will

23   pay for it through this account.

24   Q    Are wires issued from this account?

25   A    They are.

Direct Examination Dennis Bashuk

1    Q    Are ACHs debited to this account?

2    A    Oh, sorry -- I take it -- wires are not -- from this

3    account, no.

4    Q    Okay.  How are funds withdrawn from this account?

5    A    Again, all electronically through the ACH mechanism.

6    Q    Okay.  So only ACHs are issued from this account?

7    A    By and large.  But yes, that's the intent of it.

8    Q    Now, can an ACH debit go to a foreign account, an offshore

9    account?

10   A    It can, but some -- all countries are different.  It

11   actually is, in this case, slower than doing a wire.  So we

12   typically do a wire and the wire is actually less costly.  So

13   we do wires when it comes to that.

14   Q    So is it correct that in the statements you have in front

15   of you, the May of 2011 and May of 2012, only ACHs were paid

16   from this account?

17   A    Correct.  We would do wires from the master account, not

18   from this one.

19   Q    Mr. Bashuk, I'd like you to turn back to the agent's

20   affidavit, which has been marked Exhibit 2 in evidence.  Do you

21   have that?

22   A    I do.

23   Q    I'd like you to turn to page 12 of that affidavit, if you

24   would, please.

25   A    Okay.

Direct Examination Dennis Bashuk

1    Q    Now, you've testified about the Louisiana and Control

2    States EFT account in the second row, you've talked about the

3    statements that are in front of you, if you look at the bottom

4    of the page, Agent Ward refers to the Louisiana and Control

5    States EFT account and swears as follows, "Bank records show

6    numerous debits made from this account during the May 2011

7    through May 2012 period to accounts owned by liquor

8    manufacturers and distributors.  Many of these liquor

9    manufacturers are located offshore."  Do you see where she says

10   that?

11   A    I do.

12   Q    Is that a true statement?

13   A    We will make payments domestically to the banks that

14   these, you know, the subsidiaries of any company that may not

15   be domestic, but yeah.  I mean it's all, you know, we'll make

16   payments, but to domestic banks.

17   Q    Let me ask the question a little differently.  Because the

18   manufacturers are located outside the United States, maybe,

19   does that mean the payments are transferred to offshore

20   accounts?

21   A    It does not.

22   Q    Where do the payments go?

23   A    To U.S. subsidiaries, banks in the United States for the

24   U.S. subsidiaries of the suppliers if they happen to be

25   domiciled outside the country.

Direct Examination Dennis Bashuk

```
1    Q    Is that true in every case?

2    A    Yes.

3    Q    In this account?

4    A    Yes.

5    Q    Mr. Bashuk, would you please go to page 13 of the

6    affidavit, the next page?

7              MR. MACDOUGALL:  Your Honor, for reference, this is

8    the first full paragraph on page 13.

9              THE COURT:  Yes.

10             MR. MACDOUGALL:  The second sentence.  Begins with

11   the words, "Because some of the liquor manufacturers are

12   located offshore, there is reason to believe that these funds

13   are being transferred from accounts in the United States to

14   accounts outside the United States to pay for the importation

15   of liquor."

16   Q    (BY MR. MACDOUGALL)  Is that a true statement?

17   A    It is not.

18   Q    Why is that a false statement?

19   A    Because we don't do that.  Again, were all domestic bank

20   partners.

21   Q    On page 13, again, the lower half of the page, Agent Ward

22   refers to the supplier EFT account and swears as follows:

23   "Bank records show debits made from this account to liquor

24   manufacturers and distributors, many of which are located

25   offshore."  Do you see that?
```

1    A    I do.

2    Q    Is that true?

3    A    No.

4    Q    Why is it not true?

5    A    All of our activity out of this account would be ACHs to

6    domestic banks.

7    Q    Is that true in every case?

8    A    Yes.

9    Q    Okay.  Agent Ward then goes on to say, quote, "There is

10   probable cause to believe that this account also was used to

11   pay for liquor supplied by offshore manufacturers."  Is that a

12   true statement?

13   A    Again, all of our payments are done domestically.

14   Q    Have you -- I'm sorry?

15   A    We wire domestically to U.S. banks.

16   Q    Have you reviewed the Wells Fargo bank records for the

17   supplier EFT account for the 12 months from May 2011 through

18   May 2012?

19   A    I have.

20   Q    Did you find any wire transfers to bank accounts outside

21   the United States from a supplier EFT account?

22   A    No.

23   Q    Please go to the top of the next page, page 14.

24        MR. MACDOUGALL:  Your Honor, for reference, this is

25   the carry over paragraph.

Direct Examination Dennis Bashuk

1              THE COURT:  Yes.

2    Q    (BY MR. MACDOUGALL)  Where Agent Ward swears, "U.S.

3    imports include Jameson via Irish Distilleries Limited and

4    Courvoisier SA, ultimately both Jameson and Courvoisier SA

5    products were obtained by Northside -- that's one of the two

6    liquor stores cited -- only from Republic, and then sold

7    illegally to New York customers."  Do you see where she says

8    that?

9    A    I do.

10   Q    Okay.  What company owned the Courvoisier brand in 2011

11   and 2012?

12   A    Jim Beam brands.

13   Q    Jim Beam.  And where is Jim Beam located?

14   A    Deerfield, Illinois.

15   Q    Do you know where it's incorporated?

16   A    Illinois.

17   Q    Do you know where Jim Beam's bank accounts are?

18   A    Illinois.

19   Q    And in 2011 and 2012, based on your experience as

20   treasurer, how was Jim Beam paid for Courvoisier product that

21   was sold to Republic?

22   A    That would be via ACH out of that EFT account.

23   Q    Do you know which bank was used by Jim Beam?

24   A    Northern Trust.

25   Q    Do you know where Northern Trust is located?

Direct Examination Dennis Bashuk

1    A    Illinois.

2    Q    Where were Republic's payments transferred for purchases

3    of Courvoisier products during this period?

4    A    Northern Trust.

5    Q    Were any of these transfers made to offshore bank

6    accounts?

7    A    They were not.

8    Q    Now, if I was curious about where Jim Beam was located,

9    how would I find that out?

10   A    The internet, Google.

11   Q    And how would I find out where it was incorporated?

12   A    Google.

13   Q    And was that true in 2011?

14   A    Yeah, I believe --

15   Q    Was that true in 2012?

16   A    Yeah.

17   Q    Okay.  Going back to the affidavit, the agent makes

18   reference to Jameson Irish Distilleries Limited.  Do you know

19   who owns that company?

20   A    Pernod Ricard.

21   Q    Tell us about Pernod Ricard.  What kind of company is

22   that?  Where is it?

23   A    They're a large French spirits company.

24   Q    Do they have a subsidiary in the United States?

25   A    They do.

Direct Examination Dennis Bashuk

1    Q    What's the name of the company?

2    A    Pernod Ricard, U.S.A.

3    Q    And where is that company located?

4    A    New York.

5    Q    Where is it incorporated?

6    A    In --

7    Q    If you recall.

8    A    You know, I don't know.  Delaware -- I do know.

9    Delaware.

10   Q    Now, in 2011, 2012, how was Pernod Ricard paid for product

11   that was sold to Republic?

12   A    Via ACH out of that EFT account.

13   Q    Do you know which bank was used by Pernod Ricard to

14   receive payments during that time?

15   A    I do.  Bank of America.

16   Q    And which Bank of America office?

17   A    In New York.

18   Q    Were any of the transfers for Jameson distilleries, one of

19   the two names cited by Agent Ward on page 14, made to offshore

20   bank accounts?

21   A    No.

22   Q    Looking again at Agent Ward's affidavit, Petitioner's

23   Exhibit 2, on what day does it appear to have been signed?

24   A    I'm sorry.  What page?

25   Q    What date was it signed?

Direct Examination Dennis Bashuk

1    A      No.  What page?

2    Q      The last page, the final page.

3    A      June 5th, 2012.

4    Q      Do you recall what day of the week that was?

5    A      I believe it was a Tuesday.

6    Q      When did you first learn that Republic's master

7    concentration account and the four other accounts named in the

8    affidavit had been seized?

9    A      Sometime on Thursday afternoon of that week.

10   Q      How did you learn that it happened?

11   A      Couple of things.  We had some bank activity where the

12   EFTs were not moving.  We actually had some people in Virginia

13   that had some paycheck issues.  I believe those would have been

14   nondirect deposit paychecks.  So I called Wells Fargo to find

15   out why we were having trouble with a couple of these items.

16   Q      Where were you when all this happened?

17   A      My office.

18   Q      What did you learn about the circumstances of this -- of

19   the first attempt by the government to seize the account?

20   A      Well, you know, I talked to Wells Fargo and they couldn't

21   really give me much information, but what I, you know, learned

22   later was that I think the attempt of -- all the activity was

23   really 24 hours earlier than it happened.

24   Q      And what was the significance with regard to Republic's

25   7,000 employees of that difference of one day?

Direct Examination Dennis Bashuk

1    A    Well, the direct deposits for our employees worked like

2    the ACH where there's -- you initiate them and then it goes

3    through the federal system.  You know, and so had this happened

4    on Tuesday instead of Wednesday after -- you know, the direct

5    deposits were already released into the system, so had this

6    happened on Tuesday, which I believe it was scheduled to do,

7    none of the employees would get paid.

8    Q    And those employees are where, just in Maryland?

9    A    No, they're in 26 states.

10   Q    And how many were there in 2012?

11   A    7,000.

12   Q    Now, if I examine the records of the master concentration

13   account, how would I be able to find out when payroll was

14   funded?

15   A    You would see a debit.  You would see a -- see the

16   activity in the payroll account.  Then you'd see the money

17   transferred from the master account to match that disbursement

18   in that account on that day.

19   Q    And what happened next after you learned that the seizure

20   had taken place and that checks were bouncing in Virginia?

21   What did you do next?

22   A    Well, when I talked to Wells Fargo, they actually told me

23   that I needed to call the -- Mr. Kay's office.

24   Q    And what did you do next?

25   A    I called his office and I spoke with a woman who gave me a

Direct Examination Dennis Bashuk

1    time to call back later.

2    Q    So we've talked about payroll.  What was the consequence

3    of the freeze of the accounts in June of 2012 on Republic's

4    credit relationship with its lenders -- now, you're the

5    treasurer, so that's your business, dealing with the credit

6    relationships; right?

7    A    Yes.

8    Q    What was the consequence of the seizure?

9    A    Well, the seizure actually created what's called a

10   technical default.  So you know, any sort of government action

11   or anything like this would constitute a technical default.

12   You know, the banks -- you know, we could have had our loans

13   called.  So we were in technical default -- and we have three

14   credit facilities and they're all cross-defaulted.  So if we

15   default on one, we default on all three of them.  And, you

16   know, we had over $500 million of loans outstanding, which

17   could have theoretically been called if that happened.

18   Q    And what were the other immediate consequences if

19   Republic's bank accounts had remained frozen?

20   A    Well, again, we were already seeing EFTs fail, so our

21   suppliers would not get paid, which obviously would be a bad

22   thing.  We've got agreements with them there where there may be

23   a small cure period, but they're not going to want to do

24   business with us if we're not paying our bills.  Our customers

25   can't meet their obligations.  I'm sure plenty of them have

Direct Examination Dennis Bashuk

1    mortgage payments that are tied to the deposits that we make

2    for them every other week or, you know, they're on different

3    pay cycles, but for the most part they're on bimonthly.

4         You know, we couldn't fund our company pension plan.  You

5    know, we've got an obligation under ERISA for our 401(k) plan

6    to fund that.  So pretty much everything would be halted.

7    Q    Mr. Bashuk, when did you learn that the government was

8    demanding a payment of $50 million in order to lift the seizure

9    of Republic's accounts?

10   A    That would have been, I actually called one of our

11   attorneys in Texas and they ended up talking to Mr. Kay's

12   office on our behalf.  And it was some point on Friday that I

13   had heard that we needed to raise that money.

14   Q    What did you do in an effort to meet that demand?

15   A    Well, the first thing we had to do is we had to -- we were

16   in default so we had to get our bank group -- you know, we've

17   got ten banks in our main credit facility and one of our other

18   ones.  There's six or seven insurance companies and

19   agricultural banks, so we basically needed to explain to them

20   what happened -- and I didn't really know at that point, but we

21   had to get a waiver of that default in order to even raise the

22   money.

23   Q    And were you able to obtain a waiver?

24   A    We were.  You know, over the weekend.  So Monday morning

25   we finalized the waiver.

Direct Examination Dennis Bashuk

1    Q    So you borrowed the money?

2    A    The week -- yeah.  We did eventually -- they allowed --

3    they created a waiver, which allowed them to then vote to

4    actually allow us to borrow $50 million more.

5         So first, we had to get the waiver for the default before

6    they would consider the, you know, the request for the $50

7    million.

8    Q    And that $50 million borrowing is also reflected in the

9    Wells Fargo statements; is that correct?

10   A    Yeah, it is.

11   Q    What kind of collateral secured that credit, the $50

12   million credit?

13   A    Well, we've got several credit facilities, but the one

14   that we drew it on is based on our inventory, that's our

15   collateral.

16   Q    What would have been the financial consequences if Wells

17   Fargo had not waived the default, had not extended the $50

18   million in credit to the company in June?

19   A    Well, we would have been out of business.  Again, the

20   suppliers weren't being paid, the employees weren't being paid.

21   Our reputation was, you know, was harmed.

22   Q    What was the immediate impact of that borrowing, the

23   borrowing $50 million to be placed in escrow in response to the

24   government's demand?

25   A    Not sure I understand the question.

Direct Examination Dennis Bashuk

1   Q    Well, your -- as a company, you're borrowing $50 million,

2   you're placing it in escrow, it's not in working capital.

3   What's the consequence of that?

4   A    Well, that was $50 million that we didn't plan on.  And so

5   that impacted our ability to fund our working capital.  And you

6   know, some cap ex projects.  And so it was just a nonplanned

7   expense.

8   Q    And what are the consequences of the $5 million still

9   being held in escrow?

10  A    Well, I think -- $5 million is a lot of money, but, you

11  know, our banks are continually asking us for updates, you

12  know, after three years, we don't really have any answers.  I

13  think there's some worry that there's bigger issues that are

14  still unresolved, but we're obligated to give them a quarterly

15  update on where we stand with this.

16  Q    What kind of independent financial reporting does the

17  company have?

18  A    We have -- PWC is our outside auditor, and so we have

19  audited financial statements.

20  Q    What was the consequence of the $50 million escrow and now

21  the $5 million escrow in that reporting?

22  A    It's a footnote in our financial statements.

23  Q    So finally, Mr. Bashuk, can you tell us generally, what

24  were the consequences to Republic and Republic's employees of

25  the seizure of the accounts in June 2012?

```
 1   A     Like I said, ultimately, you know, those five accounts,

 2   it's really not five accounts.  It's every account in the

 3   company was frozen because of that.  You know, even the

 4   nonfrozen depository accounts, the money sat there.  None of

 5   our disbursement accounts could be funded whether they were

 6   seized or not.

 7         So none of our payroll accounts, the AP accounts, the EFT

 8   accounts that had nothing to do with this, you know, we make,

 9   like I said, all of our tax payments through that EFT account,

10   so that couldn't happen.

11         Payroll taxes couldn't be paid.  You know, pension --

12   pensions couldn't be funded, 401(k)s, we have like I said ERISA

13   requirements and we couldn't do that either.  Those get funded

14   when the payroll gets funded, so it would actually go out that

15   day as well when the payroll went out.  So basically the

16   company would be, you know, effectively shut down.

17              MR. MACDOUGALL:  Thank you, Mr. Bashuk.  No further

18   questions, Your Honor.

19              THE COURT:  Thank you very much, Mr. MacDougall.

20   Cross-examination, Mr. Kay.

21              MR. KAY:  Thank you very much, Your Honor.

22                        CROSS-EXAMINATION

23   BY MR. KAY:

24   Q    Mr. Bashuk, let's start at the end of that.  You were

25   talking about all these risks to the company because of the
```

Cross-examination Dennis Bashuk

1    seizure of the accounts, and what it took to get them

2    rectified.  You said you called my office on Friday; is that

3    right?

4    A    I think it was Thursday.  I had gotten notification -- I

5    called Wells Fargo and they really couldn't talk about it, but

6    they said that your office was expecting my call.

7    Q    It was Friday, basically, when we started talking about

8    fixing this; correct?

9    A    Yes.

10   Q    Isn't it true that I worked with you and with your company

11   and with your bankers in order to get this escrow situation set

12   up so that your company could get back in business right away?

13   And in fact, didn't I work through the weekend to make sure

14   that it got done on Monday, the next day?

15   A    Honestly, I don't really know your involvement at all.

16   I've never spoken to you and our attorneys really worked behind

17   the scene, so I don't really know.

18   Q    But you made the contact with my office; correct?

19   A    I talked to a woman who said call back and I never did.  I

20   actually called our attorney.

21   Q    And it was corrected on Monday; correct?

22   A    We worked through the weekend to get the bank approval and

23   then at some point Monday afternoon the bank accounts were

24   unfrozen.

25   Q    Right.  And you don't dispute the fact that I was involved

Cross-examination Dennis Bashuk

```
1   in that process?

2   A    I don't really know.

3   Q    Very good.  Your Honor, just -- again, going backwards,

4   you said that -- and I wrote this down, I'm not sure I got it

5   right -- that Courvoisier is made in Illinois?

6   A    I have no idea where it's physically made, but we pay for

7   it through, you know, banks --

8   Q    But as far as where it's made, did you say it's made in

9   Illinois?

10  A    I did not.

11  Q    Courvoisier products are made overseas aren't they?

12  A    Um --

13  Q    You don't even know, do you?

14  A    I don't.

15  Q    Very good.  What about Jameson in the affidavit that you

16  read, Jameson via Irish Distilleries?  Do you know where

17  Jameson products are made?

18  A    I assume they are made somewhere outside of the United

19  States.

20  Q    That's correct.  And when you said that they were made in

21  Illinois, that was incorrect?

22  A    I did not say they were made in Illinois.

23  Q    What did you say then?

24  A    I said the company has got an affiliate in Illinois and we

25  pay the banks --
```

Cross-examination Dennis Bashuk

1    Q    Let's go back to the statement that you read, that Mr. --

2              THE COURT:  MacDougall.

3    Q    (BY MR. KAY)  MacDougall -- asked you about from the

4    affidavit.  The statement reads, "U.S. imports included Jameson

5    via Irish Distilleries and Courvoisier."  You said that was a

6    false statement.

7    A    Can I see what you're -- tell me --

8    Q    Sure.  It's on page 14 at the top.  It's not false, is

9    it?

10   A    Where are you looking, please?

11   Q    Top of page 14, sir.  "U.S. imports including Jameson via

12   Irish Distilleries Limited."  Is that part false?

13   A    This is your statement.  Here, these are not my words

14   about where they're obtained.  I'm not sure I understand the

15   question.

16   Q    Do you think that's a true statement, though, that U.S.

17   imports included Jameson via Irish Distilleries and

18   Courvoisier?

19   A    Again, I don't know.

20   Q    It's not a false statement, is it?

21   A    I don't really know.  I just know how we pay --

22   Q    Very good.  Let me go back to something else you said a

23   moment ago.  You said that with regard to the 9442 account,

24   which is at the very top of the page, the master concentration

25   account, I think what you said was that during the period of a

Cross-examination Dennis Bashuk

1    day it can be zero or it can be a lot of money; correct?

2    A    It can, potentially.  The goal is to pay --

3    Q    Is that a correct statement, it could be zero or a lot of

4    money; correct?

5    A    I don't know what a lot of money is.  It could have funds

6    in the account.

7    Q    And you said it could go all the way down to zero;

8    correct?

9    A    In theory.  Mechanically, the goal is for it to -- any

10   excess that sits in the account -- again, you got to understand

11   there are going to be bank cutoffs --

12   Q    So it's not just theory, is it?  Isn't it true that if you

13   look at the bank statements, doesn't it go down to zero?  Yes

14   or no?

15   A    It depends.  If you look at the month-end bank statements

16   you will most likely see a balance, a small balance.

17   Q    This book --

18   A    That master account does not always have a zero balance,

19   no.

20   Q    But it does on occasion?

21   A    It could possibly because the intent is for it to fund all

22   the accounts.

23   Q    And it's a zero based account; correct?

24   A    The ones below it are ZBA up to the account.  There's

25   always going to be a timing difference where every dollar does

Cross-examination Dennis Bashuk

```
1    not got swept out --

2    Q    So it's possible that it could be zero; correct?

3    A    It's possible.

4    Q    Very good.

5    A    We would like it to be zero.

6    Q    Very good.  You would like it to be zero.  So when the

7    seizure warrants were executed, there was a chance that we

8    could have gotten no money out of those accounts; correct?

9    A    But you seized other accounts as well.

10   Q    Well, I'm just asking about that one because that's the

11   one you said could have been possibly zero; correct?

12   A    It could be, but most likely --

13   Q    Very good.  That's all I wanted to hear.

14            THE COURT:  Mr. Kay.  Mr. Kay, do not interrupt the

15   witness when they're answering.

16            MR. KAY:  Yes, Your Honor.

17   Q    (BY MR. KAY)  Now, you said that there's a lot of products

18   that RNDC Republic sells and distributes that are imported

19   products; correct?

20            MR. MACDOUGALL:  Objection, Your Honor.  I don't

21   think that was the witness's testimony.

22            THE COURT:  Sustained.  That's sustained.

23   Q    (BY MR. KAY)  Do you believe that Republic National has

24   products that it distributes that are imported from offshore?

25   A    That are imported by whom?
```

Cross-examination Dennis Bashuk

```
1    Q     By Republic National Distributing Company.

2    A     We don't import products.

3    Q     You don't import products?

4    A     We're not an importer by nature, but do we do business

5    with companies that could import, I suspect we can.

6    Q     Okay.  Do you know what this -- let me show you Exhibit

7    No. 1, do you know what this, a beverage journal?

8    A     I know what a beverage journal is.

9    Q     Have you ever seen a beverage journal?

10   A     I've seen the Atlanta Beverage Journal.

11         THE COURT:  Mr. Kay, are you referring to an exhibit

12   that's in evidence now?  What do you have in your hand?  Is

13   that Government Exhibit 1?

14         MR. KAY:  Yes, sir.

15         THE COURT:  All right.  Government Exhibit 1, you'll

16   mark it here.

17         Government Exhibit 1 has been marked.

18         You may proceed in evidence.  It will introduced into

19   evidence.

20         MR. KAY:  Thank you, Your Honor.

21   Q     (BY MR. KAY) Let me show you a quick couple pages in

22   Government Exhibit 1, Mr. Bashuk.  Particularly, it's marked

23   as --

24   A     Can I see the front cover of this, please?  Okay.

25   Q     If you look at one of these pages, it's marked as 191 MD.
```

```
1    And I think the copies that I made for the Court go right to
2    that page.  And it says here -- Canadian whiskey is one of the
3    products; correct?
4    A    I've never seen a Maryland Beverage Journal before.
5    Q    Can you read this?
6    A    "Canadian club."
7    Q    At the top of the page.  Right there.
8    A    "Canadian whiskey."
9    Q    Canadian whiskey.  Where do you think that comes from?  Do
10   you have any idea?
11   A    I'm going to guess Canada.
12   Q    Very good.  Turn to the next page.  It says here "Irish
13   whiskey"; correct?
14   A    It does.
15   Q    Do you know where that comes from?
16   A    I'm going to guess Ireland.
17   Q    Very good.  The next one says, "Japanese whiskey";
18   correct?
19   A    Yup.
20   Q    Any idea where that would come from?
21   A    Perhaps Japan.
22   Q    None of those places are in the United States, are they?
23   A    Uh, no.
24   Q    Very good.  Look at this page.  This is page 215 MD, and
25   it refers to a product called Absolut Vodka, does it not?
```

1   A    It does.

2   Q    And at the top it says what?

3   A    "Imported."

4   Q    Imported; correct?  Imported means from offshore;

5   correct?

6   A    By somebody, yes.

7   Q    Very good.  And right in between the words "Absolut" and

8   "Vodka," can you read what that says?  You might need your

9   glasses.

10  A    It says "Country of Sweden."

11  Q    Very good.  So that probably comes from Sweden, wouldn't

12  you agree?

13  A    I would agree.

14        MR. KAY:  Just one more, Your Honor, then I'll quit.

15  Q    (BY MR. KAY)  Page 254 MD.  Can you read the top of that

16  page there?

17  A    "Vodka Premium Imported."

18  Q    Imported.  And then what product are they talking about?

19  A    Svedka.

20  Q    Svedka vodka.  That's imported from -- do you know

21  where?

22  A    Um --

23  Q    Sweden?

24  A    Sounds right.

25  Q    Very good.  Thank you very much, sir.  So you'd agree that

Cross-examination Dennis Bashuk

1    Republic National does distribute products that are imported

2    from other countries; correct?

3    A    I would agree that somebody imports the product into the

4    United States and we sell it.

5    Q    Very good.  Let me show you Government's Exhibit No. 11.

6    And this is just a page from one of the exhibits that's already

7    in there.  It's pertaining to --

8             THE COURT:  What exactly, is this government's --

9             MR. MACDOUGALL:  Objection.

10            THE COURT:  -- Exhibit 11.  Yes, Mr. MacDougall?

11            MR. MACDOUGALL:  Objection -- been admitted into

12   evidence.

13            THE COURT:  Again, under the same rule, absent --

14   you've exchanged these exhibits, I gather; correct?

15            MR. KAY:  Yes, Your Honor.

16            THE COURT:  All right.  Then under 107.5, it will be

17   in evidence.

18            MR. KAY:  Very good, Your Honor.

19   Q    (BY MR. KAY)  And this one page pertains to what

20   account?

21   A    The master account.

22   Q    The master account.  And is there a number associated with

23   that?  You can use the last four digits.

24   A    9442.

25   Q    Can you speak up a little bit, sir?

Cross-examination Dennis Bashuk

```
 1   A     9442.

 2   Q     Very good.  And can you read what the first two words are

 3   at the top of that page?

 4   A     "Commercial checking account."

 5   Q     Would that indicate that 9442 account is the commercial

 6   checking account?

 7   A     Technically, I guess it is.

 8   Q     Well, that's what it says; correct?

 9   A     That's what it says.

10   Q     Very good.  If you go down a little further, what does it

11   say right here in the middle of the page?

12   A     "Commercial checking."

13   Q     Commercial checking; correct?

14   A     Yeah.

15   Q     And does that indicate that that account is a commercial

16   checking account?

17   A     Yeah.

18   Q     Very good.  And one more thing.  Right here, go down three

19   lines.  Can you read what that says?

20   A     Yeah, that's our master concentration account.

21              MR. MACDOUGALL:  Your Honor, can we get a page

22   reference, please?

23              THE COURT:  Yes.

24              MR. KAY:  I'm sorry?

25              THE COURT:  What page?
```

Cross-examination Dennis Bashuk

```
1              MR. KAY:  It's a single-page exhibit, Exhibit 11.
2              THE COURT:  And that is -- you said it was from
3     another exhibit previously in evidence?
4              MR. KAY:  That's correct, Your Honor.
5              THE COURT:  Which exhibit?  I'm trying to stay with
6     you.
7              MR. KAY:  Oh, I'm sorry.  I believe it's 4 -- 3 or 4
8     of petitioner's exhibits.  It's this one, this binder.  It
9     doesn't have a number on it.
10             THE COURT:  All right.  Go ahead.
11             MR. KAY:  Thank you, Your Honor.  It's in there.
12    Q    (BY MR. KAY)  Just to summarize what we pointed out here,
13    this 9442 account is marked as a commercial checking account
14    and a master concentration account; correct?
15    A    Sure.
16    Q    Is it fair to say that the statement in the affidavit
17    about that account is a true one when it says that 9442 is a
18    commercial checking account labeled master concentration
19    account?
20    A    Where are you looking, please?
21             MR. KAY:  Court's indulgence.
22    Q    (BY MR. KAY)  For the record, it's one of the three
23    statements that counsel has identified as a false statement.
24    Here it is on page 12.
25        The statement that is alleged to be false.  Right there.
```

Cross-examination Dennis Bashuk

```
1    Can you read that?

2    A     "Count No. 9442 is a commercial checking account labeled

3    master concentration account."

4    Q     Is that a false statement?

5    A     "Bank records show" --

6    Q     Stop right there.

7    A     -- routine transfers in amounts over $10,000 into two

8    additional accounts."

9    Q     Just the first sentence there, Mr. Bashuk.  First

10   sentence.

11   A     "Count No. 9442 is a commercial checking account labeled

12   master concentration account -- yes, it's our master

13   concentration account."

14   Q     Is that a true statement or false statement, sir?

15   A     It's our master concentration account.

16   Q     Is it also a commercial checking account?

17   A     Yeah, it's a commercial checking account.

18   Q     Is that a true statement?

19   A     That statement by itself is correct.

20   Q     Very good.  Thank you very much.  Now, let me go to -- let

21   me get back to the organization of these accounts.

22             MR. KAY:  Your Honor, I'm not going to take too long

23   with this, I promise.

24   Q     (BY MR. KAY)  You went through a long explanation of how

25   all the accounts are interrelated.  There's even an exhibit
```

1   that purports to show that; correct?

2   A    Yes.

3   Q    Now, you say that the -- would you say that these bank

4   accounts work well the way that they're set up?

5   A    Yes, they do.

6   Q    And are they set up this way in order to move money in a

7   certain way to make things happen?

8   A    They are set up logically to help us run our company.

9   Q    Did you set up these bank account this is way?

10  A    Some have been long-standing, but for the most part --

11  Q    So --

12  A    -- but predate me.

13  Q    Very good.  But couldn't you have just had one bank

14  account?  In other words, money comes in, you deposit it, you

15  write checks against it.  Couldn't you have just done it with

16  one account?

17  A    No.

18  Q    Why?

19  A    We do accounting.  We have state P&Ls and so it would be

20  very hard to do the accounting if we've got all the

21  activities -- deposit side.

22  Q    Sorry.  But there's a lot of functions that you talked

23  about that you accomplished with these accounts as they are set

24  up; correct?

25  A    Yes.

Cross-examination Dennis Bashuk

```
1    Q    So would you say that they're intentionally set up this

2    way?

3    A    Well, I don't know if the word is intentional.  The way

4    they -- you know, again, some of its legacy, but they work to

5    help us -- our ultimate goal is to fund the accounts and pay

6    down our revolver when we have excess cash -- it works well.

7    Q    They were not set up by accident, were they?

8    A    They were not set up by accident.

9    Q    Very good.  And you talked about the way money gets swept

10   from account to account.  Would you say that that's an

11   accident, the way that the money is swept from account to

12   account?

13   A    No, it's not an accident.

14   Q    In other words, the company wants the money to move that

15   way; correct, from account --

16   A    The company's ultimate goal is to pay our employees, pay

17   our suppliers and hopefully pay down the loan with, you know,

18   profit.

19   Q    Very good.  And the way you pay your suppliers is through

20   that sweeping of money from account to account in order to get

21   to the supplier; correct?

22   A    The way we pay the supplier, very directly, either through

23   check or through an electronic payment.

24   Q    Very good.  So if you were to see a better way to organize

25   these accounts, you could change that and fix that; correct?
```

1    A    It depends.   Depends what better --

2    Q    You couldn't change it?

3    A    We could do what we want to, sure.  It's our right to

4    change our account structure.

5    Q    Mr. Bashuk, this is awfully complicated for me.  I'm a

6    simple guy and I have a checking account.  So when I deposit

7    somebody's check into my account, it shows up on my statement

8    that that check was deposited.  But I noticed that -- when you

9    look at these statements, checks don't show up there.  Can you

10   tell me why that's so?

11   A    Well, you could look at the individual depository accounts

12   and there's going to be a deposit made every night that has

13   hundreds if not thousands of checks.  So that detail exists

14   somewhere.

15   Q    Very good.  Let me show you Government's Exhibit No. 2,

16   then ask you what that is.

17   A    It appears to be a check from something called Tech Pride

18   of America.

19   Q    And is it payable to Republic National?

20   A    It is.

21   Q    And is that a check that was deposited by Republic

22   National into its accounts?

23   A    I don't know.

24   Q    Now, how do the individual checks like this get into the

25   bank?

Cross-examination Dennis Bashuk

1    A    Again, typically in a market, in say, Jessup, Maryland,

2    we'll have an administrative person who will collect the checks

3    at the end of the night or in the afternoon, and we'll

4    bundle -- at some point back in the older days, you make a bank

5    deposit and you actually physically make a deposit --

6    Q    But in 2011 --

7    A    We would do check scanning.  Again, there may be some

8    reason why we can't do it if a salesperson picks up a check

9    instead of, you know, what I'll call the 95 percent process,

10   where the customers mail it to our office.

11   Q    So you take those checks as they come in and you don't

12   send them to the bank?

13   A    No, you put them together and you wait.  You usually

14   bundle them up.  And for the most part, you would scan them in

15   once a day, twice a day, maybe.

16   Q    And what do you mean by that when you say, "scan them

17   in"?

18   A    You would have a machine that would actually scan the

19   check and so it would electronically be deposited into your

20   depository account.

21   Q    Is there a name for that process?

22   A    We call it check scanning.

23   Q    It's remote deposit?

24   A    Yes, remote deposit.  Yes.

25   Q    Remote deposit capture; correct?

Cross-examination Dennis Bashuk

1    A    Yes.

2    Q    Otherwise known as check 21; correct?

3    A    Technically, sure.

4    Q    Very good.  Thank you very much.  So the checks get

5    scanned into electronic file and then that electronic file gets

6    sent to the bank somehow; correct?

7    A    Correct.

8    Q    Do you know how that's done?

9    A    How it gets sent?  It's an electronic transfer.

10   Q    Does it use a secured file protocol set up?

11   A    There's some IT, you know, thing behind it, yes.

12   Q    Very good.

13   A    It's a file, yes.

14   Q    It gets to the bank by electronic -- speed of light;

15   correct?

16   A    Speed of light.

17   Q    Very good.  And then it gets to the bank -- they don't get

18   the actual checks?

19   A    No.

20   Q    If the bank wanted to find a particular check, how would

21   they do that?

22   A    When you say, "The bank find a check" --

23   Q    If they wanted to see a particular copy of a check.

24   A    Well, they got the copy of the check as part of that

25   transmission -- there's a copy of that check.

Cross-examination Dennis Bashuk

```
1    Q    And Government's Exhibit 2, that's in your hands there, is
2    that a individual check that would have been scanned into the
3    bank?
4    A    I don't really know.
5    Q    Let me show you Government's Exhibit 3, which is a
6    declaration from the bank, Wells Fargo.  And you see there's a
7    highlighted portion there.  Do you see that?
8    A    I do.
9    Q    Can you read what that says?  Can you lean into the
10   microphone so we can hear you?
11   A    It says, "On February 2nd, 2012, check No. 5360 for
12   $159,653.35 was deposited with credit for 495,657.51."
13   Q    And does that refer to the check that's shown on
14   Exhibit No. 2?
15   A    It appears to be.
16   Q    That's the same check that's in your hand; correct?
17   A    This is check No. 5360.  So yeah, I would say so.
18   Q    And that indicates that it's part of a large deposit;
19   correct?
20   A    Yup.
21   Q    So that would indicate that that check was scanned in as
22   part of a larger deposit; correct?
23   A    Either scanned in or physically deposited.
24   Q    You said a moment ago that you don't do those physical --
25   A    We may have a physical deposit still.  It's not
```

Cross-examination Dennis Bashuk

1    impossible.

2    Q    Either way, it would have been part of what you call a

3    bundle; correct?

4    A    Yes.

5    Q    And what's the total amount shown on the deposit over here

6    on Exhibit 3?

7    A    $495,657.51.

8    Q    Very good.  And so that would show up on your bank

9    statement for the account 9332, the deposit amount; right?

10   A    It should, yeah.

11   Q    Let me show you Government's Exhibit 4.  I'll take this.

12   Government's Exhibit 4.  Do you see the highlighted --

13   A    I do.

14   Q    -- amount there?

15   A    Uh-huh.

16   Q    Is that the same amount -- indicate that that's the

17   deposit; right?

18   A    Yeah.

19   Q    So that deposit contains that particular check that we

20   looked at, Exhibit No. 2; correct?

21   A    Correct.

22   Q    So that's -- that check is involved in that deposit;

23   correct?

24   A    It appears to be.

25   Q    Let me show you what's marked as Government's Exhibit 5.

Cross-examination Dennis Bashuk

1    And you talked about the zero-based transfers of the funds.  So

2    getting back to Exhibit No. 4, that deposit, that big deposit

3    of 495,000 plus, that would have been part of a zero-based

4    transfer at the end of the day; correct?

5    A    Well, what will happen is that balance should go into that

6    securitization account, just like that day's deposit from 12

7    other Wells Fargo accounts -- and there's some outside Wells

8    Fargo accounts.

9    Q    That's a "yes" then?

10   A    That's my answer to your question.

11   Q    That's a "yes" -- it's part of the zero-based transfer at

12   the end of the day?

13   A    Again, theoretically depending on the cut off, they don't

14   necessarily have to make the deposit on that day, but yes, they

15   should.

16   Q    Very good.  Let me show you what's marked as Government's

17   Exhibit 5.  Do you see another highlighted portion down

18   there?

19   A    Uh-huh.

20   Q    What account does that pertain to?

21   A    I believe that's the securitization, the accounts

22   receivable securitization account.

23   Q    That's the 9332 account, though; right?

24   A    I'm looking at the 9277 --

25   Q    What account does that statement pertain to?  It's at the

Cross-examination Dennis Bashuk

1    top of the page.

2    A    This is the 9332 account.

3    Q    That's the deposit account; correct?

4    A    In Maryland.

5    Q    Right.  And the 9332 -- and the highlighted portion you

6    just looked at down there, at the bottom, the zero-based

7    transfer, where was that money transferred to?

8    A    There was a transfer from that Maryland account to the

9    securitization account on February 2nd.

10   Q    And does it say how much that transfer involved?

11   A    4,846,206.57.

12   Q    Now, based on what your testimony has been so far, isn't

13   that $159,000 check on Exhibit No. 2 part of that transfer?

14   A    It should be.

15   Q    It should be.  That's right.  So as far as it's involved

16   in that transaction; correct?

17   A    Correct.

18   Q    Very good.  Let me show you what's marked as Government's

19   Exhibit No. 6.  And what account does that pertain to at the

20   top of the page?

21   A    This is account ending in 9277.

22   Q    Very good.  And that's where this money went from, from

23   the 9332 account; correct.

24   A    Yeah, this is the securitization account, yes.

25   Q    And on Exhibit No. 5, the amount was $4.8 million;

Cross-examination Dennis Bashuk

1   correct?

2   A    Correct.

3   Q    Does it show up on that account as income?

4   A    It does.

5   Q    Very good.  And so that same $159,000 check is part of

6   that deposit into that account; correct?

7   A    It appears to be, yes.

8   Q    It's a zero-based transfer; correct?  So it's part of

9   that.

10  A    It appears to be part of that deposit based on the

11  statements you just showed me.

12  Q    But that's what you testified about.

13  A    That's how it works.

14  Q    That's how it works.  I agree.  So that's into the 9277

15  account.  Now, you also testified that there was a zero-based

16  transfer out of 9277 account into another account; correct?

17  A    That would ultimately end up in the master account, the

18  master concentration account.

19  Q    So that would show up as a debit from the 9277 account;

20  correct?

21  A    Correct.  That would be -- that 4 million would be one of

22  the -- it will be one wire out of the securitization account

23  that would include this, along with other -- other markets --

24  Q    Very good.

25            MR. MACDOUGALL:  Your Honor, I'm sorry.  Could

Cross-examination Dennis Bashuk

```
 1    Mr. Kay, for our purposes, identify the exhibit he's asking the
 2    witness about and where on the exhibit?  I'm having difficulty
 3    following.
 4              THE COURT:  Yes, if you would, Mr. Kay.
 5              MR. KAY:  I'm sorry, Your Honor.  I was a little too
 6    quick there.
 7    Q   (BY MR. KAY)  We're looking at now Exhibit No. 7 and
 8    there's a highlighted portion there.  Again, the date is the
 9    same.  It shows February 2nd; correct?
10    A    Yes.
11    Q    And it shows a debit, which means a zero-based transfer
12    out of that account; correct?
13    A    Out of the -- this is the master account, so this would be
14    into the master account.
15    Q    Out of which account?
16    A    Out of the securitization account.
17    Q    Which is the 9277 account; correct?
18    A    Yes.
19    Q    So, so far, we've traced that check all the way through to
20    this one, this transfer; correct?
21    A    Yes.
22    Q    What's the amount of that transfer?
23    A    $8,964,805 or 605.
24    Q    That's very good.  So on Exhibit No. 7, that $8.9 million
25    transfer includes that one single check; doesn't it?
```

Cross-examination Dennis Bashuk

```
1    A    Apparently.

2    Q    Apparently.  Thank you very much.

3              MR. KAY:  Just a little bit more, Your Honor.

4              Let me show you -- I've got a whole statement here

5    from the 9264 account.  This is Government's Exhibit No. 8.

6    The 9264 account, it's one of these books, Your Honor, that the

7    plaintiff put in -- petitioner put in.

8    Q    (BY MR. KAY)  Let me show you this statement.  This is

9    Exhibit No. 8.  This pertains to the 9264 account; correct?

10   A    I don't know, I haven't seen it -- yes.

11   Q    And you said in your direct testimony that this account

12   was used to pay your suppliers; correct?

13   A    Among other things, yes.

14   Q    And so it would indicate in the statement who the

15   suppliers are where the money goes; correct?  Is that true?

16   A    Say that again, what --

17   Q    Wouldn't the statement show who the payments are being

18   made to?

19   A    Yes.

20   Q    Very good.  Now, I'm looking at page 15 of that exhibit

21   number, again, Exhibit No. 8, page 15.  Near the top, it will

22   say 1529.

23        Now, if I show you this page, there's some transactions in

24   the middle of the page that I've highlighted.  Can you tell me

25   who those payments are made to?
```

Cross-examination Dennis Bashuk

```
1              MR. MACDOUGALL:  Your Honor, the copy of Exhibit 8,

2     Government's Exhibit 8, page 15, has no highlighting on it, the

3     copy we've seen.  Could I --

4              MR. KAY:  Probably doesn't show up on the copies.  He

5     can certainly read it, Your Honor.

6              THE COURT:  If you could show him what you're talking

7     about, Mr. Kay.

8              MR. KAY:  Absolutely will do, it's about ten lines

9     down.  Right there.

10             MR. MACDOUGALL:  Ready, Your Honor.  This is the

11    10th, 11th, and looks like 15th entry.

12             Thank you, Your Honor.

13             MR. KAY:  You can borrow my highlighter if you

14    want.

15             MR. MACDOUGALL:  Thank you.

16    Q    (BY MR. KAY)  Who are those payments made to, if you can

17    read that?

18    A    Something called Spirits Marque.

19    Q    And there's an "O" there too; correct?

20    A    Zero, "O", I assume --

21    Q    And it says, after that it says, "ACH EFT"; correct?

22    A    Yeah.

23    Q    And that's what you described before about how those

24    payments were made; correct?

25    A    To our nondomestic boutique spirits and wine, yeah.
```

Cross-examination Dennis Bashuk

1    Q    So that's a payment to a nondomestic supplier; correct?

2    A    As I mentioned earlier, we do have some of those, yes.

3    Q    And it says "ACH"?

4    A    Primarily, we'll do that via wire.  ACHs are typically

5    harder to do, depending on the country.

6    Q    Now, just so I can connect a couple dots here, Your Honor.

7    When you say ACH, that stands for what?  Automated

8    clearinghouse; correct?

9    A    Automated Clearinghouse Transfer.

10   Q    And this automated clearinghouse, do you know how those

11   happen?

12   A    How those happen?

13   Q    Yes.

14   A    Generally speaking, I do.

15   Q    Okay.  When this says an "ACH debit," can you explain what

16   that means?

17   A    Well, in ACH domestically, the supplier would take the

18   money after giving us notification.  We already cleared that

19   supplier to do so.

20   Q    So for those specific transactions that were highlighted

21   that you looked at, those Spirits Marque One, those were not

22   conducted by you, were they?  I mean, they were actually

23   conducted by someone else.  They withdrew the money from the

24   account; correct?

25   A    Well, we would have authorized them to do that at one

Cross-examination Dennis Bashuk

1   point or another.

2   Q    You certainly did.  So you authorized them to make that

3   debit from that account; correct?

4   A    Yeah.

5   Q    Very good.  And when they make that debit from the

6   account, they don't go in there and take it themselves, now do

7   they?

8   A    It's an automatic transfer once they've been authorized to

9   do so.

10  Q    But an ACH debit, there's only two ways to make that

11  happen.  One is through the fed and the other one is through a

12  company called NACHA; correct?

13  A    I don't know the --

14  Q    Okay.  We'll just skip how it happens.  But the fact of

15  the matter is you don't direct that payment.  You don't go in

16  there and call the bank and say, "Can you wire these funds to

17  this particular company," do you?

18  A    Well, if we do a wire, we will create a wire through

19  the -- you know, through our online banking.

20  Q    But the ones you just looked at, you just identified, said

21  ACH EFT.

22  A    But there's a process that our accounting folks in the

23  accounts payable department will go down with our suppliers to

24  authorize them to do any of this.

25  Q    But the ACH EFT is done by preauthorization by the company

Cross-examination Dennis Bashuk

1    that's owed the money; correct?

2    A    Well, we are the ones that will authorize it.  We're not

3    owed the money, but the -- I'm not sure your point.

4    Q    Can you lean into the microphone, please.

5    A    I'm not sure of your point.

6    Q    But you authorize the company that's doing the debit;

7    correct?

8    A    At some point, you know, originally we'll -- again, we

9    process them to make sure that the invoices are correct.

10   Q    Very good.  Let me show you what's marked as Government's

11   Exhibit No. 10.  And this -- can you read what it says at the

12   top?  It says --

13   A    "Spirits Marque One."

14   Q    And that seems to be the same company that's referred to

15   in that bank statement; correct?

16   A    Yes.

17   Q    And this pertains to product that was shipped to Republic

18   National; correct?  It says so right on there.

19   A    Apparently, it does.

20   Q    Very good.  And do you know what product it pertains to?

21   It should indicate in that column right there in the middle.

22   A    It looks like it could be Svedka Vodka.

23   Q    Svedka Vodka.  Which we've already established is made in

24   Sweden; correct?

25   A    Yes.

Cross-examination Dennis Bashuk

1   Q    So when you allowed that ACH debit to Spirits Marque One,

2   which this indicates is who it was billed from --

3   A    This is the Constellation Wine Company.  That's our --

4   that's the company that we do business with where we will make

5   payments to their bank.  Constellation is headquartered in New

6   York.

7   Q    Very good.  And those ACH EFTs we just looked at, did that

8   say Constellation or did it say Spirits Marque?

9   A    I didn't look, but this is Constellation Wine Company.

10  Q    Are you saying that those -- the payments for that went to

11  Constellation 1?

12  A    I'm saying you're asking me a question -- I don't know

13  where the payment went.  I'm just telling you what this invoice

14  says.

15  Q    I'll Show you again.  Can you read that -- where that

16  payment went.

17          MR. MACDOUGALL:  Again, Your Honor, could we ask for

18  a reference, please?

19          THE COURT:  Yes.

20  BY MR. KAY:

21  Q    Oh, I'm sorry.  Again, we're back to Exhibit No. 8.  Same

22  page that we were looking at before that we had highlighted,

23  page 15.  You just read it a moment ago.  Where does that go?

24  A    Spirits Marque is part of Constellation.  We pay

25  Constellation Wine Company, who apparently is the importer of

Cross-examination Dennis Bashuk

1    something called Spirit Marquee.  And we'll pay Constellation

2    Wine Company in, I'm guessing, New York.

3    Q    Very good.  But this particular payment, these three other

4    ones went to Spirits Marque, did they not?

5    A    They went to Constellation Wine Company in New York.  I

6    don't see where it says where they went.  It just says that's

7    the DBA of whatever it was.  That's just what we put in our

8    system, perhaps, as the identifier of what kind of product it

9    is, but that's a domestic company.

10   Q    A moment ago you said that these payments went to the

11   company that's indicated on the ACH.

12   A    You're asking me to read what it said.  I told you that's

13   the name of the company.  The payments went to whatever's on

14   the invoice for payment, which is Constellation Wine Company in

15   New York.

16   Q    Very good.  Going back to Exhibit No. 10, does it say who

17   the supplier -- shipper is?

18   A    Something in Belgium was shipped and our -- the company we

19   do business with is Constellation Wine Company in New York.

20   Q    Very good.  And it was shipped by Alcomarques,

21   A-l-c-o-m-a-r-q-u-e-s, Belgium; correct?

22   A    Again, it sounds like it from that invoice.

23   Q    That's what it says; correct?

24            THE COURT:  Mr. Kay, this is not constructive or

25   helping the Court in any way at all.  I understand your point

Redirect Examination Dennis Bushak

```
1    is -- I'm sitting here and conducting a hearing.  This is of no
2    significance to me at all.  I've given you 15 or 20 minutes and
3    all you've establish is, is there are some checks that go to a
4    company somewhere in New York who then brought liquor into the
5    United States.  This is of no help to me at all in determining
6    whether or not it's appropriate for the government to continue
7    to hold on -- require $5 million in escrow.  So I've given you
8    a lot of latitude on this, but let's move on.  This is of no
9    assistance to me at all right now.
10           MR. KAY:  Very good, Your Honor.
11           I think that's all I need, Your Honor.
12           THE COURT:  Thank you.  Is there any redirect,
13   Mr. MacDougall?
14           MR. MACDOUGALL:  Just briefly, Your Honor.
15           THE COURT:  Well, finish up before lunch.  Go ahead.
16           MR. MACDOUGALL:  Yes, sir.
17           THE COURT:  Just make it brief.
18                      REDIRECT EXAMINATION
19   BY MR. MACDOUGALL:
20   Q    Mr. Bashuk, Mr. Kay asked you repeatedly about Spirits
21   Marque.  Do you recall that?
22   A    Yes.
23   Q    And your testimony was the payments were to Constellation;
24   is that correct?
25   A    It is.
```

Redirect Examination Dennis Bushak

1    Q    Where is Constellation based?

2    A    New York.

3    Q    Victor, New York, right?  Okay.  And isn't it true that

4    Spirits Marque is a wholly-owned subsidiary of Constellation?

5    A    Honestly, I don't know what it is, but we made payments to

6    Constellation for that invoice.

7    Q    A New York company.  Mr. Kay --

8              MR. MACDOUGALL:  If I may approach Your Honor,

9    briefly.

10             THE COURT:  Yes.

11   Q    (BY MR. MACDOUGALL)  Mr. Kay showed you Government's

12   Exhibit 1, a catalog.  Take a quick look at it again.  And he

13   asked you repeatedly about different brands of liquor and

14   whether those brands were made outside the United States.  Do

15   you recall that testimony?

16   A    I do.

17   Q    Okay.  On June 5th, 6th, 7th, 2012 was any liquor, was any

18   product seized by the government?

19   A    No.

20   Q    What was seized?

21   A    Our money.

22   Q    Money.  And is your testimony the same as it was before

23   that all of the payments for all of the liquor that you

24   purchased were paid to bank accounts in the United States?

25   A    Yes.

Redirect Examination Dennis Bushak

1  Q    Last question.  Government Exhibit 11 is a statement, this

2  is just for housekeeping purposes to keep the record clear,

3  Your Honor.  Exhibit 11 is one page.  I think it's --

4           THE COURT:  From Government Exhibit 1, I believe;

5  correct?

6           MR. MACDOUGALL:  No, sir.  It's attached to the

7  package as Government Exhibit 11.  It's the last page.

8           THE COURT:  Okay.  Go ahead.

9  Q    (BY MR. MACDOUGALL)  That is a statement that Mr. Kay

10 asked you about, drawn on the master concentration account,

11 what's the date of that statement?

12 A    I'm sorry --

13 Q    If you look at Exhibit 11.  Do you have that in front of

14 you?

15          MR. MACDOUGALL May I approach, Your Honor.

16          THE COURT:  Yes.

17 Q    (BY MR. MACDOUGALL)  Just tell me the date of that

18 statement.

19 A    2010.  It's July 31st, 2010 through August 31st of 2010.

20 Q    And how does that date relate to the 12 months of records

21 that we've moved in evidence?

22 A    It has no relationship to that.

23          MR. MACDOUGALL:  Thank you.

24          Your Honor, no further questions.

25          THE COURT:  All right.  Thank you.  Is there any

recross just on these two points, Mr. Kay?

MR. KAY: No, Your Honor.

THE COURT: All right. Thank you very much. Mr. Bashuk. You may step down, sir.

We'll take a break for lunch now. And we'll start again at 5 minutes after 2:00.

(A recess was taken.)

THE COURT: Good afternoon everyone. We're ready to continue with the hearing in this matter. With that, Mr. MacDougall, the next witness -- or Mr. Teslik. Thank you.

MR. TESLIK: Thank you, Your Honor. We call Thomas White.

THE COURT: All right. Mr. White.

THE CLERK: Sir, could you please raise your right hand.

THOMAS MARTIN WHITE,

called as a witness, being first duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE COURT: Thank you. Please be seated. Could you please speak loudly and clearly into the microphone and state and spell your last name for the record.

THE WITNESS: Thomas Martin White, W-h-i-t-e.

DIRECT EXAMINATION

Direct Examination Thomas White

```
1    BY MR. TESLIK:

2    Q    Mr. White, where did you grow up and go to school?

3    A    I grew up in Prince George's County, Maryland.  Went to

4    high school in Prince George's County and Calvert County and

5    undergrad -- graduated from Salisbury State, which I guess is

6    now a university.

7    Q    By whom are you employed today?

8    A    Republic National Distributing Company.

9    Q    When did you go to work for Republic?

10   A    1983.

11   Q    What's your current position with the company?

12   A    Region president.

13   Q    Could you very briefly tell Judge Bennett what positions

14   you've held at Republic since you went to work for them those

15   years ago?

16   A    Okay.  I started as a district manager in Prince George's

17   County.  Held a number of positions at that level in Prince

18   George's County, Anne Arundel County.  Was division managers --

19   a division manager overseeing an off-premise division which

20   sells to package stores versus restaurants.  Was ultimately the

21   general manager of the Maryland operation, the general sales

22   manager of the Maryland operation.  At that time we had a

23   Washington company and a Virginia company.  Was over those

24   companies.

25        Then I was back in Maryland for a period of time.  And in
```

Direct Examination Thomas White

1    2004, I moved to Florida as president in the state of Florida.

2    And then back to Maryland, overseeing five states.  Actually, I

3    still live in Florida.  Sorry.

4    Q    You're still based in Florida; is that correct?

5    A    Yes.

6    Q    When did you come -- when did Maryland once again become

7    part of your responsibility, approximately?

8    A    May of 2011, middle of the year, 2011.

9    Q    I'm going to ask you some questions about the Maryland

10   operation in a moment, but first I'd like to follow up on some

11   questions from the testimony this morning.  Are you familiar

12   with a spirit brand called Svedka Vodka?

13   A    I am.

14   Q    Who owns Svedka Vodka?

15   A    Constellation brands.

16   Q    Do you know for how long Constellation brands has owned

17   Svedka Vodka?

18   A    They purchased it in 2007.

19   Q    Where is Constellation brands headquartered?

20   A    Victor, New York.

21   Q    And do you know in what state it's incorporated?

22   A    I believe Delaware.

23   Q    There was some testimony this morning also about a company

24   called Spirits Marque One, and that's M-a-r-q-u-e, One.  Are

25   you familiar with that company?

Direct Examination Thomas White

1    A    I am.

2    Q    Where is that company headquartered?

3    A    New York.

4    Q    Who owns Spirits Marque One?

5    A    Constellation.

6    Q    How long has Constellation owned Spirits Marque One?

7    A    I believe it was 2007 when they purchased Svedka.

8    Q    Could you very generally describe Republic's business in

9    the state of Maryland?

10   A    Republic National is the middle tier of the beverage

11   alcohol industry, so there are suppliers, wholesalers, and

12   retailers.  So we are the wholesaler.  We buy product from our

13   suppliers and distribute it to licensed premises in the state

14   of Maryland, both on premise and off premise.

15   Q    How long has Republic been in business?

16   A    Late 1800s.  So prior to Prohibition.

17   Q    So after Prohibition, let's start there.  From the period

18   after Prohibition until today, has the business of Republic in

19   Maryland been essentially the same as the business of Republic

20   in the other states in which it operates?

21   A    Yes.  Republic National in Maryland, its predecessor

22   company started in the 50s, and the predecessor of that company

23   also operated in Washington, D.C. since right after

24   Prohibition.

25   Q    And was that the Kronheim Company?

Direct Examination Thomas White

1    A    It was.

2    Q    How many people are currently employed by Republic

3    nationwide?

4    A    Over 9,100.

5    Q    And how many of those employees are in the state of

6    Maryland?

7    A    480.

8    Q    Could you very generally describe the jobs that the

9    employees of Republic in the state of Maryland hold?

10   A    Well, being a wholesaler, we're -- a lot of those are blue

11   collar jobs.  We have office employees, salespeople in this

12   trade, warehousemen, truck drivers, warehouse workers.  We have

13   a night shift.  We move product at night and deliver during the

14   day, so -- and then of course management and then executives.

15   Q    As being the wholesaler in the three-tier system, can

16   Republic -- can Republic sell directly to the end users or the

17   customers who purchase spirits?

18   A    No.

19   Q    And why not?

20   A    It's illegal in the state for us to sell directly to the

21   consumer.

22   Q    And similarly, in Maryland, can the distiller or the

23   supplier of the spirits sell directly to the end user?

24   A    No.  They have to go through the three-tier system.

25   Q    And again, is that by virtue of the three-tier system?

Direct Examination Thomas White

1    A    Correct.

2    Q    In Maryland, is the sale of alcoholic beverages

3    specifically the sale of spirits, regulated?

4    A    Yes.

5    Q    What government entity or entities regulate your business

6    in the state?

7    A    The state entity would be the comptroller of the

8    treasury.

9    Q    Is that in your view as president of the Maryland

10   operation, active or passive regulation?  Do you know what I

11   mean by that?

12   A    Well, I'd say they're very involved in our business, if

13   that's what you're asking.  We work with them on a weekly basis

14   to make sure we're following the guidelines set out in Article

15   (2)(B), which is the trade practice arm of the way we do

16   business.  They're also -- we're a tax collector for them.  We

17   remit our sales tax collections to them.

18   Q    Do you have reporting requirements to the comptroller?

19   A    We do.

20   Q    How frequently do you make reports to the comptroller and

21   what do those reports entail?

22        MR. KAY:  Objection, Your Honor.

23        THE COURT:  Overruled.

24        THE WITNESS:  We make reports -- we remit and make

25   reports to them on a monthly basis.  And they involve the

Direct Examination Thomas White

1    gallonage sold in the state for both spirits and wine.  And

2    then the tax collected around those sales.

3    Q    (BY MR. TESLIK)  Does the comptroller participate at all

4    in your training of your employees in Maryland?

5    A    They do.  We ask them to come in and help with compliance

6    training.  And on a regular basis, our management, our middle

7    level management would call the State if they had a question

8    about the legality of some activity they wanted to involve the

9    company in.

10   Q    Could you generally describe your duties and

11   responsibilities as president of the region that includes

12   Maryland?

13   A    I oversee all operations and all of the stateside --

14   oversee -- to include Maryland.  My role is primarily -- and I

15   deal with the senior management staff around staffing and also

16   our supplier relationships.

17   Q    Are you in a position as president of the region to

18   describe for Judge Bennett the way that the State of Maryland

19   is organized operationally by Republic?

20   A    Yes.  We basically break up our sales force into

21   on-premise and off-premise channels.  So on-premise are

22   restaurants, off-premise are package stores.  That would be our

23   selling staff all the way up to our management staff.  We have

24   warehousemen -- night warehousemen, day warehousemen, drivers

25   that deliver, as well as office staff to support all those

Direct Examination Thomas White

1    functions.

2    Q    So in any way, is Republic's operation divided or

3    segmented by county in Maryland?

4    A    No.

5    Q    So are the retail stores that exist in Cecil County, for

6    example, handled any differently than any of the retail stores

7    handled elsewhere in the state?

8    A    I don't believe so.

9         MR. TESLIK:  I'd like to marked for identification

10   Exhibit No. 6.

11        May I approach the witness, Your Honor?

12        THE COURT:  Yes, certainly.

13   Q    (BY MR. TESLIK)  Mr. White, I'm showing you what we've

14   marked for identification as Exhibit 6.  Could you take a look

15   at that document and let me know when you've had an adequate

16   opportunity to do so.

17        MR. TESLIK:  Could the record reflect that we've

18   given a copy of this to Mr. Kay?

19        THE WITNESS:  Go ahead.

20        THE COURT:  It will be so admitted.

21   Q    (BY MR. TESLIK)  Mr. White, does Republic account for its

22   sales volume nationally?

23   A    Yes.

24   Q    Does it also account for its sales volume by state?

25   A    Yes.

Direct Examination Thomas White

1   Q    Now, within a state are sales records further broken down

2   to show the volume, for example, by either county or

3   retailer?

4   A    Yes.

5   Q    Both or either?

6   A    Both.

7   Q    Thank you.  For example, in Maryland, does the company

8   have annual sales data for Republic sales in the state of

9   Maryland?

10  A    Yes.  It's on this sheet in red, $333 million.

11  Q    Let me get to that in just a moment.  I just want --

12  generally, does the company maintain sales data for its sales

13  in Cecil County by year?

14  A    I guess we could access that, yes.

15  Q    And what about for individual retail establishments in

16  Cecil County?  Do you have those data?

17  A    Yes.

18  Q    So looking at Exhibit No. 6, are you familiar with this

19  chart?

20  A    I am.

21  Q    Did you help prepare it?

22  A    I did.

23  Q    What exactly does the chart illustrate?

24  A    Well, the chart illustrates our overall volume revenue in

25  2011 for the calendar year, for the entire company, the

Direct Examination Thomas White

1    Maryland operation, Cecil County, and two stores that are in

2    question.

3    Q    And was this chart prepared with your assistance using

4    uniform company data, that is, is the data that was used to

5    determine sales in Maryland the similar data that showed the

6    company's sales nationwide and so on?

7    A    Yes.

8    Q    And does this chart, in your opinion, accurately reflect

9    and illustrate the underlying data?

10   A    Yes.

11   Q    Now, you testified that the time period of this chart was

12   calendar year 2011; is that correct?

13   A    Correct.

14   Q    The nationwide sales data is reflected in this pie chart

15   by which color of the circle?

16   A    It's blue.

17   Q    And the $4,260,000,000, what does that number reflect?

18   A    The revenue for the year 2011 for Republic National

19   Distributing Company.

20   Q    For that year, what part of that total amount was

21   reflected by sales in Maryland?

22   A    That's in red.  And it was $333,500,000.

23   Q    Were you able to determine for 2011 what the company's

24   gross sales were in Cecil County, Maryland?

25   A    We were.

Direct Examination Thomas White

1   Q     And is that reflected by a color -- colored slice of the

2   pie?

3   A     Yes.

4   Q     Which color is that?

5   A     Green.

6   Q     And the number under green is $12,780,000?

7   A     Correct.

8   Q     What does that number reflect?

9   A     The revenue from stores in Cecil County.

10  Q     And in this case, particularly with respect to the

11  affidavit of the government agent that's at issue in this

12  hearing, there was a reference to two retail stores in Cecil

13  County, Chesapeake and Northside.  First, let me ask you, are

14  you familiar with those two stores?

15  A     Yes.

16  Q     Have you ever visited either one of them?

17  A     I visited Northside probably 15 years ago by my

18  recollection.  I've never visited Chesapeake.

19  Q     Let's go back to Exhibit 6.  Are the sales from those two

20  stores, Republic sales that were made to those two stores in

21  2011, reflected on this chart?

22  A     They are.

23  Q     And by what color slice?

24  A     Purple.

25  Q     The red bar that has the $333 million amount has a

1    percentage, 7.8 percent.  Could you tell Judge Bennett what

2    that 7.8 percent is?

3    A    7.8 represents that percentage of our total revenue for

4    RNDC for 2011.

5    Q    Let's work down to Cecil County.  That's the green slice.

6    That has a percentage, three-tenths of 1 percent?

7    A    Correct.

8    Q    What does the three-tenths of 1 percent reflect?

9    A    The three-tenths of 1 percent are the revenue from Cecil

10   County to total RNDC business.

11   Q    And finally, the purple block has four one-hundredths of 1

12   percent.  What does that percentage reflect?

13   A    It says that the two stores that you mentioned earlier

14   represent four one-hundredths of a percent of our total RNDC

15   business.

16   Q    Are you familiar with the approximate profit margin that

17   was enjoyed by Republic in the state of Maryland in 2011?

18   A    I am.

19   Q    Applying -- and would that profit margin apply to the

20   retail stores in Cecil County equivalently to its application

21   to other retail stores in the state?

22   A    Yes.

23   Q    If you applied that profit margin to the sales from the

24   two retail stores, Republic and -- sorry -- Northside and

25   Chesapeake, what would the profit to Republic from its

Direct Examination Thomas White

1    wholesale sales to those stores in 2011 have been?

2    A    Approximately $300,000.

3    Q    Do you recall being at work during the first week of June

4    in 2012?

5    A    I do.

6    Q    Did something out of the ordinary occur at Republic during

7    that week?

8    A    Yes.

9    Q    What was it -- what was it that occurred and how did you

10   learn of it?

11   A    I was in Florida and I got a call from our company

12   president that our bank accounts were being seized and he asked

13   me if I knew anything about it from the state of -- out of the

14   state of Maryland, which I didn't at that time.

15   Q    What were your concerns as president of the region that

16   included Maryland and a number of other states when you learned

17   that your bank accounts had been seized?

18   A    Well, I was very concerned because the seizure of the bank

19   accounts basically brings the company to its knees.  Both our

20   employees, which we call associates, you know, their paychecks

21   and their EFTs wouldn't be -- they wouldn't have gotten those

22   that week.  Not being able to meet their own personal needs.

23   But probably more importantly, I was concerned about our

24   suppliers, because our suppliers have agreements with us that

25   this could break those agreements and cause them to choose

Direct Examination Thomas White

1    other ways to distribute in the state.

2         So the combination of the suppliers -- and then the

3    customers, we would lose, I believe, the relationship that we

4    have with our customers if we weren't in business.  So it's

5    devastating at just about every level.

6    Q    What about with respect to your relationship to the

7    Maryland comptroller?  Was that impacted at all in your view by

8    the bank accounts having been seized?

9    A    Well, it would have been because it would have seized the

10   revenues that would normally go to the State for tax

11   purposes that's collected -- that we collect --

12   Q    Had the warrant that caused the freezing of those accounts

13   not been lifted, for how long do you believe the company could

14   have survived?

15   A    A very short period of time.  I think it would be days

16   before our suppliers -- they need to get to market every day,

17   so I think the suppliers would have started to look elsewhere.

18   I think, of course, the employees would have been looking for,

19   you know, a place where they could go to work.  So a very short

20   period of time.

21   Q    What did Republic do in order to deal with the situation

22   that presented itself at the end of that week in June of

23   2012?

24   A    Put up a $50 million bond to do business.

25   Q    Take a look again at Exhibit No. 6.  What relationship, if

Cross-examination Thomas White

```
1    any, based on your knowledge of the revenues and profits of
2    Republic Nationwide in Maryland, what relationship did the
3    amount $50 million bear to the total sales of all products by
4    Republic to Northside and Chesapeake?
5    A    I don't think it had any bearing.
6    Q    And what about with respect to the net profit that you
7    estimate to have been about $300,000 from the sales to those
8    two stores?  What relationship, if any, is there in your view
9    to that and $50 million that was seized?
10   A    I don't think there's any relationship.
11             MR. TESLIK:  No further questions.
12             THE COURT:  Thank you very much, Mr. Teslik.
13             Cross-examination, Mr. Kay.
14                       CROSS-EXAMINATION
15   BY MR. KAY:
16   Q    Mr. White, were any payroll accounts seized?
17   A    I believe the accounts that we would have paid our
18   employees from, I believe were.
19   Q    This chart, Exhibit No. 1, identifies 1, 2, 3, 4, I think
20   five separate accounts that are called payroll accounts.  But
21   none of them are highlighted in red, which would indicate they
22   were seized; correct?  None of them were seized?
23   A    If you say so.
24   Q    All right.  Thank you.
25             MR. TESLIK:  Your Honor, could I have one follow-up
```

Redirect Examination Thomas White

1    question?

2              THE COURT:  Yes, certainly.

3                         REDIRECT EXAMINATION

4    BY MR. TESLIK:

5    Q    Do you have -- let's see, this -- what exhibit is this?

6    Show you Exhibit No. 1.  We'll put it up on the electronic

7    chart, Mr. White.

8         While Mr. Kay suggested none of the payroll accounts were

9    seized, was the account that funded the payroll accounts

10   seized?

11   A    Yes.

12             MR. TESLIK:  Thank you.  No further question.

13             THE COURT:  Thank you, Mr. White.

14             Any further cross-examination on that Mr. Kay?

15             MR. KAY:  No.

16             THE COURT:  You may step down, Mr. White.

17             Thank you.  Mr. MacDougall, anything -- any other

18   witnesses to be called?

19             MR. MACDOUGALL:  No further witness.

20             THE COURT:  Any other presentation of evidence?

21             MR. MACDOUGALL:  No further presentation of

22   evidence.

23             THE COURT:  Thank you.  Mr. Kay, any witnesses the

24   government is going to call?

25             MR. KAY:  No, Your Honor.

```
1              THE COURT:  Any further presentation of evidence?

2              MR. KAY:  None from the government.

3              THE COURT:  I'll be glad to hear from counsel then in

4    argument here on this.

5              Mr. MacDougall, I'll be glad to hear from you.

6              MR. MACDOUGALL:  Thank you, Your Honor.

7              Your Honor, the evidence that the Court has heard

8    today, and that has sort of filtered through the process over

9    the last three and a half years, if it means anything, it means

10   this.  The seizure of this company's $50 million, the shut down

11   of its accounts, the continuing effort to hold this money, have

12   very little to do with the investigation or prosecution of a

13   crime and everything to do about putting as much pressure as

14   quickly as could be done on a company that had the resources to

15   pay a very large settlement that was not the part of any

16   penalty.

17             The Cecil County stores, as the Court has heard, are

18   very -- are infinitesimally small in the business world of

19   RNDC.  But Mr. Kay, and the government in this case, they don't

20   want to collect a few thousand dollars.  They want a very big

21   score in 2012.  They can't use the wire fraud statute and they

22   can't use Section 1957 of the money laundering statutes.

23             They can only seize large proceeds using

24   1956(a)(1)(ii) (sic), and if there's any doubt about whether

25   that was the plan, we can look to the writings of Stefan
```

1    Cassella, formerly the U.S. Attorney's Office here, formerly

2    the chief -- until recently, the asset forfeiture unit.

3            This is cited in our briefing, Your Honor.  And

4    Mr. Cassella writes, "The ability to forfeit property involved

5    in a money laundering offense under Section 1956(a)(2)(A)

6    principal way to confiscate clean funds."

7            Confiscate clean funds.  That's what this is about.

8    Taking this company's money and ringing a settlement out of it

9    that bears no relationship to even the most extreme theory the

10   government has.

11           Mr. Kay has offered a case *U.S. v. Kivanc* just now

12   today.  It's not part of his briefing.  That case is apposite,

13   Your Honor, on dramatically different facts and different

14   findings.  And if the Court is going to consider that case,

15   we'd respectfully ask that we be allowed to brief on that in

16   response.

17           1956(a)(2)(A) is very clear, Your Honor.  Whoever

18   transports, transmits, or transfers a monetary instrument or

19   funds from a place in the United States to or through a place

20   outside the United States is liable for that offense.  And in

21   this case, that didn't happen.  The Court has seen evidence in

22   abundance that there was no -- and again, we're facing the

23   difficulty of proving a negative, that there's no evidence in

24   the record anywhere of money leaving this country.

25           But when an agent, and an Assistant U.S. Attorney, is

1    going in to see a magistrate and you want to have the ability

2    to seize very large amounts of money, you've got to show that.

3    And so what happens -- we can find out what happens when we

4    turn to Agent Ward's affidavit.

5              Just briefly, Your Honor, on page 11 of the

6    affidavit, Agent Ward begins, "Subsequent to this transaction,

7    your affiant obtained bank statements from Wachovia Bank, now

8    Wells Fargo, for all accounts belonging to Republic."  That

9    states your credibility.  I've looked at the records.  I've

10   done the work.

11             Magistrate Gallagher then hears from the affiant,

12   from Agent Ward with respect to the Louisiana and Control

13   States EFT.  And it's fascinating to look at these sentences in

14   juxtaposition.  The first one, bank records show numerous

15   debits made from this account during the May 2011 through the

16   May 2012 period to accounts owned by liquor manufacturers and

17   distributors.  That's true, absolutely true.  The Court's heard

18   evidence on that.

19             Then the next sentence, "Many of these liquor

20   manufacturers are located offshore."  Maybe that's true, maybe

21   it's not.  The Court's heard that most of them are here in the

22   United States.  The impression created on a busy judge is,

23   okay, we've got money going offshore, money coming from these

24   accounts.  All right.  I'm okay in 1956(a)(2)(A).

25             But it was all false.  We're not going to suggest to

1    the Court whether it was intentionally false or negligently

2    false, it just wasn't real.  What's not in the affidavit, Your

3    Honor, is any reference to any transfer, any specific transfer

4    outside the United States.  No wire transfer confirmations, no

5    receipts, nothing -- notwithstanding the fact that Agent Ward

6    attests at the beginning of her affidavit that she's looked at

7    the bank accounts.

8              And there's only one reason that none of that was

9    attached to the affidavit, because they don't exist.  Money did

10   not leave this country.

11             The government's policy appears to be, and the Court

12   heard it again today, that if the name sounds foreign, that's

13   all we need.  If the name sounds exotic, that's all we need to

14   convince a court that money is leaving the country.

15             Courvoisier Cognac.  Well, the court heard testimony

16   today that is not controverted -- that was owned by Jim Beam in

17   Deerfield, Illinois.  The Court heard evidence just a few

18   minutes ago when Mr. Kay sought to demonstrate that Svedka

19   Vodka and a company Spirit Marque One was some exotic entity

20   that's, in fact, owned by Constellation Liquors in Victor, New

21   York.

22             These are all domestic transfers.  The government had

23   access to information sufficient to make that clear to them and

24   they either ignored it or intentionally brought to the Court an

25   affidavit that was not true.  And if there's further question

1    or any remaining question about the motivation that the

2    government had here, Your Honor, I would respectfully refer the

3    Court to page 65 of the transcript of the first hearing in this

4    case in December 2012, where Mr. Kay states on the record, "If

5    we go through either a criminal trial against Mr. MacDougall's

6    client or a civil forfeiture proceeding against the funds that

7    we believe are forfeitable in this case, either one will be a

8    public case.  If that's the case, Mr. MacDougall's client will

9    probably end up out of business because they will be unable to

10   hold any licenses, their suppliers probably won't deal with

11   them any longer, the likelihood of there being anything left

12   for the Government to take at that point would be very high."

13          Your Honor, if there was ever a threat made in a

14   courtroom, that's it.  "Deal with me or I'm going to put you

15   out of business.  Pay me millions of dollars in settlement or I

16   will use the authority of the U.S. Government to put you out of

17   business."  It's unmistakable, Your Honor.

18          We've had limited evidence here and I'm not

19   suggesting that the Court needs anymore to reach a conclusion,

20   but the question always has to be why should the Court believe

21   any of this?  I can come and tell you my theory of things, Your

22   Honor, but why should you believe it?

23          Well, there's several reasons.  One is

24   Mr. Cassella -- Mr. Kay's supervisor, said so.  You want to

25   seize clean money, here's how you do it.  And that's exactly

```
 1    what they did.  Moreover, if there's no effort, there has been
 2    no effort from the first time Mr. Bashuk -- from the court
 3    heard today got a call that paychecks were bouncing, to this
 4    very day, of the government saying, "Gee, maybe we made a
 5    mistake.  Maybe we went too far.  Maybe we shouldn't have taken
 6    your $50 million and shut down your entire cash management
 7    system over a couple liquor stores in Cecil County.  Let's see
 8    what we can do to work it out."
 9            That still hasn't happened and we're back, taking up
10    the Court's time, trying to make this right.  And the third,
11    Your Honor, and I don't mean to be, you know, someone who
12    sounds like I'm full of bravado, but no case has been brought
13    in three and a half years.  This is not a complicated case,
14    this is not about investigating a crime using the power of the
15    grand jury and the government's ability to forfeit and seize
16    assets to preserve them for later satisfaction following a
17    criminal case.
18            This is a shake down.  That's all it is.  And the
19    best evidence of that is there is no case.  And there is no
20    case because there is no evidence and there never was any
21    probable cause.
22            So Your Honor, today we're asking for three forms of
23    relief.  The first being the one that we are here primarily to
24    talk about.  And that's the release of our $5 million that's
25    still held in escrow.
```

1        THE COURT:  Your original petition was to seek

2   release of the $50 million held in escrow and pursuant to my

3   order in December of 2012, you had $45 million released and $5

4   million was still held in the escrow account.  So the original

5   request for relief was the return -- the release, rather, of

6   the $50 million; correct?

7        MR. MACDOUGALL:  Yes, Your Honor.  That's right.  And

8   our petition here, our request here, our motion here, is for

9   the release of the remaining 5.  But we also ask, respectfully

10  ask the Court to consider vacating the seizure order and

11  striking the affidavit.  And the practical reason for our

12  request to strike the affidavit is some day this case will be

13  unsealed.  And the Court has heard more than adequate -- more

14  than adequate evidence, more than adequate testimony to

15  conclude that this affidavit was contrived, that it makes

16  allegations that are not true, that it's not worthy of being

17  part of the record of this case.

18        And the harm that the company will suffer if this is

19  not struck and if this affidavit is ever released is

20  substantial.

21        THE COURT:  That could be addressed in a subsequent

22  proceeding, could it not, if and when there's some effort to

23  unseal the documents?

24        MR. MACDOUGALL:  It could, Your Honor.  And we can

25  certainly wait till that day.  I would submit that the Court

1    has adequate evidence before it to make that decision now.  And

2    the Court has complete authority to vacate any order of this

3    court or strike any affidavit or any testimony --

4            THE COURT:  That would be the same result as if we

5    had a *Franks versus Delaware* hearing, would it not?

6            MR. MACDOUGALL:  I don't believe so, Your Honor,

7    because a *Franks* hearing would have permitted the petitioner in

8    this case to take testimony, to compel testimony from the

9    government and we have not sought to do that.  We're simply

10   asking that the harm that's been done to us and the harm that

11   can potentially be done --

12           THE COURT:  My point to you, Mr. MacDougall, on that

13   is, to the extent there's another striking of an affidavit and

14   vacating of a warrant, which is essentially the relief

15   oftentimes requested by criminal defendants in the context of a

16   *Franks versus Delaware* hearing.  That's a far more serious

17   matter that has to await perhaps a greater development of a

18   record of some sort, for example, the affiant, the Special

19   Agent Lisa Ward, who it turns out I found out was the wife of

20   Mr. Kay, the Assistant U.S. Attorney in this case.  She has not

21   testified here.  I'm not saying she needed to testify here

22   today, but in the context of a *Franks versus Delaware* hearing,

23   she would clearly testify, would she not?

24           MR. MACDOUGALL:  She would, Your Honor.  And you know

25   the difficulty with a *Franks* hearing is always that a

 1    prospective defendant in a criminal case has the unusual

 2    ability to obtain evidence from the government, either

 3    preindictment or as part of an appeal.  We're not seeking that.

 4    We don't think we're ever going to be charged, Your Honor.

 5    Just trying to make this right.

 6            THE COURT:  I understand.

 7            MR. MACDOUGALL:  And on that score, Your Honor, and I

 8    know that the Court was once the U.S. Attorney here.

 9    Mr. Teslik, Ms. Sprinzen, and I have all sat on that side of

10    the courtroom.  There's an obligation.  There's an obligation

11    when you come to a magistrate judge or a U.S. district judge,

12    ex parte, in camera, to be square, to be forthright, to do it

13    fairly and not to hide things, and certainly not to use, at the

14    very best, jumbled language.  At worst, and we think in truth,

15    false statements, to get something you want to get.

16            That's not how the system works.  Chief Justice

17    Roberts last year wrote the following in the case of *Kaley v.*

18    *United States*, it is cited in our briefing.  "It takes a little

19    imagination to see that seizure based entirely on ex parte

20    proceedings create a heightened risk of error.  Common sense

21    tells us that secret decisions based only on one side of the

22    story will prove inaccurate more often than those made after

23    hearing both sides."

24            That's what happened here, Judge.  You know, the

25    founders drafted Article III, largely, I believe, to create a

```
1    judiciary that is in the business of protecting the people from
2    the government.  And this is a situation in which you had a
3    target of government misconduct that has the resources to hire
4    a group of lawyers, litigate the case, and come into this
5    court.
6              Most people subjected to this kind of treatment
7    don't.  Homeowners who have their homes seized improperly --
8    and the news is full of them these days, small business owners,
9    others who are subjected to this.  And for them, and really,
10   for every company and every person whose property is at risk,
11   the prosecutors and the agents have an obligation to do it
12   right.  And this is an opportunity for this Court to make that
13   clear by, as we've requested, striking the affidavit and
14   vacating the warrant.
15             Thank you, Your Honor.
16             THE COURT:  Thank you, Mr. MacDougall.  I certainly
17   understand your argument there.  My reservation on the second
18   and third items of relief that you've added here is that it's a
19   serious enough matter that I think it requires a full record is
20   the point.  But I understand your argument.  Thank you very
21   much.
22             MR. MACDOUGALL:  Thank you.
23             THE COURT:  Mr. Kay, be glad to hear from you.
24             MR. KAY:  Thank you, Your Honor.  I'll be brief.
25   Mr. MacDougall said that there's an obligation to do it right.
```

1    Well, Your Honor, we had the affidavit.  The Court has looked

2    at this affidavit.  And we've had an opportunity to have a

3    hearing about this affidavit.  Mr. MacDougall has pointed to

4    three things, very specific things that he's put in his motion

5    that he has indicated are false statements.

6            Your Honor, the government submits that it has done

7    it right.  If Mr. MacDougall cannot prove that there was some

8    false statement, those three statements, Your Honor, in reverse

9    order are as follows:

10           Account No. 9442 is a commercial checking account

11   labeled Master Concentration Account.  Mr. MacDougall says that

12   that's a false statement.  His own witness testified that it

13   was a true statement, Your Honor.  It is a commercial checking

14   account.  And it is labeled the Master Concentration Account.

15   So that was done right, Your Honor.  That's a true statement.

16           Going back to the first supposedly or allegedly false

17   statement, it says this, Your Honor:  "Because some of the

18   liquor manufacturers are located offshore," which is true.  And

19   the testimony today demonstrated that some of the liquor

20   manufacturers are located offshore.  "There is reason to

21   believe that these funds are being transferred from accounts in

22   the United States to accounts outside of the United States to

23   pay for the importation of liquor."

24           If the suppliers are located offshore, then there is

25   reason to believe that the money is going to move to those

1    suppliers.  When Mr. Bashuk testified, he stated that -- he

2    acknowledged first that there -- that the suppliers are located

3    offshore.  He also acknowledged that the ACH debits were made

4    to pay for those offshore suppliers.  That was a clear

5    statement that he made, Your Honor.  It took me a while to get

6    him around to that point, but he did say exactly that.  So I

7    think that this statement has proven to be absolutely true,

8    that there was reason to believe the payments --

9              THE COURT:  Is there still reason to believe that,

10   Mr. Kay?

11             MR. KAY:  Of course there is, Your Honor.  Your

12   Honor, a company like Svedka Vodka --

13             THE COURT:  So you're standing by -- you're standing

14   by, not just in terms of -- and I'm not having a *Franks* hearing

15   here.  And your wife, Ms. Ward, has not had the opportunity to

16   testify.  But in terms of the three statements that are

17   challenged, you're not only standing by the verbatim

18   correctness of the statement, "because some of the liquor

19   manufacturers are located offshore, there is reason to believe

20   that these funds are being transferred from accounts in the

21   United States to accounts outside the United States to pay for

22   the importation of liquor."  And the inference of that -- but

23   you're standing by the allegation of international money

24   laundering out of these accounts?

25             MR. KAY:  Absolutely, Your Honor.  And that's a true

1    statement.  That's a true statement --

2              THE COURT:  I'm not asking you that.

3              MR. KAY:  Well, then what are you asking?

4              THE COURT:  I'm asking you, as an officer of the

5    Court -- I'm not going over the parsing of the words.  And I'm

6    not making any judgment on the affidavit.  I'm just asking if

7    the government is still -- you, as an officer of the Court, are

8    still contending that there is reason to believe that these

9    funds are being transferred from accounts in the United States

10   to accounts outside the United States to pay for the

11   importation of liquor?

12             MR. KAY:  Absolutely, Your Honor.  It's a true

13   statement and the government stands behind --

14             THE COURT:  That's not what I'm asking.

15             MR. KAY:  The government stands --

16             THE COURT:  I'm not getting there, Mr. Kay.  I'll

17   give you one more shot as an officer of the court.  I'm not

18   going to cross-examine you.  I'm just asking, as an Assistant

19   U.S. Attorney, who's been accused of unethical conduct that

20   we'll get to in a moment, there are very specific challenges to

21   you and your ethics.  And I assume, I assume that you have

22   notified the United States Attorney of this district as to the

23   ethical challenges made against you.  That's required.  And so

24   I'm assuming you clearly have let Mr. Rosenstein know of these

25   ethical challenges that have been raised.

```
 1            My question to you is, are you still contending in
 2     the spirit of this, that that's in fact the case -- not the
 3     accuracy of the statement.  I'm not having a Franks versus
 4     Delaware hearing.  I'm not even getting into the matter of
 5     willfulness or alleged willfulness or any falsity as to the
 6     affidavit.  Just is that still the government's contention
 7     here?
 8            MR. KAY:  Is what the government's --
 9            THE COURT:  Is it the contention -- I'll get to the
10     second one.  The second statement is, "The specified accounts
11     are also involved in money laundering transactions in violation
12     of 1956(a)(2)(A), because each transaction was designed to move
13     those same proceeds until they were moved offshore to purchase
14     more liquor that was imported through the port of Baltimore."
15            The contention essentially being that there were
16     material international transactions.  And I understood from the
17     briefing that the government is no longer contending now that
18     there were material international transactions.  I understand
19     that your contention is there was no willful falsity or no
20     intentional falsity.  I understand you're now saying there is
21     no falsity, that technically the language is correct.  What I'm
22     asking you is, as an officer of the court, representing the
23     U.S. Government, are you still contending that there are
24     material -- there's evidence of material, international
25     transfers, that would be violative of the international money
```

1    laundering laws as codified under 1956(a)(2)(A)?

2              MR. KAY:  Yes, Your Honor.

3              THE COURT:  You still are contending that?

4              MR. KAY:  Yes, Your Honor.

5              THE COURT:  So the record will so reflect.

6              MR. KAY:   The documents that we put into evidence --

7              THE COURT:  Given that this is becoming increasingly

8    important in light of the allegations here, I want to make sure

9    that it's clear you're still contending that.

10             MR. KAY:  Of course, Your Honor.

11             THE COURT:  Again, I'll have to talk to

12   Mr. Rosenstein about the allegations that have been made

13   against you.  I just want to make sure in fairness to you that

14   you're still contending that.  So go ahead, Mr. Kay.

15             MR. KAY:  Of course, Your Honor.  Of course, we're

16   still contending that.  It's a true statement in there.  And

17   what the Court's point is, you're asking me whether we believe

18   that there were transfers of funds from the United States

19   offshore to accounts offshore that relate to these specific

20   transactions.  And the answer to that is yes.  We got this

21   document, Your Honor, this one about Spirits Marque One --

22             THE COURT:  I'm familiar with what your

23   cross-examination was, with respect to trying to track funds

24   here, Mr. Kay.  We're not ligating any criminal case here.  I'm

25   just trying to make sure that you, as an officer of the court,

1    are still contending, still contending some three-plus years

2    after these accounts were frozen, that it is still your

3    contention that there is a willful violation of 1956(a)(2)(A),

4    and that there is evidence in support of that.

5              MR. KAY:  Yes, Your Honor.

6              THE COURT:  Okay.  All right.  Fine.

7              MR. KAY:  Very good.  Your Honor, going on to -- you

8    already went on to the second statement, the specified

9    accounts.  Your Honor, the government's first position is that

10   that is a statement, it's a conclusion.  It's a statement of

11   law.  It's not a statement of fact, so it's not false.  And

12   there are no false statements in any of those three statements

13   that they've identified --

14             THE COURT:  Again, so the record is clear, I'm not

15   making any finding on falsity at all.  I'm not making a finding

16   on falsity.

17             MR. KAY:  Very good, Your Honor.  And without such a

18   finding, Your Honor, there cannot be a *Franks* hearing with the

19   affiant testifying.  And I think that we demonstrated today

20   that the motion -- petition as put forth by Republic National

21   is without merit.

22             THE COURT:  All right.  Well, thank you very much,

23   Mr. Kay.

24             The petition that was originally filed in this case

25   was for the release of $50 million escrow account that was

1    required to be placed in the escrow account of the law firm

2    account of Akin Gump Strauss Hauer & Feld LLP.

3            The briefings here have noted that the petitioner has

4    noted what it contends are three allegedly false statements.

5    Specifically, because some of the liquor manufacturers are

6    located offshore, there is reason to believe that these funds

7    are being transferred from accounts in the United States to

8    accounts outside the United States to pay for the importation

9    of liquor.

10           Second, the specified accounts are also involved in

11   money laundering transactions in violation of 1956(a)(2)(A),

12   because each transaction was designed to move those same

13   proceeds until they were moved offshore to purchase more liquor

14   that was imported through the port of Baltimore.

15           And, finally, that account No. 9442 is a commercial

16   checking account labeled Master Concentration Account.  The

17   petitioner seeks not only the release of the remaining funds

18   held in escrow, specifically $5 million, but seeks to have this

19   Court strike the government affidavit from the record of the

20   case and to vacate the search warrant issued on June 6th, 2012.

21           In the context of a *Franks versus Delaware* hearing in

22   a criminal case -- and *Franks versus Delaware* applies to a

23   criminal case, not to a Rule 41(g) proceeding, but in the

24   context of *Franks versus Delaware*, the -- a defendant in a

25   criminal case must make a dual showing, which incorporates both

```
 1    a subjective and an objective threshold component as the 4th
 2    Circuit has recognized in United States versus Colkley,
 3    C-o-l-k-l-e-y, 899 F.2d 297, a 4th Circuit opinion in 1990.
 4           This has not been a Franks versus Delaware hearing.
 5    Presumably, we're not going to get to a Franks versus Delaware
 6    hearing where the defendant would need to make a substantial
 7    preliminary showing that a false statement was knowingly and
 8    intentionally, or with reckless disregard for the truth,
 9    included in a warrant affidavit.  And secondly, that the
10    offending information must be essential to the probable cause
11    determination.  I'm not making any finding as to that.
12           Somewhat to my amazement is based upon -- let's just
13    say that I'm somewhat surprised that based upon the submissions
14    of the parties, and what I thought was clearly an
15    acknowledgment by the government that there really isn't any
16    material international transfer that has been evidenced, as it
17    turns out, many times government inquiries don't turn out as
18    expected, it is still apparently the position of the government
19    that there's some sort of evidence of willful violation of the
20    international money laundering laws.
21           The -- I had noted in December at the December 13,
22    2012 hearing that was two -- over two years and eight months
23    ago, I had found that as far under Rule 41(g) analysis, that
24    the petitioner, Republic National, has indeed suffered from a
25    deprivation of property.  And in light of the proportionality,
```

1    or lack thereof, I ordered that $45 million be released from

2    the escrow account that I initially held, based upon the

3    evidence before me, that $5 million remain in that account

4    pending the outcome of the government's presumed future civil

5    forfeiture proceeding.

6              We're now here two years and eight months later.  The

7    only reason we're here is because I finally noted that nothing

8    had happened in this case for some two and a half years and

9    asked for a status report.  That was reflected by papers No. 20

10   and 21.  Understandably, Republic National Distributing Company

11   had to reluctantly respond, because when you represent an

12   entity that's been subject to government action, you are at --

13   really, at the mercy of government authorities, as

14   Mr. MacDougall has essentially -- to which he's essentially

15   alluded in his argument here today.

16             So we scheduled a hearing.  And we began on June the

17   12th.  I permitted this to be continued to give the government

18   an opportunity to respond with respect to some very real

19   concerns that I have here in this case.  And now that has

20   been -- we've had the summer to get ready for this and

21   essentially what has been presented to me is the most sketchy

22   of evidence as to the matter of any type of material

23   international transfer that would be within the ambit of the

24   international money laundering laws.  And indeed, the

25   government has presented no evidence, other than just a

1   cross-examination of Republic National Distributing Company

2   officials.

3          This case cries out for the resolution by the Court.

4   And what is even more troubling to me is that there are

5   allegations of ethical impropriety as to Assistant U.S.

6   Attorney Richard Kay, which I presume, Mr. Kay, consistent with

7   the office policy of the U.S. Attorney's Office, has advised

8   his supervisors of.

9          This record will reflect, Mr. Kay, that you are now

10  being instructed that immediately after this hearing, you will

11  so advise Rod Rosenstein, the U.S. Attorney, of the ethical

12  challenges that have been made to you.  And I'm not making any

13  finding on the ethical challenges.  But they are in this sealed

14  record before me and they cause me sufficient concern that

15  after advising Mr. Rosenstein personally of these charges that

16  have been raised against you in paper Nos. 29 and 32 of the

17  defendant -- of the petitioner's submissions, if you'll have

18  Mr. Rosenstein call me, please, Mr. Kay.  And, again, I'm not

19  passing any judgment.  But they're serious enough to be raised

20  against an Assistant U.S. Attorney in this Court, that the

21  Court is instructing you to have the U.S. Attorney contact me.

22         Presently before this Court is the petition of

23  Republic National Distributing Company for the release of funds

24  held in escrow.  Presently remaining in the escrow account of

25  Republic National's escrow agent, Akin Gump Strauss Hauer &

1    Feld, LLP, pursuant to this Court's amended order of December

2    12 -- December 17, 2012, paper No. 18, is $5 million.  After no

3    action on this matter for over two years, this Court required a

4    status report from the petitioner, Republic National and the

5    government, as reflected in paper Nos. 20 and 21.  As I've

6    said, a sealed motions hearing was held on June 12th, 2015.

7    And the hearing was continued until today.

8            For the reasons that I've set forth here on the

9    record, this Court has previously held that there was a

10   deprivation of property within the meaning of Rule 41(g) of the

11   Federal Rules of Criminal Procedure, and has ordered that $5

12   million shall remain in escrow with Republic National's escrow

13   agent, Akin Gump Strauss Hauer & Feld, pending further order of

14   this Court.  Further order of this Court is now proceeding.

15   And it's been over two and a half years.  It's been two years

16   and eight months.

17           This Court having received evidence, reviewed

18   submissions of the parties, and having heard argument of

19   counsel at the sealed hearing, and for the reasons stated on

20   the record that I'll further expound upon, finds that Republic

21   National Distributing Company has continued to be aggrieved by

22   the deprivation of property for an unreasonable period of time,

23   without sufficient legal basis having been proffered by the

24   respondent government pursuant to Rule 41(g).

25           And Rule 41(g) provides that "A person aggrieved by

1    an unlawful search and seizure of property, or by the

2    deprivation of property, may move for the property's return."

3    So the record is clear, I am not making a finding at this point

4    that there has been an unlawful search and seizure.  I am

5    making a finding that there has been deprivation of the

6    property for an unreasonable period of time, not to be

7    permitted by the rules.

8              Accordingly, it's hereby ordered, this 27th day of

9    August, 2015, that Akin Gump Strauss Hauer & Feld LLP, as the

10   escrow agent in possession of $5 million, which has remained in

11   escrow, is hereby to disburse the remaining $5 million to

12   Republic National Distributing Company and may do so

13   immediately, this afternoon.

14             As the original relief sought in the petition for

15   release has now been obtained, it will be further ordered that

16   the clerk of the court shall close this case this afternoon.

17             And I would note, specifically, that with respect to

18   the evidence that's presented, that I'm not making a finding

19   that there were material false statements or omissions by Lisa

20   Ward at this point in time.  I'm not making a finding one way

21   or the other.  I don't need to make that finding at this point.

22   I'm satisfied, based on the evidence presented by Republic

23   National and the almost -- the literally no evidence presented

24   by the government, other than efforts of cross-examination of

25   two witnesses from Republic National, I'm satisfied that any

1    notion of international transactions or offshore movement of

2    money that would be within the ambit of 18, united States Code,

3    Section 1956(a)(2)(A), are highly questionable at best and

4    certainly don't warrant the continued seizure of funds in this

5    case.

6            And the nature of the seized accounts, I'm satisfied

7    from review of the manner in which a large national company is

8    structured, and the manner in which accounts are used for

9    different purposes, which is absolutely fundamental.  Large

10   national corporations don't have one account.  And the notion

11   to take -- to try to jump start that to infer that there's some

12   impropriety here, I've had the better part of the day listening

13   to this, and that is tenuous at best, if not a stretch.

14           So there is -- the nature of these seized accounts

15   clearly does not in any way support any notion that there's

16   international money laundering going on here.  I am not going

17   to address the allegations with respect to what was or was not

18   disclosed to Magistrate Judge Gallagher with respect to

19   Assistant U.S. Attorney Richard Kay and Special Agent Lisa

20   Ward, the fact that they are married and husband and wife, and

21   she was the attesting agent here.  I'm not making any finding

22   as to what should or should not have been revealed to Judge

23   Gallagher.  Or furthermore, in addition, the matter of the

24   conflict of interest that petitioner's counsel has suggested,

25   warrants further scrutiny.  And paper No. 32, I'm not making

1    any finding there as well, given that that's a serious matter.

2              But for the reasons that I've indicated on the

3    record, some two years and eight months after I ordered the

4    release of escrow funds and ordered that $5 million remain in

5    this account, time is up for the government.  American

6    citizens, be they corporate or individual, are entitled to some

7    due process.  And the notion that the government can, at its

8    own pleasure, decide when it decides to return the money seized

9    falls on deaf ears of this Court.  So I'm signing an order to

10   that effect today.

11             Mr. MacDougall, your client, your law firm can

12   immediately release those escrow funds within the next matter

13   of minutes, and send them right to Republic National's account.

14   They're no longer held in escrow.

15             Mr. Clerk, I've signed the appropriate order here and

16   this case shall be closed.  And this case having now been

17   closed, there's no pending matter before me.

18             Mr. Clerk, to the extent that there is any related

19   case that's filed, be it criminal or civil in this case, it is

20   to be assigned to me, and the clerk will be so instructed.

21             And with that, this concludes this hearing.  And

22   again, Mr. Kay, if you'll make sure Mr. Rosenstein contacts me

23   in light of the ethical allegations that have been made against

24   you.

25             Is there anything further from the point of view of

1        the petitioner, Mr. MacDougall?

2                MR. MACDOUGALL:  No, Your Honor, thank you.

3                THE COURT:  Anything further, Mr. Kay, from the point

4        of view of the government?

5                MR. KAY:  Nothing, Your Honor.  Thank you.

6                THE COURT:  You'll please stand and address the

7        Court.

8                MR. KAY:  Nothing, Your Honor.

9                THE COURT:  All right.  Assistant U.S. Attorneys

10       stand up when they address the Court, Mr. Kay.  They don't sit

11       in a chair.  None of them do.

12                Is there anything further from the point of view of

13       the government?

14                MR. KAY:  No, Your Honor.

15                THE COURT:  Good.  I'll expect Mr. Rosenstein's call

16       by 5:00 o'clock today.  Court stands adjourned.

17                (The proceedings were concluded.)

18            I, Christine Asif, RPR, CRR, do hereby certify that
         the foregoing is a correct transcript from the stenographic
19       record of proceedings in the above-entitled matter.

20

21                            _____

22                              Christine T. Asif
                                Official Court Reporter

23

24

25

```
1                              INDEX

2    Witness Name                                      Page

3    Dennis Bashuk

4       Direct Examination By Mr. MacDougall .............. 22

5       Cross-examination By Mr. Kay ....................... 59

6       Redirect Examination By Mr. MacDougall ............ 90

7    Thomas Martin White

8       Direct Examination By Mr. Teslik .................. 94

9       Cross-examination By Mr. Kay ...................... 107

10      Redirect Examination By Mr. Teslik ................ 108

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
August 27th, 2015
  1:19.
August 31st
  92:19.
August, 2015
  130:9.
December 12
  129:1.
December 13, 2012
  126:21.
December 14, 2012
  4:24.
December 17, 2012
  129:2.
December 2012
  113:4.
February 2nd 80:9,
  82:9.
February 2nd, 2012
  77:11.
July 31st, 2010
  92:19.
June 2012 18:1,
  44:17, 58:25.
June 5th, 2012
  13:1, 53:3.
June 5th, 6th, 7th,
  2012 91:17.
June 6th, 2012
  125:20.
May 2011 47:6,
  49:17, 111:15.
May 2012 47:7,
  49:18, 111:16.
May 7th 5:15,
  5:16.
"O" 84:19, 84:20.
$10,000 71:7.
$12,780,000
  103:6.
$159,000 80:13,
  81:5.
$159,653.35
  77:12.
$300,000 105:2,
  107:7.
$330 33:5.
$333 101:10,
  103:25.

$333,500,000
  102:22.
$4 14:20, 24:7.
$4,260,000,000
  102:17.
$4.8 80:25.
$45 2:10, 4:19,
  115:3, 127:1.
$495,657.51 78:7.
$5 2:10, 4:20,
  7:18, 8:25, 9:19,
  9:22, 10:16,
  11:19, 11:24,
  12:23, 15:17,
  20:17, 58:8,
  58:10, 58:21,
  90:7, 114:24,
  115:3, 125:18,
  127:3, 129:2,
  129:11, 130:10,
  130:11, 132:4.
$50 2:7, 3:12,
  4:17, 15:17,
  16:23, 17:2,
  56:8, 57:4, 57:6,
  57:8, 57:11,
  57:17, 57:23,
  58:1, 58:4,
  58:20, 106:24,
  107:3, 107:9,
  109:10, 114:6,
  115:2, 115:6,
  124:25.
$500 55:16.
$8,964,805 82:23.
$8.9 82:24.
.
.
< 1 >.
1 26:11, 27:2,
  29:22, 32:13,
  65:7, 65:13,
  65:15, 65:17,
  65:22, 88:11,
  91:12, 92:4,
  104:6, 104:8,
  104:9, 104:11,
  107:19.
1. 108:6.
10 89:16.

10. 87:11.
100 40:7.
101 1:47.
107.5 26:20,
  68:16.
109 30:17.
109. 32:19.
10th 84:11.
11 22:11, 23:1,
  70:1, 92:1, 92:3,
  111:5.
11. 68:5, 68:10,
  92:7, 92:13.
11:00 1:19.
11th 5:17, 84:11.
12 22:25, 25:13,
  25:15, 39:24,
  42:9, 42:21,
  46:23, 49:17,
  79:6, 92:20.
12. 70:24.
12th 2:13, 5:20,
  6:5, 6:7, 127:17,
  129:6.
13 25:13, 25:15,
  48:5, 48:8,
  48:21.
14 52:19, 62:8,
  62:11.
14. 49:23.
15 83:20, 84:2,
  90:2, 103:17.
15. 83:21, 88:23.
1529. 83:22.
154 6:18.
15th 84:11.
18 3:19, 4:8,
  18:14, 129:2,
  131:2.
1800s 96:16.
191 65:25.
1956(a)(1)(ii
  109:24.
1956(a)(2)(a 15:6,
  18:15, 19:2,
  110:5, 110:17,
  111:24, 122:12,
  123:1, 124:3,
  125:11, 131:3.
1957 17:22, 18:18,

18:25, 19:1,
19:9, 19:18,
109:22.
1957. 18:15.
1978 6:18.
1983 94:10.
1990 6:23.
1990. 126:3.
.
.
< 2 >.
2 28:23, 46:20,
52:23, 74:15,
77:1, 77:14,
78:20, 80:13,
107:19.
2)(B 98:15.
2. 28:6.
20 5:15, 25:5,
90:2, 127:9,
129:5.
2004 95:1.
2007 95:18, 96:7.
2010. 92:19.
2011 24:6, 24:13,
25:19, 33:4,
34:19, 35:12,
36:12, 38:9,
39:25, 40:12,
42:22, 43:22,
45:8, 46:15,
50:10, 50:19,
51:13, 52:10,
75:6, 95:8,
101:25, 102:12,
102:18, 102:23,
103:21, 104:4,
104:17, 105:1.
2012 2:7, 3:10,
3:11, 5:7, 5:9,
18:1, 24:10,
24:15, 25:19,
32:25, 33:17,
34:21, 36:14,
38:9, 40:1,
40:12, 42:22,
43:24, 45:8,
46:15, 50:11,
50:19, 51:15,
52:10, 54:10,

55:3, 105:4,
106:23, 115:3.
2012. 109:21.
2015 5:11.
2015. 5:10,
129:6.
21 5:17, 76:2.
21. 127:10,
129:5.
21201 1:48.
215 66:24.
22 14:15.
24 53:23.
254 67:15.
26 23:6, 54:9.
27 6:3.
27th 130:8.
29 128:16.
297 6:23, 126:3.
2:00. 93:6.
.
.
< 3 >.
3 37:16, 38:7,
38:24, 39:25,
70:7, 77:5, 78:6,
107:19.
30 25:21.
32 128:16,
131:25.
33 25:18, 27:14.
350 14:16.
.
.
< 4 >.
4 35:13, 36:3,
40:13, 42:7,
42:8, 70:7, 79:2,
81:21, 107:19.
4,846,206.57.
80:11.
4. 44:10, 78:11,
78:12.
401(k 56:5.
401(k)s 59:12.
41(g 3:20, 3:23,
4:12, 4:14, 4:16,
8:1, 8:14, 10:5,
125:23, 126:23,
129:10, 129:24,

129:25.
438 6:18.
45 17:4.
480 97:7.
495,000 79:3.
495,657.51.
77:12.
4th 1:47, 6:21,
6:23, 19:14,
126:1, 126:3.
.
.
< 5 >.
5 17:15, 44:5,
44:10, 45:2,
45:7, 45:20,
80:25, 93:6.
5. 78:25, 79:17,
115:9.
5.2 24:11.
50 17:4.
50s 96:22.
5227 40:17.
5227. 31:22,
40:21.
5360 77:11.
5360. 77:17.
5:00 133:16.
.
< 6 >.
6 101:18.
6. 80:19, 100:10,
100:14, 103:19,
106:25.
605 82:23.
65 113:3.
.
.
< 7 >.
7 82:7, 82:24.
7,000 14:16, 16:16,
53:25, 54:11.
7.8 104:1, 104:2,
104:3.
714 19:14.
782. 19:14.
.
.
< 8 >.

8 83:21, 84:1,
 84:2.
8. 83:5, 83:9,
 88:21.
899 6:23, 126:3.
.
.
< 9 >.
9,100 97:4.
90 9:1.
9227 34:24.
9227. 30:21.
9264 83:5, 83:6,
 83:9.
9264. 32:2.
9277 33:25, 79:24,
 80:21, 81:14,
 81:16, 81:19,
 82:17.
9277. 33:24,
 34:6.
9332 30:15, 78:9,
 79:23, 80:2,
 80:5, 80:23.
9332. 32:20.
9442 62:23, 68:24,
 69:1, 69:5,
 70:13, 70:17,
 71:2, 71:11,
 119:10, 125:15.
9442. 31:6, 35:24,
 36:18.
95 75:9.
981 19:17.
983(f 3:20, 4:8.
.
.
< A >.
A-l-c-o-m-a-r-q-u-e
 -s 89:21.
a.m. 1:19.
ability 58:5,
 110:4, 111:1,
 114:15, 117:2.
able 17:7, 30:4,
 54:13, 56:23,
 102:23, 105:22.
above-entitled
 133:20.
absent 68:13.

Absolut 66:25,
 67:7.
Absolutely 28:4,
 43:15, 84:8,
 111:17, 120:7,
 120:25, 121:12,
 131:9.
abundance 110:22.
accepted 4:6.
access 101:14,
 112:23.
accident 73:7,
 73:8, 73:11,
 73:13.
accomplished
 72:23.
according 3:22.
Accordingly
 130:8.
account. 69:4,
 71:3, 71:13.
accounting 26:4,
 41:1, 41:2,
 72:19, 72:20,
 86:22.
accounts. 29:1,
 71:8.
accumulate 15:15.
accumulations
 14:1.
accuracy 122:3.
accurately 102:8.
accused 121:19.
ACH 26:1, 39:20,
 41:9, 41:11,
 46:5, 46:8,
 50:22, 52:12,
 54:2, 84:21,
 85:3, 85:7,
 85:15, 85:17,
 86:10, 86:21,
 86:25, 88:1,
 88:7, 89:11,
 120:3.
Achs 46:1, 46:6,
 46:15, 49:5,
 85:4.
acknowledged 120:2,
 120:3.
acknowledgment

11:10, 126:15.
act 41:18.
action 9:4, 9:6,
 20:4, 20:9,
 20:10, 55:10,
 127:12, 129:3.
active 98:10.
activities 27:10,
 27:11, 72:21.
activity 5:9,
 31:11, 32:6,
 32:22, 37:5,
 38:10, 38:13,
 49:5, 53:11,
 53:22, 54:16,
 99:8.
actual 11:11,
 24:25, 41:13,
 76:18.
Actually 16:17,
 17:13, 29:16,
 29:18, 30:4,
 30:5, 30:7, 31:4,
 32:10, 35:5,
 39:14, 39:20,
 39:22, 41:10,
 41:17, 41:19,
 46:11, 46:12,
 53:12, 54:22,
 55:9, 56:10,
 57:4, 59:14,
 60:20, 75:5,
 75:18, 85:22,
 95:2.
added 118:18.
addition 16:12,
 34:1, 131:23.
additional 71:8.
address 10:13,
 131:17, 133:6,
 133:10.
addressed 115:21.
addressing 9:10,
 12:13.
adequate 100:15,
 115:13, 115:14,
 116:1.
adjourned 133:16.
administrative
 33:15, 75:2.

admissibility
   13:20, 37:20.
admission 44:12.
admitted 37:21,
   42:11, 44:13,
   68:11, 100:20.
advance 26:17.
advise 128:11.
advised 128:7.
advising 128:15.
affiant 7:2, 10:8,
   111:7, 111:11,
   116:18, 124:19.
affiliate 61:24.
affiliates 14:22.
afternoon 53:9,
   60:23, 75:3,
   93:8, 130:13,
   130:16.
Agent 5:24, 7:24,
   10:7, 12:25,
   13:15, 15:3,
   21:8, 28:7,
   29:23, 46:19,
   47:4, 48:21,
   49:9, 50:2,
   51:17, 52:19,
   52:22, 103:11,
   110:25, 111:4,
   111:6, 111:12,
   112:5, 116:19,
   128:25, 129:13,
   130:10, 131:19,
   131:21.
agents 8:7,
   118:11.
aggrieved 129:21,
   129:25.
ago 35:25, 36:4,
   62:23, 77:24,
   88:23, 89:10,
   94:15, 103:17,
   112:18, 126:23.
agree 8:2, 8:5,
   8:13, 9:20,
   10:22, 67:12,
   67:13, 67:25,
   68:3, 81:14.
agreed 6:2,
   13:19.

agreement 31:5,
   45:13.
agreements 55:22,
   105:24, 105:25.
agricultural
   56:19.
ahead 12:7, 12:16,
   12:19, 28:10,
   70:10, 90:15,
   92:8, 100:19,
   123:14.
Akin 10:16, 125:2,
   128:25, 129:13,
   130:9.
alcohol 23:4,
   96:11.
alcoholic 98:2.
Alcomarques
   89:20.
allegation 11:16,
   11:17, 120:23.
allegations 5:22,
   115:16, 123:8,
   123:12, 128:5,
   131:17, 132:23.
alleged 4:18, 5:23,
   11:7, 16:20,
   70:25, 122:5.
allegedly 119:16,
   125:4.
allow 13:25,
   57:4.
allowed 57:2, 57:3,
   88:1, 110:15.
alluded 127:15.
almost 16:23,
   130:23.
alone 29:17.
already 8:25, 11:8,
   26:24, 54:5,
   55:20, 68:6,
   85:18, 87:23,
   124:8.
amazement 126:12.
ambit 127:23,
   131:2.
amended 129:1.
America 1:10, 40:9,
   52:15, 52:16,
   74:18.

American 132:5.
Among 83:13.
amount 16:24,
   17:11, 17:12,
   18:6, 20:12,
   20:13, 78:5,
   78:9, 78:14,
   78:16, 80:25,
   82:22, 102:20,
   103:25, 107:3.
amounts 71:7,
   111:2.
analogize 11:3.
analysis 4:12,
   126:23.
analyze 11:4.
Anne 94:18.
annual 33:3, 35:11,
   101:8.
answer 79:10,
   123:20.
answering 64:15.
answers 58:12.
anticipation
   20:6.
AP 59:7.
apologize 36:3.
Apparently 11:9,
   11:14, 11:15,
   16:11, 83:1,
   83:2, 87:19,
   88:25, 126:18.
appeal 117:3.
appear 52:23.
appears 11:9,
   29:10, 36:18,
   74:17, 77:15,
   78:24, 81:7,
   81:10, 112:11.
application 5:24,
   19:5, 28:25,
   104:20.
applied 104:23.
applies 125:22.
apply 104:19.
Applying 104:19.
apposite 110:12.
approach 26:14,
   28:3, 37:12,
   42:3, 44:1, 91:8,

92:15, 100:11.
appropriate 8:16,
    8:18, 8:20, 9:13,
    90:6, 132:15.
approval 18:10,
    60:22.
approves 39:2.
approximate 24:5,
    33:3, 35:11,
    104:16.
Approximately 95:7,
    105:2.
argument 109:4,
    118:17, 118:20,
    127:15, 129:18.
arm 98:15.
around 99:2, 99:15,
    120:6.
arranged 4:2.
arrangements 4:1.
artery 16:21.
Article 98:14,
    117:25.
articulated 3:15.
Arundel 94:18.
Asif 1:45, 133:18,
    133:26.
aspect 18:16,
    18:18.
asset 110:2.
assets 16:19,
    114:16.
assigned 9:6,
    132:20.
assist 27:9.
assistance 90:9,
    102:3.
Assistant 110:25,
    116:20, 121:18,
    128:5, 128:20,
    131:19, 133:9.
associated 68:22.
associates 14:22,
    105:20.
assume 27:22,
    61:18, 84:20,
    121:21.
assuming 121:24.
Atlanta 13:7,
    29:19, 29:21,

65:10.
attached 92:6,
    112:9.
attacking 6:19.
attempt 53:19,
    53:22.
attention 32:8.
attesting 131:21.
attests 112:6.
Attorney 60:20,
    110:1, 110:25,
    116:20, 117:8,
    121:19, 121:22,
    128:6, 128:7,
    128:11, 128:20,
    128:21, 131:19.
Attorneys 56:11,
    60:16, 133:9.
audited 58:19.
auditor 58:18.
August 2:7, 3:11,
    17:3.
AUSA 1:33.
authenticity
    13:20.
authorities 4:10,
    127:13.
authority 8:15,
    113:16, 116:2.
authorize 86:24,
    87:2, 87:6.
authorized 39:2,
    39:5, 85:25,
    86:2, 86:8.
Automated 39:4,
    85:7, 85:9,
    85:10.
automatic 86:8.
available 8:8.
average 38:16.
await 116:17.
awaits 20:18.
aware 28:16.
away 60:12.
awfully 74:5.
.
.
< B >.
B-a-s-h-u-k 22:1.
back 9:18, 17:3,

18:1, 21:6,
    25:21, 29:22,
    46:19, 51:17,
    55:1, 60:12,
    60:19, 62:1,
    62:22, 71:21,
    75:4, 79:2,
    88:21, 89:16,
    94:25, 95:2,
    103:19, 114:9,
    119:16.
backwards 61:3.
bad 55:21.
balance 31:14,
    38:16, 38:23,
    63:16, 63:18,
    79:5.
Baltimore 1:20,
    1:48, 29:11,
    29:17, 125:14.
Baltimore.
    122:14.
bankers 60:11.
banking 24:22,
    27:10, 31:12,
    86:19.
banks 14:20, 47:13,
    47:16, 47:23,
    49:6, 49:15,
    55:12, 56:17,
    56:19, 58:11,
    61:7, 61:25.
bar 103:25.
based 13:7, 50:19,
    57:14, 63:23,
    80:12, 81:10,
    91:1, 95:4,
    107:1, 117:19,
    117:21, 126:12,
    126:13, 127:2,
    130:22.
Bash 21:5.
basic 18:18.
basically 9:1,
    56:19, 59:15,
    60:7, 99:20,
    105:19.
basis 8:16, 8:24,
    10:15, 18:2,
    19:5, 27:6,

44:12, 98:13,
98:25, 99:6,
129:23.
Beam 50:12, 50:13,
50:17, 50:20,
50:23, 51:8,
112:16.
bear 107:3.
bearing 107:5.
bears 110:9.
become 28:16,
95:6.
becoming 123:7.
beforehand 39:22.
began 6:6,
127:16.
beginning 112:6.
Begins 48:10,
111:6.
behalf 2:23,
56:12.
behest 3:13,
5:11.
behind 12:11,
12:14, 60:16,
76:11, 121:13.
Belgium 89:18,
89:21.
belonging 111:8.
below 63:24.
Bennett 1:18,
94:13, 99:18,
104:1.
best 114:19,
117:14, 131:3,
131:13.
better 73:24, 74:1,
131:12.
Beverage 23:3,
65:7, 65:8, 65:9,
65:10, 66:4,
96:10.
beverages 98:2.
big 26:1, 26:7,
26:8, 45:11,
79:2, 109:20.
bigger 58:13.
billed 88:2.
billion 14:20,
24:11, 24:14,

24:17, 36:2,
36:3, 40:13.
Billion. 36:3.
bills 55:24.
bimonthly 56:3.
binder 37:16, 38:6,
42:8, 42:21,
44:5, 70:8.
Binghamton 22:24.
bit 22:12, 24:3,
24:16, 40:15,
41:21, 68:25,
83:3.
block 104:11.
blue 97:10,
102:16.
bodies 14:2.
bond 106:24.
book 63:17.
books 83:6.
borrow 57:4,
84:13.
borrowed 57:1.
borrowing 57:8,
57:22, 57:23,
58:1.
bottom 27:17, 30:9,
47:3, 80:6.
bounce 16:18.
bounced 16:17.
bouncing 54:20,
114:3.
boutique 40:9,
40:14, 84:25.
box 12:15.
branch 29:19.
brand 50:10,
95:12.
brands 50:12,
91:13, 91:14,
95:15, 95:16,
95:19.
bravado 114:12.
break 93:5, 99:20,
105:25.
brief 90:17,
110:15, 118:24.
briefing 6:5, 7:5,
110:3, 110:12,
117:18, 122:17.

briefings 125:3.
briefly 90:14,
91:9, 94:13,
111:5.
brings 105:19.
broken 101:1.
broker 41:18.
brokerage 41:4.
brought 9:5, 90:4,
112:24, 114:12.
bundle 33:17, 75:4,
75:14, 78:3.
business. 113:17.
busy 111:22.
buy 23:9, 23:13,
23:21, 45:22,
96:12.
.
.
< C >.
C-o-l-k-l-e-y 6:23,
126:3.
calendar 24:6,
101:25, 102:12.
call 3:6, 7:16,
18:10, 31:9,
31:25, 54:23,
55:1, 60:6,
60:19, 75:9,
75:22, 78:2,
86:16, 93:12,
99:7, 105:11,
105:20, 108:24,
114:3, 128:18,
133:15.
called 19:12,
21:21, 30:25,
31:12, 35:3,
36:21, 36:24,
44:23, 53:14,
54:25, 55:9,
55:13, 55:17,
56:10, 60:2,
60:5, 60:20,
66:25, 74:17,
84:18, 86:12,
89:1, 93:18,
95:12, 95:24,
107:20, 108:18.
calling 2:2,

44:8.
calls 21:4.
Calvert 94:4.
camera 117:12.
Canada 66:11.
Canadian 66:2,
    66:6, 66:8,
    66:9.
candor 11:17.
cap 58:6.
capital 24:12,
    58:2, 58:5.
caption 30:17.
captioned 26:13,
    29:4, 32:2.
capture 75:25.
carotid 16:21.
carry 49:25.
cases 33:14.
cash 24:20, 27:10,
    31:16, 37:10,
    38:20, 73:6,
    114:6.
Cassella 110:1,
    110:4, 113:24.
catalog 91:12.
cause 7:4, 49:10,
    105:25, 114:21,
    126:10, 128:14.
caused 16:10,
    106:12.
Cecil 15:7, 15:10,
    17:24, 100:5,
    101:13, 101:16,
    102:1, 102:24,
    103:9, 103:12,
    104:5, 104:9,
    104:20, 109:17,
    114:7.
center 34:7, 34:25,
    36:18, 44:21.
certain 26:19,
    72:7.
certainly 7:14,
    7:15, 7:16, 8:5,
    8:15, 8:21,
    11:22, 11:25,
    21:10, 21:14,
    26:15, 28:1,
    42:5, 84:5, 86:2,

100:12, 108:2,
    115:25, 117:13,
    118:16, 131:4.
certify 133:18.
chair 133:11.
challenged
    120:17.
challenges 121:20,
    121:23, 121:25,
    128:12, 128:13.
chance 64:7.
change 73:25, 74:2,
    74:4.
channels 99:21.
charge 19:2.
charged 19:4,
    117:4.
charges 128:15.
chart 26:13, 27:4,
    27:6, 27:9,
    27:13, 29:22,
    29:24, 30:14,
    30:21, 31:8,
    31:23, 32:3,
    34:7, 34:25,
    36:18, 40:18,
    44:16, 44:18,
    101:19, 101:23,
    101:24, 102:3,
    102:8, 102:11,
    102:14, 103:21,
    107:19, 108:7.
check 18:7, 73:23,
    74:7, 74:8,
    74:17, 74:21,
    75:7, 75:8,
    75:19, 75:22,
    76:2, 76:20,
    76:22, 76:23,
    76:24, 76:25,
    77:2, 77:11,
    77:13, 77:16,
    77:17, 77:21,
    78:19, 78:22,
    80:13, 81:5,
    82:19, 82:25.
checking 69:4,
    69:6, 69:13,
    69:16, 70:13,
    70:18, 71:2,

71:11, 71:16,
    71:17, 74:6,
    119:10, 119:13,
    125:16.
checking. 69:12.
checks 25:10,
    25:25, 29:16,
    32:22, 33:13,
    33:16, 39:17,
    54:20, 72:15,
    74:9, 74:13,
    74:24, 75:2,
    75:11, 76:4,
    76:18, 90:3.
Chesapeake 103:13,
    103:18, 104:25,
    107:4.
Chief 110:2,
    117:16.
choose 10:11,
    105:25.
chooses 9:3.
Christine 1:45,
    133:18, 133:26.
████████████████

██
circle 102:15.
Circuit 6:22, 6:23,
    19:15, 126:2,
    126:3.
circumstances
    53:18.
cited 13:15, 19:11,
    50:6, 52:19,
    110:3, 117:18.
citing 4:10,
    16:8.
citizens 132:6.
Civil 1:7, 2:3,
    4:22, 9:3, 9:5,
    19:19, 20:3,
    20:9, 113:6,
    127:4, 132:19.
clarify 3:3, 9:22,
    18:25, 19:25.
clean 110:6, 110:7,
    113:25.
clear 6:14, 16:2,
    16:19, 17:6,
    17:11, 35:25,

92:2, 110:17,
112:23, 118:13,
120:4, 123:9,
124:14, 130:3.
cleared 33:22,
85:18.
Clearinghouse 85:8,
85:9, 85:10.
clearly 93:22,
116:23, 121:24,
126:14, 131:15.
Clerk 9:7, 21:17,
21:24, 22:2,
28:4, 93:15,
130:16, 132:15,
132:18, 132:20.
client 9:17, 113:6,
113:8, 132:11.
close 25:21, 35:13,
35:19, 130:16.
closed 20:18,
132:16, 132:17.
closer 22:12,
22:14, 28:18,
28:21.
club. 66:6.
Code 3:19, 18:14,
131:2.
codified 123:1.
Cognac 112:15.
Colkley 6:22,
126:2.
collar 97:11.
collateral 31:4,
57:11, 57:15.
collect 75:2,
106:11, 109:20.
collected 33:8,
99:2, 106:11.
collection 35:15.
collections 31:19,
33:11, 34:3,
36:23, 37:2,
37:6, 98:17.
collector 98:16.
color 102:15,
103:1, 103:4,
103:23.
colored 103:1.
Columbia 23:6.

column 87:21.
combination
106:2.
combine 33:16.
comes 46:13, 66:9,
66:15, 67:11,
72:14.
comfortable
12:16.
coming 111:23.
Commercial 69:4,
69:5, 69:12,
69:13, 69:15,
70:13, 70:18,
71:2, 71:11,
71:16, 71:17,
119:10, 119:13,
125:15.
commingled 19:20.
commission 41:19.
Common 117:20.
companies 14:21,
14:23, 14:24,
39:17, 40:5,
56:18, 65:5,
94:24.
compare 35:17.
compel 116:8.
complete 7:19,
116:2.
compliance 99:5.
complicated 74:5,
114:13.
component 126:1.
comptroller 98:7,
98:18, 98:20,
99:3, 106:7.
concentrates
36:23.
Concentration
26:13, 31:10,
36:6, 36:17,
36:22, 38:10,
38:17, 40:4,
53:7, 54:12,
62:24, 69:20,
70:14, 70:18,
71:3, 71:12,
71:13, 71:15,
81:18, 92:10,

119:11, 119:14,
125:16.
concern 128:14.
concerned 105:18,
105:23.
concerning 27:10,
27:21.
concerns 105:15,
127:19.
conclude 17:8,
115:15.
concluded.
133:17.
concludes 132:21.
conclusion 12:21,
113:19, 124:10.
conduct 4:18, 6:2,
121:19.
conducted 2:4,
2:12, 2:13, 5:21,
10:19, 85:22,
85:23.
conducting 90:1.
confirmations
112:4.
Confiscate 110:6,
110:7.
conflict 131:24.
connect 85:6.
Connor 1:28,
2:19.
consequence 55:2,
55:8, 58:3,
58:20.
consequences 55:18,
57:16, 58:8,
58:24.
consequently
19:19.
consider 8:18,
12:22, 57:6,
110:14, 115:10.
consistent 128:6.
Constellation 88:3,
88:5, 88:8, 88:9,
88:11, 88:24,
88:25, 89:1,
89:5, 89:14,
89:19, 90:23,
91:1, 91:4, 91:6,

95:15, 95:16,
95:19, 96:5,
96:6, 112:20.
constitute 55:11.
constructive
89:24.
consumer 97:21.
consumers 23:11.
contact 60:18,
128:21.
contacts 132:22.
contained 38:13.
contains 78:19.
contending 121:8,
122:1, 122:17,
122:23, 123:3,
123:9, 123:14,
123:16, 124:1.
contends 125:4.
contention 122:6,
122:9, 122:15,
122:19, 124:3.
context 6:20, 7:17,
8:20, 8:24, 9:10,
10:4, 10:23,
11:2, 12:1,
116:15, 116:22,
125:21, 125:24.
continually
58:11.
continuation 2:12,
6:4.
continue 8:25,
9:18, 10:15,
90:6, 93:9.
continued 11:19,
127:17, 129:7,
129:21, 131:4.
continuing 6:6,
12:2, 109:11.
contrived 115:15.
Control 32:1,
40:17, 40:23,
41:3, 41:4, 41:7,
41:15, 41:24,
42:1, 42:14,
42:23, 43:6,
43:10, 43:13,
44:9, 47:1, 47:4,
111:12.

controls 41:17.
controverted
112:16.
convenience 30:2.
convince 15:21,
112:14.
convincing 14:17,
15:20.
copies 26:17, 66:1,
84:4.
copy 20:22, 28:5,
76:23, 76:24,
76:25, 84:1,
84:3, 100:18.
corporate 2:19,
132:6.
corporations
131:10.
corrected 60:21.
correctly 4:25,
5:8, 6:8.
correctness
120:18.
costly 46:12.
counsel 2:14, 3:14,
5:12, 70:23,
109:3, 129:19,
131:24.
Count 71:2,
71:11.
countries 46:10,
68:2.
Country 15:5,
47:25, 67:10,
85:5, 110:24,
112:10, 112:14.
County 15:8, 15:10,
17:24, 94:3,
94:4, 94:17,
94:18, 100:3,
100:5, 101:2,
101:13, 101:16,
102:1, 102:24,
103:9, 103:13,
104:5, 104:10,
104:20, 109:17,
114:7.
Couple 25:20,
35:25, 41:13,
53:11, 53:15,

65:21, 85:6,
114:7.
course 38:3, 97:14,
106:18, 120:11,
123:10, 123:15.
courtroom 2:5,
21:6, 113:14,
117:10.
Courvoisier 50:4,
50:10, 50:20,
51:3, 61:5,
61:11, 62:18,
112:15.
Courvoisier.
62:5.
cover 65:24.
create 35:6, 86:18,
117:20, 117:25.
created 43:2, 55:9,
57:3, 111:22.
creative 16:1.
credibility
111:9.
credit 24:24, 26:5,
26:8, 31:3, 35:4,
38:11, 38:14,
55:4, 55:5,
55:14, 56:17,
57:11, 57:12,
57:13, 57:18,
77:12.
credits 31:18,
37:7, 38:25.
cries 128:3.
crime 16:20, 17:13,
109:13, 114:14.
Criminal 3:20,
4:18, 4:23, 6:20,
9:5, 10:4, 113:5,
114:17, 116:15,
117:1, 123:24,
125:22, 125:23,
125:25, 129:11,
132:19.
criminally 19:21.
critical 13:17,
15:19, 15:20.
cross-defaulted
55:14.
Cross-examination

```
         59:20, 59:22,
         107:13, 107:14,
         108:14, 123:23,
         128:1, 130:24,
         134:9, 134:17.
cross-examine
         121:18.
CRR 1:45, 133:18.
cure 55:23.
curious 51:8.
current 94:11.
currently 25:12,
         97:2.
custodian 13:21.
customer 23:20,
         33:1.
customer-related
         32:22.
customers 33:13,
         34:4, 55:24,
         75:10, 97:17,
         106:3, 106:4.
customers. 50:7.
Customs 28:8, 32:6,
         43:4, 45:1.
cut 79:13.
cutoffs 63:11.
cycles 56:3.
.
.
< D >.
D. 1:18, 31:22.
D.C. 96:23.
data 14:2, 101:8,
         101:12, 101:16,
         102:4, 102:5,
         102:9, 102:14.
date 16:7, 52:25,
         82:8, 92:11,
         92:17, 92:20.
day 13:3, 16:4,
         16:5, 16:6,
         17:18, 39:2,
         39:3, 52:23,
         53:4, 53:25,
         54:18, 59:15,
         60:14, 63:1,
         75:15, 79:4,
         79:6, 79:12,
         79:14, 97:14,
```

```
         99:24, 106:16,
         114:4, 115:12,
         115:25, 130:8,
         131:12.
days 39:21, 41:13,
         75:4, 106:15,
         118:8.
DBA 89:7.
dead 34:7.
deaf 132:9.
Deal 11:20, 99:15,
         106:21, 113:10,
         113:14.
dealing 55:5.
debit 45:13, 46:8,
         54:15, 81:19,
         82:11, 85:15,
         86:3, 86:5,
         86:10, 87:6,
         88:1.
debited 41:11,
         46:1.
debits 31:18, 37:7,
         38:25, 43:2,
         47:6, 48:23,
         111:15, 120:3.
December 3:9, 5:7,
         5:9, 17:4, 115:3,
         126:21.
decide 20:16,
         20:20, 132:8.
decides 132:8.
decision 116:1.
decisions 117:21.
declaration 77:6.
deemed 26:20.
Deerfield 50:14,
         112:17.
default 55:10,
         55:11, 55:13,
         55:15, 56:16,
         56:21, 57:5,
         57:17.
Defendant 1:12,
         1:31, 6:21, 6:25,
         117:1, 125:24,
         126:6, 128:17.
defendants
         116:15.
Delaware 6:17,
```

```
         7:11, 7:13, 10:4,
         10:7, 10:13,
         52:8, 52:9,
         95:22, 116:5,
         116:16, 116:22,
         122:4, 125:21,
         125:22, 125:24,
         126:4, 126:5.
deliver 41:22,
         97:13, 99:25.
delivered 43:17.
demand 56:14,
         57:24.
demanding 16:23,
         56:8.
demonstrate
         112:18.
demonstrated
         119:19, 124:19.
demonstrative
         14:1.
Dennis 2:20, 13:5,
         21:4, 21:20,
         22:1, 134:5.
deny 4:5.
Department 28:7,
         41:1, 86:23.
depending 79:13,
         85:5.
Depends 63:15,
         74:1.
depicted 29:23.
deposit 32:22,
         33:7, 33:9,
         53:14, 72:14,
         72:21, 74:6,
         74:12, 75:5,
         75:23, 75:24,
         75:25, 77:18,
         77:22, 77:25,
         78:5, 78:9,
         78:17, 78:19,
         78:22, 79:2,
         79:6, 79:14,
         80:3, 81:6,
         81:10.
deposited 33:11,
         33:21, 35:8,
         35:20, 36:25,
         42:23, 45:9,
```

74:8, 74:21,
75:19, 77:12,
77:23.
depository 25:6,
25:9, 25:11,
25:15, 27:18,
27:19, 29:15,
30:19, 31:2,
31:16, 33:23,
34:1, 35:10,
59:4, 74:11,
75:20.
deposits 33:1,
33:3, 35:11,
35:16, 39:13,
54:1, 54:5,
56:1.
deprivation 3:24,
4:15, 126:25,
129:10, 129:22,
130:2, 130:5.
deprived 4:2.
derived 19:21.
describe 23:2,
27:13, 41:15,
96:8, 97:8,
99:10, 99:18.
described 84:23.
designed 122:12,
125:12.
detail 41:16,
74:13.
determination 7:4,
126:11.
determine 102:5,
102:23.
determined 4:4,
4:14.
determining 90:5.
devastating
106:5.
development
116:17.
developments
20:19.
difference 53:25,
63:25.
different 25:24,
26:4, 41:21,
46:10, 56:2,

91:13, 110:13,
131:9.
differently 47:17,
100:6.
difficulty 82:2,
110:23, 116:25.
digits 30:21, 31:6,
31:22, 32:2,
32:20, 68:23.
Direct 22:3, 32:8,
39:13, 54:1,
54:4, 83:11,
86:15, 93:25,
134:7, 134:15.
directly 73:22,
97:16, 97:20,
97:23.
disburse 29:16,
130:11.
disbursed 45:17.
disbursement 25:23,
27:15, 31:24,
32:4, 37:5, 37:8,
38:22, 54:17,
59:5.
disbursements
31:19, 36:23,
37:3, 37:11.
disclosed 131:18.
discussion 17:15.
disproportionate
4:17.
dispute 60:25.
disputed 15:11.
disregard 7:2,
126:8.
distiller 97:22.
Distilleries 50:3,
51:18, 52:18,
61:16, 62:5,
62:12, 62:17.
distinct 20:10,
20:11.
distribute 68:1,
96:13, 106:1.
distributed
38:22.
distributes 64:18,
64:24.
Distributing 1:5,

2:3, 2:6, 2:17,
22:8, 23:3, 29:8,
65:1, 94:8,
102:19, 127:10,
128:1, 128:23,
129:21, 130:12.
distribution
41:18.
distributors 47:8,
48:24, 111:17.
District 1:1, 1:2,
23:6, 94:16,
117:11, 121:22.
divided 100:2.
division 94:18,
94:19.
docket 5:8.
document 100:15,
123:21.
documents 115:23,
123:6.
doing 8:17, 14:15,
41:2, 46:11,
87:6.
dollar 63:25.
dollars 18:4, 24:7,
24:11, 24:14,
35:13, 36:3,
40:13, 40:15,
109:20, 113:15.
domestic 18:18,
19:10, 47:15,
47:16, 48:19,
49:6, 89:9,
112:22.
domestically 47:13,
49:13, 49:15,
85:17.
domiciled 47:25.
done 25:20, 39:16,
49:13, 60:14,
72:15, 76:8,
86:25, 109:14,
111:10, 116:10,
116:11, 119:6,
119:15.
dots 85:6.
doubt 109:24.
down 12:12, 17:15,
22:14, 22:15,

31:21, 37:8,
37:9, 38:21,
59:16, 61:4,
63:7, 63:13,
69:10, 69:18,
73:6, 73:17,
79:17, 80:6,
84:9, 86:23,
93:4, 101:1,
104:5, 108:16,
109:10, 114:6,
114:18.
downward 38:22.
dozen 34:10.
drafted 117:25.
drafting 16:1.
dramatically
110:13.
draw 37:8, 39:22.
drawn 92:10.
drew 57:14.
driver 33:14.
drivers 97:12,
99:24.
drop 17:15.
dual 6:24,
125:25.
due 132:7.
duly 21:21,
93:18.
During 28:17, 47:6,
51:3, 52:14,
62:25, 97:13,
105:3, 105:6,
111:15.
duties 43:4,
99:10.
.
.
< E >.
E. 29:4.
earlier 5:20,
27:15, 53:23,
85:2, 104:13.
ears 132:9.
east 44:20.
eastern 13:11.
educational
11:11.
effect 4:24, 5:7,

11:22, 132:10.
effectively
59:16.
effort 16:25, 17:8,
17:18, 56:14,
109:11, 114:1,
114:2, 115:22.
efforts 130:24.
EFT 26:1, 27:16,
39:21, 40:17,
40:24, 41:8,
41:9, 42:9,
42:24, 43:10,
43:13, 44:9,
44:11, 44:17,
45:10, 45:19,
47:2, 47:5,
48:22, 49:17,
49:21, 50:22,
52:12, 59:7,
59:9, 84:21,
86:21, 86:25,
111:13.
Efts 43:16, 43:19,
53:12, 55:20,
88:7, 105:21.
eight 126:22,
127:6, 129:16,
132:3.
Either 7:15, 8:21,
9:11, 31:15,
32:23, 41:9,
59:13, 73:22,
77:23, 78:2,
101:2, 101:5,
103:16, 112:24,
113:5, 113:7,
117:2.
electrical 32:5.
electronic 35:22,
44:25, 73:23,
76:5, 76:9,
76:14, 108:6.
electronically
26:2, 32:6,
32:24, 46:5,
75:19.
elsewhere 100:7,
106:17.
employed 94:7,

97:2.
employees 14:16,
39:13, 39:15,
53:25, 54:1,
54:7, 54:8,
57:20, 58:24,
73:16, 97:5,
97:9, 97:11,
99:4, 105:20,
106:18, 107:18.
end 8:17, 24:13,
24:15, 25:9,
29:11, 31:11,
32:23, 33:15,
34:4, 37:4,
45:15, 59:24,
75:3, 79:4,
79:12, 81:17,
97:16, 97:23,
106:22, 113:9.
ended 56:11.
ending 33:24,
35:24, 80:21.
ends 30:14, 31:6,
31:22, 32:2,
32:19, 35:23,
40:21.
Enforcement 28:8.
enjoyed 104:17.
enormous 16:24.
enough 118:19,
128:19.
entail 98:21.
entered 5:7.
entire 8:22, 19:21,
19:22, 36:1,
101:25, 114:6.
entirely 117:19.
entities 98:5.
entitled 3:21,
132:6.
entitles 4:8.
entitling 3:24.
entity 29:6, 98:5,
98:7, 112:19,
127:12.
entries 5:8.
entry 84:11.
equity 24:12.
equivalently

104:20.
ERISA 56:5,
  59:12.
error 117:20.
Esquire 1:25, 1:26,
  1:27, 1:28.
essential 7:4,
  126:10.
Essentially 3:9,
  3:12, 3:17, 3:22,
  3:25, 4:2, 4:4,
  6:2, 6:4, 6:17,
  6:19, 6:21, 7:8,
  7:10, 8:11, 8:25,
  10:18, 11:7,
  18:8, 96:19,
  116:14, 122:15,
  127:14, 127:21.
establish 90:3.
established 6:5,
  6:22, 29:21,
  87:23.
establishments
  101:15.
estimate 107:7.
ethical 121:23,
  121:25, 128:5,
  128:11, 128:13,
  132:23.
ethics 121:21.
Europe 40:10.
event 20:9.
eventually 14:7,
  57:2.
everyone 30:1,
  93:8.
everything 56:6,
  109:13.
evidenced 126:16.
ex 58:6, 117:12,
  117:19.
exact 35:19.
Exactly 10:22,
  19:7, 20:21,
  68:8, 101:23,
  113:25, 120:6.
Examination 22:3,
  90:18, 93:25,
  108:3, 134:7,
  134:11, 134:15,

134:19.
examine 10:24,
  54:12.
examined 21:21,
  93:18.
example 11:7,
  11:13, 41:24,
  100:6, 101:2,
  101:7, 116:18.
exceeds 14:20.
excess 31:20, 37:9,
  38:20, 63:10,
  73:6.
exchanged 68:14.
executed 64:7.
executives 97:14.
exhibits 7:16,
  12:5, 14:1, 14:4,
  26:17, 68:6,
  68:14, 70:8.
exist 25:21, 100:5,
  112:9.
existence 28:16.
exists 74:13.
exotic 112:13,
  112:19.
expect 133:15.
expected 126:18.
expecting 10:7,
  10:9, 60:6.
expense 58:7.
expenses 38:14.
experience 50:19.
explain 56:19,
  85:15.
explained 8:8.
explanation
  71:24.
expound 129:20.
extended 57:17.
extent 116:13,
  132:18.
extreme 110:9.
.
.
< F >.
F.2d 6:23, 126:3.
F.3d 19:14.
facilities 24:24,
  26:8, 38:12,

55:14, 57:13.
facility 31:3,
  35:4, 38:14,
  56:17.
facing 110:22.
fact 4:15, 11:16,
  15:17, 60:13,
  60:25, 86:14,
  112:5, 112:20,
  122:2, 124:11,
  131:20.
factor 17:21.
facts 11:11,
  110:13.
factual 27:6.
fail 55:20.
fair 11:5, 23:18,
  70:16.
fairly 117:13.
fairness 123:13.
falls 132:9.
false 6:25, 48:18,
  62:6, 62:8,
  62:12, 62:20,
  70:23, 70:25,
  71:4, 71:14,
  111:25, 112:1,
  112:2, 117:15,
  119:5, 119:8,
  119:12, 119:16,
  124:11, 124:12,
  125:4, 126:7,
  130:19.
falsity 122:5,
  122:19, 122:20,
  122:21, 124:15,
  124:16.
familiar 20:24,
  28:13, 37:23,
  95:11, 95:25,
  101:18, 103:14,
  104:16, 123:22.
far 61:8, 80:12,
  80:15, 82:19,
  114:5, 116:16,
  126:23.
fascinating
  111:13.
fed 86:11.
Federal 1:46, 3:20,

23:25, 39:14,
  54:3, 129:11.
feel 12:16.
fees 45:1.
Feld 125:2, 129:1,
  129:13, 130:9.
few 39:21, 109:20,
  112:17.
fifth 44:15, 44:16,
  45:18.
file 9:3, 76:5,
  76:10, 76:13.
filed 2:6, 3:11,
  12:24, 16:4,
  124:24, 132:19.
filtered 109:8.
final 53:2.
finalized 56:25.
finally 5:11,
  58:23, 104:11,
  125:15, 127:7.
financial 22:20,
  57:16, 58:16,
  58:19, 58:22.
find 16:1, 40:6,
  44:18, 49:20,
  51:9, 51:11,
  53:14, 54:13,
  76:20, 76:22,
  111:3.
finding 4:7, 4:13,
  7:22, 124:15,
  124:18, 126:11,
  128:13, 130:3,
  130:5, 130:18,
  130:20, 130:21,
  131:21, 132:1.
findings 3:17,
  110:14.
finds 8:16,
  129:20.
Fine 8:11, 12:19,
  20:24, 22:15,
  28:10, 28:21,
  124:6.
finish 90:15.
finished 30:8.
firm 4:21, 9:23,
  10:16, 125:1,
  132:11.

First 3:18, 12:22,
  13:5, 18:10,
  21:2, 21:21,
  28:23, 28:24,
  30:14, 37:18,
  48:8, 53:6,
  53:19, 56:15,
  57:5, 69:2, 71:9,
  93:18, 95:10,
  103:13, 105:3,
  111:14, 113:3,
  114:2, 114:23,
  119:16, 120:2,
  124:9.
fiscal 24:6.
five 13:11, 14:18,
  29:3, 29:18,
  29:23, 32:11,
  43:13, 59:1,
  59:2, 95:2,
  107:20.
fix 73:25.
fixing 60:8.
flavor 8:12.
Floor 1:47.
Florida 95:1, 95:3,
  95:4, 105:11.
flow 24:20, 34:11,
  36:1, 36:5.
focus 15:8, 16:6.
focused 3:23.
folks 86:22.
follow 95:10.
follow-up 107:25.
following 29:1,
  82:3, 98:14,
  114:16, 117:17.
follows 21:22,
  47:5, 48:22,
  93:19, 119:9.
footnote 58:22.
force 99:20.
foregoing 133:19.
foreign 14:23,
  46:8, 112:12.
forfeit 110:4,
  114:15.
forfeitable 19:9,
  113:7.
forfeiture 4:22,

9:4, 9:5, 19:19,
  19:23, 20:1,
  20:3, 20:9,
  20:10, 110:2,
  113:6, 127:5.
formerly 110:1.
forms 12:22,
  114:22.
forth 124:20,
  129:8.
forthright
  117:12.
forward 21:5.
found 19:14,
  116:19, 126:23.
founders 117:25.
four 30:20, 31:22,
  53:7, 68:23,
  104:11, 104:14.
fraction 15:17.
Franks 6:17, 6:19,
  6:24, 7:11, 7:13,
  8:6, 10:3, 10:6,
  10:12, 10:23,
  11:2, 11:3,
  116:5, 116:7,
  116:16, 116:22,
  116:25, 120:14,
  122:3, 124:18,
  125:21, 125:22,
  125:24, 126:4,
  126:5.
fraud 17:22,
  109:21.
free 9:2.
freeze 55:3.
freezing 16:19,
  106:12.
French 51:23.
frequently 98:20.
Friday 5:20, 6:4,
  56:12, 60:2,
  60:7.
front 38:6, 38:24,
  39:25, 45:20,
  46:14, 47:3,
  65:24, 92:13.
frozen 55:19, 59:3,
  124:2.
full 8:12, 13:10,

40:20, 48:8,
114:12, 118:8,
118:19.
functions 72:22,
100:1.
fund 37:5, 37:8,
39:14, 45:16,
56:4, 56:6, 58:5,
63:21, 73:5.
fundamental
131:9.
funded 31:15,
31:20, 38:14,
38:21, 42:25,
54:14, 59:5,
59:12, 59:13,
59:14, 108:9.
funds. 110:6.
future 4:22,
127:4.
.
.
< G >.
Gallagher 3:16,
3:18, 4:7, 4:13,
13:3, 15:21,
111:11, 131:18,
131:23.
gallonage 99:1.
gather 26:22,
68:14.
gave 54:25.
Gee 114:4.
general 25:14,
94:21.
Generally 5:1,
10:2, 24:3,
39:11, 58:23,
85:14, 96:8,
97:8, 99:10,
101:12.
generated 15:11.
George 94:3, 94:4,
94:16, 94:18.
gets 59:14, 73:9,
76:5, 76:9,
76:14, 76:17.
getting 8:12, 79:2,
121:16, 122:4.
give 7:18, 39:21,

53:21, 58:14,
121:17, 127:17.
Given 90:2, 90:7,
100:18, 123:7,
132:1.
giving 85:18.
glad 9:11, 10:20,
12:4, 21:1,
109:3, 109:5,
118:23.
glasses 67:9.
goal 15:19, 15:20,
38:19, 63:2,
63:9, 73:5,
73:16.
Google 51:10,
51:12.
gotten 60:4, 64:8,
105:21.
grabbed 17:19.
graduate 22:22.
graduated 94:5.
grand 114:15.
grant 4:5, 11:23.
granted 3:19, 6:20,
20:18.
gravamen 7:8.
great 12:12.
greater 116:17.
Green 103:5, 103:6,
104:5.
grew 94:3.
grocery 23:16.
gross 102:24.
group 26:9, 56:16,
118:4.
grow 94:2.
guess 8:19, 9:8,
66:11, 66:16,
69:7, 94:5,
101:14.
guessing 89:2.
guidelines 98:14.
Gump 10:16, 125:2,
128:25, 129:13,
130:9.
guy 74:6.
.
.
< H >.

half 24:7, 35:13,
36:3, 40:13,
40:15, 48:21,
109:9, 114:13,
127:8, 129:15.
halted 56:6.
hand 21:17, 37:15,
44:4, 65:12,
77:16, 93:16.
handled 100:6,
100:7.
hands 77:1.
happen 33:12,
47:24, 59:10,
72:7, 79:5,
85:11, 85:12,
86:11, 110:21.
happened 53:10,
53:16, 53:23,
54:3, 54:6,
54:19, 55:17,
56:20, 114:9,
117:24, 127:8.
happens 35:20,
37:6, 39:8, 39:9,
86:14, 111:3.
hard 72:20.
harder 85:5.
harm 115:18,
116:10.
harmed 57:21.
Hauer 125:2,
128:25, 129:13,
130:9.
headquartered 88:5,
95:19, 96:2.
hear 7:14, 7:15,
8:21, 9:11,
10:20, 11:14,
11:21, 11:25,
12:4, 12:6,
14:12, 14:17,
15:1, 15:7,
15:10, 16:3,
16:18, 18:9,
18:23, 21:1,
28:19, 28:20,
64:13, 77:10,
109:3, 109:5,
118:23.

heard 8:3, 10:2,
  12:9, 18:22,
  56:13, 109:7,
  109:17, 111:17,
  111:21, 112:12,
  112:15, 112:17,
  114:3, 115:13,
  129:18.
hears 111:11.
heightened
  117:20.
Held 2:7, 2:11,
  3:10, 3:13, 6:24,
  7:7, 58:9, 94:14,
  94:17, 114:25,
  115:2, 115:4,
  125:18, 127:2,
  128:24, 129:6,
  129:9, 132:14.
help 11:18, 18:24,
  72:8, 73:5, 90:5,
  99:5, 101:21.
helpful 11:21,
  11:25, 30:6,
  32:11.
helping 41:19,
  89:25.
hereby 130:8,
  130:11, 133:18.
hide 117:13.
high 94:4.
high. 113:12.
highlight 30:7.
highlighted 77:7,
  78:12, 79:17,
  80:5, 82:8,
  83:24, 85:20,
  88:22, 107:21.
highlighter
  84:13.
highlighting 32:12,
  84:2.
highly 131:3.
hire 118:3.
hold 8:25, 10:15,
  10:16, 11:18,
  90:7, 97:9,
  109:11, 113:10.
holding 19:16.
Homeland 28:7.

Homeowners 118:7.
homes 118:7.
Honestly 60:15,
  91:5.
Honorable 1:18.
hopefully 73:17.
hours 53:23.
housekeeping
  92:2.
hundred 18:4.
hundreds 74:13.
husband 131:20.
.
.
< I >.
ICE 21:8.
idea 61:6, 66:10,
  66:20.
identification
  26:11, 37:17,
  42:7, 44:6,
  44:11, 100:9,
  100:14.
identified 29:10,
  70:23, 86:20,
  124:13.
identifier 89:8.
identifies 30:20,
  107:19.
identify 2:14,
  30:1, 30:13,
  31:7, 32:16,
  40:3, 82:1.
ignored 112:24.
III 117:25.
illegal 97:20.
illegally 50:7.
Illinois 50:14,
  50:16, 50:18,
  51:1, 61:5, 61:9,
  61:21, 61:22,
  61:24, 112:17.
illustrate 101:23,
  102:9.
illustrates
  101:24.
imagination
  117:19.
immediate 4:9,
  55:18, 57:22.

Immediately 29:3,
  128:10, 130:13,
  132:12.
Immigration 28:8.
impact 57:22.
impacted 58:5,
  106:7.
import 65:2, 65:3,
  65:5.
important 14:25,
  15:18, 123:8.
importantly
  105:23.
importation 48:14,
  119:23, 120:22,
  121:11, 125:8.
Imported 64:18,
  64:24, 64:25,
  67:4, 67:18,
  67:20, 68:1,
  122:14, 125:14.
Imported. 67:3,
  67:17.
importer 65:4,
  88:25.
imports 50:3, 62:4,
  62:11, 62:17,
  68:3.
impossible 78:1.
impression
  111:22.
improperly 118:7.
impropriety 128:5,
  131:12.
in. 83:7.
inaccuracies 5:23,
  8:11, 10:25,
  11:8, 13:1.
inaccurate
  117:22.
include 50:3,
  81:23, 99:14.
included 7:2, 62:4,
  62:17, 105:16,
  126:9.
includes 82:25,
  99:11.
including 13:11,
  19:22, 62:11.
income 81:3.

incoming 35:14.
incorporated 50:15,
   51:11, 52:5,
   95:21.
incorporates
   125:25.
incorrect 19:11,
   61:21.
increasingly
   123:7.
independent
   58:16.
INDEX 134:1.
Indiana 22:22.
indicate 69:5,
   69:15, 77:21,
   78:16, 83:14,
   87:21, 107:21.
indicated 7:13,
   7:14, 89:11,
   119:5, 132:2.
indicates 77:18,
   88:2.
individual 23:20,
   31:2, 35:10,
   39:15, 74:11,
   74:24, 77:2,
   101:15, 132:6.
indulgence 70:21.
industry 23:8,
   96:11.
infer 131:11.
inference 17:7,
   120:22.
infinitesimally
   15:12, 109:18.
information 7:4,
   53:21, 112:23,
   126:10.
initial 5:24,
   12:24.
initially 7:20,
   127:2.
initiate 54:2.
ink 32:12.
inquiries 126:17.
inquiry 16:12.
instead 16:9, 54:4,
   75:9.
instructed 128:10,

132:20.
instructing
   128:21.
instrument
   110:18.
insurance 56:18.
intend 36:2.
intent 46:7,
   63:21.
intentional 73:3,
   122:20.
intentionally 7:1,
   73:1, 112:1,
   112:24, 126:8.
interest 131:24.
international
   11:13, 14:18,
   15:22, 15:23,
   17:20, 18:2,
   18:15, 19:1,
   120:23, 122:16,
   122:18, 122:24,
   122:25, 126:16,
   126:20, 127:23,
   127:24, 131:1,
   131:16.
internet 51:10.
interrelated
   71:25.
interrupt 64:14.
introduce 12:6,
   27:24.
introduced 26:21,
   28:1, 65:18.
introduction 3:5.
inventory 41:5,
   41:20, 41:22,
   57:14.
investigating
   114:14.
investigation 4:18,
   4:23, 9:3, 15:9,
   15:16, 109:12.
invoice 88:13,
   89:14, 89:22,
   91:6.
invoices 87:9.
involve 24:19,
   98:25, 99:8.
involved 19:17,

19:20, 27:3,
   60:25, 78:22,
   80:10, 80:15,
   98:12, 110:4,
   122:11, 125:10.
involvement
   60:15.
Ireland 66:16.
Irish 50:3, 51:18,
   61:16, 62:5,
   62:12, 62:17,
   66:12.
issue 103:11.
issued 6:3, 45:24,
   46:6, 125:20.
issues 7:24, 38:19,
   53:13, 58:13.
items 53:15,
   118:18.
itself 4:10, 6:19,
   9:14, 71:19,
   106:22.
.
.
< J >.
J. 1:25.
Jameson 50:3, 50:4,
   51:18, 52:18,
   61:15, 61:16,
   61:17, 62:4,
   62:11, 62:17.
Japan 66:21.
Japanese 66:17.
Jessup 23:21,
   29:14, 29:15,
   29:20, 30:17,
   30:19, 32:19,
   43:17, 75:1.
Jim 50:12, 50:13,
   50:17, 50:20,
   50:23, 51:8,
   112:16.
job 22:10, 22:18.
jobs 97:8, 97:11.
joining 22:17.
Journal 65:7, 65:8,
   65:9, 65:10,
   66:4.
Judge 3:16, 3:17,
   4:6, 4:13, 13:3,

15:21, 94:13,
99:18, 104:1,
111:22, 117:11,
117:24, 131:18,
131:22.
judgment 11:22,
121:6, 128:19.
judiciary 118:1.
jumbled 117:14.
jump 131:11.
June 2:13, 5:20,
6:5, 6:7, 12:3,
42:22, 55:3,
57:18, 105:3,
106:22, 127:16,
129:6.
jury 12:15,
114:15.
Justice 117:16.
juxtaposition
111:14.
.
.
< K >.
K-i-v-a-n-c
19:14.
Kaley 117:17.
Kay107 134:17.
Kay59 134:9.
keep 92:2.
Kind 9:3, 15:4,
25:6, 40:25,
51:21, 57:11,
58:16, 89:8,
118:6.
Kivanc 19:14,
20:23, 110:11.
knees 105:19.
knowingly 7:1,
126:7.
knowledge 107:1.
known 76:2.
Kronheim 96:25.
.
.
< L >.
labeled 70:18,
71:2, 71:11,
119:11, 119:14,
125:16.

lack 7:23, 127:1.
language 29:10,
117:14, 122:21.
Large 14:2, 18:6,
39:19, 46:7,
51:23, 77:18,
109:15, 109:23,
111:2, 131:7,
131:9.
largely 117:25.
larger 77:22.
Last 21:25, 30:20,
32:2, 53:2,
68:23, 92:1,
92:7, 93:23,
109:9, 117:17.
lasted 25:2.
Late 96:16.
later 11:15, 41:13,
53:22, 55:1,
114:16, 127:6.
latitude 90:8.
laundering 15:22,
15:23, 17:21,
18:3, 18:14,
18:16, 18:19,
19:2, 19:18,
19:20, 109:22,
110:5, 120:24,
122:11, 123:1,
125:11, 126:20,
127:24, 131:16.
law 4:21, 9:23,
10:16, 23:25,
24:4, 124:11,
125:1, 132:11.
laws 24:1, 24:3,
123:1, 126:20,
127:24.
lawyers 118:4.
lead 24:25, 26:8.
lean 77:9, 87:4.
learn 53:6, 53:10,
53:18, 56:7,
105:10.
learned 53:21,
54:19, 105:16.
least 40:25.
leave 112:10.
leaving 110:24,

112:14.
lecturn 12:10.
left 17:22,
113:11.
legacy 73:4.
legal 20:1, 20:22,
129:23.
legality 99:8.
legitimate 19:19,
19:23.
lenders 26:7,
55:4.
length 10:14.
Less 23:1, 24:16,
25:20, 40:7,
46:12.
letter 6:3.
letters 30:14.
level 94:17, 99:7,
106:5.
liable 110:20.
license 23:16.
licensed 96:13.
licenses 113:10.
lift 56:8.
lifted 106:13.
ligating 123:24.
light 3:10, 5:18,
10:14, 76:14,
76:16, 123:8,
126:25, 132:23.
likelihood
113:11.
likely 63:16,
64:12.
Limited 50:3,
51:18, 113:18.
Limited. 62:12.
lines 69:19,
84:8.
liquor 23:8, 41:18,
41:23, 47:7,
47:8, 48:11,
48:23, 49:11,
50:6, 90:4,
91:13, 91:17,
91:23, 111:16,
111:19, 114:7,
119:18, 119:19,
120:18, 121:11,

122:14, 125:5,
  125:9, 125:13.
liquor. 48:15,
  119:23, 120:22.
Liquors 112:20.
Lisa 5:24, 7:24,
  10:8, 28:7,
  116:19, 130:19,
  131:19.
list 29:3.
listed 29:23.
listening 131:12.
literally 130:23.
litigate 118:4.
Little 22:12, 23:1,
  24:3, 24:16,
  28:18, 40:15,
  41:16, 41:21,
  47:17, 68:25,
  69:10, 82:5,
  83:3, 109:12,
  117:18.
live 95:3.
LLC 42:9, 44:11,
  44:17, 45:19.
LLP 125:2, 129:1,
  130:9.
loan 31:5, 37:8,
  37:9, 38:21,
  73:17.
loans 55:12,
  55:16.
local 26:20.
located 29:11,
  29:18, 47:9,
  47:18, 48:12,
  48:24, 50:13,
  50:25, 51:8,
  52:3, 111:20,
  119:18, 119:20,
  119:24, 120:2,
  120:19, 125:6.
location 29:14.
locations 34:4.
logically 72:8.
Lombard 1:47.
long 13:6, 22:10,
  25:2, 71:22,
  71:24, 95:16,
  96:6, 96:15,

106:13.
long-standing
  72:10.
longer 113:11,
  122:17, 132:14.
Look 14:6, 26:10,
  27:2, 28:22,
  42:7, 47:3,
  63:13, 63:15,
  65:25, 66:24,
  74:9, 74:11,
  88:9, 91:12,
  92:13, 100:14,
  106:17, 106:25,
  109:25, 111:13.
looked 78:20, 80:6,
  85:21, 86:20,
  88:7, 111:9,
  112:6, 119:1.
Looking 42:12,
  45:2, 52:22,
  62:10, 70:20,
  79:24, 82:7,
  83:20, 88:22,
  101:18, 106:18.
looks 34:10, 84:11,
  87:22.
lose 106:3.
lot 26:1, 58:10,
  63:1, 63:3, 63:5,
  64:17, 72:22,
  90:8, 97:10.
loudly 93:22.
Louisiana 31:24,
  31:25, 40:17,
  40:23, 41:1,
  41:3, 41:6,
  42:13, 42:23,
  43:8, 43:10,
  43:13, 44:9,
  47:1, 47:4,
  111:12.
lower 48:21.
lunch 90:15,
  93:5.
.
.
< M >.
M-a-r-q-u-e
  95:24.

Macdougall22
  134:7.
Macdougall90
  134:11.
machine 75:18.
Magistrate 3:16,
  4:12, 13:3,
  15:21, 111:1,
  111:11, 117:11,
  131:18.
mail 33:13,
  75:10.
main 36:24,
  56:17.
maintain 24:22,
  25:12, 101:12.
manage 41:20.
management 24:20,
  27:10, 97:14,
  99:6, 99:7,
  99:15, 99:23,
  114:6.
manager 94:16,
  94:19, 94:21,
  94:22.
managers 94:18.
managing 24:20.
manner 131:7,
  131:8.
manufacturers
  14:24, 47:8,
  47:9, 47:18,
  48:11, 48:24,
  111:16, 111:20,
  119:18, 119:20,
  120:19, 125:5.
manufacturers.
  49:11.
margin 104:16,
  104:19, 104:23.
Mark 1:25, 2:17,
  28:4, 65:16.
marked 26:11,
  27:23, 37:16,
  44:5, 46:20,
  65:17, 65:22,
  65:25, 70:13,
  78:25, 79:16,
  80:18, 87:10,
  100:9, 100:14.

market 75:1,
    106:16.
markets 25:8,
    25:21, 27:18,
    81:23.
Marque 84:18,
    85:21, 87:13,
    88:1, 88:8,
    88:24, 89:4,
    90:21, 91:4,
    95:24, 96:4,
    96:6, 112:19,
    123:21.
Marquee 89:1.
married 131:20.
Martin 93:17,
    93:24, 134:13.
Maryland. 29:11.
Massachusetts
    22:19.
match 54:17.
material 14:18,
    15:5, 122:16,
    122:18, 122:24,
    126:16, 127:22,
    130:19.
materials 19:11.
matter 2:2, 2:4,
    5:9, 6:3, 7:11,
    9:17, 10:8,
    10:13, 11:10,
    11:22, 20:8,
    20:11, 86:15,
    93:9, 116:17,
    118:19, 122:4,
    127:22, 129:3,
    131:23, 132:1,
    132:12, 132:17,
    133:20.
maximum 16:22,
    17:12, 18:7.
MD 65:25, 66:24,
    67:15.
mean 29:13, 31:13,
    41:5, 47:15,
    47:19, 75:16,
    85:22, 98:11,
    114:11.
meaning 129:10.
means 67:4, 82:11,

85:16, 109:9.
Mechanically 33:11,
    63:9.
mechanism 46:5.
meet 55:25, 56:14,
    105:22.
mentioned 27:15,
    34:25, 85:2,
    104:13.
merchants 40:14.
mercy 127:13.
merged 25:3.
mergers 25:20.
merit 124:21.
microphone 22:13,
    22:15, 77:10,
    87:4, 93:22.
middle 34:7, 69:11,
    83:24, 87:21,
    95:8, 96:10,
    99:6.
middleman 23:9,
    23:18, 23:19.
millions 113:15.
minutes 35:25,
    90:2, 93:6,
    112:18, 132:13.
misconduct 118:3.
misleading 13:1.
misspoke 42:13,
    44:8.
mistake 16:8,
    16:16, 114:5.
mistakes 8:23.
misunderstandings
    8:24.
moment 2:9, 12:9,
    36:17, 62:23,
    77:24, 88:23,
    89:10, 95:10,
    101:11, 121:20.
Monday 56:24,
    60:14, 60:21,
    60:23.
monetary 110:18.
month-end 63:15.
Monthly 38:5,
    42:20, 45:6,
    98:25.
months 39:24, 42:9,

42:21, 49:17,
    92:20, 126:22,
    127:6, 129:16,
    132:3.
Moore 19:12.
morning 2:16, 2:24,
    3:1, 21:18, 22:5,
    22:6, 56:24,
    95:11, 95:23.
mortgage 56:1.
motion 8:14, 10:4,
    115:8, 119:4,
    124:20.
motions 129:6.
motivation 113:1.
move 28:18, 31:17,
    41:14, 44:12,
    72:6, 73:14,
    90:8, 97:13,
    119:25, 122:12,
    125:12, 130:2.
moved 7:7, 92:21,
    95:1, 122:13,
    125:13.
movement 11:13,
    15:23, 131:1.
moving 53:12.
Ms. 15:20, 117:9,
    120:15.
much. 17:20.
Mullin 1:28,
    2:19.
myself 12:12,
    12:18.
.
.
< N >.
NACHA 86:12.
Name 21:25, 35:7,
    36:21, 44:23,
    52:1, 75:21,
    89:13, 93:23,
    112:12, 112:13,
    134:3.
named 31:7, 53:7.
names 52:19.
nationally
    100:22.
Nationwide 16:17,
    24:8, 97:3,

102:6, 102:14,
107:2.
nature 13:2, 65:4,
131:6, 131:14.
Near 83:21.
necessarily 20:20,
79:14.
necessary 21:16.
need 7:22, 7:25,
11:18, 12:15,
20:12, 20:20,
67:8, 90:11,
106:16, 112:13,
126:6, 130:21.
needed 54:23,
56:13, 56:19,
116:21.
needs 105:22,
113:19.
negative 110:23.
negligently
112:1.
net 31:18, 31:19,
37:7, 39:1,
107:6.
New 22:23, 50:7,
52:4, 52:17,
88:5, 89:2, 89:5,
89:15, 89:19,
90:4, 91:2, 91:3,
91:7, 95:20,
96:3, 112:20.
news 118:8.
next 16:5, 27:20,
31:22, 34:23,
48:6, 49:23,
54:19, 54:21,
54:24, 60:14,
66:12, 66:17,
93:10, 111:19,
132:12.
Nice 2:21, 2:22,
3:1.
Nicole 1:26,
2:18.
night 25:9, 31:3,
31:11, 32:23,
33:15, 34:5,
35:14, 37:4,
45:16, 74:12,

75:3, 97:13,
99:24.
non 34:2, 34:4,
35:14.
nonalcoholic
41:6.
nonbeverage 23:4.
nondirect 53:14.
nondomestic 84:25,
85:1.
None 54:7, 59:4,
59:7, 66:22,
107:21, 107:22,
108:8, 109:2,
112:8, 133:11.
nonfrozen 59:4.
nonplanned 58:6.
nor 3:20, 10:7.
normal 41:6.
normally 106:10.
North 15:10.
Northern 1:2,
50:24, 50:25,
51:4.
Northside 50:5,
103:13, 103:17,
104:24, 107:4.
Nos. 128:16,
129:5.
note 5:8, 7:5,
13:19, 130:17.
noted 10:3, 11:8,
12:21, 12:23,
15:9, 125:3,
125:4, 126:21,
127:7.
notes 3:23.
Nothing 17:14,
43:15, 59:8,
112:5, 127:7,
133:5, 133:8.
notice 39:21.
noticed 74:8.
notification 41:13,
60:4, 85:18.
notified 121:22.
notion 131:1,
131:10, 131:15,
132:7.
notwithstanding

112:5.
Number 2:4, 29:20,
36:18, 68:22,
70:9, 83:21,
94:17, 102:17,
103:6, 103:8,
105:16.
numerous 47:6,
111:14.
.
.
< O >.
o'clock 133:16.
Objection 21:12,
21:13, 26:22,
64:20, 68:9,
68:11, 98:22.
objections 3:16.
objective 126:1.
obligated 58:14.
obligation 56:5,
117:10, 118:11,
118:25.
obligations
55:25.
obtain 23:12,
56:23, 117:2.
obtained 50:5,
62:14, 111:7,
130:15.
obviously 27:25,
55:21.
occasion 63:20.
occupation 22:7.
occur 105:6.
occurred 105:9.
off-premise 94:19,
99:21, 99:22.
offending 7:3,
126:10.
offense 17:23,
110:5, 110:20.
offer 13:4.
offered 110:11.
offering 13:13.
Office 33:14,
52:16, 53:17,
54:23, 54:25,
56:12, 60:2,
60:6, 60:18,

75:10, 97:11,
99:25, 110:1,
128:7.
officer 121:4,
121:7, 121:17,
122:22, 123:25.
officers 2:19.
Official 1:46,
133:27.
officials 128:2.
offshore 15:24,
46:8, 47:19,
48:12, 49:11,
51:5, 52:19,
64:24, 67:4,
111:23, 119:18,
119:20, 119:24,
120:3, 120:4,
120:19, 122:13,
123:19, 125:6,
125:13, 131:1.
offshore. 47:9,
48:25, 111:20.
often 117:22.
oftentimes
116:15.
old 14:13.
older 75:4.
omissions 130:19.
on-premise 99:21.
Once 6:8, 17:11,
26:21, 33:20,
33:22, 75:15,
86:8, 95:6,
117:8.
one-hundredths
104:11, 104:14.
One. 30:1, 87:13,
95:24.
ones 32:5, 56:18,
63:24, 86:20,
87:2, 89:4.
online 86:19.
opening 12:9,
18:22.
operated 96:23.
operates 96:20.
operation 94:21,
94:22, 95:10,
98:10, 100:2,

102:1.
operationally
99:19.
operations 13:11,
99:13.
opinion 6:18, 6:23,
102:8, 126:3.
opportunity 100:16,
118:12, 119:2,
120:15, 127:18.
oppose 11:1.
order 4:23, 5:7,
6:3, 8:1, 8:16,
16:20, 16:24,
56:8, 56:21,
60:11, 72:6,
73:20, 106:21,
115:3, 115:10,
116:2, 119:9,
129:1, 129:13,
129:14, 132:9,
132:15.
ordered 4:19, 17:4,
127:1, 129:11,
130:8, 130:15,
132:3, 132:4.
ordering 10:6.
ordinary 38:3,
105:6.
organization
71:21.
organize 73:24.
organized 99:19.
original 2:6, 7:8,
115:1, 115:4,
130:14.
originally 87:8,
124:24.
originate 35:9,
37:1, 42:24,
45:14.
others 118:9.
Otherwise 76:2.
out. 114:8.
outcome 4:22,
127:4.
outlet 23:16.
outside 34:17,
36:9, 40:4,
47:18, 47:25,

48:14, 49:20,
58:18, 61:18,
79:7, 91:14,
110:20, 112:4,
119:22, 120:21,
121:10, 125:8.
outstanding
55:16.
overall 101:24.
overnight 38:16.
Overruled 98:23.
overseas 13:16,
13:17, 39:18,
40:5, 61:11.
oversee 99:13,
99:14.
overseeing 94:19,
95:2.
owed 87:1, 87:3.
own 105:22, 119:12,
132:8.
owned 16:9, 47:7,
50:10, 95:16,
96:6, 111:16,
112:16, 112:20.
owner 29:6.
owners 25:4,
118:8.
owns 51:19, 95:14,
96:4.
.
.
.
< P >.
P&ls 72:19.
package 23:15,
92:7, 94:20,
99:22.
pages 65:21,
65:25.
paid 14:20, 26:2,
46:15, 50:20,
52:10, 54:7,
55:21, 57:20,
59:11, 91:24,
107:17.
paper 5:15, 5:17,
6:3, 128:16,
129:2, 129:5,
131:25.
papers 10:3, 11:8,

127:9.
Paragraph 30:3,
  30:20, 31:6,
  31:22, 48:8,
  49:25.
paragraphs 29:9.
parsing 121:5.
parte 117:12,
  117:19.
participants
  38:15.
participate 99:3.
particular 28:24,
  35:4, 76:20,
  76:23, 78:19,
  86:17, 89:3.
Particularly 65:22,
  103:10.
parties 5:12,
  126:14, 129:18.
partners 48:20.
party 4:8.
passing 128:19.
passive 98:10.
payable 27:15,
  74:19, 86:23.
payables 25:25.
paycheck 53:13.
paychecks 16:7,
  16:17, 53:14,
  105:20, 114:3.
paying 55:24.
payment 39:16,
  45:13, 56:8,
  73:23, 85:1,
  86:15, 88:13,
  88:16, 89:3,
  89:14.
payments 41:5,
  43:4, 44:25,
  47:13, 47:16,
  47:19, 47:22,
  49:13, 51:2,
  52:14, 56:1,
  59:9, 83:17,
  83:25, 84:16,
  84:24, 88:5,
  88:10, 89:10,
  89:13, 90:23,
  91:5, 91:23,

120:8.
Payroll 25:24,
  27:16, 39:10,
  39:12, 39:13,
  54:13, 54:16,
  55:2, 59:7,
  59:11, 59:14,
  59:15, 107:16,
  107:20, 108:8,
  108:9.
penalty 109:16.
pending 4:21, 4:22,
  127:4, 129:13,
  132:17.
pension 56:4,
  59:11.
pensions 59:12.
people 53:12, 97:2,
  118:1, 118:6.
percent 9:1, 75:9,
  104:1, 104:2,
  104:6, 104:8,
  104:9, 104:12,
  104:14.
percentage 104:1,
  104:3, 104:6,
  104:12.
Perhaps 43:4,
  66:21, 89:8,
  116:17.
period 11:19,
  15:16, 35:18,
  47:7, 51:3,
  55:23, 62:25,
  94:25, 96:17,
  102:11, 106:15,
  106:20, 111:16,
  129:22, 130:6.
periods 38:7,
  45:7.
permission 13:25.
permitted 4:15,
  116:7, 127:17,
  130:7.
Pernod 51:20,
  51:21, 52:2,
  52:10, 52:13.
person 21:6, 33:16,
  75:2, 118:10,
  129:25.

personal 19:17,
  105:22.
personally
  128:15.
pertain 79:20,
  79:25, 80:19.
pertaining 68:7.
pertains 68:19,
  83:9, 87:17,
  87:20.
petition 2:6, 3:10,
  3:12, 7:9, 9:9,
  12:24, 20:18,
  115:1, 115:8,
  124:20, 124:24,
  128:22, 130:14.
petitioned 17:2.
Petitioner 2:17,
  5:1, 5:13, 5:22,
  6:16, 7:6, 21:4,
  28:23, 37:16,
  38:7, 44:5,
  52:22, 70:8,
  83:7, 116:7,
  125:3, 125:17,
  126:24, 128:17,
  129:4, 131:24,
  133:1.
phenomena 38:23.
phrase 29:11.
physical 25:8,
  25:25, 29:14,
  77:24, 77:25.
physically 32:23,
  61:6, 75:5,
  77:23.
pick 33:14.
picks 75:8.
pie 102:14,
  103:2.
place 54:20,
  106:19, 110:19.
placed 57:23,
  125:1.
placement 4:17.
places 66:22.
placing 58:2.
Plaintiff 1:7,
  1:23, 26:11,
  27:24, 28:5,

28:6, 32:12,
42:7, 83:7.
plan 18:5, 56:4,
56:5, 58:4,
109:25.
planning 3:6.
pleading 8:16.
Please 2:15, 21:5,
21:17, 21:24,
22:7, 22:13,
24:19, 27:2,
27:13, 28:22,
29:22, 30:1,
30:14, 32:8,
46:24, 48:5,
49:23, 62:10,
65:24, 69:22,
70:20, 87:4,
88:18, 93:15,
93:21, 93:22,
128:18, 133:6.
pleasure 132:8.
plenty 55:25.
plus 41:6, 79:3.
podium 12:14.
point 5:1, 5:4,
6:9, 6:11, 8:19,
14:25, 18:25,
19:8, 20:1, 20:7,
56:12, 56:20,
60:23, 75:4,
86:1, 87:3, 87:5,
87:8, 89:25,
113:12, 116:12,
120:6, 123:17,
130:3, 130:20,
132:25, 133:3,
133:12.
point. 118:20,
130:21.
pointed 70:12,
119:3.
points 93:1.
policy 112:11,
128:7.
port 122:14,
125:14.
portion 77:7,
79:17, 80:5,
82:8.

position 4:1,
22:20, 94:11,
99:17, 124:9,
126:18.
positions 94:13,
94:17.
possession
130:10.
possibility
11:12.
possible 18:13,
64:2, 64:3.
possibly 18:3,
63:21, 64:11.
posture 4:25.
potentially 20:8,
39:18, 63:2,
116:11.
power 114:14.
practical 115:11.
practice 98:15.
preauthorization
86:25.
predate 72:12.
predecessor 96:21,
96:22.
prefer 12:10.
preindictment
117:3.
prejudice 9:17.
preliminary 6:25,
9:16, 126:7.
premise 96:14.
premises 96:13.
Premium 67:17.
preparation 27:3.
prepare 101:21.
prepared 102:3.
preparing 27:6.
present 9:12,
12:5.
presentation
108:20, 108:21,
109:1.
presented 106:22,
127:21, 127:25,
130:18, 130:22,
130:23.
Presently 128:22,
128:24.

preserve 114:16.
president 13:10,
94:12, 95:1,
98:9, 99:11,
99:17, 105:12,
105:15.
pressure 16:22,
18:7, 109:13.
Presumably 126:5.
presume 128:6.
presumed 127:4.
pretty 56:6.
previous 42:16,
44:8.
previously 40:11,
70:3, 129:9.
Pride 74:17.
Primarily 26:1,
27:14, 44:24,
85:4, 99:14,
114:23.
primary 24:22,
32:20, 32:25.
Prince 94:3, 94:4,
94:16, 94:17.
principal 110:6.
prior 96:16.
probable 7:4,
49:10, 114:21,
126:10.
Probably 25:5,
29:13, 67:11,
84:4, 103:17,
105:23, 113:9,
113:10.
procedural 4:25.
procedurally 3:3.
Procedure 3:21,
129:11.
proceed 3:4,
65:18.
proceeding 4:22,
27:25, 113:6,
115:22, 125:23,
127:5, 129:14.
Proceedings 1:17,
117:20, 133:17,
133:20.
proceeds 16:20,
17:13, 17:23,

19:10, 19:21,
109:23, 122:13,
125:13.
process 28:17,
31:12, 35:23,
37:4, 39:4, 61:1,
75:9, 75:21,
86:22, 87:9,
109:8, 132:7.
produced 14:3,
38:1, 42:17,
45:3.
product 14:20,
23:9, 23:12,
23:13, 23:17,
39:16, 43:16,
45:1, 45:13,
45:22, 50:20,
52:10, 66:25,
67:18, 68:3,
87:17, 87:20,
89:8, 91:18,
96:12, 97:13.
products 39:10,
50:5, 51:3,
61:1, 61:17,
64:17, 64:19,
64:24, 65:2,
65:3, 66:3, 68:1,
107:3.
proffered 129:23.
profit 73:18,
104:16, 104:19,
104:23, 104:25,
107:6.
profits 107:1.
prohibit 24:1.
Prohibition 96:16,
96:17, 96:18,
96:24.
projects 58:6.
promise 71:23.
proper 11:4, 19:13,
35:7.
property 3:24,
4:15, 10:5,
19:17, 19:20,
19:22, 110:4,
118:10, 126:25,
129:10, 129:22,

130:1, 130:2,
130:6.
proportionality
126:25.
proposition 4:11.
prosecution
109:12.
prosecutors
118:11.
prospective 16:20,
117:1.
protecting 118:1.
protocol 76:10.
prove 13:18,
117:22, 119:7.
proven 120:7.
provide 25:7,
26:6.
provided 14:8,
26:16.
provides 129:25.
proving 110:23.
public 113:8.
published 19:15.
Pull 22:14, 22:15,
28:20, 28:21.
purchase 97:17,
122:13, 125:13.
purchased 19:21,
91:24, 95:18,
96:7.
purchases 14:19,
41:7, 51:2.
Purple 103:24,
104:11.
purports 72:1.
purpose 16:6,
32:20, 32:21,
32:25, 40:8.
purposes 26:4,
26:12, 82:1,
92:2, 106:11,
131:9.
pursuant 44:17,
115:2, 129:1,
129:24.
Put 8:20, 17:2,
17:8, 18:6,
75:13, 83:7,
89:7, 106:24,

108:6, 113:14,
113:16, 119:4,
123:6, 124:20.
putting 16:21,
16:22, 109:13.
PWC 58:18.
.
.
< Q >.
quarterly 58:14.
quasi 7:11,
10:12.
question 47:17,
57:25, 62:15,
79:10, 88:12,
92:1, 99:7,
102:2, 108:1,
108:12, 112:25,
113:1, 113:20,
122:1.
questionable
131:3.
questions 42:15,
59:18, 92:24,
95:9, 95:11,
107:11.
quick 35:23, 65:21,
82:6, 91:12.
quickly 109:14.
quit 67:14.
quote 49:9.
.
.
< R >.
raise 21:17, 56:13,
56:21, 93:15.
raised 7:25,
121:25, 128:16,
128:19.
Randolph 1:27.
Randy 2:18.
rather 115:5.
RDB-12-2472 1:7,
2:4.
reach 113:19.
read 30:2, 61:16,
62:1, 66:5, 67:8,
67:15, 69:2,
69:19, 71:1,
77:9, 84:5,

84:17, 87:11,
88:15, 88:23,
89:12.
reads 62:4.
Ready 84:10, 93:8,
127:20.
real 19:17, 112:2,
127:18.
really 17:9, 53:21,
53:23, 56:20,
58:12, 59:2,
60:5, 60:15,
60:16, 60:17,
61:2, 62:21,
77:4, 118:9,
126:15, 127:13.
reason 6:14, 15:18,
16:6, 48:12,
75:8, 112:8,
115:11, 119:20,
119:25, 120:8,
120:9, 120:19,
121:8, 125:6,
127:7.
reasonably 20:24.
reasons 17:10,
25:24, 113:23,
129:8, 129:19,
132:2.
recall 33:2, 52:7,
53:4, 90:21,
91:15, 105:3.
receipts 112:5.
receivable 31:1,
34:24, 35:3,
35:21, 36:5,
36:8, 79:22.
receivables 31:4,
35:5.
receive 52:14.
received 9:1, 38:3,
42:19, 45:5,
129:17.
recently 110:2.
recess 93:7.
reckless 7:1,
126:8.
recognize 29:7,
29:20.
recognized 126:2.

recollection
103:18.
recommendations
3:17.
record 2:14, 7:9,
9:13, 10:8,
21:25, 27:22,
32:10, 44:7,
70:22, 92:2,
93:23, 100:17,
110:24, 113:4,
115:17, 116:18,
118:19, 123:5,
124:14, 125:19,
128:9, 128:14,
129:9, 129:20,
130:3, 132:3,
133:20.
records 13:14,
13:20, 15:2,
15:3, 16:14,
37:19, 47:5,
48:23, 49:16,
54:12, 71:5,
92:20, 101:1,
111:9, 111:14.
recover 16:20.
recross 93:1.
rectified 60:2.
red 32:12, 101:10,
102:22, 103:25,
107:21.
Redirect 90:12,
90:18, 108:3,
134:11, 134:19.
refer 77:13,
113:2.
reference 6:17,
48:7, 49:24,
51:18, 69:22,
88:18, 103:12,
112:3.
referenced 26:21.
references 18:12,
27:21.
referencing
30:10.
referred 87:14.
referring 65:11.
refers 47:4, 48:22,

66:25.
reflect 100:17,
102:8, 102:17,
103:8, 104:8,
104:12, 123:5,
128:9.
reflected 38:7,
38:11, 38:23,
45:7, 57:8,
102:14, 102:21,
103:1, 103:21,
127:9, 129:5.
reflects 10:9.
regard 53:24,
62:23.
regarding 36:1.
Region 94:12,
99:11, 99:17,
105:15.
regional 13:10.
regular 99:6.
regulate 98:5.
regulated 98:3.
regulation 98:10.
reject 16:10.
rejected 4:12,
16:25.
relate 38:11,
92:20, 123:19.
related 9:4, 45:1,
132:18.
relates 2:5.
relation 19:9.
relationship 24:23,
25:2, 25:4,
43:12, 45:12,
45:18, 55:4,
92:22, 106:3,
106:6, 106:25,
107:2, 107:8,
107:10, 110:9.
relationships
24:21, 41:4,
55:6, 99:16.
release 2:7, 3:12,
3:18, 4:9, 7:7,
8:1, 8:14, 11:24,
12:23, 114:24,
115:2, 115:5,
115:9, 124:25,

125:17, 128:23,
130:15, 132:4,
132:12.
released 2:10,
4:19, 7:18, 17:5,
20:17, 54:5,
115:3, 115:19,
127:1. ███████
███████
relief 3:21, 3:25,
4:5, 4:8, 4:13,
4:16, 7:19, 8:13,
8:18, 9:1, 11:23,
12:22, 12:24,
114:23, 115:5,
116:14, 118:18,
130:14.
relief. 17:17.
reluctantly
127:11.
remain 4:20, 127:3,
129:12, 132:4.
remained 55:19,
130:10.
remaining 7:7,
7:18, 8:1, 9:19,
9:23, 11:24,
113:1, 115:9,
125:17, 128:24,
130:11.
remains 2:11,
9:12.
remit 98:17,
98:24.
Remote 75:23,
75:24, 75:25.
repeatedly 90:20,
91:13.
report 3:16, 5:14,
127:9, 129:4.
reported 35:17.
Reporter 1:46,
133:27.
reporting 58:16,
58:21, 98:18.
reports 5:18,
98:20, 98:21,
98:24, 98:25.
represent 27:7,

104:14, 127:11.
representing
122:22.
represents 104:3.
Republic. 111:8.
reputation 57:21.
request 57:6,
115:5, 115:8,
115:12.
requested 8:7,
116:15, 118:13.
require 10:16,
90:7.
required 15:5,
31:4, 121:23,
125:1, 129:3.
requirements 59:13,
98:18.
requires 15:23,
118:19.
reservation
118:17.
resolution 128:3.
resources 109:14,
118:3.
respect 3:23, 5:23,
6:16, 6:18, 7:23,
29:9, 103:10,
106:6, 107:6,
111:12, 123:23,
127:18, 130:17,
131:17, 131:18.
respectfully
110:15, 113:2,
115:9.
respond 127:11,
127:18.
respondent
129:24.
response 10:12,
11:15, 57:23,
110:16.
responsibilities
24:19, 99:11.
responsibility
95:7.
responsible 13:10,
41:2.
rest 2:22.
restaurants 23:15,

94:20, 99:22.
restrain 12:18.
result 20:3,
116:4.
retail 23:10,
100:5, 100:6,
101:15, 103:12,
104:20, 104:21,
104:24.
retailer 101:3.
retailers 96:12.
return 9:9, 9:18,
10:5, 115:5,
132:8.
return. 130:2.
revealed 131:22.
revenue 24:5, 33:5,
33:8, 35:17,
40:12, 101:24,
102:18, 103:9,
104:3, 104:9.
revenues 106:10,
107:1.
reverse 119:8.
review 7:16, 39:24,
131:7.
reviewed 6:1, 7:14,
15:3, 49:16,
129:17.
revolver 31:20,
31:21, 73:6.
Ricard 51:20,
51:21, 52:2,
52:10, 52:13.
Richard 1:18, 1:33,
2:24, 128:6,
131:19.
ringing 110:8.
risk 117:20,
118:10.
risks 59:25.
RNDC 64:18, 104:4,
104:10, 104:14,
109:19.
roamer 12:12.
Roberts 117:17.
Rod 128:11.
role 41:21,
99:14.
roll 31:2, 37:2.

rolls 31:11.
Rosenstein 121:24,
   123:12, 128:11,
   128:15, 128:18,
   132:22, 133:15.
routine 71:7.
row 40:20, 44:20,
   47:2.
RPR 1:45, 133:18.
Rule 3:20, 3:23,
   4:12, 4:14, 4:16,
   8:1, 8:14, 10:5,
   20:16, 26:20,
   68:13, 125:23,
   126:23, 129:10,
   129:24, 129:25.
Rules 3:20, 129:11,
   130:7.
run 72:8.
.
.
< S >.
SA 50:4.
sale 98:2, 98:3.
sales 15:15, 94:21,
   98:17, 99:2,
   99:20, 100:22,
   100:24, 101:1,
   101:8, 101:12,
   102:5, 102:6,
   102:14, 102:21,
   102:24, 103:19,
   103:20, 104:23,
   105:1, 107:3,
   107:7.
salespeople
   97:11.
salesperson 33:14,
   75:8.
Salisbury 94:5.
sat 59:4, 117:9.
satisfaction
   114:16.
satisfied 130:22,
   130:25, 131:6.
saying 9:9, 11:1,
   11:2, 28:19,
   88:10, 88:12,
   114:4, 116:21,
   122:20.

says 19:15, 47:9,
   50:7, 66:2,
   66:12, 66:17,
   67:2, 67:8,
   67:10, 69:8,
   69:9, 69:19,
   70:17, 77:9,
   77:11, 84:21,
   85:3, 85:15,
   87:11, 87:12,
   87:18, 88:14,
   89:6, 89:23,
   104:13, 119:11,
   119:17.
scan 25:9, 29:15,
   33:17, 75:14,
   75:16, 75:18.
scanned 32:24,
   76:5, 77:2,
   77:21, 77:23.
scanning 75:7,
   75:22.
scenario 8:22.
scene 60:17.
schedule 6:5,
   7:6.
scheduled 5:19,
   54:6, 127:16.
school 22:21,
   22:22, 94:2,
   94:4.
scope 6:16.
score 109:21,
   117:7.
screen 30:5, 30:6,
   30:7, 30:9.
scrutiny 131:25.
seal 2:5.
sealed 2:12, 5:19,
   27:25, 128:13,
   129:6, 129:19.
search 5:25, 7:2,
   14:14, 19:6,
   125:20, 130:1,
   130:4.
seated 21:24,
   93:21.
Second 12:25,
   34:23, 36:4,
   40:20, 44:20,

47:2, 48:10,
   118:17, 122:10,
   124:8, 125:10.
secondarily 7:3.
secondly 7:3,
   126:9.
secret 117:21.
Section 3:19, 4:8,
   15:6, 19:16,
   19:18, 27:14,
   109:22, 110:5,
   131:3.
Sections 18:14.
secure 34:3.
secured 2:5, 57:11,
   76:10.
securitization
   31:1, 33:24,
   34:6, 34:11,
   34:14, 34:24,
   35:3, 35:21,
   36:5, 36:9, 37:3,
   79:6, 79:21,
   79:22, 80:9,
   80:24, 81:22,
   82:16.
securitize 35:5.
Security 28:7,
   35:6.
seeing 55:20.
seek 4:7, 4:16,
   9:18, 115:1.
seeking 117:3.
seeks 125:17,
   125:18.
seem 6:15.
seems 87:14.
seen 9:12, 14:4,
   65:9, 65:10,
   66:4, 83:10,
   84:3, 110:21.
segmented 100:3.
segregate 26:4.
seizable 19:9.
seize 18:6, 53:19,
   109:23, 111:2,
   113:25, 114:15.
seizure 7:10, 7:25,
   9:14, 13:2,
   14:15, 17:21,

18:2, 28:25,
54:19, 55:8,
55:9, 56:8,
58:25, 60:1,
64:7, 105:18,
109:10, 115:10,
117:19, 130:1,
130:4, 131:4.
sell 23:10, 23:14,
23:15, 23:16,
23:20, 35:5,
68:4, 97:16,
97:20, 97:23.
selling 99:23.
sells 23:10, 64:18,
94:20.
send 41:12, 75:12,
132:13.
senior 99:15.
sense 117:20.
sent 76:6, 76:9.
sentence 28:24,
48:10, 71:9,
71:10, 111:19.
sentences 111:13.
separate 40:25,
41:1, 107:20.
serious 116:16,
118:19, 128:19,
132:1.
served 16:5.
services 25:6,
26:5, 27:19.
set 27:17, 41:11,
60:11, 72:4,
72:6, 72:8, 72:9,
72:23, 73:1,
73:7, 73:8,
76:10, 98:14,
129:8.
sets 13:13,
37:18.
settle 16:24.
settlement 109:15,
110:8, 113:15.
seven 56:18.
several 18:4,
39:16, 57:13,
113:23.
shake 114:18.

shall 129:12,
130:16, 132:16.
shareholders
24:12.
sheet 101:10.
shift 97:13.
shipped 87:17,
89:18, 89:20.
shipper 89:17.
short 24:14,
106:15, 106:19.
shortfall 31:15,
31:20, 37:7.
shortfalls 38:21.
shot 121:17.
shouldn't 114:5.
showed 81:11,
91:11, 102:5.
showing 6:24, 6:25,
100:13, 125:25,
126:7.
shown 77:13,
78:5.
shows 27:13, 74:7,
82:9, 82:11.
shut 59:16, 109:10,
114:6.
sic 109:24.
Side 7:15, 8:21,
9:11, 15:10,
72:21, 117:9,
117:21.
sides. 117:23.
signed 4:23, 13:3,
52:23, 52:25,
132:15.
significance 53:24,
90:2.
signing 132:9.
similar 102:5.
similarly 97:22.
simple 74:6.
simply 116:9.
single 33:25,
82:25.
single-page 70:1.
Sir 17:25, 21:17,
37:14, 44:3,
62:11, 65:14,
67:25, 68:25,

71:14, 90:16,
92:6, 93:4,
93:15.
sit 12:12, 21:11,
133:10.
sits 37:10, 38:20,
63:10.
sitting 33:2,
90:1.
situation 18:8,
60:11, 106:21,
118:2.
six 56:18.
sketchy 127:21.
skip 86:14.
slice 103:1,
103:23, 104:5.
slower 46:11.
small 15:12, 15:13,
15:17, 40:5,
55:23, 63:16,
109:18, 118:8.
smaller 22:19,
26:3, 39:17.
sold 50:6, 50:21,
52:11, 99:1.
somebody 67:6,
68:3, 74:7.
somehow 76:6.
someone 85:23,
114:11.
Sometime 53:9.
Somewhat 20:10,
20:11, 126:12,
126:13.
somewhere 61:18,
74:14, 90:4.
Sorry 14:11, 25:14,
40:12, 46:2,
49:14, 52:24,
69:24, 70:7,
72:22, 81:25,
82:5, 88:21,
92:12, 95:3,
104:24.
sort 11:3, 55:10,
109:8, 116:18,
126:19.
sought 4:5, 4:13,
7:20, 8:14, 9:1,

11:24, 12:24,
112:18, 116:9,
130:14.
Sounds 67:24,
89:22, 112:12,
112:13, 114:12.
source 13:16.
South 40:9.
speaking 20:25,
24:4, 85:14.
Special 5:23, 7:24,
21:8, 28:7,
116:18, 131:19.
specific 5:22,
11:16, 11:17,
85:20, 112:3,
119:4, 121:20,
123:19.
Specifically 4:6,
17:24, 19:16,
32:16, 34:16,
36:8, 98:3,
125:5, 125:18,
130:17.
specified 122:10,
124:8, 125:10.
Speed 76:14,
76:16.
spell 21:25,
93:23.
Spirit 26:2, 39:20,
45:11, 89:1,
95:12, 112:19,
122:2.
Spirits 41:25,
51:23, 84:18,
84:25, 85:21,
87:13, 88:1,
88:8, 88:24,
89:4, 90:20,
91:4, 95:24,
96:4, 96:6,
97:17, 97:23,
98:3, 99:1,
123:21.
spoke 54:25.
spoken 60:16.
spouse 10:9.
Sprinzen 1:26,
2:18, 117:9.

square 117:12.
staff 99:15, 99:23,
99:25.
staffing 99:15.
stand 12:11, 12:13,
58:15, 133:6,
133:10.
standing 120:13,
120:17, 120:23.
stands 85:7,
121:13, 121:15,
133:16.
start 32:18, 59:24,
93:5, 96:17,
131:11.
started 7:22, 12:2,
60:7, 94:16,
96:22, 106:17.
stated 120:1,
129:19.
statements 7:1,
37:24, 38:11,
38:24, 39:24,
42:9, 42:17,
45:2, 45:20,
46:14, 47:3,
57:9, 58:19,
58:22, 63:13,
63:15, 70:23,
74:9, 81:11,
111:7, 117:15,
119:5, 119:8,
120:16, 124:12,
125:4, 130:19.
stateside 99:13.
status 5:6, 5:13,
5:14, 5:18,
127:9, 129:4.
statute 15:23,
18:14, 18:16,
109:21.
statutes 18:1,
109:22.
stay 12:14, 70:5.
Stefan 109:25.
stenographic
133:19.
step 93:4,
108:16.
steps 9:2.

stipulate 13:19.
stipulated 37:19.
Stop 71:6.
stores 15:8, 15:9,
15:12, 15:16,
23:15, 23:16,
41:20, 41:23,
50:6, 94:20,
99:22, 100:5,
100:6, 102:1,
103:9, 103:12,
103:14, 103:20,
104:13, 104:20,
104:21, 104:24,
105:1, 107:8,
109:17, 114:7.
story 117:22.
stranglehold
17:9.
Strauss 125:2,
128:25, 129:13,
130:9.
Street 1:47.
stretch 131:13.
strike 8:15, 9:13,
12:25, 115:12,
116:3, 125:19.
striking 7:9,
115:11, 116:13,
118:13.
struck 115:19.
structure 74:4.
structured 131:8.
subject 16:12,
19:18, 19:23,
20:1, 20:8,
127:12.
subjected 118:6,
118:9.
subjective 126:1.
submissions 6:15,
7:5, 126:13,
128:17, 129:18.
submit 5:13,
115:25.
submits 119:6.
submitted 5:14,
5:15, 5:16, 5:19,
7:17, 11:8,
28:25.

Subsequent 111:6,
  115:21.
subsequently 2:9.
subsidiaries 14:22,
  14:24, 47:14,
  47:23, 47:24.
subsidiary 51:24,
  91:4.
substantial 6:25,
  115:20, 126:6.
substantially
  14:19.
successful 20:9.
suffer 115:18.
suffered 4:15,
  126:24.
sufficient 112:23,
  128:14, 129:23.
suggest 111:25.
suggested 10:24,
  10:25, 108:8,
  131:24.
suggesting
  113:19.
suggestion 6:15.
summarize 70:12.
summarized 4:25,
  6:8, 10:21.
summer 5:20,
  127:20.
supervisor
  113:24.
supervisors
  128:8.
supplied 49:11.
Supplier 32:21,
  41:11, 41:12,
  42:9, 44:9,
  44:11, 44:17,
  44:25, 45:10,
  45:19, 48:22,
  49:17, 49:21,
  73:21, 73:22,
  85:1, 85:17,
  85:19, 89:17,
  97:23, 99:16.
suppliers 23:10,
  23:13, 26:2,
  27:17, 32:5,
  39:19, 43:3,

45:11, 45:12,
  47:24, 55:21,
  57:20, 73:17,
  73:19, 83:12,
  83:15, 86:23,
  96:11, 96:13,
  105:24, 106:2,
  106:16, 106:17,
  113:10, 119:24,
  120:1, 120:2,
  120:4.
support 28:25,
  99:25, 124:4,
  131:15.
supposedly
  119:16.
suppress 10:5.
Supreme 6:18.
surprised 126:13.
survived 106:14.
suspect 65:5.
Sustained 64:22.
Svedka 67:19,
  67:20, 87:22,
  87:23, 95:12,
  95:14, 95:17,
  96:7, 112:18,
  120:12.
swears 47:5, 48:22,
  50:2.
Sweden 67:11,
  67:23, 87:24.
Sweden. 67:10.
sweeping 73:20.
swept 38:20, 64:1,
  73:9, 73:11.
sworn 21:21,
  93:18.
system 33:18,
  39:14, 54:3,
  54:5, 89:8,
  97:15, 97:24,
  97:25, 114:7,
  117:16.
.
.
< T >.
T. 1:45, 133:26.
table 12:11, 12:14,
  21:11, 21:15.

taken. 93:7.
talked 47:2, 53:20,
  54:22, 55:2,
  60:19, 72:22,
  73:9, 79:1.
talks 28:24.
target 118:3.
tax 43:3, 59:9,
  98:16, 98:17,
  99:2, 106:10.
taxes 32:7, 43:19,
  45:1, 59:11.
teams 21:7.
Tech 74:17.
technical 55:10,
  55:11, 55:13.
Technically 35:5,
  69:7, 76:3,
  122:21.
technique 11:3.
tells 117:21.
template 41:12.
ten 56:17, 84:8.
ten-bank 26:9.
tenuous 131:13.
terms 8:11, 8:22,
  9:11, 10:12,
  10:14, 11:12,
  11:22, 12:5,
  18:13, 120:14,
  120:16.
Teslik 1:27, 2:18,
  93:10, 93:12,
  94:1, 99:3,
  100:9, 100:13,
  100:17, 100:21,
  107:11, 107:12,
  107:25, 108:4,
  108:12, 117:9,
  134:15, 134:19.
Teslik108 134:19.
Teslik94 134:15.
testified 21:22,
  34:10, 40:11,
  43:5, 47:1,
  81:12, 81:15,
  93:19, 102:11,
  116:21, 119:12,
  120:1.
testify 10:10,

27:21, 116:21,
116:23, 120:16.
testifying 30:11,
40:1, 124:19.
testimony 8:8,
11:25, 13:4,
18:23, 27:10,
35:25, 36:4,
64:21, 80:12,
83:11, 90:23,
91:15, 91:22,
95:11, 95:23,
112:15, 115:14,
116:3, 116:8,
119:19.
Texas 56:11.
theirs 41:14.
themselves 2:14,
39:11, 86:6.
theoretical
17:12.
Theoretically
38:18, 55:17,
79:13.
theory 11:11,
11:16, 11:17,
17:14, 63:9,
63:12, 110:9,
113:21.
thereafter 29:3.
thereof 7:23,
127:1.
they'll 45:16.
They've 14:8,
19:11, 86:8,
124:13.
third 13:2, 36:16,
114:10, 118:18.
Thomas 13:9, 93:12,
93:17, 93:24,
134:13.
though 62:16,
79:23.
thoughts 10:19.
thousand 18:4,
109:20.
thousands 74:13.
threat 113:13.
three 11:7, 11:9,
12:22, 13:13,

13:14, 24:24,
37:18, 55:13,
55:15, 58:12,
69:18, 70:22,
89:3, 109:9,
114:13, 114:22,
119:4, 119:8,
120:16, 124:12,
125:4.
three-plus 124:1.
three-tenths 104:6,
104:8, 104:9.
three-tier 97:15,
97:24, 97:25.
threshold 126:1.
thumb 16:21.
Thursday 1:19,
53:9, 60:4.
tied 56:1.
tier 96:10.
till 115:25.
timing 38:19,
63:25.
Title 4:8.
today 2:11, 6:5,
6:6, 8:18, 10:19,
13:5, 13:18,
13:21, 14:13,
16:25, 20:16,
33:2, 40:1, 94:7,
96:18, 109:8,
110:12, 112:12,
112:16, 114:3,
114:22, 116:22,
119:19, 124:19,
127:15, 129:7,
132:10, 133:16.
together 75:13.
Tom 2:20.
took 4:1, 17:20,
60:1, 120:5.
Top 27:14, 36:19,
40:20, 49:23,
62:8, 62:11,
62:24, 66:7,
67:2, 67:15,
69:3, 80:1,
80:20, 83:21,
87:12.
total 24:5, 24:12,

25:16, 33:3,
35:11, 35:16,
35:17, 40:13,
40:21, 78:5,
102:20, 104:3,
104:10, 104:14,
107:3.
touch 30:7, 30:8,
30:9.
touches 30:5.
traced 82:19.
track 123:23.
trade 97:12,
98:15.
training 99:4,
99:6.
transaction 19:18,
80:16, 111:6,
122:12, 125:12.
transactions 83:23,
85:20, 122:11,
122:16, 122:18,
123:20, 125:11,
131:1.
Transcript 1:17,
6:1, 113:3,
133:19.
Transfer 13:16,
13:17, 35:22,
76:9, 79:4,
79:11, 80:7,
80:8, 80:10,
80:13, 81:8,
81:16, 82:11,
82:20, 82:22,
82:25, 85:9,
86:8, 112:3,
112:4, 126:16,
127:23.
transferred 33:20,
34:13, 34:17,
36:9, 47:19,
48:13, 51:2,
54:17, 80:7,
119:21, 120:20,
121:9, 125:7.
transfers 14:19,
15:4, 40:3,
49:20, 51:5,
52:18, 71:7,

79:1, 110:18,
112:22, 122:25,
123:18.
transmission
76:25.
transmits 110:18.
transports
110:18.
treasurer 13:6,
13:7, 22:8,
22:25, 24:18,
50:20, 55:5.
treasury 98:8.
treatment 118:6.
trial 113:5.
triggered 17:2,
17:3.
trouble 53:15.
troubling 128:4.
truck 97:12.
Trust 50:24, 50:25,
51:4.
truth 7:2, 117:14,
126:8.
try 131:11.
trying 6:14, 10:13,
13:18, 70:5,
114:10, 117:5,
123:23, 123:25.
Tuesday 53:5, 54:4,
54:6.
Turn 34:23, 40:16,
46:19, 46:23,
66:12, 111:4,
126:17.
turns 116:19,
126:17.
twice 75:15.
two 2:19, 3:6,
3:17, 11:9, 13:4,
14:1, 15:9, 18:1,
50:5, 52:19,
69:2, 71:7,
86:10, 93:1,
102:1, 103:12,
103:14, 103:19,
103:20, 104:13,
104:24, 107:8,
126:22, 127:6,
127:8, 129:3,

129:15, 130:25,
132:3.
type 127:22.
typically 46:12,
75:1, 85:4.
.
.
< U >.
U.S. 6:18, 14:20,
14:21, 14:24,
47:23, 47:24,
49:15, 62:16,
110:1, 110:11,
110:25, 113:16,
116:20, 117:8,
117:11, 121:19,
122:23, 128:5,
128:7, 128:11,
128:20, 128:21,
131:19, 133:9.
U.S.A 52:2.
ultimate 11:23,
73:5, 73:16.
ultimately 17:1,
17:4, 31:17,
35:23, 50:4,
59:1, 81:17,
94:20.
unable 113:9.
undergrad 94:5.
undergraduate
22:23.
underlying 102:9.
underneath 31:14.
understand 3:5,
8:19, 11:6,
11:18, 57:25,
62:14, 63:10,
89:25, 117:6,
118:17, 118:20,
122:18, 122:20.
Understandably
127:10.
understanding
10:6.
understood
122:16.
unethical 121:19.
unfrozen 60:24.
uniform 102:4.

unit 110:2.
University 22:22,
22:23, 94:6.
unlawful 130:1,
130:4.
unless 26:21.
unmistakable
113:17.
unreasonable
129:22, 130:6.
unresolved 58:14.
unseal 115:23.
unsealed 115:13.
until 5:9, 6:5,
96:18, 110:2,
122:13, 125:13,
129:7.
unusual 117:1.
update 58:15.
updates 58:11.
urge 8:17.
user 97:23.
users 97:16.
uses 31:4.
using 102:3,
109:23, 114:14.
.
.
< V >.
v. 110:11,
117:17.
vacate 7:25, 8:16,
9:14, 13:2,
116:2, 125:20.
vacating 7:10,
115:10, 116:14,
118:14.
validity 7:23.
value 40:14.
varies 38:18.
various 4:10.
vary 24:3.
verbatim 120:17.
verifying 9:16.
versus 2:3, 6:17,
6:22, 7:11, 7:13,
10:3, 10:7,
10:13, 19:12,
19:13, 94:20,
116:5, 116:16,

116:22, 122:3,
125:21, 125:22,
125:24, 126:2,
126:4, 126:5.
Via 39:20, 41:11,
50:3, 50:22,
52:12, 61:16,
62:5, 62:11,
62:17, 85:4.
viable 11:12.
Victor 91:3, 95:20,
112:20.
view 5:1, 5:4, 6:9,
6:11, 8:20, 9:16,
98:9, 106:7,
107:8, 132:25,
133:4, 133:12.
violation 19:10,
19:18, 122:11,
124:3, 125:11,
126:19.
violations 18:13.
violative 122:25.
Virginia 41:23,
41:25, 53:12,
54:20, 94:23.
virtue 97:25.
visited 103:16,
103:17, 103:18.
Vodka 66:25, 67:8,
67:17, 67:20,
87:22, 87:23,
95:12, 95:14,
95:17, 112:19,
120:12.
volume 100:22,
100:24, 101:2,
101:24.
vote 57:3.
vs 1:8.
.
.
< W >.
W-h-i-t-e 93:24.
W. 1:27, 1:47.
Wachovia 25:3,
25:4, 111:7.
Wachovia/wells
25:5.
wait 75:13,

115:25.
waived 57:17.
waiver 56:21,
56:23, 56:25,
57:3, 57:5.
walk 23:21.
wanted 19:7, 64:13,
76:20, 76:23,
99:8.
wants 7:16, 9:12,
73:14.
Ward 5:24, 7:24,
10:8, 12:25,
15:3, 15:20,
28:7, 29:23,
47:4, 48:21,
49:9, 50:2,
52:19, 52:22,
111:4, 111:6,
111:12, 112:5,
116:19, 120:15,
130:20, 131:20.
warehouse 23:21,
33:19, 97:12.
warehousemen 97:12,
99:24.
warrant 5:25, 7:3,
7:10, 7:25, 9:14,
13:2, 14:14,
14:15, 16:5,
16:10, 17:21,
18:2, 19:6,
44:17, 106:12,
116:14, 118:14,
125:20, 126:9,
131:4.
warrants 29:1,
64:7, 131:25.
Washington 94:23,
96:23.
ways 39:16, 86:10,
106:1.
Wednesday 54:4.
week 53:4, 53:9,
56:2, 57:2,
105:3, 105:7,
105:22, 106:22.
weekend 56:24,
60:13, 60:22.
weekly 98:13.

welcome 2:22,
21:10, 21:14.
whatever 9:2, 14:9,
41:20, 89:7,
89:13.
whereas 45:12.
whether 3:23, 7:17,
8:22, 10:14,
11:4, 11:12,
11:23, 20:12,
20:19, 59:5,
90:6, 91:14,
109:24, 112:1,
123:17.
whiskey 66:2, 66:9,
66:13, 66:17.
whiskey. 66:8.
White 2:20, 13:9,
16:4, 93:13,
93:14, 93:17,
93:24, 94:2,
100:13, 100:21,
107:16, 108:7,
108:13, 108:16,
134:13.
Whoever 110:17.
whole 27:25,
83:4.
wholesale 23:7,
105:1.
wholesaler 22:19,
23:7, 23:12,
23:18, 23:20,
96:12, 97:10,
97:15.
wholesalers
96:11.
wholly-owned
91:4.
whom 14:16, 64:25,
94:7.
wife 10:9, 116:19,
120:15, 131:20.
willful 122:19,
124:3, 126:19.
willfulness
122:5.
willing 8:21,
12:1.
Wine 26:1, 39:19,

40:5, 40:9,
  40:14, 45:11,
  84:25, 88:3,
  88:9, 88:25,
  89:2, 89:5,
  89:14, 89:19,
  99:1.
wineries 26:3,
  39:18.
wire 15:4, 17:22,
  33:25, 35:14,
  39:18, 40:3,
  41:9, 46:11,
  46:12, 49:15,
  49:20, 81:22,
  85:4, 86:16,
  86:18, 109:21,
  112:4.
wired 34:3.
wires 26:3, 40:8,
  40:14, 45:24,
  46:2, 46:13,
  46:17.
withdrawn 46:4.
withdrew 85:23.
within 101:1,
  127:23, 129:10,
  131:2, 132:12.
without 11:19,
  18:2, 124:17,
  124:21, 129:23.
Witness 13:9,
  18:11, 21:2,
  21:21, 21:23,
  22:1, 26:14,
  27:21, 37:12,
  42:3, 64:15,
  64:21, 82:2,
  93:10, 93:18,
  93:20, 93:24,
  98:24, 100:11,
  100:19, 108:19,
  119:12, 134:3.
witnesses 2:20,
  3:7, 7:15, 8:7,
  8:8, 12:5, 13:5,
  13:25, 108:18,
  108:23, 130:25.
woman 54:25,
  60:19.

word 23:7, 28:19,
  73:3.
words 48:11, 62:13,
  67:7, 69:2,
  72:14, 73:14,
  121:5.
work 60:13, 72:4,
  73:4, 94:9,
  94:14, 98:13,
  104:5, 105:3,
  106:19, 111:10,
  114:8.
worked 22:19, 54:1,
  60:10, 60:16,
  60:22.
workers 97:12.
working 58:2,
  58:5.
works 41:8, 73:6,
  81:13, 81:14,
  117:16.
world 109:18.
worry 58:13.
worst 117:14.
worthy 115:16.
write 18:7, 39:17,
  72:15.
writes 110:4.
writings 109:25.
wrote 61:4,
  117:17.
.
.
< Y >.
year 2:13, 5:16,
  5:20, 14:20,
  24:6, 33:7,
  40:11, 95:8,
  101:13, 101:25,
  102:12, 102:18,
  102:20, 117:17.
years 22:11, 22:25,
  25:5, 58:12,
  94:15, 103:17,
  109:9, 114:13,
  124:1, 126:22,
  127:6, 127:8,
  129:3, 129:15,
  132:3.
York 22:23, 50:7,

52:4, 52:17,
  88:6, 89:2, 89:5,
  89:15, 89:19,
  90:4, 91:2, 91:3,
  91:7, 95:20,
  96:3, 112:21.
Yup 66:19, 77:20.
.
.
< Z >.
ZBA 31:12, 31:13,
  33:23, 37:4,
  63:24.
Zero 31:14, 38:18,
  38:23, 39:1,
  45:16, 63:1,
  63:3, 63:7,
  63:13, 63:18,
  63:23, 64:2,
  64:5, 64:11,
  84:20.
zero-based 79:1,
  79:3, 79:11,
  80:6, 81:8,
  81:15, 82:11.
zero. 64:6.
zeroing 39:3.