**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **v.** | * | **Criminal No.   MJG-16-0258** |
| | * | |
| **REPUBLIC NATIONAL DISTRIBUTING** | * | |
| **COMPANY, LLC, et al.,** | * | |
| **Defendants.** | * | |
| | * | |

…ooo0ooo…

## GOVERNMENT'S RESPONSE TO DEFENDANTS'
## MOTION TO DISMISS THE INDICTMENT

The United States of America, through undersigned counsel, hereby respectfully opposes and responds to the motion filed by the defendants, Republic National Distributing Company ("RNDC") and the others, in which they seek an order dismissing the indictment.  The defendants offer three lines of argument in an attempt to support the motion: (a) first, they suggest that the indictment does not allege an offense; (b) second, they suggest that the indictment does not provide sufficient facts under Rule 7(c) of the Federal Rules of Criminal Procedure; and (c) third, they allege that the government engaged in such significant misconduct in a related forfeiture action that it merits the extraordinary relief of dismissal of this indictment.  Because the indictment correctly tracks the statutory language of each offense charged, and it provides a broad outline of the interstate liquor smuggling scheme in which the defendants participated, it properly charges the various offenses and provides more than sufficient factual detail to provide the defendants with proper notice of the charges against them.  Because the defendants do not properly allege or prove any improper government conduct, there is no evidence of a vindictive prosecution; consequently, the motion to dismiss should be denied.

Statement of Facts

In 2012, the Honorable Stephanie A. Gallagher, U.S. Magistrate Judge, issued several seizure warrants for bank accounts based on an affidavit that alleged that the accounts contained the proceeds of wire fraud and were involved in money laundering. As is set forth in the affidavit that was submitted in support of the application for those warrants, the investigation first focused on a single retail liquor store in Cecil County, known as Northside Liquors, that was supplying bulk liquor to smugglers. Motion Exhibit B at 4-5. Surveillance confirmed that the bulk liquor was being sold out the back door of the store to smugglers who loaded dozens of cases of liquor into vans and SUVs and then took it to New York where it was sold in retail stores. *Id*. Evidence also established that the smugglers routinely called or sent faxes from New York to Northside to place the orders for bulk liquor. *Id*. at 7.[1]

New York law requires that anyone importing liquor or distributing it to retailers must register as a wholesaler and pay excise taxes on the distribution of that liquor. The smugglers did not register or pay the excise taxes. *Id*. at 4. Sources told the investigators that the RNDC salesmen routinely went to Northside and took the bulk liquor orders directly from the faxes that had been sent from New York. *Id*. at 7. RNDC then filled the orders, and the smugglers picked up the liquor, loaded it into vehicles, and paid Northside in cash. The store managers deposited the cash into the bank and then wrote checks to RNDC to pay for the bulk liquor. *Id*. at 7-8. RNDC then moved the funds from account to account until it was used to pay the companies that supplied RNDC with the products. *Id*. at 12-14.

The warrant application relied on three theories to support the issuance of warrants for the RNDC bank accounts: (1) that the accounts contained the proceeds of the liquor smuggling,

---

[1] "Bulk liquor" in this case refers generally to a substantial number of cases of liquor, usually between at least 35 to 150 cases at a time and, on occasion, as much as 500 cases at a time.

(2) that the accounts were involved in domestic money laundering through transactions over $10,000; and (3) that the accounts were involved in international money laundering based on a reason to believe that RNDC was paying for imported liquor supplied by off-shore producers. *Id.* at 1-2 and 20-21. At the time that the warrants were executed, the government did not know the amount of money in the accounts, only that the accounts were involved in the movement of the smuggling proceeds. Motion Exhibit F at 57 ("the matter of just whatever the figure was that was in the sweep account, in fairness to the government, the government would not be aware of it.").

On the same day that the agents executed the seizure warrants, government agents interviewed six individuals; one of those was defendant Jason Lockerman.  At that time, the agents had in their possession a target letter, dated June 5, 2012, addressed to Lockerman, but did not give it to him. A copy of that letter is annexed hereto as Exhibit A.  Lockerman voluntarily provided information to the agents and identified a number of liquor stores in Cecil County that were participating in bulk liquor sales.  The agents offered Lockerman an opportunity to cooperate in the investigation of those liquor stores.  Lockerman said that he thought that he could do that.  The agents advised Lockerman that he could be charged with an offense because he knew that the liquor was not intended for retail sales and instead was being moved across state lines.

Shortly after that, RNDC hired counsel to represent Lockerman.  During a telephone conversation, government counsel offered the lawyer the same opportunity for Lockerman to cooperate in the ongoing investigation.  Despite Lockerman's statement to the agents that he was willing to cooperate, counsel for Lockerman advised government counsel that RNDC did not want Lockerman to cooperate and that RNDC would not authorize him to cooperate on company time.  Government counsel asked Lockerman's counsel to confirm in writing that it was RNDC

that was making the decision about Lockerman's cooperation, and counsel did so.  That letter set forth counsel's misunderstanding that Lockerman was only a witness.  A copy of that letter is annexed hereto as Exhibit B.

Government counsel sent a letter that same day to clarify that Lockerman was considered a target of the investigation and that an attempt would be made to gain permission from RNDC for Lockerman to cooperate.  A copy of that letter is annexed hereto as Exhibit C.  Counsel for Lockerman then sent another letter confirming that RNDC would not authorize Lockerman to cooperate. A copy of that letter is annexed hereto as Exhibit D.  In a final effort to offer Lockerman the benefits of cooperation, government counsel finally suggested that perhaps Lockerman could cooperate on his days off. A copy of that letter is annexed hereto as Exhibit E. At that point another liquor salesman offered to cooperate and Lockerman's assistance was no longer needed.

Once the warrants were executed, counsel for RNDC called government counsel and requested that the accounts be released so that normal business activity could resume.  Within days, the parties agreed that RNDC could place a similar amount of funds in escrow pending resolution of the forfeiture.  Based on that agreement, government counsel requested, and Judge Gallagher issued an order that authorized the substitution of funds and released the accounts.[2]

Counsel for the parties met and discussed a potential reduction of the escrow amount. RNDC requested that it be reduced to $2.3 million and the government suggested that it be reduced to $15 million. Judge Gallagher's Report and Recommendations  at 2 n.1.  When the parties could not reach an agreement, RNDC subsequently filed a motion seeking release of the

---

[2]      The defendants attempt to attach some opprobrium to the fact that the warrants were obtained ex parte and executed without notice to the targets.  Motion at 6.  The defendants do not cite a single case, however, in which the targets of an investigation were given advance warning of a planned execution of a search or seizure, and certainly none in which advance notice by the government is required in the ordinary course.

substituted funds, and argued (1) that its business had been seized and (2) that the government had possession of the funds held in RNDC's attorney's escrow account.   Judge Gallagher recommended that the motion be denied because (1) the business had not been seized, and (2) the funds were not in the government's possession. *Id*. at 4 and 7.

A hearing was held before the Honorable Richard D. Bennett, U.S. District Judge, and the court concluded that the government had done nothing wrong in connection with the warrant or the seizure.   Motion Exhibit F at 55-57. Considering the proportionality of the seizure compared to the projected tax loss, however, the court suggested that the escrow amount be reduced to $5 million, and both parties agreed.

The government and counsel for the defendants continued negotiations in an attempt to reach a resolution of the case, but when negotiations broke down, counsel for RNDC sent a letter to the Deputy Attorney General.   In that letter, dated July 7, 2014, counsel mentioned "an impending indictment of our client, Republic National Distributing Company (RNDC)."     It went on to say, "RNDC has refused that office's demand for a pre-indictment settlement and was recently informed that, as a result, an indictment is imminent."   In September 2014, counsel for RNDC met with supervisor-level lawyers at the United States Attorney's Office in Baltimore to discuss the expected indictment. Further negotiations followed, but those negotiations concluded in January 2015.[3]

During 2015, the government concluded a number of plea agreements with liquor retailers and liquor smugglers and went through a series of Rule 11 proceedings with those related defendants, all of whom are named in the indictment as co-conspirators.   Once all of

---

[3]     During the negotiation period, forfeiture proceedings were delayed by agreement of RNDC.  Indeed, counsel for RNDC signed tolling agreements, delaying proceedings, in October 2012, January 2013, April 2013, July 2013, October 2013, January 2014, April 2014, July 2014, October 2014, January 2015, April 2015, and they filed a motion seeking further delay in July 2015.  All of these delays were at RNDC's request.

those related proceedings were concluded, this case was prepared for an indictment that was returned on May 24, 2016.

In May 2015, Judge Bennett requested a status update on the seized funds. RNDC alleged that the warrant affidavit contained misstatements of fact, and suggested that there was some conflict of interest because the assigned AUSA and the affiant on the seizure warrant are married. Motion Exhibit E at 6-8. The defendants have never explained how this supposed conflict would manifest itself in this case. After a hearing that was held on August 27, 2015, Judge Bennett made no findings about the allegations made by RNDC about the facts in the affidavit or the supposed conflict of interest. Motion Exhibit E at 130-32. Instead, without any reference to an applicable statute of limitations, the court concluded that the investigation was taking too long and ordered the remaining $5 million held in escrow released. Motion Exhibit E at 132 ("time is up for the government."[4] In the defendants' motion, they repeatedly refer to the seizure as "unlawful" when there has been no such finding.

On February 16, 2016, RNDC sent a second letter to the Deputy Attorney General, again suggesting that an indictment was imminent, and asking that the Department of Justice review the case. After the Deputy Attorney General declined to intervene, the indictment followed.

On August 1, 2016, the defendants filed the pending motion alleging that the indictment does not charge an offense and that there has been some misconduct in the prosecution. Because the indictment correctly tracks the statutory language of each offense charged, and it provides a broad outline of the interstate liquor smuggling scheme in which the defendants participated, it properly charges the various offenses. Because the defendants do not properly allege or prove any improper government conduct, and they do not allege or prove any improper influence on

---

[4]    Judge Bennett's conclusion was at odds with his position in the earlier hearing. Motion Exhibit F at 54 ("the government should have every right to take as long as it wants with respect to its grand jury investigation.").

the grand jury, there is no evidence of a vindictive prosecution; consequently, the motion to dismiss should be denied.

## ARGUMENT

RNDC offers three arguments in an attempt to support the motion to dismiss: first, they rely upon Rule 12(b) of the Federal Rules of Criminal Procedure to suggest that the indictment does not allege an offense.  Second, they suggest that the indictment does not provide sufficient facts under Rule 7(c) to satisfy the elements of the offenses charged.  Third, they allege that the government engaged in misconduct so egregious that it warrants dismissal of the indictment. Because the indictment correctly tracks the statutory language of each offense charged, and it also provides a broad factual outline of the interstate liquor smuggling scheme and the money laundering in which the defendants participated, it properly charges the various offenses. Because the defendants do not properly allege and have not proven any improper government conduct and there is no evidence of a vindictive prosecution, the motion to dismiss should be denied.

I.      The Indictment Properly States the Offenses Charged.

The defendants first suggest that the indictment does not allege an offense.  They make this argument in two parts, generally relying upon Rule 12(b) to argue that the indictment is insufficient.  In the first part, defendants suggest that a state regulatory scheme precludes federal criminal prosecution on other grounds.  In the second part, they argue that control states' cross-border sales of alcohol to consumers are somehow analogous to, and preclude prosecution of an interstate smuggling scheme.  Each allegation lacks merit.

A.    Because the indictment tracks the statutory language for each
      <u>offense charged, it meets the requirements of due process</u>.

When considering a defendant's challenge to the sufficiency of an indictment pursuant to

Rule 12(b)(3)(B)[5], the district court must treat the allegations in the indictment as true. *See*

*United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) (citing *United States v. Sampson*, 371

U.S. 75, 78-79 (1962)).  "To pass constitutional muster, an indictment must (1) indicate the

elements of the offense and fairly inform the defendant of the exact charges and (2) enable the

defendant to plead double jeopardy in subsequent prosecutions for the same offense.  *United*

*States v. Williams,* 152 F.3d 294, 299 (4th Cir. 1998). *Accord Hamling v. United States,* 418 U.S.

87, 117 (1974).  With rare exception, an indictment is constitutionally sufficient if it faithfully

tracks the statutory language.  *Hamling,* 418 U.S. at 117; *United States v. Wicks,* 187 F.3d 426,

427 (4th Cir. 1999).

"In general, if an indictment sets forth the essential elements of the offense in sufficient

detail so as fairly to inform the defendant of the nature of the charge, then it is immune from

attack on a motion to dismiss." *United States v. Brandon*, 150 F. Supp. 2d 883, 884 (E.D. Va.

2001).  In order to give a defendant sufficient notice of the charge against him, the indictment

need only track the language of the statute at issue. *See Wicks*, 187 F.3d at 427; *United States v.*

*Smith*, 44 F.3d 1259, 1264 (4th Cir. 1995); *United States v. Fogel*, 901 F.2d 23, 25 (4th Cir.

1990). Previous judicial interpretations or limitations of various terms of the charged statute do

not alter the essential elements of the charge that must be alleged in the indictment. *United States*

*v. Vinyard*, 266 F.3d 320, 326 (4th Cir. 2001).

---

[5]  Defendants mistakenly cite Rule 12(b)(3)(B)(iv), which addresses improper joinder, but it appears from the substance of the argument that Defendants intended to cite Rule 12(b)(3)(B)(v).

By alleging in the indictment that the defendants violated the wire fraud, conspiracy, and money laundering statutes, however, the government has, by definition, charged the defendants with committing acts within the scope of those sections. So long as there is sufficient factual detail to put the defendants on notice as to the charges, the government is not required to explain in detail the precise evidence it believes will prove each element of the charges beyond a reasonable doubt. "As the language of the rule indicates, when the issue raised involves a question that may not be determined without 'trial of the general issue' it is not proper for decision by pretrial motion." *United States v. Ayarza-Garcia*, 819 F.2d 1043, 1048 (11th Cir. 1987). It follows that a pretrial motion to dismiss under Rule 12(b) "cannot be based on a sufficiency of the evidence argument because such an argument raises factual questions embraced in the general issue." *Id.*; *accord, e.g.*, *United States v. Terry*, 257 F.3d 366, 372 (4th Cir.) (King, J., concurring); *United States v. Gallagher*, 602 F.2d 1139, 1142 (3d Cir. 1979); see also *United States v. King*, 581 F.2d 800, 802 (10th Cir. 1978) (dismissal of charging instrument on basis that "[defendants'] conduct did not constitute a violation of the statute charged" was improper, because it was "in effect a determination of guilt made at a point in the proceedings when the district judge was without jurisdiction to render it"); 24 Moore's Federal Practice § 612.02, at 612-7 (3d ed. 1997) ("A Rule 12(b) motion to dismiss is not the proper way to raise a factual defense.").

Here, the indictment successfully tracks the statutory language of each of the three offenses charged.  Count One charges a wire fraud conspiracy in violation of 18 U.S.C. § 1349, which provides as follows:

> Any person who attempts or conspires to commit any offense under this chapter [which includes wire fraud under 18 U.S.C. § 1343] shall [have committed an offense].

Count One charges as follows:

> From at least in or about June 2009 through and including on or about June 5, 2012, in the District of Maryland, and elsewhere, the defendants,
> ### REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC,
> ### EUGENE GERZSENYI,
> ### JASON LOCKERMAN,
> ### and
> ### LISA ROBBINS,
> did knowingly conspire, combine, confederate, and agree with each other and with Anil Patel, Dilip Patel, Jatin Patel, Nilesh Patel, Tushar Patel, Bin Luo, Bao Zheng, Alexander Lew, Ting Wei, and others known and unknown to the Grand Jury to knowingly devise a scheme and artifice to defraud New York State, New York City, and registered New York wholesalers, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises ("the scheme to defraud") and for the purpose of executing and attempting to execute the scheme to defraud would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

Thus, it is clear that Count One faithfully tracks the statute, and properly charges the offense of conspiracy to commit wire fraud.  Paragraphs 1 through 8 and 10 through 23 provide sufficient factual detail to allow defendants to mount a defense and to preclude any attempt to prosecute them again on the same charges.

Counts Two through Five charge four instances of wire fraud in violation of 18 U.S.C. § 1343, which provides as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice shall [have committed an offense].

Counts Two through Five charge as follows:

> On or about the dates set forth below, in the District of Maryland and elsewhere, the defendants,
> ### REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC,
> ### EUGENE GERZSENYI,

**JASON LOCKERMAN,**
**and**
**LISA ROBBINS,**

for the purpose of executing and attempting to execute the scheme to defraud, did knowingly cause to be transmitted in interstate commerce by means of wire communications certain signals, signs, and sounds, as follows:….

This is followed by a table that describes four wire communications that took place on dates specified. The scheme to defraud is outlined in Count One and incorporated by reference, and thus, it is clear that Counts Two through Five faithfully track the statute, and properly charge the offense.

Counts Six through Twenty-three charge money laundering in violation of 18 U.S.C. § 1957, which provides as follows:

(a)     Whoever, [using transactions in the United States] …, knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall [have committed an offense.] [Wire fraud is a specified unlawful activity as defined in 18 U.S.C. sections 1956(c)(7) and 1961(1)(A).]

Counts Six through Twenty-three charge as follows:

On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

**REPUBLIC NATIONAL DISTRIBUTING COMPANY, LLC**,

did knowingly engage and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is a transfer of funds in the amounts set forth below from Wells Fargo Bank account ****9227 to Wells Fargo Bank account ****9442, such property having been derived from a specified unlawful activity, that is, a wire fraud conspiracy and wire fraud, as charged in Counts One through Five.

This is followed by a table that describes 18 financial transactions that took place on dates specified. Again, Counts Six through Twenty-three faithfully track the statute, and properly charge the offense, providing sufficient factual detail to put the defendants on notice as to the specific conduct charged.

Indeed, despite the fact that the defendants claim in the motion that "the indictment does not charge a crime," they do not even allege that the charging language is in any way incorrect. Because the indictment correctly tracks the statutory language for each count and each statutory offense, the motion to dismiss based on Rule 12(b) must be denied.

B.      Just because liquor wholesalers are subject to regulations does <u>not mean that the defendants cannot be charged with a crime</u>.

Instead of challenging the sufficiency of the charging language, the defendants make the bizarre argument that a liquor wholesaler or other entity operating within a regulatory framework cannot be charged with any crime, regardless of their conduct, if it relates in any way to the regulated activity.  The defendants' argument seems to be that wholesalers have to comply with state and federal liquor regulations, and, therefore, they cannot be charged with a crime related to liquor distribution.  This, of course, is nonsense.  Every business and industry is subject to some sort of regulations.  According to the defendants' reasoning then, no regulated business ever could be charged with any crime, regardless of their conduct.  In reality, a wire fraud scheme to defraud a state taxing authority is not implicated by, and does not implicate the regulatory scheme.  Put another way, the government is not using criminal law to regulate the liquor industry; it is using criminal law to regulate fraud.

The defendants also suggest that the indictment somehow imposes upon them "a duty to investigate retailer conduct" that might constitute a crime.  <u>Motion</u> at 13, 18.  Of course, there is no such duty and the indictment does not contemplate one.  Again, the defendants miss the obvious point that they are *not charged with a failure to discover liquor smuggling*, but with knowingly participating in and benefiting from a conspiracy involving liquor smuggling.  Indeed, the indictment alleges that the defendants knew about, assisted in, and profited from the liquor smuggling operation.  The government, therefore, must prove that the defendants knew of the

smuggling activity and that they knowingly agreed to participate in that scheme, and intends to do so – at trial.

Shockingly, the defendants actually argue that state and federal liquor regulations *require* them to sell liquor which they know is destined not for retail sale to consumers, but for wholesale distribution to liquor smugglers.  To make this argument, they quote 27 C.F.R. § 6.153(a), and state that "[a]pplicable federal regulation prohibits any wholesaler practice that 'restricts or hampers the free economic choice of a retailer to decide which products to purchase or the quantity in which to purchase them for *sale to consumers*.'"  <u>Motion</u> at 16-17, emphasis added. Therein lies the rub:  the sales which are the subject of the conspiracy charged in the indictment are not intended for sale to consumers in Maryland, but for wholesale distribution to smugglers.

The defendants, of course, intentionally miss the point that, as set forth in the indictment, the Cecil County liquor stores were not buying in bulk to sell to "consumers" and that the stores were not acting as retailers; they were acting as wholesalers, selling to other wholesalers, i.e., the smugglers.  Consequently, this regulation does not *require* that the defendants participate in a liquor smuggling scheme by selling liquor that they know is going to be immediately resold to smugglers and taken out of state.  Moreover, the defendants do not even attempt to quote any other state or federal regulation that might authorize them to commit wire fraud or money laundering.

The defendants also suggest that "there could be no criminal liability if the New York retailers ultimately paid New York excise taxes."  <u>Motion</u> at 18.  Even if it was true that the taxes were paid—and it is not – that is not what is charged.  Instead, the indictment charges that the New York retailers and the smugglers <u>did not pay the taxes</u>, and that the defendants knew it (or were willfully blind to the fact).  Those allegations govern this proceeding, as it is black letter

law that, on a motion to dismiss the indictment, the allegations of the indictment must be accepted as true. *Hall*, 20 F.3d at 1087. When the defendants argue that they had no way to know if the taxes were paid or not, they simply miss the point that this is an issue of fact that should be left to a jury to decide.

The defendants also suggest that liquor smuggling is not a crime because the smugglers have no duty to report their smuggling to New York authorities. <u>Motion</u> at 19. The indictment, on the other hand, describes the duty that requires that all liquor importers and wholesalers have to register with the state and provide monthly reports about the liquor carried into the state. Indeed, in *Pasquantino v. United States*, the Supreme Court concluded that liquor smuggling is a crime, and that when perpetrated though interstate or international wire communications, it violates the wire fraud statute. 544 U.S. 349, 357 (2005). In that case, the smugglers were prosecuted for sneaking liquor from Maryland to Canada without paying the import duties. The failure to report to Canadian Customs officials the importation of the liquor was held to be a material misrepresentation of fact.

> The evidence showed that petitioners routinely concealed imported liquor from Canadian officials and failed to declare those goods on customs forms. By this conduct, they represented to Canadian customs officials that their drivers had no goods to declare. This, then, was a scheme "designed to defraud by representations," and therefore a "scheme or artifice to defraud" Canada of taxes due on the smuggled goods.

*Id.* Similarly here, the failure of the smugglers to report to New York officials the importation of liquor was a material misrepresentation of fact.

In this case, the government also alleges that RNDC knowingly facilitated the failure to report by filing false reports in Maryland, and in other ways that will be proven at trial. RNDC supplied liquor to the smuggling chain with full knowledge of the scheme and to its own benefit; indeed, the evidence will demonstrate that the defendants at times *instigated* the smuggling to

address shortfalls in RNDC's sales in Maryland.   RNDC knew that the smugglers were not reporting the liquor to New York tax authorities, and RNDC actively participated in that scheme, including the filing of false reports in Maryland to obscure the scheme, all to further the purposes of the scheme: to deprive New York of tax dollars and enrich the participants.   This wire fraud theory satisfies the holding in *Pasquantino*.   Again, instead of focusing on whether the indictment actually alleges a crime, the defendants attempt to challenge the indictment on factual grounds, relying on "facts" other than those alleged in the indictment.   Such issues must be left to a jury at trial.

The defendants create a straw man argument, relying on *Hemi Group LLC v. City of New York*, 559 U.S. 1 (2010), for the proposition that *they* had no duty to pay excise taxes to New York. Motion at 19-20.   In *Hemi*, however, a civil case, the cigarette distributor had no duty to pay taxes to New York.   Hemi was selling cigarettes online to customers in New York City, and neither state nor city law required out of state sellers to collect or pay taxes; the taxes were required by law to be paid by the customers. *Id.* at 2-3.   The situation in the case before this Court is quite different.   The indictment alleges that New York law required the importer and distributor of liquor to pay the excise taxes.    Therefore, in contrast to *Hemi*, the smugglers here, as importers and distributors, had a duty under law to report the importation of liquor and to pay excise taxes.

The indictment properly alleges that the defendants knowingly participated in a conspiracy with the retailers and the smugglers, who actually had such a duty to report the movement of liquor to New York and to pay the excise taxes. The indictment alleges that the defendants knew that the smugglers had this duty to report to New York that they were importing huge amounts of untaxed liquor into the state and did not do so, and the defendants actively

assisted and promoted that activity.  This is, without question, a crime that is completely and properly alleged in the indictment.

      C.      New Hampshire's sale of alcohol to consumers from Massachusetts does not authorize the defendants to participate in large-scale <u>bulk liquor smuggling to New York in defiance of New York law</u>.

The defendants next suggest that they should be permitted to participate in bulk liquor smuggling to New York simply because the State of New Hampshire "openly encourages *customers* from neighboring states to travel into New Hampshire to purchase alcoholic beverages…." <u>Motion</u> at 20, emphasis added.  To make this tissue-thin argument, the defendants absurdly ignore the difference between a consumer who buys a bottle of wine for personal consumption and someone who repeatedly, regularly, and routinely smuggles hundreds of cases of liquor to another state for resale.  There simply is no evidence that New Hampshire encourages bulk smuggling of liquor to New York for resale. There is even less of a basis for arguing that sale to consumers by control states such as New Hampshire precludes enforcement of criminal statutes against these defendants.

In sum, the indictment tracks the statutory language for each of the three offenses charged and, therefore, satisfies due process.  Second, the defendants offer no support for the proposition that regulated businesses cannot be charged with a crime.  Third, it is just plain silly for the defendants to suggest that because New Hampshire makes cross-border sales of a few bottles of wine to end customers from other states, the defendants can conspire to smuggle millions of dollars' worth of bulk liquor into New York for resale without any possibility of criminal prosecution.

II.     The Indictment Properly Alleges Essential Elements and
        Sufficient Facts to Advise the Defendants of the Circumstances
        of the Offense and to Avoid Double Jeopardy in the Future.

The defendants next suggest that the indictment does not allege enough facts, pursuant to Rule 7(c), to alert them as to the conduct involved in the offense. Motion at 22. "A motion to dismiss the indictment tests whether the indictment sufficiently charges the offense set forth against the defendant." *Brandon*, 150 F. Supp.2d at 884. Rule 7(c) of the Federal Rules of Criminal Procedure provides that "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged .... It need not contain a formal introduction or conclusion." Fed. R. Crim. P. 7(c)(1). Furthermore, an indictment meets the guarantees of the Fifth and Sixth Amendments "'if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Wicks*, 187 F.3d at 427 (*quoting Hamling*, 418 U.S. at 117).

Rule 12 of the Federal Rules of Criminal Procedure provides that "[a]ny defense, objection, or request that the court can determine without a trial on the merits" can be the subject of a pretrial motion. Fed. R. Crim. P. 12(b)(1) (emphasis added). A pretrial motion to dismiss is not the proper way to raise a factual defense. Rather, when ruling on such a motion to dismiss, the Court must presume the truth of the allegations in the indictment. *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir.1996); *United States v. Barker Steel Co.*, 985 F.2d 1123, 1125 (1st Cir. 1993). A motion to dismiss cannot resolve questions that require trying the facts of the case, which would invade the province of the jury. *United States v. Knox*, 396 U.S. 77, 83-84 & n.7 (1969); *United States v. Torkington*, 812 F.2d 1347, 1353 (11th Cir. 1987) ("a court may not dismiss an indictment ... on a determination of facts that should have been developed at trial").

"[A] defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence. A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence.... The Court should not consider evidence not appearing on the face of the indictment." *Jensen*, 93 F.3d at 669; see also *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) (per curiam) ("There is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of the evidence.").

In order to prevail on a pretrial motion to dismiss an indictment for failure to allege a crime, a defendant must "demonstrate that the allegations therein, even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004); *United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (criminal procedure rules do not provide for pretrial determinations of sufficiency of evidence).  As is set forth above, to meet the guarantees of the Fifth and Sixth Amendments to the United States Constitution, an indictment is sufficient if it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against him, and (2) enables him to plead double jeopardy as a bar to future prosecutions for the same offense. *Wicks*, 187 F.3d at 427. An indictment that tracks the statutory language is normally sufficient, if it contains all the elements and is accompanied by sufficient factual detail that adequately apprises the defendant of the charges against him. *See, e.g., Hamling*, 418 U.S. at 117; *United States v. Lockhart*, 382 F.3d 447,449 (4th Cir. 2004); *United States v. Bolden*, 325 F.3d 471, 490 (4th Cir. 2003); *United States v. Fogel*, 901 F.2d 23, 25 (4th Cir. 1990); *United States v. American Waste Fibers Co.,* 809 F.2d 1044, 1046-47 (4th Cir. 1987).

Here, the indictment includes a detailed description of the liquor smuggling activity, the locations of the retailers in Cecil County, the others involved, and the time period at issue.

Although a wire fraud conspiracy under 18 U.S.C. §1349 does not require alleging or proving any overt acts,[6] the indictment lists them anyway, describing with precision, among other things, the people involved, the timing of the activity, the amounts of liquor smuggled, and purpose of the various payments involving proceeds of the smuggling and the specific, subsequent transfers of those funds from account to account.  Thus, the indictment is sufficient in accordance with Rule 7(c) to allow the defendants to prepare for trial and to assert a defense of double jeopardy in future prosecutions for similar offenses.  Consequently, the indictment should not be dismissed.

The defendants allege that the wire fraud charge requires an allegation of active concealment or a material false statement.  In *Pasquantino*, however, the Supreme Court held that the act of smuggling liquor across a border is an active concealment that deprives the pertinent sovereign of tax revenue. 544 U.S. at 357. Therefore, according to the Supreme Court, the allegation of liquor smuggling constitutes an allegation of an active concealment.  In addition, however, the indictment alleges at least one material misrepresentation in the scheme to defraud, as set forth in Count One, paragraphs 10-23, and in Counts Two through Five, paragraph 1.

---

[6]       The 2002 Sarbanes Oxley legislation added 18 U.S.C. § 1349, which provides that attempts and conspiracies to commit any offense under Chapter 63 are punished in the same manner as the substantive offenses. As is the case with regard to a drug conspiracy charged under 18. U.S.C. § 846, the language of § 1349 does not require proof of an overt act.  Courts that have considered the question have held that no overt act requirement exists. See, e.g., *United States v. Chinasa*, 789 F.Supp.2d 691 (E.D. Va. 2011); *United States v. Albers*, 2011 WL 1225548 (E.D.N.Y. 2011); *United States v. Fishman*, 645 F.3d 1175 (10th Cir. 2011); *United States v. Stoll*, 2010 WL 5313486 (S.D. Fla. 2010); *United States v. Berger*, 2010 WL 4237925 (W.D. Pa. 2010).  These cases all analyze the issue in light of the Supreme Court's holding in *United States v. Shabani*, 513 U.S. 10 (1994).  As noted in *United States v. Chinasa*, the Supreme Court held in *United States v. Shabani* that since there was no overt-act requirement set forth in  21 U.S.C. ' 846, which is worded nearly identically to 18 U.S.C. ' 1349, then no overt act need be proven at trial.  "[T]he plain language of the statute and settled interpretive principles reveal that proof of an overt act is not required to establish a violation of 21 U.S.C. '846." *United States v. Chinasa*, citing *United States v. Shabani*, 513 U.S. at 15-16.  Indeed, the court in *United States v. Chinasa* noted that "the same reasoning was applied in *Salinas v. United States*, 522 U.S. 52 (1997) to find that there was no overt-act requirement" for a RICO conspiracy under 18 U.S.C. § 1962(d) (citation added).  The United States Supreme Court, in *Whitfield v. United States*, 543 U.S. 209 (2005) applied the same analysis to 18 U.S.C. § 1956(h), a money laundering statute, making "clear that where a conspiracy statute does not include an express overt act requirement, Congress intended to exclude that requirement." *United States v. Berger*, 2010 WL 4237925 (W.D. Pa. 2010), citing *Whitfield v. United States*, 543 U.S. at 213.

The defendants also point to a specific allegation in the indictment about a false statement made by RNDC in the forms that they filed with the Maryland Comptroller's Office.  Instead of taking the allegation as true, as they are required to do in a motion to dismiss, they assert the opposite; they suggest that the statements in the reports are not false and ask this Court to resolve this factual dispute – which is the province of the jury – in a motion to dismiss.  To do so would be clearly improper.

As set forth above, RNDC reported the sales to the Cecil County stores as if they were sales to retailers who would sell the product to end consumers.  In reality, the defendants knew that the Cecil County stores were acting as wholesalers.  By misreporting the sales, as if they were intended for retail sale to customers in Maryland, the defendants were able to actively conceal the smuggling activity.  Smuggling, by nature, is a deceptive activity, and the defendants aided in the deception.

The defendants rely on *United States v. Falcone,* 311 U.S. 205 (1940), for the proposition that a distributor should be allowed to knowingly facilitate felonies committed by others. Motion at 25-26. That case says nothing of the kind.

In that case, "the two Falcones, who were in business as sugar jobbers, were shown to have sold sugar to three wholesale grocers who, in turn, were shown to have sold some of the sugar to distillers."  311 U.S. at 208 n.1.  Another defendant in that case, "Alberico was a member of a firm of wholesale grocers who dealt in sugar and five-gallon tin cans among, other things. They sold sugar to wholesale grocers and jobbers." *Id*.  The Court concluded that there was no *evidence admitted at trial* that showed that these defendants knew that there was a conspiracy of distillers that were making illegal alcoholic beverages. *Id*.  In effect, the Supreme Court was relying on what is known as the buyer-seller rule; if the facts describe a simple

transaction between a buyer and a seller, for example to exchange drugs for money, this does not describe a conspiracy. Moreover, in *Falcone* the government failed to introduce evidence to support a finding that the defendants knew of the conspiracy.

It was the government's position in *Falcone* "that one who, with knowledge of a conspiracy to distill illicit spirits, sells materials to a conspirator knowing that they will be used in the distilling is himself guilty of the conspiracy. It is said that he is either because his knowledge combined with his action makes him a participant in the agreement which is the conspiracy, or -- what is the same thing -- he is a principal in the conspiracy as an aider or abettor…." *Id.* at 208. The problem was not with the theory; the problem was that the evidence did not show that the distributors of sugar and other products knew that there was an illegal distilling conspiracy being supplied by their wholesalers. *Id.* In the instant case, however, the indictment alleges more than a simple buyer-seller relationship. The indictment alleges that there was a conspiracy that involved the Cecil County retailers and a number of smugglers who took the bulk liquor to New York for retail sale there. It further alleges that the defendants knew about that liquor smuggling conspiracy and knowingly participated in that conspiracy, thereby becoming members of the conspiracy. Thus, *Falcone* simply does not apply; indeed, it differs from the case at bar in every significant respect.

The defendants also mistakenly rely upon *Direct Sales Co. v. United States*, 319 U.S. 703 (1943). In *Direct Sales*, the defendants, like the defendants here, sought to be insulated from criminal conduct by relying on *Falcone*. The Supreme Court's observations are directly on point in this case:

> Petitioner obviously misconstrues the effect of the Falcone decision in one respect. This is in regarding it as deciding that one who sells to another with knowledge that the buyer will use the article for an illegal purpose cannot, under any circumstances, be found guilty of conspiracy with the buyer to further his

illegal end. The assumption seems to be that, under the ruling, so long as the seller does not know there is a conspiracy between the buyer and others, he cannot be guilty of conspiring with the buyer, to further the latter's illegal and known intended use, by selling goods to him.

The Falcone case creates no such sweeping insulation for sellers to known illicit users. That decision comes down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally. The Government did not contend, in those circumstances, as the opinion points out, that there was a conspiracy between the buyer and the seller alone. It conceded that on the evidence neither the act of supplying itself nor the other proof was of such a character as imported an agreement or concert of action between the buyer and the seller amounting to conspiracy. This was true, notwithstanding some of the respondents could be taken to know their customers would use the purchased goods in illegal distillation.

This difference is important for two purposes. One is for making certain that the seller knows the buyer's intended illegal use. The other is to show that by the sale he intends to further, promote and cooperate in it. This intent, when given effect by overt act, is the gist of conspiracy. While it is not identical with mere knowledge that another purposes unlawful action, it is not unrelated to such knowledge. Without the knowledge, the intent cannot exist.  Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal. This, because charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning what, in that case, was called a dragnet to draw in all substantive crimes.

There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested cooperation, stimulation, instigation. And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy.  Petitioner's stake here was in making the profits which it knew could come only from its encouragement of Tate's illicit operations. In such a posture the case does not fall doubtfully outside either the shadowy border between lawful co-operation and criminal association or the no less elusive line which separates conspiracy from overlapping forms of criminal cooperation.

319 U.S. at 709.  Thus, the *Direct Sales* Court makes it clear that defendants can be found guilty

of participating in a conspiracy if there is evidence that the defendants knew about the charged

conspiracy and that they then joined in that conspiracy.  Here, the indictment alleges exactly that, which is all that is required to defeat a motion to dismiss the indictment.[7]

The defendants point out that "the defendant in *Direct Sales* solicited orders of morphine every ten days, employing volume discounts, targeted solicitations, and high pressure sales tactics." <u>Motion</u> at 26.  While it is clear that there is no requirement that the indictment allege such specific activity, the defendants seem to acknowledge that similar evidence of volume discounts, targeted solicitations, and high pressure sales tactics in this case is relevant to prove the conspiracy charge.  While these may be present in this case, they hold no talisman-like magical properties.  In sum, the several pages of specific allegations in the indictment certainly are sufficient to allow the defendants to prepare for trial and then to plead double jeopardy if they are charged with the same offenses in the future.  For these reasons, the indictment is sufficiently particular to comply with the requirements of Rule 7(c), and, therefore, the motion should be denied.

    III.    The Defendants Have Failed to Establish the
             <u>Existence of Any Government Misconduct</u>.

    A.    <u>Overview of Argument</u>

The defendants next suggest that the indictment should be dismissed based on their allegations of improper government conduct in the forfeiture proceeding.  Despite their allegations to the contrary, the Honorable Richard D. Bennett did not make any findings of government misconduct in that proceeding. <u>Motion Exhibit E</u> at 130-32. Moreover, the record does not support any allegations of misconduct.

---

[7]   Again, both *Falcone* and *Direct Sales* relate to the sufficiency of the evidence in those cases.  On a motion to dismiss, the sufficiency of the evidence is not the issue.

The defendants first suggest that there are false statements in the affidavit submitted in support of several seizure warrants.  There are no false statements.  They next suggest that there was some sort of conflict of interest in the relationship between a prosecutor and the affiant on the seizure warrant applications.  There was no conflict of interest, and even if there was, the relationship was disclosed to the Magistrate Judge.  Moreover, the agent has since retired, which would render any alleged prior conflict moot.

Finally, the defendants also suggest that the government used improper tactics in the investigation.  They argue that the government acted improperly by offering a liquor salesman an opportunity to cooperate, and then continuing the investigation when he failed to do so.  There was nothing improper in making such an offer.  Similarly, there was nothing improper in pursuing charges when, after consulting with counsel provided by co-defendant RNDC, the potential cooperator declined to cooperate.  If prosecutors were barred from prosecuting individuals who were offered and refused the opportunity to cooperate, then cooperation would be a thing of the past.

Defendants next echo their first argument, claiming that contested allegations in the seizure warrants and government counsel's defense of these allegations is a basis for dismissal of a criminal case in which the affidavit has not been offered.  To the extent that the dispute over the affidavit matters at all in this case – and it does not – the government stands by the factual allegations in the affidavit.  Further, even if the inferences drawn from the facts are inartfully written or inadvertently incorrect, these provisions relate solely to one of three legal rationales for the seizure. They could be excised entirely from the affidavit and it would still state probable cause for the seizure at issue, which has already been vacated and is of absolutely no import in this case.

The last argument the defendants offer, as set forth in their sealed addendum, is based upon alleged selective prosecution, i.e., that they have been indicted when another participant in the fraud scheme has not yet been indicted, and that this somehow establishes that the prosecution is vindictive.  Not only have defendants failed to allege even a prima facia case of selective prosecution, but their argument does not support a vindictive prosecution claim either.

### B.      The Decision to Prosecute or Not is within the Prosecutor's Discretion.

"In the ordinary case so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring, generally rests entirely in his discretion." *United States v. Jarrett*, 447 F.3d 520, 525 (7th Cir. 2006). Since a claim of vindictive prosecution "asks a court to exercise judicial power over a 'special province' of the Executive, courts must begin from a presumption that the government has properly exercised its constitutional responsibilities to enforce the nation's laws." *Id.* This "presumption of regularity" in prosecutorial decision-making can only be overcome by "clear evidence to the contrary." *Id.* The standard of proof "is a demanding one." *Id.*  Here, the defendants have not provided clear evidence of misconduct.[8]

### C.      There are no false statements in the seizure warrant affidavit.

The defendants first allege that there are false statements in the seizure warrant affidavit, but there has been no finding of a single false statement.[9]  According to RNDC, the three allegedly false statements are as follows:

---

[8]      The defendants also mistakenly allege that the government was trying to force RNDC out of business. During the 2012 hearing, counsel for RNDC suggested that the seized funds could be released because RNDC would always "have assets to pay the judgment." Motion Exhibit F at 64.  In response, government counsel simply suggested that it was conceivable that RNDC might not be able to pay a judgment. Id. at 65.Thus, the comment was simply a response to a question from the court.

[9]      In the hearing transcript attached as Exhibit E to the defendants' motion, the court specifically said repeatedly that he was not making a finding on the allegations. Motion Exhibit E at 121, 124, 126, and 130 ("And I

(1)     "Because some of the liquor manufacturers are located off-shore, there is reason to believe that these funds are being transferred from accounts in the United States to accounts outside the United States to pay for the importation of liquor."  Gov't Aff. 13.

(2)     "The specified accounts are also involved in money laundering transactions in violation of 1956(a)(2)(A) because each transaction was designed to move those same proceeds until they were moved off-shore to purchase more liquor that was imported through the Port of Baltimore." *Id.* at 21.

(3)     "Account number 9442 is a commercial checking account labeled 'Master Concentration Account.'" *Id.* at 12.

RNDC Memorandum filed in case 12-2472 on July 7, 2015, at 8.  All three of these statements, however, are true statements.[10]

(1).   <u>The First Statement</u>

"Because some of the liquor manufacturers are located off-shore, there is reason to believe that these funds are being transferred from accounts in the United States to accounts outside the United States to pay for the importation of liquor."

This is a true statement.  In the hearing transcript attached as Exhibit E to the defendants' motion, RNDC's Treasurer, Dennis Bashuk, acknowledged that some of the manufacturers of the products sold by RNDC are located off-shore. <u>Motion Exhibit E</u> at 69 ("I would agree that somebody imports the product into the United States and we sell it.")  Indeed, the Maryland Beverage Journal indicates that more than 50% of Republic's products apparently are imported. Moreover, an entirely unchallenged part of the affidavit states that "Customs and Border Protection (CBP) records confirm that from May 2, 2011, through May 8, 2012, Republic <u>imported</u> approximately $47 million in liquor from numerous manufacturers and distributors through the Port of Baltimore." <u>Motion Exhibit B</u> at 13-14 (emphasis supplied).  This

---

would note, specifically, that with respect to the evidence that's presented, that I'm not making a finding that there were material false statements or omission by [DHS Special Agent] Lisa Ward at this point in time.")

[10]    Even if there were a misstatement of fact, it would be part of a *Franks* analysis running to the sufficiency of the information in the affidavit, not a basis for dismissing an indictment.

unchallenged statement alone serves as a basis for believing that "some of the liquor manufacturers are located off-shore," as is stated in the affidavit.

The rest of the first statement, that there is reason to believe that funds were being transferred off-shore to pay for the imported liquor, is simply an inference that payments for the imported liquor were moving to the off-shore companies. In that same hearing transcript, Bashuk admitted that the RNDC bank records showed a number of transactions to non-domestic suppliers of liquor.

> Q: And that's what you described before about how those payments were made; correct?
>
> A. To our non-domestic boutique spirits and wine, yeah.
>
> Q: So, that's a payment to a non-domestic supplier; correct?
>
> A: As I mentioned earlier, we do have some of those, yes.
>
> Q: And it says "ACH"?
>
> A: Primarily, we'll do that by wire. ACHs are typically harder to do, depending on the country.

Motion Exhibit E at 84-85. Thus, RNDC's Treasurer admitted that RNDC made payments from its bank accounts to "non-domestic supplier[s]." He even acknowledged that some of these payments were "harder to do, depending on the country." Therefore, the record supports the inference drawn in the affidavit that funds were being transferred off-shore.

(2)     The Second Statement

> "The specified accounts are also involved in money laundering transactions in violation of 1956(a)(2)(A) because each transaction was designed to move those same proceeds until they were moved off-shore to purchase more liquor that was imported through the Port of Baltimore."

This second allegation by RNDC is similar to the first one, and the response is the same. The first part is a legal conclusion, not a statement of fact. The second part says that "each

transaction was designed to move those proceeds until they were moved off-shore."  This is a true statement.  It suggests that Republic intentionally paid funds that went to the off-shore manufacturers, which is true.  As is mentioned above, Republic knew that it was paying for liquor that it had imported, and it was reasonably foreseeable that the payments for this imported liquor would be moved out of the United States, either by RNDC directly, or by domestic affiliates of the producers of imported liquor, wine, beer, or spirits.  Again, RNDC Treasurer Bashuk confirmed that RNDC authorized the transfers of funds to the non-domestic suppliers.

> Q:    So, for those specific transactions that were highlighted that you looked at, those Spirits Marque One, those were not conducted by you, were they:  I mean, they were actually conducted by someone else.  They withdrew the money from the account; correct?
>
> A:    Well, we would have authorized them to do that at one point or another.
>
> Q:    You certainly did.  So, you authorized them to make that debit from that account; correct?
>
> A:    Yeah.

Motion Exhibit E at 85-86.  Thus, RNDC's Treasurer admitted that the company had authorized the payments to the domestic affiliates of off-shore suppliers, such as Spirits Marque One, which, according to the record, shipped Svedka Vodka from Sweden to RNDC.  Therefore, the record supports the conclusion that RNDC authorized transactions from its bank account to pay for liquor that was imported.

(3)    The Third Statement

"Account number 9442 is a commercial checking account labeled 'Master Concentration Account.'"

This third allegation by the defendants simply recites what the bank records showed.  In order to prove that this is a false statement, RNDC would have to prove that account 9442 is not a "commercial checking account" and that it is not labeled as "Master Concentration Account."

When he was asked about this statement, Treasurer Bashuk admitted that it was a correct statement.

> Q:     Just the first sentence there, Mr. Bashuk. First sentence.
>
> A:     "Account Number 9442 is a commercial checking account labeled master concentration account" – yes, it's our master concentration account.
>
> Q:     Is that a true statement or false statement, sir?
>
> A:     It's our master concentration account.
>
> Q:     Is it also a commercial checking account?
>
> A:     Yeah, it's a commercial checking account.
>
> Q:     Is that a true statement?
>
> A:     That statement by itself is correct.

Motion Exhibit E at 71.  Thus, RNDC's Treasurer admitted that the account was exactly as the affidavit had described it and he admitted that the statement was correct. Therefore, the record supports the conclusion that the third challenged statement is not false.

In sum, the record demonstrates that none of the challenged statements in the affidavit were false and the AUSA's "failure to correct" them was not misconduct. Although the RNDC treasurer has a much more detailed and nuanced understanding of how RNDC moved money, none of the contested factual allegations made by the agent in the affidavit for the seizure warrant were false, and certainly Judge Bennett did not find them so.  Consequently, the record does not support the defendants' allegations of misconduct involving the seizure warrant affidavit.

The defendants have not demonstrated that there was any misconduct in this case. First, the affidavit at issue has not been offered in this case.  Even it if had been, the law is clear, however, that if any false statements had been found in the warrant affidavit, the proper result

would be to excise those parts and then analyze the remainder of the affidavit for probable cause. As the defendants acknowledge, the affidavit here sets forth several theories to support the seizure, and only one was challenged by the defendants.

Defendants state without support that 18 U.S.C. § 1957 does not support the seizure of the contents of the accounts, but the law states the contrary.   According to 18 U.S.C. § 981(a)(1)(A), all of the property "involved in" a transaction in violation of section 1957 can be seized.  During the August 27, 2015, hearing, RNDC Treasurer Bashuk was shown a check paid to RNDC by one of the Cecil County retailers who has pled guilty to participating in the liquor smuggling that is charged in this case. Motion Exhibit E at 74.   RNDC Treasurer Bashuk admitted that the check was "involved in" a series of transactions through a number of RNDC bank accounts. Motion Exhibit E at 78 ("Q: So that check is involved in that deposit; correct? A: It appears to be."); at 80 ("Q: It should be. That's right.  So, as far as it's involved in that transaction; correct?  A: Correct."); at 82-83 ("Q: That's very good.  So, on Exhibit Number 7, that $8.9 million transfer includes that one, single check; doesn't it? A. Apparently.").  Because section 981 authorizes the seizure of all property "involved in" money laundering transactions, it authorizes the seizure of all of the funds in the affected accounts.  Consequently, even if there had been false statements in the affidavit that pertained to the international money laundering theory, this domestic money laundering theory would still have supported the seizure.

D.    There was no conflict of interest.

The defendants also suggest that there is some sort of fatal conflict of interest which requires dismissal of the indictment because the affidavit for the seizure warrants (which have not been offered in this case) were sworn out by a Homeland Security Investigations Special Agent who is married to the Assistant United States Attorney (AUSA) handling the case.  Aside

from broad pronouncements that the AUSA is retaliating against the defendants due to "extreme embarrassment" of losing RNDC's challenge to the forfeiture, defendants offer no support for their allegations.  Embarrassment, however extreme, is not a conflict of interest.  Moreover, defendants do not allege any sort of financial interest on the part of either the agent or the AUSA in either the forfeiture or – more to the point – the prosecution.  Instead of identifying any cognizable interest either the agent or AUSA have in the outcome of the investigation or prosecution, RNDC instead retreats to an assertion that "the only reasonable explanation" for the indictment is that the prosecution wants to make the company pay for fighting the forfeiture.  Of course, another reasonable explanation for the indictment is that there is probable cause to believe the defendants committed the offenses with which they are charged.[11]

The defendants' allegations are absurd. If the AUSA was retaliating against RNDC for winning its challenge to the forfeiture, why wait nearly a year to do so?  A more "reasonable explanation" – and one actually supported by the record – is that the government continued to diligently and methodically document its case against these defendants, taking guilty pleas from co-conspirators, and interviewing potential witnesses until ready to indict.

Of course, the defendants also complain about the slow pace of the investigation. But as RNDC and the other defendants well know, substantial periods of that delay were the result of RNDC calling "time out" to attempt, unsuccessfully, to derail the investigation and thwart the prosecution by seeking audiences with the United States Attorney and senior office management, and twice seeking the intervention of the Deputy Attorney General, including substantial briefing of issues in this context.

---

[11]     The record shows that government counsel agreed to the initial reduction of the escrowed funds to only $5 million.  Therefore, the further reduction was hardly a source of embarrassment.

Finally, RNDC well knew that the government had identified RNDC as a target and was putting together a case for indictment long before RNDC sought return of the forfeited sums, slinging accusations of misconduct along the way.  In a letter to the Deputy Attorney General dated July 7, 2014, over a year before the August 29, 2015 order returning the seized funds and closing that case, RNDC stated that "RNDC has refused that office's demand for pre-indictment settlement and was recently informed that as a result, an indictment was imminent."  Thus, two years ago, RNDC stated that, not only was an indictment "imminent," but that that it was a result of their decision not to reach a pre-indictment resolution of the charges.  The accusation that the indictment was a reaction to the August 2015, order conveniently ignores RNDC's 2014 letter acknowledging an "imminent indictment."  It seems RNDC makes whatever allegations benefit it at that point in time, and has no qualms about rewriting history.

There are, of course, other problems with the defendants' allegations that there is a conflict of interest in this case which is the motivation for the prosecution.  First, the conflict of interest about which the defendants are so incensed was disclosed to the Magistrate Judge who issued the warrants.  More importantly, the agent who swore out the affidavit has since retired. The assertion that AUSA Kay is pursuing the indictment to benefit his wife's career, although never true, falls apart when one realizes that the agent has no career to protect or advance.

On a final desperate note, the defendants repeatedly reference AUSA Kay's comments at the hearing on the seizure in December 2011.  Explaining why he was agreeable to a significant reduction in the escrow down to the losses to the defrauded taxing authorities and why the government believed that forfeiture in at least that amount was necessary, AUSA Kay said:

> …[I]f we go through either a criminal trial against Mr. MacDougall's client or a civil forfeiture proceeding against the funds that we believe are forfeitable in this case, either one will be a public case.  If that's the case, Mr. MacDougall's client will probably end up out of business because they will be unable to hold licenses.

Their suppliers probably won't deal with them any longer. The likelihood of there being anything left for the government to take at that point could be very high.[12]

Defendants now quote this out of context as a threat and as evidence of government counsel's draconian bargaining tactics.   AUSA Kay's comments are, in fact, the opposite: acknowledgment of the power the government wields and his commitment to avoid these harsh consequences if possible.   When, as in this case, however, defendants decline to take any opportunity to avoid prosecution, the government is left with a Hobbesian choice:  let RNDC walk away from serious criminal conduct or enforce the law even if the collateral consequences may be significant.   There is no question that prosecution is within the government's discretion. The defendants themselves elevated this case up through the Department of Justice management seeking to prevent indictment of this case.   At every level, DOJ management declined to interfere with the investigation and prosecution of this case, even after reviewing extensive submissions by RNDC.   The indictment of this matter reflects not only the considered judgment of a grand jury, but the reasoned decision of many prosecutors, not the imagined vengeance of one.  It should not be dismissed.

E.      The government offered Lockerman an opportunity to cooperate.

The defendants finally suggest that it was somehow improper to offer defendant Jason Lockerman an opportunity to cooperate in the investigation.   This is nonsense.   The government made the offer and the defendant declined to accept it.

On June 6, 2012, agents contacted Jason Lockerman and indicated that they wanted to interview him. At that time, the agents had in their possession a target letter, dated June 5, 2012, addressed to Lockerman, but they did not give him the letter at that time because he was being

---

[12]  AUSA Kay meant the likelihood would be very low.

cooperative.[13]  He voluntarily provided information and identified liquor stores in Cecil County that were participating in bulk liquor sales.  The agents offered Lockerman an opportunity to cooperate in the investigation of those liquor stores.  Lockerman said that he thought that he could do that.  The agents advised Lockerman that he could be charged with an offense because he knew that the liquor was not intended for retail sales and instead was being moved across state lines.

Shortly after that, RNDC hired counsel to represent Lockerman.  Government counsel then offered the lawyer the same opportunity for Lockerman to cooperate in the ongoing investigation.  Despite Lockerman's statement to the agents that he was willing to cooperate, counsel for Lockerman advised government counsel that RNDC did not want Lockerman to cooperate and that RNDC would not authorize him to cooperate.  Government counsel suggested that perhaps Lockerman could cooperate on his days off (Exhibit E), but the lawyer again said that RNDC would not allow it.  At that point another liquor salesman offered to cooperate and Lockerman was no longer needed.

The defendants simply suggest that Lockerman was offered an opportunity to reduce his criminal exposure in exchange for cooperation, which he rejected.  Leniency in exchange for cooperation is a standard prosecutorial practice that has long been sanctioned as constitutionally permissible.  *Brady v. United States*, 397 U.S. 742, 753 (1970) ("But we cannot hold that it is unconstitutional for the State to extend a benefit to a defendant who in turn extends a substantial benefit to the state….").   Here, Lockerman indicated his own desire to cooperate, and it is safe to assume that Lockerman would have received the benefit of such cooperation if the company

---

[13]     Lockerman was thus identified as a target of the investigation on June 6, 2012.  His attorney's subsequent letter to the AUSA, dated June 26, 2012, asserting that he was only a witness was immediately answered by AUSA Kay, by letter the very next day, who noted again that he was a target.

(and target) that was paying his lawyer simply would have allowed it.[14]   At bottom, the government did nothing improper in offering Lockerman the opportunity to cooperate and to benefit from that cooperation, and did nothing improper by continuing to investigate and eventually indicting Lockerman when he refused.

F.      The defendants have not alleged and cannot establish selective
        prosecution to bolster their vindictive prosecution claim.

        The last argument the defendants offer, as set forth in their sealed addendum, is that they have been the target of selective prosecution and this proves that the prosecution is vindictive and retaliatory.   They claim that another entity was also involved in the charged conspiracy and wire fraud, and has not been indicted (or more accurately, has not *yet* been indicted).   Of course, the United States is at a distinct disadvantage in responding to this allegation, because the criminal investigation is ongoing.

        What is crystal clear, however, is that the defendants have not set forth a valid case for selective prosecution.   As noted by the Supreme Court in *United States v. Armstrong*, 517 U.S. 456, 463 (1996), selective prosecution is not a defense on the merits, but an assertion that the "prosecutor has brought the charge for reasons forbidden by the Constitution." *Id.* at 463.   "The requirements for a selective prosecution claim draw on 'ordinary equal protection standards.'" Id. at 465, citing, *Wayte v. United States*, 470 U.S. 598, (1985).   Typically, this requires the defendant to "demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose,'" such as race or religion.   *Id.*   Obviously, the defendants do not make such a claim because they cannot.   Instead, they attempt to use their unfounded allegation of "selective prosecution" as evidence of the "vindictive prosecution" they

---

[14]      The defendants curiously suggest that RNDC had some right to authorize Lockerman to cooperate or to prevent Lockerman from cooperating.  This bizarre suggestion would require the government to contact the head of a drug organization to ask permission for a drug courier to cooperate.

have argued, by suggesting that one party has been indicted and another has not yet been indicted, and – in a sample of two -- that proves something.

Many things may affect the pace of prosecution, such as whether there are still on-going discussions between the United States and the putative defendants.  Just as RNDC and its fellow defendants were all given an opportunity to meet with the prosecution team and the office management prior to indictment, so too would those courtesies be extended to other similarly situated individuals and entities, until such time as those talks prove to be unproductive.  As AUSA Kay noted, a criminal prosecution can have serious collateral consequences, and every effort has to be made to avoid those consequences if possible.

The United States takes great care in thoroughly investigating criminal conduct and evaluating whether or not it merits federal prosecution in light of numerous considerations.  Each target is evaluated separately under the facts and the law to determine whether charges are appropriate.  That determination is uniquely the province of the prosecutor, and Courts are understandably loathe to interfere without a showing that prosecutors are acting on unconstitutional grounds.  '"The presumption of regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'"  *Id.* at 464, quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926).

The United States does not comment on the merits or details of ongoing investigations or matters before the grand jury.  What the government can say, however, is that it voluntarily applied Judge Bennett's rulings to other similarly situated targets or subjects, so its decision to seek indictment of the defendants in the instant case when it did so – and its decision not to seek

indictment of others at the same time – is utterly unrelated to the outcome regarding the prior seizures.

      G.    <u>There is no basis for the sanction of dismissal.</u>

As a sanction for alleged misconduct, the standard for dismissal of an indictment is extremely high. The Supreme Court held that a district court may not exercise its supervisory powers to dismiss an indictment for prosecutorial misconduct in such a way that by-passes the harmless error rule of Fed.R.Crim.P. 52(a). *Bank of Nova Scotia v. United States,* 487 U.S. 250 (1988). Thus, dismissal is appropriate only "'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations." *Id.* at 256 (quoting *United States v. Mechanik,* 475 U.S. 66, 78 (1986)).

A district court has "no authority to dismiss an indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct." *Id.* at 263. *See also United States v. Williams,* 504 U.S. 36, 47 (1992) (further restricting supervisory power of a court to its own procedures). Thus, an allegation of misconduct, no matter how egregious, does not provide grounds for dismissing an indictment without a showing of actual prejudice. Because dismissal of an indictment is an extreme remedy, a defendant seeking a dismissal on either constitutional or ethical grounds must prove <u>actual prejudice</u>. *United States v. Morrison*, 449 U.S. 361, 365-66 (1981); *Bank of Nova Scotia,* 487 U.S. at 255. *See also United States v. Derrick,* 163 F.3d 799, 807 (4th Cir. 1998); *United States v. McDonald*, 61 F.3d 248, 253 (4th Cir. 1995). As demonstrated by the above-cited cases, courts have routinely refused to dismiss indictments for want of actual prejudice. The United States Supreme Court in the *Morrison* case articulated the public interest underlying this policy:

So drastic a step [as dismissal] might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book.

449 U.S. at 366 n.3, quoting *United States v. Blue*, 384 U.S. 251, 255 (1966).

Of course, a grand jury must find probable cause to support the indictment. There is a strong presumption of regularity surrounding a grand jury proceeding. *United States v. Ruppel*, 666 F.2d 261, 268 (5th Cir. 1982). The Supreme Court has stated that the prosecutor's charging decision is presumptively lawful: "In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Here, there was a probable cause finding by the grand jury. There was no misconduct. There are no grounds to dismiss the indictment. The motion should be denied.

## CONCLUSION

Because the indictment correctly tracks the statutory language of each offense charged, and it provides a broad outline of the facts regarding the interstate liquor smuggling scheme in which the defendants participated, it properly charges the various offenses. Because the defendants cannot establish any government misconduct and there is no evidence of a vindictive prosecution, the motion to dismiss should be denied.

Respectfully submitted,
Rod J. Rosenstein
United States Attorney


_____//s//_____
Richard C. Kay
Assistant United States Attorney

_____//s//_____
Tamera L. Fine
Assistant United States Attorney
36 South Charles Street
Baltimore, Maryland 21201
410-209-4800


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 22, 2016, a copy of the foregoing Governments

Response to Defendants' Motion to Dismiss the Indictment was provided to counsel of record by

efiling.


_____//s//_____
Richard C. Kay
Assistant United States Attorney