**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DISTRICT**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **CASE NO. 1:16-CR-258-MJG** |
| **v.** | ) | |
| | ) | |
| **REPUBLIC NATIONAL** | ) | |
| **DISTRIBUTING COMPANY, LLC,** | ) | |
| **EUGENE GERZSENYI, JASON** | ) | |
| **LOCKERMAN, AND LISA ROBBINS,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**REPLY IN SUPPORT OF
MOTION TO DISMISS INDICTMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

I.      THE INDICTMENT FAILS TO ALLEGE A CRIME ......................................................3

        A.      The Government Seeks to Criminalize the Lawful Operation of a State
                Liquor Wholesaler ...............................................................................................3

        B.      The Government Provides No Legal Distinction Between Republic's
                Conduct and the Lawful Conduct of the State of New Hampshire.......................7

II.     THE WIRE FRAUD AND WIRE FRAUD CONSPIRACY COUNTS SHOULD
        BE DISMISSED ...............................................................................................................9

        A.      The Indictment Fails to Allege a Required Material Falsehood ............................9
        B.      The Indictment Fails to Allege Essential Elements of a Conspiracy ...................12

III.    THE GOVERNMENT'S MISCONDUCT WARRANTS DISMISSAL...........................14

        A.      AUSA Kay's Proffer of False Testimony in the Midst of an Inherent
                Conflict of Interest Warrants Dismissal ..............................................................14

        B.      The Government's Vindictive and Retaliatory Prosecution Warrants
                Dismissal.............................................................................................................17

        C.      The Government's Pattern of Misconduct Warrants Dismissal ...........................18

CONCLUSION...................................................................................................................20

# TABLE OF AUTHORITIES

**CASES:**

*Bond v. United States*
    134 S. Ct. 2077 (2014) ................................................................................. 1, 4, 6

*Direct Sales Co. v. United States*
    319 U.S. 703 (1943) ...................................................................................... 12, 13

*Hemi Group, LLC v. City of New York*
    559 U.S. 1 (2010) ........................................................................................... 6, 7, 8

*Neder v. United States*
    527 U.S. 1 (1999) ................................................................................................. 10

*Pasquantino v. United States*
    544 U.S. 349 (2005) .................................................................................... 3, 4, 12

*United States v. Brandon*
    298 F.3d 307 (4th Cir. 2002) ............................................................................... 9

*United States v. Bunch*
    No. 3:09-CR-127, 2010 U.S. Dist. LEXIS 20624 (E.D. Tenn. Jan. 25, 2010) ........................ 11

*United States v. Covington*
    395 U.S. 57 (1969) .......................................................................................... 2, 11

*United States v. Falcone*
    311 U.S. 205 (1940) ............................................................................................ 12

*United States v. FedEx Corp.*
    No. Cr. 14-00380 (N.D. Cal. June 17, 2016) ......................................................... 8

*United States v. Goodwin*
    457 U.S. 368 (1982) ............................................................................................ 17

*United States v. Jones*
    542 F.2d 661 (6th Cir. 1976) .............................................................................. 11

*United States v. Kurlander*
    No. CRIM. 11-315 WHW, 2012 WL 2263290 (D.N.J. June 14, 2012) ................................ 13

*United States v. Levin*
    973 F.2d 463 (6th Cir. 1992) ................................................................................ 2

*United States v. Moore*
    27 F.3d 969 (4th Cir. 1994) ................................................................................. 15

*United States v. Omni International Corp.*
 634 F. Supp. 1414 (D. Md. 1986) .................................................................2, 15, 20

*United States v. Pasquantino*
 336 F.3d 321 (4th Cir. 2003) .................................................................................9

*United States v. Rutgard*
 116 F.3d 1270 (9th Cir. 1997) ..............................................................................15

*United States v. Souder*
 No 1:09-cr-00136–2, 2009 WL 88919 (M.D.N.C. Jan. 12, 2009) ........................11

*United States v. Steffen*
 687 F.3d 1104 (8th Cir. 2012) ...........................................................................9, 10

STATUTES & REGULATIONS:

18 U.S.C.
 § 1343...................................................................................................................15
 § 1957...................................................................................................................15
 § 1957(a) ..............................................................................................................15

N.Y. ALCO. BEV. CONT. LAW
 §§ 102, 130............................................................................................................5

N.Y. TAX LAW
 § 433(1)(d) ............................................................................................................5

OTHER AUTHORITIES:

27 C.F.R. § 6.153(a)......................................................................................................4

FED. R. CRIM. P.
 7(c) ........................................................................................................................9
 12(b) ..................................................................................................................1, 11
 12(e) .....................................................................................................................11
 12(g) .....................................................................................................................11
 41(g) ...............................................................................................................18, 20

M.D. LAW R. PROF. CONDUCT 3.3 cmt. 16 ..................................................................15

NEW HAMPSHIRE HOUSE OF REPRESENTATIVES, FINAL REPORT OF THE SPECIAL
 COMMITTEE TO EVALUATE THE NEW HAMPSHIRE LIQUOR COMMISSION AND TO
 RECOMMEND STRUCTURAL AND OVERSIGHT REFORMS (November 13, 2012).........................8

NEW HAMPSHIRE STATE LIQUOR COMMISSION, 2015 COMPREHENSIVE ANNUAL
 FINANCIAL REPORT .................................................................................................8

## PRELIMINARY STATEMENT

The government does not dispute that this case represents the first-ever use of the wire fraud statutes to criminalize domestic deliveries of spirits to licensed state retailers—conduct constitutionally delegated to state regulatory enforcement.  The government does not acknowledge a single provision of the Maryland regulatory scheme governing Republic's operations or consider the conflicting legal obligations that its legal theory will introduce into an 80-year-old state regulatory scheme.  The Supreme Court has made clear that it will not accept a presumption "that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction . . . [a]bsent a *clear statement* of that purpose." *Bond v. United States*, 134 S. Ct. 2077, 2089, 2093 (2014) (emphasis added) (internal citation omitted).  The government has not offered—because Congress has not issued—any statement of intent to put the federal fraud statutes to this unprecedented use.  The government is unable to identify a single legal distinction between Republic's alleged conduct and the conduct of control states—like New Hampshire—that actively sell liquor to cross-border purchasers.  No theory of criminal liability has ever been stretched so far.

The government alleges only one false statement of fact in the Indictment at Paragraph 22, in which the Company is said to have filed "false and fraudulent reports to the Maryland State Comptroller's Office, indicating that all liquor sold to the Cecil County retailers was intended for resale in Maryland."  Indictment ¶ 22.  The certification says nothing of the kind. The government now appears to acknowledge that this allegation in the Indictment was fabricated and now seeks to avoid scrutiny by characterizing the certification as a "factual dispute for trial."  The language of the certification—the only alleged false statement in the Indictment—is not in dispute.  There is no prohibition against the consideration of extrinsic evidence for purposes of a Rule 12(b) motion to dismiss.  Rule 12(b) "permits factual hearings

prior to trial if necessary to resolve issues of fact peculiar to the motion" and this Court has already contemplated such a hearing in connection with Republic's motion to dismiss. *United States v. Covington*, 395 U.S. 57, 60 (1969). *See also United States v. Levin*, 973 F.2d 463, 470 (6th Cir. 1992) (noting that courts may dismiss an indictment on the motion of a defendant where the court concludes, based on its preliminary findings of fact, that the government cannot, as a matter of law, prove a required element of the charged crime). The inclusion of a demonstrably false allegation raises the obvious question of what evidence was presented by the government to the grand jury in order to persuade the grand jury to include this averment in the Indictment.

The Indictment similarly fails to allege essential elements of conspiracy, including any agreement on the part of Republic to achieve the alleged object of depriving New York of taxes. The government's failure to allege anything more than mere knowledge of illegality on the part of Republic is a fatal defect in the Indictment.

From the outset, this case has been tainted by government misconduct that warrants dismissal of the Indictment, including an unlawful and nearly catastrophic seizure premised upon the false testimony of the responsible AUSA's wife, tactics that violate Department of Justice policies, fictitious allegations of international funds transfers and certifications to Maryland state regulators, a systematic effort to extract a large cash payment from the Company, and the return of a retaliatory indictment resulting from Republic's exercise of its legal rights. In response, the government claims that these instances of misconduct were "harmless" or did not result in actual prejudice. That argument was rejected by this Court in *United States v. Omni International Corp.*, 634 F. Supp. 1414, 1423 (D. Md. 1986). As discussed below and in Republic's opening brief, the Company has in fact suffered actual prejudice. But as U.S. District Judge Walter E. Black articulated in *Omni*, the fact that a defendant is able to, time after time, through

2

painstaking investigations and hearings, minimize the harm caused by repeated misconduct, does not excuse the government.  At some point, reached long ago in this case, the Court must act to preserve the integrity of the judicial system.

Republic has articulated three independent bases for the Court to dismiss the Indictment—the absence of a cognizable legal theory, fatal defects in the Indictment, and an unprecedented pattern of prosecutorial misconduct.  In this case, any of the three provides the Court with ample basis to dismiss.  When considered together, the Court should have no reluctance in dismissing the instant Indictment.

## I.      THE INDICTMENT FAILS TO ALLEGE A CRIME

### A.      The Government Seeks to Criminalize the Lawful Operation of a State Liquor Wholesaler

The government does not acknowledge or address the unique status of the liquor industry under the Twenty-First Amendment, which grants to the states exclusive power to control the manufacture, transportation, and consumption of alcoholic beverages.  There is no dispute that the present case represents the first attempt by the federal government to regulate exclusively domestic liquor distribution using the wire fraud statutes.  The government finds no refuge in *Pasquantino v. United States*, 544 U.S. 349 (2005).  The international liquor smuggling involved in *Pasquantino* implicated a range of federal interests, including foreign relations with Canada, the revenue policies of foreign sovereigns, U.S. tax treaties, the customs laws of a foreign nation, and an international border.  *See* 544 U.S. at 349, 352, 358, 369, 381.  As a result, the Supreme Court determined that the case was properly "brought by the Executive [Branch], the sole organ of the federal government in the field of *international* relations."  *Id.* at 369 (emphasis added) (internal quotation marks and citation omitted).

The Court is now well aware of the government's previous fabrication of international transactions in this case, which the government was forced to abandon after Judge Bennett heard the Company's evidence and characterized the government's theory as "highly questionable," "sketchy," "tenuous," and "a stretch."[1]  The government has now recast this prosecution as an effort to "regulate fraud."  Opp'n. 12.  The Constitution does not permit this kind of prosecutorial sleight-of-hand.  It is a "well-established principle that it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers."  *Bond*, 134 S. Ct. at 2088 (internal quotations marks and citation omitted).  The Supreme Court has made clear that it will not accept hasty assumptions "that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction."  *Id.* at 2089.  Courts may "not presume Congress to have authorized such a stark intrusion into traditional state authority . . . [a]bsent a *clear statement* of that purpose."  *Id.* at 2093 (emphasis added) (internal citation omitted).  The government does not identify any authority suggesting that Congress authorized the use of the wire fraud statute to criminalize exclusively domestic conduct constitutionally delegated to enforcement by the states.

The government does not acknowledge a single provision of the Maryland regulatory scheme[2] that governs Republic's operations.  This new theory of federal criminal liability would make compliance with state and federal law mutually exclusive.  The government acknowledges,

---

[1] August 27, 2015 Hr'g. Tr. at 131:3, 127:21-23, 131:11-13 (previously attached as Exhibit E).

[2] The only regulation the government acknowledges is a federal regulation, 27 C.F.R. § 6.153(a), which prohibits any wholesaler practice that "restricts or hampers the free economic choice of a retailer to decide which products to purchase or the quantity in which to purchase them for sale to consumers."  Opp'n. 13.  While ignoring every applicable provision of Maryland law, the government gamely argues that this C.F.R. provision does not require Republic to sell liquor to Cecil County retail stores because those retailers allegedly sold product to individuals other than "consumers"—a distinction the regulation itself nor any court has ever drawn.

as it must, that this case hinges upon whether New York retailers ultimately paid New York excise taxes.  Opp'n. 13.  In order to avoid liability, the company would have to police parties three steps removed from Republic to ensure that those parties ultimately pay applicable taxes.  This would impose a duty to investigate that the government now concedes does not exist.  *Id.* at 12.  It would also require the very wholesaler/retailer integration that the three-tier system was designed to prevent.  For instance, if Republic were to certify, as the government suggests, that the liquor was "delivered" *outside* of Maryland[3] and was therefore not subject to Maryland excise tax, the statement would not only be false, but would expose Republic to prosecution under Maryland law.[4]

The government acknowledges that this case involves "a wire fraud scheme to defraud a state taxing authority" and whether certain individuals "report[ed] the liquor to New York tax authorities."  Opp'n. 12, 15.  The government seeks to superimpose the federal fraud statutes—carrying potential twenty-year terms of incarceration—upon conduct that is penalized as a *misdemeanor* under New York law.  *See, e.g.*, N.Y. ALCO. BEV. CONT. LAW §§ 102, 130 (punishing as *misdemeanors* the (1) delivery into the state of alcoholic beverages to persons who are not licensed to traffic in alcoholic beverages, and (2) sale of alcoholic beverages without an appropriate license); N.Y. TAX LAW, § 433(1)(d) (setting the penalty for failure to pay excise taxes as a result of fraud at twice the amount of tax due).  The Supreme Court has specifically directed courts to dismiss claims seeking to "impos[e] . . . liability to substitute for or complement a governing body's uncertain ability or desire to collect taxes directly from those

---

[3] The single falsehood alleged in the indictment is Republic's certification that the liquor in question was "delivered" to Maryland retailers.  This certification is discussed at length below and in Republic's opening brief, but it shows the conflicting duties this case would introduce for companies seeking to comply with the law.

[4] *See, e.g.*, Md. Code Ann. Tax-Gen § 13-1009 (any person "who participates in evading the alcoholic beverage tax is guilty of a crime and, on conviction, is subject to a fine not exceeding $10,000 or imprisonment not exceeding 5 years or both").

who owe them." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 11 (2010).  The government fails to address why the laws of New York are insufficient to prosecute the relevant conduct absent this unprecedented intrusion into matters of state law enforcement.  To the extent New York has declined to prosecute the alleged conduct, "the exercise of state officials' prosecutorial discretion [is] a valuable feature of our constitutional system."  *Bond*, 134 S. Ct. at 2092.

The government tries to distinguish *Hemi* by noting that "the cigarette distributor had no duty to pay taxes to New York."  Opp'n. 15.  Neither did Republic.  In *Hemi*, the City of New York alleged that an out-of-state cigarette distributor's failure to file a report with the State of New York's tobacco tax administrator constituted the predicate acts of mail and wire fraud.  *Id.* at 5-7.  Specifically, the City of New York alleged that:

> Hemi committed fraud by selling cigarettes to city residents and failing to submit the required customer information to the State.  Without the reports from Hemi, the State could not pass on the information to the City, even if it had been so inclined.  Some of the customers legally obligated to pay the cigarette tax to the City failed to do so.  Because the City did not receive the customer information, the City could not determine which customers failed to pay the tax.  The City thus could not pursue those customers for payment.  The City thereby was injured in the amount of the portion of back taxes that were never collected.

*Id.* at 9.  The Supreme Court held that the City's complaint should have been dismissed for failure to state a claim, emphasizing that "the general tendency of the law" with respect to liability for damages "is not to go beyond the first step."  *Id.* at 10 (citing *Holmes v. Secs. Inv. Prot. Corp.*, 502 U.S. 258, 271-72 (1992)).  The Supreme Court concluded that:

> [T]he conduct directly responsible for the City's harm was the customers' failure to pay their taxes.  And the conduct constituting the alleged fraud was Hemi's failure to file Jenkins Act reports [with the State of New York].  Thus . . . the conduct directly causing the harm was distinct from the conduct giving rise to the fraud. . . .  Multiple steps . . . separate the alleged fraud from the asserted injury. . . . The City's theory of liability rests on the independent actions of third and even fourth parties.

*Hemi*, 559 U.S. at 11, 15.

Here, the government's theory is even more attenuated than the one rejected in *Hemi*.
The government acknowledges that it was "the smugglers, as importers and distributors, [who]
had a duty under law to report the importation of liquor and to pay excise taxes."  Opp'n. 15.
Unlike *Hemi*, the government does not dispute that Republic filed all required reports with the
State of Maryland.  The government's theory would require the Court to extend criminal liability
to circumstances where a liquor wholesaler's report to the State of Maryland allegedly facilitated
the non-payment of taxes by parties who received liquor from smugglers, who purchased liquor
from Cecil County retailers, who purchased liquor from wholesalers like Republic.  The Court
should decline the invitation to expand criminal liability well beyond the "first step."

**B.     The Government Provides No Legal Distinction Between Republic's Conduct
and the Lawful Conduct of the State of New Hampshire**

The government is unable to identify any legal distinction between Republic's alleged
conduct and the undisputedly lawful conduct of control states like New Hampshire, which sell
liquor to purchasers knowing that they will travel across state lines and actively encourage and
advertise for such cross-border sales.  In the absence of any legal distinction, the government
seeks to conjure a factual distinction "between a consumer who buys *a bottle of wine* for
personal consumption and someone who repeatedly, regularly, and routinely smuggles hundreds
of cases of liquor to another state for resale."  *Id.* at 16 (emphasis added).  In 2015, the New
Hampshire Liquor Commission reported sales of 5,284,800 cases of liquor and wine, including
5,365,137 gallons of distilled spirits.[5]  In a report issued in November 2012, a Special Committee
of the New Hampshire Legislature confirmed that 50% of sales by state-controlled liquor stores

---

[5] NEW HAMPSHIRE STATE LIQUOR COMMISSION, 2015 COMPREHENSIVE ANNUAL FINANCIAL REPORT,
available at https://www.nh.gov/liquor/AnnualReportFY15.pdf.

were from purchasers outside of New Hampshire.[6]  Of these the largest component, accounting for 21% of total sales, were made to purchasers in Massachusetts.  So the "few bottles of wine" that the government contends are sold by New Hampshire retailers to cross-border purchasers actually totaled in 2015 2,642,400 cases or approximately 2,682,550 gallons of distilled spirits.

In truth, the government's case is strikingly similar to *United States v. FedEx Corp.*, No. Cr. 14-00380 (N.D. Cal. June 17, 2016), where the company was charged in a "novel" and "unusual"[7] prosecution with conspiracy and money laundering for delivering packages containing pharmaceuticals with alleged knowledge that the drugs were illegally ordered from Internet pharmacies.  Before the government dropped the charges, U.S. District Judge Charles R. Breyer of the Northern District of California asked the government why conduct when performed by the U.S. Postal Service was lawful, but when conducted by FedEx was suddenly a federal crime:

> The question that's still in my mind is the Postal Service.  What did the Government do about the Postal Service?  And, as I understand it, the Government says, "Well, we didn't do anything about the Postal Service because they didn't do anything wrong."  And the question is:  Really?  I'm trying to understand that.  Didn't they deliver pills?  And didn't they deliver the same kind of medicine that FedEx is accused of delivering?  And didn't they do it at or about the same time?  If all of those things are "Yes," then I am interested in why the Government didn't decide to prosecute the Postal Service.[8]

After Judge Breyer raised these questions, the prosecutors dropped the charges mid-trial.  Here, the government similarly has no answer as to how the conduct charged in the Indictment is any different from the regular business of the New Hampshire Liquor Commission.

---

[6] NEW HAMPSHIRE HOUSE OF REPRESENTATIVES, FINAL REPORT OF THE SPECIAL COMMITTEE TO EVALUATE THE NEW HAMPSHIRE LIQUOR COMMISSION AND TO RECOMMEND STRUCTURAL AND OVERSIGHT REFORMS 4-5 (November 13, 2012).

[7] Transcript of Proceedings at 44:18, 46:3, *United States v. FedEx Corp.*, No. Cr. 14-00380 (N.D. Cal. May 19, 2016), ECF No. 303.

[8] *Id.* at 6:4-16.

## II.   THE WIRE FRAUD AND WIRE FRAUD CONSPIRACY COUNTS SHOULD BE DISMISSED

The government devotes a considerable portion of its opposition attempting to demonstrate that the Indictment "faithfully tracks" the language of the relevant statutes. Opp'n. 9-11. However, "simply parroting the language of the statute in the indictment is insufficient" to avoid dismissal. *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002). Where, as here, "the words of a statute are used to describe the offense generally, they must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Id.* (internal quotations marks and citation omitted). *See also* FED. R. CRIM. P. 7(c) (requiring that an indictment contain a statement of "essential facts constituting the offense charged"). Despite the government's efforts to dismiss the requirement that the Indictment recite the requisite facts by asking the Court and the Defendants to wait and see what happens at trial, the Indictment does not allege essential elements of wire fraud and conspiracy and should be dismissed.

### A.   The Indictment Fails to Allege a Required Material Falsehood

The government acknowledges the well-settled principle that a scheme to defraud requires an alleged "assertion of a material falsehood with the intent to deceive or active concealment of a material fact with the intent to deceive." *United States v. Pasquantino*, 336 F.3d 321, 333 (4th Cir. 2003). *See also United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012) (upholding the district court's dismissal of an indictment where the defendant was not alleged to have made any false representation). The only material falsehood averred in the Indictment is Republic's filing of the allegedly "false and fraudulent reports to the Maryland State Comptroller's Office, indicating that all liquor sold to the Cecil County retailers was intended for resale in Maryland." Indictment ¶ 22 (citing Maryland Alcohol Tax Form ATT-034, which was

previously attached as Exhibit G).[9]  The government tries to obscure this fact by arguing that "RNDC knowingly facilitated the failure to report by filing false reports in Maryland, *and in other ways that will be proven at trial.*").  Opp'n. 14 (emphasis added).  The government is unable to identify any other material falsehoods because there are none.

As a threshold matter, the government's allegation that Republic's "filing of false reports in Maryland" somehow "deprive[d] New York of tax dollars" fails as a matter of law because the alleged misrepresentation must have "a natural tendency to influence or be capable of influencing, the decision of the decision-making body *to which it was addressed*."  *Neder v. United States*, 527 U.S. 1, 16 (1999) (emphasis added).  Moreover, as set forth in Republic's opening brief, the actual report requires liquor wholesalers to (1) report the amount of distilled spirits (in proof gallons) "[d]elivered to retail licensees in [Maryland] (less returns)" and (2) identify "each State or the District of Columbia *shipped into*."  Maryland Alcohol Tax Form ATT-034 (Exhibit G).  Nowhere is Republic required to certify "that all liquor sold to the Cecil County retailers was intended for resale in Maryland" as the government alleges.

Confronted with the actual language of the required certification—which makes clear that the government fabricated the only material misrepresentation alleged in the Indictment—the government again tries to characterize a defect in the Indictment as a factual dispute.  Opp'n. 20 (Republic "suggest[s] that the statements in the reports are not false and ask[s] this Court to resolve this factual dispute—which is the province of the jury—in a motion to dismiss").  Setting aside the truthfulness of Republic's certification—which would be accurate even accepting as true the allegations in the Indictment—the form of certification required by state regulators is a matter of law appropriately resolved in a motion to dismiss.

---

[9] The government does not deny that Form ATT-034 is at issue in Paragraph 22 of the Indictment.

Even accepting the government's argument that the required certification is a factual issue, Rule 12(b) "permits factual hearings prior to trial if necessary to resolve issues of fact peculiar to the motion." *Covington*, 395 U.S. at 60.  There is no prohibition against the consideration of extrinsic evidence for purposes of a Rule 12(b) motion to dismiss.  *See*, *e.g.*, *United States v. Souder,* No 1:09-cr-00136–2, 2009 WL 88919, at *7 (M.D.N.C. Jan. 12, 2009). Courts "may dismiss an indictment on the motion of a defendant if [the court] concludes based on its preliminary findings of fact that the Government cannot, as a matter of law, prove a required element of the charged crime." *See United States v. Bunch*, No. 3:09-CR-127, 2010 U.S. Dist. LEXIS 20624, at *7 (E.D. Tenn. Jan. 25, 2010) (citing *United States v. Levin*, 973 F.2d 463, 470 (6th Cir. 1992)).  *See also United States v. Jones*, 542 F.2d 661, 664-65 (6th Cir. 1976) ("Rules 12(e) and (g) clearly envision that a district court may make preliminary findings of fact necessary to decide questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact.").  Here, the language of the form is not in dispute and does not require a trial to establish.  The Court has already expressed a willingness to allow Republic to introduce evidence during the hearing.  In light of the actual language of the form, the Court should determine, as a matter of law, that the government would be unable to prove the required element of a material misrepresentation.

In the absence of any alleged material misrepresentation, the government incorrectly claims that *Pasquantino* stands for the proposition that the act of smuggling liquor across state lines is itself a material falsehood.  Opp'n. 19.  The Supreme Court said no such thing.  There, the smugglers not only "concealed imported liquor from Canadian officials," but "failed to declare those goods on customs forms . . . [and] represented to Canadian customs officials that their drivers had no goods to declare." *Pasquantino*, 544 U.S. at 357-58.  Furthermore, the

11

defendants hid products in the trunks of their vehicles to avoid detection and deliberately failed to declare the liquor at the Canadian border in response to questions by Canadian border officials. *Id.* at 353. None of these misrepresentations are alleged here. Furthermore, the misrepresentations alleged in *Pasquantino* were all made by the smugglers because the Maryland retailers and liquor wholesalers were not charged despite engaging in the exact conduct alleged in this case. The Indictment does not identify a single deceptive action on the part of Republic, much less the requisite material falsehood required to withstand a motion to dismiss.

### B.    The Indictment Fails to Allege Essential Elements of a Conspiracy

The government repeatedly casts legal defects in the conspiracy charge as factual disputes for trial, while making a series of deceptive claims about what is actually alleged in the Indictment. The government does not dispute that there is no allegation of an agreement or specific intent on the part of Republic or the individual defendants to achieve the object of conspiracy—to deprive New York of taxes. Absent an allegation of a specific agreement and intent to join a conspiracy, the government must allege something more than mere knowledge of illegality to adequately allege a conspiracy. *See Direct Sales Co. v. United States*, 319 U.S. 703, 709 (1943); *see United States v. Falcone*, 311 U.S. 205, 206 (1940).[10] Failure to allege something beyond mere knowledge is not a sufficiency issue. It is a fatal defect in a charging document. *See, e.g.*, *United States v. Kurlander*, No. CRIM. 11-315 WHW, 2012 WL 2263290, at *5 (D.N.J. June 14, 2012) (declining to dismiss a conspiracy charge because the indictment alleged that the defendant not only knew of the criminal activity, but also provided "approval" constituting the necessary "affirmative action relative to the activity or outcome").

---

[10] The government makes much of the distinguishing features between *Direct Sales* and *Falcone*. But the Supreme Court in *Direct Sales* reinforced the point that mere knowledge on the part of a supplier that his product is being used illegally is insufficient to sustain the charge of conspiracy. *Direct Sales*, 319 U.S. at 711-12.

Without citing to the Indictment, the government falsely claims that "the indictment charges that the New York retailers and the smugglers <u>did not pay taxes</u>, and that the defendants knew it (or were willfully blind to the fact)."  Opp'n. 13 (emphasis in original).  *See also id.* at 15 ("RNDC knew that the smugglers were not reporting the liquor to New York tax authorities.").  Nowhere does the Indictment allege that Republic knew the smugglers did not pay taxes, let alone specifically intended such a result.  In fact, the Indictment alleges that "*the New York retailers* . . . sold the liquor . . . knowing that the New York excise taxes had not been paid."  Indictment ¶ 16 (emphasis added).  Viewed in a light most favorable to the government, the Indictment fatally alleges nothing more than knowledge on the part of Republic that liquor was "going out the back door."  *Id.* at ¶¶ 23(b), (c).

The government seems to acknowledge this defect by introducing claims nowhere alleged in the Indictment.  Opp'n. 15-16 ("[T]he defendants actively assisted and promoted that activity.").  The government also tries to portray charging defects as factual issues for trial.  *Id.* at 14-15 (claiming that "the evidence will demonstrate that the defendants at times *instigated* the smuggling to address shortfalls in RNDC's sales in Maryland").  In a particularly deceptive statement, the government states that "the defendants seem to acknowledge that similar evidence of volume discounts, targeted solicitations, and high pressure sales tactics in this case is relevant to prove the conspiracy charge."  *Id.* at 23.  Of course, the government does not—and cannot—claim that such conduct was actually alleged and a cursory review of the Indictment reveals that the government has not alleged that Republic engaged in any efforts to actively encourage the object of the conspiracy.  The Indictment as charged fatally alleges nothing more than mere knowledge on the part of Republic of criminal activity.

### III.    THE GOVERNMENT'S MISCONDUCT WARRANTS DISMISSAL

**A.    AUSA Kay's Proffer of False Testimony in the Midst of an Inherent Conflict of Interest Warrants Dismissal**

Without citing any authority, the government seeks to excuse the seizure of Republic's nationwide bank accounts in the midst of a conflict of interest by claiming that Judge Bennett released the Company's assets "without mak[ing] any findings of government misconduct in that proceeding." *Id.* at 23.  As an initial matter, Judge Bennett did find that the government's international money laundering theory was "highly questionable," was premised upon "the most sketchy of evidence," and was "tenuous at best, if not a stretch."[11]  He also concluded that there was no "sufficient legal basis" to restrain the property.[12]  As Judge Bennett noted, "the government *is no longer contending* now that there were material international transactions.  I understand that [the government's] contention is there was no willful falsity or no intentional falsity."[13]  It is hardly an endorsement of the government's conduct that it was forced to admit that there were no material international transactions after Republic's extensive investigation and several hearings.  The fact that the government avoided a finding of "willful falsity" does not prevent the Court from dismissing the Indictment.  *See Omni*, 634 F. Supp. at 1423 (dismissing an indictment due to the government's "certainly misleading and probably false" testimony during an evidentiary hearing).

The government argues that the false statements regarding international funds transfers were harmless because there were other bases for the seizure.  That is not true.  The government does not attempt to argue that wire fraud under 18 U.S.C. § 1343 supported the seizure.  And contrary to the government's claim, "domestic" money laundering under 18 U.S.C. § 1957 would

---

[11] August 27, 2015 Hr'g. Tr. at 131:3, 127:21-23, 131:11-13.

[12] *Id.* at 130:21-23.

[13] *Id.* at 123:17-20 (emphasis added).

not have supported the seizure of the entire contents of Republic's bank accounts.  Section 1957 subjects to forfeiture allegedly "dirty" assets or a "monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a) (emphasis added).  Seizures under Section 1957 must be limited to "the full amount originally derived from crime," which according to the Agent's Affidavit was less than $400,000.  *United States v. Moore*, 27 F.3d 969, 977 (4th Cir. 1994).[14]  As a practical matter, the specter of international money laundering conveyed a false threat of international dissipation of assets and was critical to the government's establishment of probable cause for the seizure.  Furthermore, Judge Bennett could have found that these alternative legal theories warranted the continued retention of Republic's property, but found no "sufficient legal basis" to do so.

The government does not cite any authority for a government attorney obtaining a seizure warrant based on the sworn testimony of his wife proffered to the district court in an *ex parte* proceeding, where a lawyer has a heightened duty of candor.  MD. LAW. R. PROF. CONDUCT 3.3 cmt. 16.  Instead, the government seeks to minimize the conflict.  First, the government argues that "Judge Bennett made no findings about . . . the supposed conflict of interest."  Opp'n. 6. Judge Bennett did find AUSA Kay's conflict "troubling."[15]  AUSA Kay reported his conflict to the U.S. Attorney only after being ordered to do so by Judge Bennett.[16]  AUSA Kay further claims that he disclosed his conflict of interest to Magistrate Judge Stephanie A. Gallagher. While there is nothing in the record to evidence the asserted disclosure, if taken as true, Mr. Kay

---

[14] *See also United States v. Rutgard*, 116 F.3d 1270, 1292-93 (9th Cir. 1997) ("[Section 1957] does not create a presumption that any transfer of cash in an account tainted by the presence of a small amount of fraudulent proceeds must be a transfer of these proceeds. . . . To create such a presumption in order to sustain a conviction under § 1957 would be to multiply many times the power of that draconian law.  It would be an essay in judicial lawmaking, not an application of the statute.").

[15] August 27, 2015 Hr'g. Tr. at 128:4-5.

[16] *Id.* at 121:23-25, 123:11-14, 128:9-21.

apparently suggests that Magistrate Judge Gallagher unilaterally waived the application of the conflict of interest provisions of the Code of Professional Conduct as they applied to Mr. Kay and his wife.  Judge Bennett did not issue any findings regarding this claim,[17] but the Court did order Mr. Kay to immediately report his conduct to the U.S. Attorney.  The government seems to seek to shift responsibility for this inexplicable episode of misconduct to Magistrate Judge Gallagher—which this Court should not countenance.

The government argues that Republic has not made clear how AUSA Kay's conflict of interest might "manifest itself," noting that his wife has since retired and the "defendants do not allege any sort of financial interest on the part of either the agent or the AUSA in either the forfeiture or . . . the prosecution."  Opp'n. 6, 31.  The government does not address whether the conduct at issue led to (1) Special Agent Ward's retirement or (2) the institution of policies at the U.S. Attorney's Office for the District of Maryland specifically addressing this conduct.  In many ways, the inherent and unavoidable conflict of interest "manifested itself" as soon as AUSA Kay decided to elicit sworn testimony from his wife in connection with the underlying investigation.  Clearly, AUSA Kay did not take the necessary steps to ensure that the statements in the sworn affidavit from his wife were true—even though the exclusively domestic nature of the transactions could be confirmed by a simple reading of the bank transfer records.  AUSA Kay never took remedial measures or sought independent review of his wife's testimony.  Rather, he sought to downplay the false statements and continues to downplay them.  *Id.* at 24 ("[T]he government stands by the factual allegations in the affidavit" even if they were "inartfully written or inadvertently incorrect.").  The conflicts rules governing AUSA Kay are designed to

---

[17] *Id.* at 131:16-23.

prevent attorneys from placing themselves in precisely these types of situations, which involve inherent conflicts between an attorney's own interests and those of his client.

### B.     The Government's Vindictive and Retaliatory Prosecution Warrants Dismissal

The government does not dispute any of the facts supporting Republic's claim of retaliatory indictment set forth in the Sealed Addendum, which by itself establishes that a "reasonable likelihood of vindictiveness exists" as required for this Court to dismiss the Indictment. *United States v. Goodwin*, 457 U.S. 368, 373 (1982). Despite the overwhelming disparities between the conduct of the two wholesalers identified in the Sealed Addendum, Republic exercised its rights to secure the release of its property and was indicted. The Second Wholesaler, on the other hand, did not exercise its rights to seek recovery of its assets and still does not have access to millions of dollars seized by the government. The government's claim that it is engaged in "still on-going discussions" with the Second Wholesaler is disingenuous. Opp'n. 36. *See also id.* (claiming the Second Wholesaler "has not *yet* been indicted"). Much of the conduct alleged against the Second Wholesaler in the Agent's Affidavit would be time-barred under the applicable five-year statute of limitations. *See* Agent's Aff. 4-9.

Unable to challenge the overwhelming facts described in the Sealed Addendum, the government resorts to a misleading portrayal of the timeline of the prosecution as circumstantial evidence that the Indictment was not retaliatory. "If the AUSA was retaliating against RNDC for winning its challenge to the forfeiture, why wait nearly a year to do so?" Opp'n. 31. The government did not wait "nearly a year." On August 27, 2015, Judge Bennett ordered the immediate return to Republic of all funds that the government originally seized in June 2012,

characterizing AUSA Kay's conflict of interest as "troubling"[18] and ordering him to self-report the allegations of ethical impropriety to the U.S. Attorney.[19]  Judge Bennett addressed his concerns on the record that such a ruling may lead to a retaliatory indictment.[20]  On December 22, 2015, less than four months after Judge Bennett's ruling, Republic received a target letter from the U.S. Attorney's Office indicating that an indictment would be returned on or after February 12, 2016.  On February 9, 2016, Republic's counsel met with the prosecutors assigned to this case and were told that Republic would be indicted in approximately two weeks.  On February 16, 2016, Republic requested a meeting with the Deputy Attorney General.  On April 28, 2016, the Deputy Attorney General declined the request.  The Indictment was returned approximately three weeks later.  Contrary to the government's portrayal, the government immediately took the necessary steps to indict Republic after the Rule 41(g) proceeding.

### C.      The Government's Pattern of Misconduct Warrants Dismissal

The government reinforces the fact that the seizure warrant served on Republic's nationwide bank accounts was designed to create the conditions necessary to force the Company to pay a maximum cash penalty.  The Company demanded and secured the release of all of the frozen funds in what the government seems to acknowledge was an "embarrassing" setback to its case.  Opp'n. 31.  Once the Court returned $50 million to Republic, despite the fact that nothing had occurred in the four years since the seizure to advance the government's case, the government was left with no recourse other than an indictment to extract a large settlement.  The government tacitly admits that, from the outset, this case has been an effort to extract a large and

---

[18] August 27, 2015 Hr'g. Tr. at 128:4-5.
[19] *Id.* at 121:23-25, 123:11-14, 128:9-21.
[20] *See* June 12, 2015 Hr'g. Tr. 18:23-25.

arbitrary cash payment.  Opp'n. 33 (claiming that an indictment followed because "defendants decline[d] to take any opportunity to avoid prosecution").

There is no dispute that the government pressured Defendant Jason Lockerman, a former Republic salesman, to participate in the undercover sting operation described in Republic's opening brief.  The government contends that Mr. Lockerman's status in the investigation was not upgraded in response to his reluctance to participate in the covert sale of alcohol using Republic's licenses.[21]  "At that time, the agents had in their possession a target letter, dated June 5, 2012, addressed to Lockerman, but they did not give him the letter at that time because he was being cooperative."  *Id.* at 33-34.  Accepting the government's version of events, concealing a witness' "target" status in this manner violates applicable Department of Justice policy.[22]

The government argues that dismissal requires a showing of actual prejudice resulting from the government's misconduct.  As described in Republic's opening brief, there is ample evidence of actual prejudice.  It was Republic's efforts that minimized the damage caused by the seizure of the Company's nationwide bank accounts on the eve of payroll.  The lack of international funds transfers was revealed because of the Company's investigations.  The $50 million was returned—not because of the government's remedial measures—but because Republic demonstrated that the seizure was baseless over the course of several hearings. Republic, not the government, revealed during the Rule 41(g) proceeding AUSA Kay's conflict of interest, which he reported to the U.S. Attorney only after being ordered to do so by Judge Bennett.  The Second Wholesaler—alleged to have engaged in an identical scheme involving far

---

[21] As the June 2012 correspondence between Mr. Lockerman's counsel and the government makes clear, Mr. Lockerman expressed willingness to cooperate in a manner that did not involve the undercover sale of alcohol using Republic's licenses.

[22] *See* United States Attorneys' Manual 9-11.151 (noting that the Department of Justice "continues its longstanding policy to advise witnesses who are known 'targets' of the investigation that their conduct is being investigated for possible violation of Federal criminal law").

more sales as described in the Sealed Addendum—did not exercise its rights to the return of property, is still unable to access millions of dollars in seized assets, and has not been charged.

In *Omni*, where this Court dismissed an indictment based on government misconduct, the Court rejected the same argument made by the government that the defendant had not suffered actual prejudice:

> Defendants and the Court clearly suffered prejudice from this misconduct. . . . The fact that all of the documents were finally produced only occurred because of the Omni defendants' strenuous efforts. . . . Defendants should not be forced to conduct lengthy hearings to learn the basic essential facts needed as a predicate to a pretrial motion. Courts should not be forced to question whether government witnesses are testifying truthfully and fully.

*Omni*, 634 F. Supp. at 1438-41.  As U.S. District Judge Walter E. Black made clear in *Omni*, the supervisory power "doctrine operates to vindicate a defendant's rights in an individual case, [but] is designed and invoked primarily to preserve the integrity of the judicial system." *Id.* at 1438. The government's longstanding misconduct in this case warrants dismissal of the Indictment to preserve the integrity of the judicial system.

## **CONCLUSION**

For the foregoing reasons and those described in Defendants' opening brief, Defendants respectfully move the Court to dismiss all counts of the Indictment.

Dated: August 30, 2016

Respectfully submitted,

_____/s/_____

Mark J. MacDougall (Bar No. 18547)
Connor Mullin
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, NW
Washington, DC  20036
Telephone:  (202) 887-4000
Fax:  (202) 887-4288
E-mail:  mmacdougall@akingump.com

Steven H. Levin
LEVIN AND CURLETT LLC
201 N. Charles Street Suite 2000
Baltimore, MD 21201
Telephone: (410) 685-4444
E-mail: slevin@levincurlett.com

*Counsel for Defendant RNDC*

_____/s/_____

Robert P. Trout (Bar No. 01669)
John F. Hundley
TROUT CACHERIS & JANIS PLLC
1350 Connecticut Avenue NW
Suite 300
Washington, DC  20036
Telephone: (202) 464-3300
Fax:  (202) 464-3319
E-mail: rtrout@troutcacheris.com

*Counsel for Defendant Eugene Gerzsenyi*

_____/s/_____

Danny C. Onorato (Bar No. 15706)
Robert J. Spagnoletti
Stuart A. Sears
SCHERTLER AND ONORATO LLP
575 Seventh St NW Ste 300 South
Washington, DC 20004
Telephone: (202) 628-4199
Fax: (202) 628-4177
E-mail: donorato@schertlerlaw.com

*Counsel for Defendant Jason Lockerman*

_____/s/_____

Thomas M. Buchanan (Bar No. 06913)
Matthew M. Saxon
WINSTON AND STRAWN LLP
1700 K Street NW
Washington, DC 20006
Telephone: (202) 282-5000
Fax: (202) 282-5100
E-mail: tbuchanan@winston.com

*Counsel for Defendant Lisa Robbins*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served via electronic case

filing on this 30th day of August, 2016 upon:

    Richard C. Kay
    Assistant U.S. Attorney
    United States Attorney's Office
    36 South Charles Street, Fourth Floor
    Baltimore, MD 21201
    Richard.Kay@usdoj.gov

    Tamera Lynn Fine
    Assistant U.S. Attorney
    United States Attorney's Office
    36 South Charles Street, Fourth Floor
    Baltimore, MD 21201
    Tamera.Fine@usdoj.gov

                                                  /s/
                                        Mark J. MacDougall